## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BORDEN DAIRY COMPANY, *et al.*, | Case No. 20-10010 (CSS) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF JASON MONACO IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jason Monaco, hereby declare under penalty of perjury:

1.      I am the Executive Vice President, Chief Financial Officer ("**CFO**"), Treasurer, and Assistant Secretary of Borden Dairy Company ("**Borden**" or the "**Company**" and, collectively with its affiliated debtors and debtors in possession, the "**Debtors**").  In my capacity as CFO of Borden, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration (this "**Declaration**") to assist the Court (as defined herein) and parties in interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "**Chapter 11 Cases**") and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "**First Day Motions**").  I am authorized by the Debtors to submit this Declaration.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Borden Dairy Company (1509); Borden Dairy Holdings, LLC (8504); National Dairy, LLC (9109); Borden Dairy Company of Alabama, LLC (5598); Borden Dairy Company of Cincinnati, LLC (1334); Borden Transport Company of Cincinnati, LLC (3462); Borden Dairy Company of Florida, LLC (5168); Borden Dairy Company of Kentucky, LLC (7392); Borden Dairy Company of Louisiana, LLC (4109); Borden Dairy Company of Madisonville, LLC (7310); Borden Dairy Company of Ohio, LLC (2720); Borden Transport Company of Ohio, LLC (7837); Borden Dairy Company of South Carolina, LLC (0963); Borden Dairy Company of Texas, LLC (5060); Claims Adjusting Services, LLC (9109); Georgia Soft Serve Delights, LLC (9109); NDH Transport, LLC (7480); and RGC, LLC (0314).  The location of the Debtors' service address is: 8750 North Central Expressway, Suite 400, Dallas, TX 75231.

2.      I have served as CFO of Borden since I was hired in December 2018.  Before joining Borden, beginning in January 2017, I served as Vice President of Finance/Group Chief Financial Officer at Celanese Corporation, a global technology and specialty materials company. Prior to my time at Celanese Corporation, from October 2014 until December 2016, I served as Vice President and Treasurer at Arrow Electronics, a company specializing in distribution and value added services relating to electronic components and computer products.  Prior to my time at Arrow Electronics, from April 1998 to September 2014, I held a variety of finance leadership roles at Kimberly-Clark.

3.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents or my opinion, based upon my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, at my direction, and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## COMMENCEMENT OF THE CHAPTER 11 PROCEEDINGS

4.      On January 5, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (this "**Court**").  As set forth in detail herein, the Debtors commenced the Chapter 11 Cases to preserve and maximize Borden's enterprise value for the benefit of its stakeholders in the face of an impending liquidity shortfall and significant industry headwinds.  The Debtors' principal business is the production and distribution of a wide variety of branded and private-label traditional, flavored and specialty milk,

2

buttermilk, dips and sour cream, juices, tea, and flavored drinks to mass merchandisers, educational institutions, food service retailers, grocery stores, drug stores, convenience stores, food and beverage wholesale distributors, and retail warehouse club stores across the United States. Like other milk producers and distributors, Borden is facing a multi-year trend of shrinking margins and increasing competition. These negative trends have been exacerbated by declining margin over milk at retail even as the price of raw Class 1 milk has been increasing.

5.      As of the Petition Date, the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Concurrently with the filing of this Declaration, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no committees have been appointed or designated at this time.

6.      Part I of this Declaration provides an overview of the Debtors' businesses and capital structure. Part II provides a discussion of the events that compelled the commencement of the Chapter 11 Cases and a summary of the Debtors' prepetition restructuring efforts to date. Part III affirms the facts set forth in the First Day Motions that the Debtors believe are necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during the Chapter 11 Cases.

## I.      THE DEBTORS' BUSINESSES

### A.      History and Corporate Structure

7.      Borden is one of the oldest and largest processors and direct-to-store distributors of fresh fluid milk, dairy case products, and other beverages in the United States. The Borden brand name has a rich history that traces its roots back to Gail Borden who, shortly after receiving a

3

patent for processing condensed milk in 1856, founded the New York Condensed Milk Company and opened the first successful condensed milk processing plant in 1861. During the late 1800s, the New York Condensed Milk Company both continued producing new products and added processed milk and evaporated milk to its offerings and pioneered the use of glass milk bottles.

8.     In 1919, the New York Condensed Milk Company changed its name to Borden Company. Over the course of the next decade, the Borden Company expanded rapidly by acquiring two of the largest ice cream manufacturers in the U.S., adding cheese to its product offerings, and acquiring a chemicals company. By 1930, Borden Company had bought more than 200 companies around the U.S. and became the nation's largest distributor of fluid milk.

9.     In 1936, "Elsie the Cow" was introduced as the Borden Company's dairy mascot. Elsie was an advertising fixture throughout the 1940s and was officially trademarked in 1951. Elsie became an American icon, bringing Borden nationwide recognition through contests and campaigns throughout subsequent decades, and was ultimately named one of the top 10 advertising icons of the 20th century by AdAge in 2000.

10.     Borden Company continued to expand throughout the 20th century, with Borden Company's chemical division becoming particularly successful. In 1958, this division was renamed Borden Chemical, which specialized in the manufacturing of adhesives, plastics and resins. Borden Company's expansion into chemicals and other non-dairy industry segments resulted in Borden Company's evolution into Borden Inc., a large conglomerate serving as the gold standard for a variety of industry segments. For example, from a regulatory perspective, Borden Inc. became the first U.S. dairy producer to use the U.S. Department of Agriculture Inspection Shield. In addition, Borden Inc.'s food division acquired companies specializing in the

4

creation of pastas and sauces, bakery products, snacks, jams and jellies and, of course, cheese, milk and ice cream.

11.     By the 1980s, Borden Inc. was the world's largest dairy operator, with sales exceeding $7.2 billion.  It was also the nation's most active participant in the M&A market in 1987 after making 23 acquisitions totaling $442.6 million.  Before the end of the decade, Borden acquired an additional 39 operations.

12.     By the early 1990s, however, Borden Inc. began experiencing financial distress, resulting in a number of its business units being divested.  In 1995, Borden Inc. was sold to Kohlberg Kravis Roberts & Co. ("**KKR**") for $2 billion, and became a private company.  Over the next decade, Borden Inc. underwent a series of reorganizations, which ultimately resulted in KKR selling off many of the divisions and brands of Borden Inc. to various buyers.

13.     In 2017, the Company and certain of its subsidiaries entered into a *Reorganization and Subscription Agreement* (as amended, modified, restated, amended and restated, and/or supplemented from time to time, the "**2017 RSA**"), pursuant to which the Company reorganized under a new holding company and the existing equity holder sold an equity position to a new investor.  Following consummation of the 2017 RSA (together with the transactions consummated in connection therewith, the "**Restructuring**"), Borden and its sixteen direct and indirect subsidiaries are each wholly-owned, directly or indirectly, by Holdings.  A chart detailing the Debtors' corporate structure is attached hereto as **Exhibit A**.

### B.     Capital Structure

14.     On July 6, 2017, Borden, as borrower, the other Loan Parties (as defined in the Credit Agreement (as defined below)) party thereto (together with Borden, the "**Loan Parties**"), each of the lenders from time to time party thereto (the "**Lenders**"), the L/C Issuer (as defined in the Credit Agreement), and PNC Bank, National Association ("**PNC**"), as administrative agent (in

such capacity, the "**Administrative Agent**") and collateral agent (in such capacity, the "**Collateral Agent**," and in such capacities, the "**Agent**," and together with the Lenders, the L/C Issuer, and each other Secured Party (as defined in the Credit Agreement), the "**Prepetition Secured Parties**"), entered into that certain Financing Agreement (as amended, modified, restated, amended and restated, and/or supplemented from time to time, the "**Credit Agreement**"), which provided the Debtors with a $275 million credit facility (the "**Credit Facility**").  The Credit Facility consisted of: (a) a $30 million term loan A facility (the "**Term Loan A Facility**") held by PNC, (b) a $175 million term loan B facility (the "**Term Loan B Facility**") now held by certain affiliates of KKR Credit Advisors (US) LLC and/or Franklin Square Holdings, L.P., and (c) a $70 million revolving credit facility (the "**RCF Facility**")[2] provided by PNC, which includes a $25 million subfacility for the issuance of letters of credit ("**Letters of Credit**").

15.     Borrowings under the Term Loan A Facility and Term Loan B Facility bear interest for the interest period in effect, at either the reference rate, plus an applicable margin of 6.5 percent per annum, or LIBOR, plus an applicable margin of 7.5 percent per annum.  The effective interest rate on both facilities on December 31, 2019 was 9.3 percent.

16.     Pursuant to the Second Amendment to the Credit Agreement, borrowings under the RCF Facility may bear interest at different rates during the Revolving Credit Increase Period (as defined in the Second Amendment to the Credit Agreement).  Specifically, the first $10 million of borrowings outstanding during the Revolving Credit Increase Period that are LIBOR Rate Loans (as defined in the Credit Agreement) bear interest for the interest period in effect at LIBOR plus

---

[2]     Pursuant to the *Second Amendment and Waiver to Financing Agreement*, dated November 20, 2019 (the "**Second Amendment to the Credit Agreement**"), between Borden and PNC, the RCF Facility was temporarily increased from $60 million to $70 million through February 18, 2020.  Subject to availability under the borrowing base, the total available amount to be drawn down under the RCF Facility, inclusive of letter of credit amounts, is $70 million.  For the avoidance of doubt, the principal amounts under the RCF Facility exclude (i) committed (but undrawn) Letters of Credit against the RCF Facility in the amount of $12.6 million and (ii) $500,000 for lease liabilities in connection with the Debtors' corporate office.

25812920.3

an applicable margin of 4.0 percent per annum; all other borrowings under the RCF Facility that are LIBOR Rate Loans during the Revolving Credit Increase Period bear interest for the interest period in effect at LIBOR plus an applicable margin of 2.0 percent per annum; and all borrowings that are Reference Rate Loans (as defined in the Credit Agreement) bear interest for the interest period in effect at a reference rate.  The RCF Facility is also subject to an unused commitment fee of 0.25 percent per annum of the average excess of the revolving loan commitment over the average principal balance of revolving loans and letter of credit obligations.  The effective interest rate on revolving loans for the period ended December 31, 2019 was 4.95 percent per annum.

17.    As of the Petition Date, there is approximately $255.8 million of principal amount of loans outstanding under the Credit Facility, comprised of:  (a) approximately $56.7 million of principal amount of loans outstanding under the RCF Facility, plus approximately $13 million of Letters of Credit that have been drawn, (b) approximately $24.1 million of principal amount of loans outstanding under the Term Loan A Facility, and (c) approximately $175 million of principal amount of loans outstanding under the Term Loan B Facility, plus accrued and unpaid interest, fees, expenses, and all other obligations payable under the Loan Documents (as defined in the Credit Agreement) (collectively, the "**Prepetition Loan Obligations**").[3]

18.    Pursuant to the Credit Agreement and the Security Documents (as defined in the Credit Agreement), the Loan Parties secured their obligations under the Loan Documents by granting the Collateral Agent, for the benefit of itself and the other Prepetition Secured Parties, a (a) security interest in and lien on outstanding Equity Interests (as defined in the Security Agreement (as defined in the Credit Agreement)) and indebtedness owned by the Debtors or in

---

[3]    Certain of the Prepetition Loan Obligations under the RCF Facility and Term Loan A Facility are also evidenced by Notes (as defined in the Credit Agreement).

which the Debtors have an interest, and (b) security interest in substantially all of the Debtors' other personal property and fixtures (subject to customary exclusions), including cash collateral (as defined in section 363(a) of the Bankruptcy Code, "**Cash Collateral**") (collectively, the "**Prepetition Collateral**," and the security interests in and liens on the Prepetition Collateral, the "**Prepetition Liens**").[4]

19.     In connection with the Credit Agreement, certain of the Lenders and the Agent entered into that certain Agreement Among Lenders, dated as of July 6, 2017 (as amended, modified, restated, amended and restated, and/or supplemented from time to time, the "**AAL**"). The AAL sets forth certain of the Lenders' respective rights and obligations under the Credit Agreement.

20.     Prior to the Petition Date, the Company made periodic payments on account of settlement agreements they entered into with respect to certain withdrawal liabilities related to two pension plans: (i) Central States, Southeast and Southwest Areas Pension Fund ("**Central States**"), which was terminated in 2014; and (ii) the Retail, Wholesale and Department Store International Union (the "**RWDSU**" and together with Central States, the "**Pension Plans**"), which was terminated in 2016.

21.     In connection with the Restructuring, the Company established a special purpose account (the "**Reserve Account**") at PNC that was funded with a $30 million deposit.  The Reserve Account was established to provide a reserve from which the Company could continue to fund periodic payments to Central States and RWDSU—principally, monthly installments of $183,225

---

[4]     The Debtors may lease equipment through PNC Equipment Finance, LLC (the "**Lessor**"), pursuant to that certain Master Lease Agreement, dated as of August 15, 2019 (as amended, restated, supplemented, or otherwise modified from time to time) (the "**Master Lease Agreement**"), by and among Lessor and Borden Dairy Company of Texas, LLC as lessee.  As of the Petition Date, the Debtors are not leasing any equipment under the Master Lease Agreement and, accordingly, have no amounts owed to the Lessor under the Master Lease Agreement.

25812920.3

payable by the Company to Central States and quarterly installments of approximately $6,000 payable by the Company to RWDSU pursuant to the settlement agreements referred to above. The terms governing establishment of the Reserve Account were set forth in the 2017 RSA.

22.    As of December 31, 2019, the Reserve Account had a value of approximately $26.6 million. The Reserve Account is not subject to liens or security interests held by the Collateral Agent, and the Loan Documents specifically exclude the Reserve Account from Prepetition Collateral. Similarly, Central States and RWDSU do not have liens on or security interests in the Reserve Account. The Reserve Account was established in 2017, several years after the Company began making payments to Central States and RWDSU, and it was established pursuant to the provisions of the 2017 RSA, an agreement to which Central States and RWDSU are not parties. Access to the cash and securities in that account are absolutely critical to the Debtors' reorganization efforts. Without access to the Reserve Account, the Debtors will be unable to continue operating.

### C.    Current Business Operations

#### i.    *Products and Brands*

23.    The Debtors produce and distribute a wide variety of branded and private label traditional, flavored and specialty milk, buttermilk, dips and sour cream, juices, tea, and flavored drinks (collectively, the "**Customer Products**") to mass merchandisers, educational institutions, food service retailers, grocery stores, drug stores, convenience stores, food and beverage wholesale distributors, and retail warehouse club stores (*e.g.*, Sam's Club, Costco Wholesale Corporation, etc.) (collectively, the "**Customers**") across the United States. In 2018, aggregate sales were divided by product line as follows: (i) fluid milk & cream (inclusive of traditional, protein enhanced, flavored, buttermilk and lactose free fluid milks)—92 percent of total revenue; (ii) juices and drinks (including teas, and fruit drinks)—5 percent of total revenue; (iii) ice

9

cream—2 percent of total revenue; and (iv) cultured products (such as sour creams and cottage cheese)—1 percent of total revenue.

24.    As of December 31, 2019, the Debtors' national, local and regional proprietary and licensed brands include the following:

| Proprietary | Licensed[5] |
|---|---|
| • Coburg® <br> • Dairy Fresh® <br> • Dairymens® <br> • Flav-O-Rich® <br> • Kid Builder® <br> • Saba Sunburst® <br> • Sallie's Southern Tea® <br> • Sunburst™ <br> • Velda® | • Borden® <br> • Poinsettia® |

25.    The primary ingredient used in most of the Customer Products is conventional raw milk (which contains both raw skim milk and butterfat) that is purchased from independent farmers and cooperatives.  For the trailing twelve months ending in December 2019, the Debtors processed and distributed approximately 400 million gallons of milk, dairy, and other products.

26.    Other significant raw materials used by the Debtors include (a) resin, which is a fossil fuel-based product used to make plastic bottles, (b) corrugate and cardboard, a paper-based packaging material, and (c) sweeteners, flavorings, and juice concentrates.  Other commodities used by the Debtors also include diesel fuel, which is used to operate their extensive truck fleet and DSD system (as defined herein).

---

[5]    The "Borden" name, along with all related marks and logos, and "Elsie the Cow," along with all related brands, marks, and logos, are licensed to the Company by Comercializadora de Lacteos y Derivados, S.A. de C.V.

ii.    *Pricing*

27.    The Debtors generally increase or decrease the prices of their fluid dairy products on a monthly basis in connection with fluctuations in the costs of raw materials (largely driven by Class 1 Federal Market Order prices for raw milk).  The Debtors manage the pricing of their branded fluid milk products on a longer-term basis, balancing consumer demand with net price realization but, in some cases, pricing is subject to the terms of sales agreements with respect to the means and/or timing of price increases.  The pricing by government entities fluctuates monthly based on the Federal Market Order system, and requires the Debtors to be cognizant of such fluctuations when negotiating long-term sales agreements with Customers.

28.    The price of resin fluctuates based on changes in crude oil and natural gas prices. Similarly, the Debtors seek to protect themselves from these price fluctuations through customer pricing, supplier contract management, and customer cost of living adjustments where available.

iii.    *Supply Chain*

29.    The Debtors produce and distribute Customer Products from their 12 manufacturing facilities and more than 75 distribution centers, with sales predominantly located in the Southeastern region of the United States.  Due to the perishable nature of the Customer Products, the majority of products are directly delivered to Customers via a fleet of approximately 2,800 refrigerated trucks or trailers that the Debtors own or lease.  This form of delivery is called a "direct-to-store delivery" or "DSD" system.  Borden has one of the most extensive refrigerated DSD systems in the United States.  Borden makes approximately 54,000 service calls to its Customers each week.

*[See Next Page for Graphic Depicting the Debtors' Supply and Processing Chain]*

11



iv.    *Customers*

30.    The Customers are largely comprised of household retail names including large format retailers such as Walmart, Sam's Club, Food Lion and Kroger, wholesale distributors such as Sysco, US Foods and Gordon Foodservice, small format retailers such as Circle K, 7-Eleven, CVS and Walgreens, fast food chains such as Dairy Queen, Dunkin, and Starbucks, and educational institutions ranging from elementary schools to universities and colleges. Approximately 90% of the Debtors' total annual sales are derived from the foregoing Customers.

v.    *Employees*

31.    The Debtors employ approximately 3,264 employees (collectively, the "**Employees**") across several states, approximately 551 of which are salaried individuals on a full-time or part-time basis, and approximately 2,713 of which are paid hourly on either a full-time or part-time basis. Approximately 22 percent of the Employees participate in at least one of a multitude of collective bargaining agreements with the Debtors of varying duration and terms (the "**CBAs**"). In addition to the Employees, the Debtors also regularly and continuously use the services of independent contractors (collectively, the "**Independent Contractors**") to complete discrete projects, as well as temporary workers sourced periodically from various staffing agencies (collectively, the "**Temporary Staffing Agencies**") to fulfill certain duties on a short-term basis. In addition to the Employees, the Debtors have historically used approximately two Independent Contractors and approximately twenty Temporary Staffing Agencies, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and the temporary workers supplied by the Temporary Staffing Agencies are a critical component of the Debtors' workforce.

### D.      Innovation, Strategy, and Impact

32.      Although Borden is no longer the large, public conglomerate that it was in the late 1900s, it has made efforts to increase its presence and impact as a dairy processor and distributor and as a contributor to its local communities.

33.      Following the Restructuring, the Company brought in new leadership to help it re-establish its foothold as one of America's leading consumer brands.  A new Marketing and Research and Development ("**R&D**") team was built and, after extensive research, the team refreshed the visual identity of the brand, including updating all packaging as part of the updates required to comply with the new FDA Nutrition Facts rules, and developed a new marketing campaign to reintroduce the beloved Elsie the Cow with the tagline "Glass Half-Full Since 1857," highlighting the "pure joy" and optimism of Borden products for its target consumer segment—households with children 2–12.

34.      The Marketing and R&D team also leveraged various forms of primary and secondary research to define innovation territories in attractive market segments where Borden has the ability to win market share, and thereafter Borden built a robust pipeline of new products in these territories to enable the Borden brand to compete in a highly commoditized space.  This team also built a multi-stage new product commercialization process to more efficiently harness Company resources and effectively oversee products to market.   Some of the new products that have been introduced into the marketplace include Borden's new Kid Builder flavored milk (with 50 percent more protein and calcium than regular milk and no added sugar), "state fair" inspired flavored milk, Gingerbread Egg Nog, and two new lines of refrigerated Dips, Creamy Salsa and Deli Dips, which are beginning to ship this month.

35.     Borden has made meaningful efforts to add value to the communities it serves by providing support to consumers that goes beyond the products placed on the shelves.  In 2018, the Debtors' leadership team introduced "The Borden Difference," the Company's identity and rally cry to be the most service-oriented dairy company and a "People First" organization.  The most recent examples of this include the following:

(a)     Borden's donation of nearly 1,000 cases of Kid Builder milk, apple juice and orange juice to the Houston Food Bank following an ammonia leak in Q4 2019 which caused it to discard all of its perishable goods.

(b)     Borden's sponsorship of Dallas Children's Medical Center's State Fair day, for which Borden donated 800 16-oz. bottles of "state fair" inspired flavored milks and Borden-branded prizes for the patients.  Borden Employees volunteered to serve the milk to patients, families and hospital staff.

(c)     Borden's sponsorship of Dallas' inaugural 9/11 day, for which the Company donated $25,000 to provide 35,000 meals for North Texans in need in Q3 2019.  Approximately 150 Borden Employees spent half a day volunteering to pack the meals.

(d)     Borden's partnership with World Central Kitchen in Q4 2018 to distribute over 177,000 individual servings of milk, orange juice, iced tea and bottled water to those affected by Hurricane Michael, the first Category 5 hurricane to strike the contiguous United States since 1992.

(e)     Borden's partnership with the Food Bank of Central & Eastern North Carolina and World Central Kitchen to distribute approximately 45,000 individual servings of whole, 2% and chocolate milk to those affected by Hurricane Florence in September 2018.

**E.     Senior Management**

36.     As discussed in the immediately preceding section, Borden is led by a team of professionals that was brought in to rejuvenate the Debtors' growth and sales strategies following the Restructuring.  The leadership team has made concerted efforts over the past two years to attempt to grow the business through superior service, competitive pricing, and a focused and engaged workforce.

25812920.3

## II.    EVENTS LEADING TO THE CHAPTER 11 CASES

37.    Notwithstanding the Debtors' best efforts, an overwhelming debt burden and a host of industry trends have combined to drive the Debtors to seek chapter 11 relief.  In 2018, the Debtors reported consolidated net sales of $1.181 billion with gross profit of $292 million. Notwithstanding the foregoing, the Debtors experienced an income loss from operations in the amount of $2.6 million and a total net income loss of $14.6 million.  These losses continued into 2019, with the Debtors reporting income loss from operations in the amount of $22.3 million and a total net income loss of $42.4 million from January 2019 through December 7, 2019.

38.    Accordingly, the Debtors have an immediate need for continued access to liquidity to, among other things, maintain business relationships with their vendors and suppliers, pay payroll and certain benefits, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  More specifically, the Debtors require immediate access to the Prepetition Collateral and cash equivalents in the Reserve Account as requested in the Cash Collateral Motion (as defined below) to satisfy the day-to-day needs of the Debtors' business operations.  Access to liquidity will address any concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases, and the financial difficulties described in the following sections.

### A.    Unsustainable Debt Obligations and Other Liabilities

#### i.    *Credit Agreement Obligations*

39.    Despite Borden's best efforts over the past several years, its current obligations under the Credit Agreement have severely limited its ability to produce positive net income.  The Debtors have paid approximately $21 million per year in cash interest over the past several years,

16

a burden that can no longer be serviced by the Company's underlying earnings and cash flow.  The Credit Agreement also requires Borden to make quarterly payments totaling $2.35 million each year on the Term Loan A Facility, further depleting the Company's operating cash.

40.     These liabilities and their impact on net income have significantly impaired Borden's ability to pursue its strategic plan, including potential transactions with third parties. Borden has insufficient liquidity to run its core business, to invest in core elements of its operations to mitigate ongoing secular headwinds, or to make necessary investments to sustainably grow earnings.

> ii.     *Employee Obligations Under Mandatory Retirement Plans and Settlements Related to the Penson Funds*

41.     In addition to their obligations under the Credit Agreement, the Debtors have obligations to their Employees arising under the minimum funding requirements of the Employee Retirement Income Security Act of 1974 ("**ERISA**") as well as certain settlement agreements related to the termination of prior multiemployer pension plans (the "**Employee Obligations**"). The Employee Obligations consist of the following:

> a.     <u>Borden Dairy of Kentucky, LLC Retirement Plan</u>

42.     Borden sponsors a noncontributory defined benefit retirement plan, the Borden Dairy of Kentucky, LLC Retirement Plan (the "**Kentucky Plan**"), for one of its subsidiaries.  The Kentucky Plan is frozen for new participation.  It provides participating Employees with retirement benefits in accordance with benefit pension formulas, which are generally based on a benefit factor multiplied by an Employee's year of service.  Borden's funding policy for the Kentucky Plan is to contribute amounts sufficient to meet the minimum funding requirement of the ERISA, which is approximately $300,000.  Borden uses a December 31st measurement date for the Kentucky Plan.

b.    <u>Multiemployer Pension Obligations</u>

43.    Prior to the Restructuring, Borden was party to various multiemployer pension plans that covered certain Employees.   However, the Company was unable to sustain its obligations under such plans and subsequently withdrew from these multiemployer pension plans.

44.    ***Central States, Southeast and Southwest Areas Pension Fund*** (the "**Central States Fund**").  As described above, on or around November 9, 2014, Borden withdrew from the Central States Fund.  As a result of the withdrawal, Borden entered into a settlement agreement with affected employees who were beneficiaries under the Central States Fund (the "**Central States Fund Settlement Agreement**"), whereby Borden would pay $183,225 each month for 240 consecutive months for a total of $43,974,000.  The first payment was made on January 31, 2015.  The aggregate outstanding liability under the Central States Fund Settlement Agreement is recorded on the Debtors' books as the net present value of all remaining payments.   As of December 31, 2019, the outstanding liability under the Central States Fund Settlement Agreement was $33.2 million.

45.    ***Retail, Wholesale and Department Store International Union and Industry Pension Fund*** (the "**RWDSU Fund**").  In January of 2016, Borden withdrew from the RWDSU Fund.  As a result of the withdrawal, Borden entered into a settlement agreement with affected employees who were beneficiaries under the RWDSU Fund (the "**RWDSU Fund Settlement Agreement**" and together with the Central States Fund Settlement Agreement, the "**Pension Settlement Agreements**"), whereby Borden would pay $6,000 each quarter for 80 consecutive quarters for a total of $489,000.  The first payment was made on or around April 2016.  The aggregate outstanding liability under the RWDSU Fund Settlement Agreement is recorded on the

Debtors' books as the net present value of all remaining payments.  As of December 31, 2019, the outstanding liability under the RWDSU Fund Settlement Agreement was $391,000.

### B.    Negative Industry Trends

46.    The Debtors' struggling financial performance over the past two years is directly correlated to the milk processing industry's highly competitive nature, rapidly-changing industry landscape, and dynamic retail environment.  In recent years, dairy products have begun to compete with other replacement non-dairy nutritional products and beverages for consumer sales, which has contributed to demand decreases. In addition, the growth of discount grocery retailers has intensified competition and reduced the margin over milk at retail, making it increasingly difficult for Borden to hold its margin while competitively pricing its products to appeal to consumer price sensitivities.  Borden competes against others that do not depend on the profitability of milk exclusively, including vertically-integrated retailers and dairy cooperatives that now process their own milk.

47.    **Category Declines**.  While milk remains a household item in the United States, people are simply drinking less of it.  Aggregate U.S. consumption of conventional dairy milk has declined approximately 6 percent since 2015.[6]  In parallel, since the turn of the century, the number of U.S. dairy farms has rapidly declined.  From 1992 to 2018, over 94,000 family dairies closed their doors at the rate of 10 dairy farms per day.  In the past year and a half alone, over 2,730 dairy farms have gone out of business.[7]

---

[6]    *See* United States Department of Agriculture: Economic Research Service. *USDA ERS - Dairy products: Per capita consumption, United States* (Sept. 4, 2019).  Available at: https://www.ers.usda.gov/data-products/dairy-data/ [Accessed 4 Jan. 2020].

[7]    *See* Kaika, A.  *It's Time to Reform the U.S. Dairy Industry*, National Farmers Union (June 18, 2019). Available at: https://nfu.org/2019/06/18/its-time-to-reform-the-u-s-dairy-industry/ [Accessed 4 Jan. 2020].

*[See Next Page for Graphic Depicting Decline in Licensed Dairy Operations]*



Figure 1. Data Retrieved from USDA NASS Milk Production Reports

48.     Concurrent to the decline of the number of milk producers, dairy processers have seen bottling margins decline due to competitive pressures from milk suppliers and large (and sometimes vertically integrated) customers.  Couple this with the fact that for the past forty-five years consumption has steadily declined by over 100 gallons per person in North America,[8] and it is no surprise that Borden and other dairy suppliers (such as Dean Foods) have begun to feel the same negative effects that have plagued dairy farmers for the past decade.

---

[8]     *See* United States Department of Agriculture: Economic Research Service. *USDA ERS - Dairy products: Per capita* consumption*, United States* (Sept. 4, 2019).  Available at: https://www.ers.usda.gov/data-products/dairy-data/ [Accessed 4 Jan. 2020].

25812920.3



49.    This shrinking consumption of fluid milk has changed the business of conventional milk processors such as the Debtors.  Over time, the Debtors' sales volume mirrors this downward trend in consumption.  The strategies of Borden's new management team has returned the business to growth, however, the return to growth has not yet generated enough income to offset the long-term secular trends in the dairy category and Borden's overwhelming debt service burden.

50.    **Changing consumer tastes and increased product competition.**  The decline in dairy sales has occurred in conjunction with the rise of oat, nut, soy, and other alternative "milk" products at retailers and food service locations across the country.  Options like almond, soy, rice, coconut, and hemp beverages are beginning to demand more and more space on grocery store shelves as consumers have grown to embrace new flavors and alternative diets.  Sales of nut and

plant beverages grew by 9% in 2018 and had sales of $1.6 billion, according to the Plant Based

Foods Association.[9]

51.    **Raw Milk Price Increases**. As shown in the chart below, the price of conventional

raw milk has risen 27 percent since January 2019.  This increase in the cost of milk to supply the

Debtors' operations is at odds with the downward trend of prices for the end user (as discussed in

further detail below).  The Debtors expect further raw milk inflation in 2020.



52.    **Consolidation leads to compressed margins**. Consolidation in the retail sector

has given a few retailers and supermarket chains considerable buying power.  This trend combined

9    *See* Plant Based Foods Association. *Nielsen Data Release 2018 - Plant Based Foods Association*.  Available at:
https://plantbasedfoods.org/consumer-access/nielsen-data-release-2018/ [Accessed 4 Jan. 2020].

25812920.3

with the growth of budget retailers and store label products has translated to increasing pressure on already thin profit margins.

53.     **Competitors on both ends of value chain vertically integrating leads to further margin compression.**  Over the past two years, some of the Debtors' large format retail customers have become more vertically integrated—meaning they have bought or built processing assets to compete with the Debtors.[10]  In addition, some of Borden's suppliers have invested in processing assets to combat the contracting market pressures felt by dairy farmers.

54.     This has resulted in two negative consequences.  *First*, retailers that are vertically integrated typically re-dedicate key shelf-space that was formerly occupied by branded products for their own private label products.  Accordingly, customer awareness at major food service retail establishments has decreased, which in turn has muted the marketing and sale initiatives implemented by the Debtors in the past two years.  *Second*, by expanding up and down the value chains, these retailers and suppliers enjoy the benefits of broader profit pools while relying on smaller profit margins.  Retailers have aggressively priced their private label milk to drive foot traffic in their brick and mortar outlets.  This trend has negatively affected the Debtors as it has required them to price their products more competitively, compressing already thin profit margins.  These low margins are unsustainable for companies such as the Debtors who solely operate in the processing space.  Since 2018, the Debtors have experienced a 31% decline in gross margin (inclusive of distribution costs).

55.     **Fuel, Resin and External Freight Costs**.  The Debtors purchase diesel fuel to operate their extensive transportation fleet.  In 2019, the Debtors spent approximately $22 million

---

[10]   Parkin, H.  *Retailers Are Bottling Their Own Milk, Raising Pressure on Dairy Companies*, The Wall Street Journal (Oct. 13, 2017).  Available at:  https://www.wsj.com/articles/retailers-are-bottling-their-own-milk-raising-pressure-on-dairy-companies-1507887002 [Accessed 4 Jan. 2020].

annually on fuel.  Resin, a fossil fuel-based product, is another significant raw material input for Borden and is used to produce plastic bottles.  Sustained, national driver shortages over the past few years have also added to freight costs by increasing the wage, overtime and temporary employee costs.

### C.    Discussions with Key Stakeholders Prior to the Petition Date

56.    In January 2019, Borden engaged with key stakeholders on the financial issues facing the Company and the need for relief under the Company's secured loans.

57.    As 2019 progressed, the Debtors implemented a number of customer growth initiatives, overhead cost reductions, and input cost savings initiatives that gained traction. However, these initiatives were not enough to offset the major industry headwinds experienced by the Debtors and other dairy processing industry participants throughout 2019, including the precipitous rise in the price of raw milk, the continued compression of bottling margins, and a more aggressive competitor environment.  These difficulties ultimately resulted in one of the Debtors' largest competitors and fellow industry participants, Southern Foods Group, LLC d/b/a Dean Foods, filing for chapter 11 relief on November 12, 2019.

58.    By the fall of 2019, it became clear to the Debtors that they needed immediate relief from their overwhelming debt burden, as operational fixes were not enough to overcome industry headwinds.  In response to these mounting challenges, on October 1, 2019, the Debtors once again formally reengaged in discussions with such parties to explore restructuring alternatives that would allow the Debtors to reduce their current debt service burden and provide liquidity relief. Following these discussions, the Debtors retained a financial advisory firm, Conway McKenzie, to assist the Debtors with cash management practices and to evaluate company cost structure.

59.    These conversations ultimately resulted in a forbearance agreement, dated November 27, 2019, whereby the Lenders and the Agent agreed to forbear from exercising certain remedies under the Loan Documents until January 6, 2020, while the parties thereto worked to document and consummate a potential out-of-court restructuring on the terms outlined therein. In connection with the forbearance, the borrowing amount available to the Debtors under the RCF Facility was increased from $60 million to $70 million to provide the Debtors with additional liquidity to sustain their operations. Unfortunately, the parties were unable to finalize and implement an out-of-court restructuring by the forbearance termination date, and the Lenders were unwilling to extend such date further and provide necessary liquidity, necessitating the filing of these Chapter 11 Cases..

### III.    FIRST DAY MOTIONS

60.    Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.  The facts set forth in the First Day Motions are incorporated herein in their entirety.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring that value is preserved as they transition into chapter 11.

61.    I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors. The relief sought in each of the First Day Motions constitutes a critical element in the successful implementation of the Debtors' efforts to maximize creditor recoveries.  To this end, Debtors have filed the following First Day Motions:

25812920.3

A. **Administrative Motions**

    i.    *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief*

    ii.    *Debtors' Application for Authorization to Employ and Retain Donlin Recano & Company, Inc. as Claims and Noticing Agent Effective* Nunc Pro Tunc *to the Petition Date*

B. **Operational Motions Requiring Immediate Relief**

    i.    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain their Existing Cash Management System, Bank Accounts, Business Forms, and PNC and Fuel Card Programs, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (III) Granting Related Relief*

    ii.    *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation and Reimbursable Expenses, and (B) Continue Employee Benefits Program, and (II) Granting Related Relief*

    iii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Continue Its Insurance Premium Finance Agreements, and (II) Granting Related Relief*

    iv.    *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*

    v.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief*

    vi.    *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Practices, and (II) Granting Related Relief*

      vii.    *Debtors' Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral and Granting Adequate Protection, (B) Authorizing Use of Reserve Account Cash, (C) Scheduling a Final Hearing, and (D) Granting Related Relief (the "**Cash Collateral Motion**")*

**C.**    **Payment of Claims Motions**

      i.    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Critical Vendor Claims and 503(B)(9) Claims in the Ordinary Course of Business, (II) Authorizing the Debtors to Return Goods, and (III) Granting Related Relief*

            a.    *Declaration of Jason Monaco in Support of Debtors' Motion For Authorization To Pay Critical Vendors*

      ii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants, and (II) Granting Related Relief*

61.    The First Day Motions seek authority to, among other things, continue use of the Debtors' Cash Collateral, honor workforce-related compensation and benefits obligations, pay claims of vendors and suppliers, and continue the Debtors' cash management system and other operations in the ordinary course in order to ensure minimal disruption of the Debtors' business operations during the pendency of these Chapter 11 Cases. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

62.    I am familiar with the substance contained in each First Day Motion, and I believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in the Debtors achieving a successful and prompt reorganization, and (c) best serves the Debtors' estates and their stakeholders' interests. The facts and descriptions of the relief set forth in the First Day Motions are true and correct to the best of my information and belief and are

25812920.3

incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts.

## **<u>CONCLUSION</u>**

63.     The Debtors' ultimate goal in the Chapter 11 Cases is to achieve an orderly, efficient, consensual and successful reorganization to maximize the value of the Debtors' estates for their stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of the Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

*[Signature page follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 6, 2020

/s/ Jason Monaco
Jason Monaco
Executive Vice President, Chief Financial Officer,
Treasurer, and Assistant Secretary

**<u>Exhibit A</u>**

**Corporate Organizational Chart**

BORDEN DAIRY HOLDINGS, LLC
DELAWARE
BORDEN DAIRY COMPANY
DELAWARE
NATIONAL DAIRY, LLC
DELAWARE
Claims Adjusting Services, LLC
Delaware
Borden Dairy Company of Alabama, LLC
(fka Dairy Fresh of Alabama, LLC)
Delaware
Borden Dairy Company of Louisiana, LLC
(fka Dairy Fresh of Louisiana, LLC)
Delaware
Borden Dairy of South Carolina, LLC
(fka Coburg Dairy, LLC)
South Carolina
Borden Dairy of Kentucky, LLC
(fka Flav-O-Rich Dairies, LLC)
Delaware
Georgia Soft Serve Delights, LLC
Delaware
Borden Dairy Company of Cincinnati, LLC
(fka H.Meyer Dairy, LLC)
Delaware
Borden Dairy Company of Texas, LLC
(fka Milk Products, LLC)
Delaware
NDH Transport, LLC
Texas
Borden Dairy Company of Ohio, LLC
(fka Oberlin Farms Dairy, LLC)
Delaware
Borden Dairy Company of Florida, LLC
(fka Velda Farms, LLC)
Delaware
Borden Dairy Company of Madisonville, LLC
(fka U.C. Milk Company, LLC)
Kentucky
RGC, LLC
Delaware
Borden Transport Company of Cincinnati, LLC
(fka Meyer Transport, LLC)
Delaware
Borden Transport Company of Ohio, LLC
(fka Dairymens Transport, LLC)
Ohio



