# IN THE UNITED STATES BANKRUPTCY COURT
# FOR DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>BORDEN DAIRY COMPANY. *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 20-10010 (CSS)<br><br>(Joint Administration Requested)<br><br>Hearing Date: January 7, 2020 at 4:00 p.m. (ET) |

## OMNIBUS OBJECTION AND RESERVATION OF RIGHTS OF CERTAIN PREPETITION LENDERS TO DEBTORS' FIRST DAY PLEADINGS AND JOINDER TO OBJECTION OF PNC BANK, NATIONAL ASSOCIATION

KKR Credit Advisors (US) LLC, on behalf of itself, certain of its affiliates and its or their managed funds and accounts, as lenders (the "Lenders") under the Debtors' prepetition Term Loan B Facility (as defined in the Cash Collateral Motion (defined below)), acting through its undersigned counsel, hereby (A) submits the following omnibus objection (the "Objection") to certain of the Debtors' requested first-day relief, including, without limitation, the (i) *Debtors' Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral and Granting Adequate Protection, (B) Authorizing Use of Reserve Account Cash, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* [Dkt. No. 13] (the "Cash Collateral Motion"), (ii) *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Critical Vendor Claims and 503(b)(9) Claims in the Ordinary Course of Business, (II) Authorizing the Debtors to Return Goods, and (III) Granting Related Relief* [Dkt. No. 10] (the

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Borden Dairy Company (1509); Borden Dairy Holdings, LLC (8504); National Dairy, LLC (9109); Borden Dairy Company of Alabama, LLC (5598); Borden Dairy Company of Cincinnati, LLC (1334); Borden Transport Company of Cincinnati, LLC (3462); Borden Dairy Company of Florida, LLC (5168); Borden Dairy Company of Kentucky, LLC (7392); Borden Dairy Company of Louisiana, LLC (4109); Borden Dairy Company of Madisonville, LLC (7310); Borden Dairy Company of Ohio, LLC (2720); Borden Transport Company of Ohio, LLC (7837); Borden Dairy Company of South Carolina, LLC (0963); Borden Dairy Company of Texas, LLC (5060); Claims Adjusting Services, LLC (9109); Georgia Soft Serve Delights, LLC (9109); NDH Transport, LLC (7480); and RGC, LLC (0314). The location of the Debtors' service address is: 8750 North Central Expressway, Suite 400, Dallas, TX 75231.

"Critical Vendors Motion"), (iii) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants, and (II) Granting Related Relief* [Dkt. No. 9] (the "Prepetition Claims Motion"); (iv) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Practices, and (II) Granting Related Relief* [Dkt. No. 8] (the "Customer Programs Motion"); and (v) *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Dkt. No. 4] (the "Utilities Motion"),[2] and (B) files this joinder to the *Objection of PNC Bank, National Association to Debtors' Cash Collateral Motion and Other First Day Motions* [Dkt. No. 40] (the "PNC Objection"), and in support thereof, respectfully states as follows:

**OBJECTION**

1. Just before midnight on January 5, 2020, after months of negotiations among the Lenders, the Debtors and the Debtors' other secured creditors and stakeholders in furtherance of a consensual out-of-court restructuring, the Debtors had in hand a consensual negotiated out-of-court restructuring (the "Out-of-Court Transaction") that would address both the liquidity needs of the Debtors and provide for a comprehensive recapitalization.

2. The key terms of the Out-of-Court Transaction had been set for some time. Indeed, the Prepetition Secured Parties and the Debtors had agreed to a forbearance agreement on November 27, 2019, to which an agreed term sheet for a consensual out-of-court restructuring

---

[2] All defined terms shall have the meaning ascribed to them in the Cash Collateral Motion, Critical Vendors Motion, Prepetition Claims Motion, Customer Programs Motion, or Utilities Motion, as applicable, unless otherwise defined herein.

was attached (a copy of the forbearance agreement, and the related term sheet, are attached hereto as Exhibit 1).  The Debtors' controlling equity holder, Acon Dairy Investors, L.L.C. ("Acon"), which led negotiations on behalf of the Debtors and had committed to provide a substantial equity contribution in furtherance of the Out-of-Court Transaction, also signed the forbearance agreement, agreeing to work in good faith with the Lenders to negotiate definitive documentation with respect to the Out-of-Court Transaction.  By January 5, 2020, such definitive documentation was already in largely final form, subject to resolving a handful of relatively minor open business and legal points.  And, while the forbearance agreement was set to expire on January 6, 2020 by its terms, the parties had agreed to a short-term extension of the forbearance agreement to provide the parties with time to "cross the finish line" and were close to finalizing that document.  In fact, the Lenders, demonstrating their continued commitment to the Out-of-Court Transaction, were preparing signature pages to attach to the final document.

3. Inexplicably, however, with an almost fully-baked out-of-court restructuring solution in the form of the Out-of-Court Transaction seemingly in-hand, the Debtors instead chose to recklessly file these Chapter 11 Cases without (i) any prior notice to the Lenders, (ii) any discussion regarding use of cash collateral or other financing alternatives for these Chapter 11 Cases or (iii) any sense of what, exactly, the Debtors hope to accomplish through bankruptcy or how a calamitous and unprepared-for Chapter 11 filing will further those ends.

4. The Debtors have no discernable path through bankruptcy and – by their own admission – they have no tangible way to fund the Chapter 11 Cases.  The Debtors' Cash Collateral Motion seeks authority to use Cash Collateral and an allegedly unencumbered $26.6 million on deposit in the Reserve Account (together, the "Funding Sources"), and the Debtors' various first-day motions seek authority to pay in excess of $56 million in prepetition claims—on

information and belief, nearly the entirety of all outstanding unsecured claims against the Debtors as of the Petition Date (excluding the Central States obligations).[3] But the Debtors' own Budget [Dkt. No. 29] evidences that such Funding Sources are not sufficient to take the Debtors through even the initial Budget period. Moreover, embedded within the Cash Collateral Motion is a presumption that the only likely source of financing in these Chapter 11 Cases would be debtor-in-possession financing provided by the Debtors' prepetition secured creditors. Cash Collateral Motion at ¶17.[4] As such, it appears that the Debtors' "strategy" for funding the Chapter 11 Cases is to file a surprise and value-destructive bankruptcy, tread water for a short period at the direct expense of the Debtors' prepetition secured creditors and other stakeholders and only then decide to initiate discussions with those same secured creditors in hopes that they will agree to provide a debtor-in-possession financing facility on an extremely expedited timeframe.

5.  As for the Debtors' strategy for the Chapter 11 Cases as a whole, it seems to boil down to somehow using the bankruptcy process to negotiate a transaction that will be more advantageous to Acon than the Out-of-Court Transaction the parties were on the verge of consummating. Such a strategy is economically irrational and value-destructive. By filing these Chapter 11 Cases, the Debtors have chosen to incur substantial costs while also exposing the Debtors' businesses to the inherent uncertainties of a bankruptcy process, which uncertainties are compounded by the Debtors' failure to plan for the process or to articulate a clear path forward.

---

[3] The Debtors seek authority on an interim basis to pay $40 million under the Critical Vendors Motion, $500,000 under the Prepetition Claims Motion, $4 million under the Customer Programs Motion, $200,000 under the Utilities Motion, $7 million in wage and employee benefits, $3 million in taxes and $1 million to continue their insurance programs.

[4] Stating that "[a]t this time, the Debtors do not have an agreement with their Lenders to provide debtor-in-possession financing, and the Debtors believe that, given the significant amount of secured debt on the Company, no third-party lender will provide such financing on an unsecured, junior or pari passu basis . . . [and] [s]imilarly, given the unsustainable level of secured debt, it is not realistic to expect that the Lenders would consent on being primed by a third-party DIP Loan." *Id.*

In so doing, the Debtors and their board of directors have exposed their businesses and estates to substantial harm, not for the benefit of the estates but for the benefit of out-of-the money equity holders.

6. The Debtors should not, and cannot, be allowed to use chaos of their own making to distract from the clear facts. There is no economic justification for the Debtors' sudden chapter 11 filings, and the Debtors cannot use the Lenders' collateral to finance an attempt by Acon to re-trade the Out-of-Court Transaction. Accordingly, the Lenders object to, among other things, (i) the nonconsensual use of their Cash Collateral on the terms set forth in the Cash Collateral Motion and (ii) any use of their Cash Collateral to make any of the payments of prepetition claims sought on an interim basis pursuant to the Critical Vendors Motion, Prepetition Claims Motion, Customer Programs Motion and Utilities Motion, without the consent of the Lenders pursuant to an agreed upon Budget. There is no dispute that the Cash Collateral is rightfully Collateral of the Lenders (see Cash Collateral Motion at ¶9). As such, the Cash Collateral may not be used absent the provision of adequate protection to the Lenders. The "adequate protection" contemplated by the Debtors' Cash Management motion is far from adequate and the protection it purports to provide is illusory. Merely providing replacement liens, on an interim basis, on Collateral that the Lenders are already entitled to by virtue of Bankruptcy Code Section 552(b), is not adequate protection. Moreover, the Debtors have made no showing—nor could they—that the Lenders are otherwise adequately protected.

7. As noted above and despite the erroneous assertion in the *Declaration of Jason Monaco in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 15 at ¶59] that the Lenders were "unwilling to extend [the expiring forbearance period]", until the filing of the petitions for these Chapter 11 Cases, the Lenders remained committed to the Out-of-Court

Transaction and were, in fact, working around the clock to finalize definitive documentation with respect thereto such that an extension of the forbearance period would not even be necessary.

8. Despite their surprise and displeasure with how these Chapter 11 Cases have begun, as the undisputed fulcrum economic stakeholder in these cases, the Lenders recognize the need to stabilize the Debtors' businesses and preserve estate value for all constituencies. Accordingly, the Lenders are open to discussing terms governing the consensual use of Cash Collateral going forward—however, at a minimum, such use of Cash Collateral must be conditioned on, among other things, the following requirements:

- The Debtors should be required to grant to the Lenders replacement liens on unencumbered assets to the extent of any diminution in the value of the Prepetition Collateral;

- The Debtors should be required to make adequate protection payments to the Lenders in an amount equal to interest at the rate required under the Loan Documents;

- The Debtors should be required to reimburse the fees and expenses of the Lenders (including, without limitation, legal fees and expenses);

- The Debtors should not be authorized to use Cash Collateral to fund actions adverse to the Lenders' interests;

- The Budget (and any updates thereto) shall be acceptable to the Lenders and professional fees of the Debtors and any Committee must be subject to said Budget;

- Any use of Cash Collateral should be subject to covenants acceptable to the Lenders, including, without limitation, permitted variances of no more than

10% on a line item basis from the Budget then in effect;

- The Carve-Out should be acceptable to the Lenders in all respects, including caps on all professional fees;

- The form of interim and final orders governing use of Cash Collateral should be acceptable to the Lenders;

- In the event that the Court finds that the Reserve Account is, in fact, unencumbered by the Lenders' security interest, the Debtors should be required to exhaust available funds on deposit in that account before turning to any other sources of funds; and

- The Debtors should agree to provide a reasonable and standard suite of reporting and information rights that are acceptable to the Lenders and provide reasonable access to the Debtors' management and advisors upon the reasonable request of the Lenders.

9. While the Lenders are amenable to the consensual use of Cash Collateral on the right terms (including the modifications set forth above), under no circumstances should the Debtors be permitted to use funds on deposit in the Reserve Account on an interim basis. Upon information and belief, the Lenders and other parties in interest may have a continuing interest in such Reserve Account, and such account should be untouched until interested parties have sufficient time to evaluate whether such account is in fact unencumbered. To the extent that funds on deposit in the Reserve Account constitute Cash Collateral and are used, such funds should be subject to adequate protection.

10. The Lenders acknowledge that the unplanned and precipitous nature of the filing of these Chapter 11 Cases has created an imminent need for funding of the Debtors'

continued operations; however, given the fact that the Lenders were not afforded any advance notice of, or opportunity to discuss the Debtors' funding needs prior to commencing these Chapter 11 Cases, any such use of Cash Collateral to pay requested first-day relief should be extremely limited. Unless and until the Lenders have an adequate time to assess the Budget and the Debtors' proposed use of Cash Collateral, their Cash Collateral should be used only for the most crucial payments. However, here the Debtors seek authority to pay in excess of $44 million on an interim basis on account of prepetition Critical Vendor Claims, Lien Claims and Customer Obligations. *See* Critical Vendors Motion at ¶¶13-14; Prepetition Claims Motion at ¶7; Customer Programs Motion at ¶7. The Debtors make no attempt to show that such prepetition amounts critically need to be paid in the interim period, and the Lenders hereby object to the payment of any such amounts prior to any final hearing on the applicable motions and/or pursuant to any agreed Budget. With respect to the Utilities Motion, there is no basis for hearing that motion at the first day hearing and it should be moved to a later date.[5]

11. The uncoordinated and sudden nature of the filing of these Chapter 11 Cases has created an unnecessary, and avoidable, challenge to achieving a successful reorganization. Normal conversations that a normal distressed business such as the Debtors would have had with stakeholders prior to a chapter 11 filing did not happen here. The Debtors have not provided the Lenders with any opportunity to diligence the sources and uses or to otherwise vet the Budget by appropriate parties. The Lenders need time to assess the situation created by this surprise filing to properly address the financing need during this pivotal moment in these Chapter 11 Cases.

12. That being said, and as set forth in detail above, the Lenders are willing to discuss limited access to Cash Collateral for a short interim period that permits payment of only

---

[5] *See* 11 U.S.C. § 366(b) ("Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.")

the most essential post-petition items and certain limited prepetition items while the Lenders continue to work toward a longer term financing solution that provides for a tangible path for the Debtors to reorganize through these Chapter 11 Cases.

13. The Lenders hereby reserve and preserve all rights with respect to the Cash Collateral Motion, Critical Vendors Motion, Prepetition Claims Motion, Customer Programs Motion and Utilities Motion and all other first-day relief sought, including without limitation, to object to and provide comments on the form of any proposed order and Budget submitted to this Court in connection with the use of any Cash Collateral, the use of the Reserve Account or to any other first day or subsequent relief requested by the Debtors, and the right to seek relief from the automatic stay in order to pursue their rights and remedies under the Loan Documents and applicable law. The Lenders further join in the arguments set forth in the PNC Objection, and reserve all rights to make comments to the form of order attached thereto. The Lenders reiterate that they have been, and remain, willing to engage the Debtors in good-faith on a comprehensive solution to the Debtors' financial distress.

| | |
|---|---|
| Dated: January 7, 2020<br>Wilmington, Delaware | **MORRIS NICHOLS ARSHT & TUNNELL LLP**<br><br> */s/ Robert J. Dehney*<br>Robert J. Dehney (No.3578)<br>Curtis S. Miller  (No. 6258)<br>Matthew B. Harvey (No. 5186)<br>Matthew O. Talmo (No. 2836)<br>1201 North Market Street, Suite 1600<br>Wilmington, DE 19801<br>Telephone:  (302) 658-9200<br>Facsimile: (302) 658-3989<br>Email: rdehney@mnat.com<br>       cmiller@mnat.com<br>       mharvey@mnat.com<br>       mtalmo@mnat.com<br><br> -and-<br><br>**KING & SPALDING LLP**<br>Roger G. Schwartz<br>Peter Montoni<br>Christopher G. Boies<br>Stephen M. Blank<br>1185 Avenue of the Americas, 34th floor<br>New York, NY 10036<br>Telephone (212) 556-2100<br>Email: rschwartz@kslaw.com<br>       pmontoni@kslaw.com<br>       cboies@kslaw.com<br>       sblank@kslaw.com<br><br>*Counsel to the Lenders* |