## **EXHIBIT 1**

**APA**

26699693.1

**ASSET PURCHASE AGREEMENT**

DATED AS OF JUNE 26, 2020

BY AND AMONG

BORDEN DAIRY COMPANY,

EACH OF THE SUBSIDIARIES OF BORDEN DAIRY COMPANY

LISTED ON THE SIGNATURE PAGES HERETO,

AND

NEW DAIRY OPCO, LLC

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS**                                                          **1**

Section 1.01      Definitions..................................................................................1
Section 1.02      Other Definitions and Interpretive Matters...................................20

**ARTICLE 2 PURCHASE AND SALE**                                                     **22**

Section 2.01      Purchase and Sale .........................................................................22
Section 2.02      Excluded Assets ............................................................................25
Section 2.03      Assumed Liabilities .......................................................................26
Section 2.04      Excluded Liabilities .......................................................................28
Section 2.05      Cure Costs; Desired 365 Contracts ................................................28
Section 2.06      Assignment of Assets Subject to Consent Requirements .................30
Section 2.07      Additional Excluded Assets ...........................................................32
Section 2.08      Misallocated Assets .......................................................................32
Section 2.09      Further Assurances.........................................................................32
Section 2.10      Withholding ...................................................................................33

**ARTICLE 3 PURCHASE PRICE**                                                        **33**

Section 3.01      Purchase Price................................................................................33

**ARTICLE 4 CLOSING**                                                               **33**

Section 4.01      Closing Date...................................................................................33
Section 4.02      Buyer's Deliveries..........................................................................34
Section 4.03      The Selling Entities' Deliveries .....................................................34

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES**    **35**

Section 5.01      Organization and Good Standing....................................................35
Section 5.02      Authority; Validity.........................................................................35
Section 5.03      Governmental Approvals; No Conflict............................................36
Section 5.04      Financial Statements......................................................................36
Section 5.05      No Undisclosed Material Liabilities ...............................................37
Section 5.06      Absence of Certain Changes ..........................................................37
Section 5.07      Legal Proceedings..........................................................................37
Section 5.08      Compliance with Laws; Permits ....................................................38
Section 5.09      Food Safety Matters.......................................................................38
Section 5.10      Material Contracts..........................................................................40
Section 5.11      Government Contracts ....................................................................41
Section 5.12      Intellectual Property.......................................................................43
Section 5.13      Environmental, Health and Safety Matters .....................................47
Section 5.14      Title.................................................................................................47
Section 5.15      Matters Related to Assets; Casualty Losses....................................48

Section 5.16    Inventory; Accounts Receivable and Payable.................................49
Section 5.17    Insurance .................................................................................49
Section 5.18    Security Arrangements..............................................................50
Section 5.19    Customers and Suppliers...........................................................50
Section 5.20    Anti-Corruption.......................................................................50
Section 5.21    Brokers or Finders....................................................................51
Section 5.22    Employee Benefit Plans; Labor and Employment Matters.............51
Section 5.23    Taxes .......................................................................................53

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER          53**

Section 6.01    Organization and Good Standing.................................................53
Section 6.02    Authority; Validity; Consents ....................................................54
Section 6.03    Governmental Approvals; No Conflict.........................................54
Section 6.04    Legal Proceedings.....................................................................55
Section 6.05    Bankruptcy...............................................................................55
Section 6.06    Brokers or Finders....................................................................55
Section 6.07    Financing..................................................................................55
Section 6.08    Independent Evaluation ............................................................55

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE          55**

Section 7.01    Access and Reports ...................................................................55
Section 7.02    Operations Prior to the Closing Date ..........................................56
Section 7.03    Reasonable Best Efforts ............................................................60
Section 7.04    Regulatory Approvals................................................................60
Section 7.05    Bankruptcy Court Approval.......................................................62
Section 7.06    Alternative Proposals................................................................62
Section 7.07    Buyer Efforts to Obtain Financing..............................................63
Section 7.08    Cooperation with Financing.......................................................63
Section 7.09    Damage or Destruction..............................................................64
Section 7.10    Additional Selling Entities ........................................................65
Section 7.11    Public Announcements; Filings ..................................................65
Section 7.12    Collective Bargaining Agreements .............................................65

**ARTICLE 8 ADDITIONAL AGREEMENTS          65**

Section 8.01    Taxes........................................................................................65
Section 8.02    Allocation of Purchase Price......................................................66
Section 8.03    Assigned Contracts; Adequate Assurance and Performance ..........66
Section 8.04    Employee Matters .....................................................................67
Section 8.05    Post-Closing Books and Records ................................................68
Section 8.06    Intellectual Property Licenses ....................................................68
Section 8.07    Title Matters.............................................................................70
Section 8.08    Permit Matters..........................................................................70
Section 8.09    Insurance Access ......................................................................70
Section 8.10    Confidentiality .........................................................................71

Section 8.11    Disclaimers .................................................................................71
Section 8.12    Collection of Accounts Receivable.............................................73
Section 8.13    Excess Cash and Accounts Receivable........................................73

**ARTICLE 9 CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES                                                                  74**

Section 9.01    No Order ......................................................................................74
Section 9.02    Sale Order ....................................................................................74
Section 9.03    Successor Liability.......................................................................74
Section 9.04    Antitrust Laws..............................................................................74

**ARTICLE 10 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE                                                                                          74**

Section 10.01    Accuracy of Representations .....................................................74
Section 10.02    Selling Entities' Performance ....................................................75
Section 10.03    Seller's Deliveries .....................................................................75
Section 10.04    Material Adverse Effect .............................................................75
Section 10.05    Working Capital Assets At Closing............................................75
Section 10.06    [Intentionally omitted.................................................................75
Section 10.07    Release of Liens .........................................................................75

**ARTICLE 11 CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE                                                                     75**

Section 11.01    Accuracy of Representations .....................................................75
Section 11.02    Buyer's Performance ..................................................................76
Section 11.03    Buyer's Deliveries .....................................................................76
Section 11.04    DIP Order....................................................................................76
Section 11.05    DIP Financing .............................................................................76
Section 11.06    Release of Liens..........................................................................76

**ARTICLE 12 TERMINATION                                                                      76**

Section 12.01    Termination Events.....................................................................76
Section 12.02    Effect of Termination .................................................................77
Section 12.03    Procedure Upon Termination......................................................78

**ARTICLE 13 GENERAL PROVISIONS                                                               78**

Section 13.01    No Survival of Representations and Warranties ..........................78
Section 13.02    Notices ........................................................................................78
Section 13.03    Waiver.........................................................................................80
Section 13.04    Entire Agreement; Amendment ..................................................80
Section 13.05    Assignment .................................................................................81
Section 13.06    Severability .................................................................................81
Section 13.07    Expenses .....................................................................................81

| | | |
|---|---|---|
| Section 13.08 | Specific Performance | 81 |
| Section 13.09 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 82 |
| Section 13.10 | Counterparts | 83 |
| Section 13.11 | Parties in Interest; No Third Party Beneficiaries | 83 |
| Section 13.12 | No Recourse | 84 |
| Section 13.13 | Disclosure Schedules; Materiality | 85 |
| Section 13.14 | Liquidating Trustee | 86 |
| Section 13.15 | Final Schedules | 86 |
| Section 13.16 | Conflicts; Privileges | 86 |
| Section 13.17 | Non-Recourse | 87 |

**Exhibits:**

| | |
|---|---|
| Exhibit A | Form of Master Assignment |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Trademark Assignment Agreement |
| Exhibit D | DIP Term Sheet |

**Annexes:**

| | |
|---|---|
| Annex 1 | Terms of Schedules |

**Schedules:**

| | |
|---|---|
| Schedule 1.01(a) | Independent Contractors |
| Schedule 1.01(b)(1) | Seller Knowledge Persons |
| Schedule 1.01(b)(2) | Buyer Knowledge Persons |
| Schedule 1.01(c) | Matters Not Constituting a Material Adverse Effect |
| Schedule 1.01(d) | Retained Causes of Action |
| Schedule 2.01(b)(vii) | Acquired Owned Real Property and Acquired Leased Real Property |
| Schedule 2.01(b)(ix) | Transferred Permits |
| Schedule 2.01(b)(xvi) | Assumed Plans |
| Schedule 2.02(h) | Certain Insurance Policies |
| Schedule 2.02(r) | Additional Excluded Assets |
| Schedule 2.03(b) | Cure Costs |
| Schedule 2.03(d) | Administrative Claims |
| Schedule 2.05(a) | Desired 365 Contracts |
| Schedule 7.02 | Operation Prior to Close |
| Schedule 7.04 | Transferred Permits and Certifications |
| Schedule 8.04(a) | Non-Offered Company Employees |

26699695.1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of June __, 2020 is by and among Borden Dairy Company, a corporation organized under the laws of the State of Delaware whose address is 8750 North Central Expressway, Suite 400, Dallas, TX 75231 ("**Seller**"), each of the Subsidiaries of Seller listed on the signature pages hereto (together with Seller, the "**Selling Entities**") and New Dairy Opco, LLC, a Delaware limited liability company ("**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, the Selling Entities are engaged in the Business;

WHEREAS, on January 5, 2020 (the "**Petition Date**"), the Selling Entities commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, the Selling Entities desire to sell to Buyer all of the Assets, and Buyer desires to purchase from the Selling Entities all of the Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

WHEREAS, the Selling Entities' ability, and Buyer's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01    Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**365 Contracts**" means, with the exception of Government Contracts, all of the Selling Entities' respective executory Contracts and unexpired Leases, in each case, within the meaning of section 365 of the Bankruptcy Code pertaining to the Assets or Assumed Liabilities.

"**Accounts Payable**" means any and all accounts, notes, trade, other payables and accrued expenses owed by Seller or any of its Subsidiaries, or that may become payable, by Seller or any of its Subsidiaries, with respect to products bought or services rendered on or prior to the Closing Date, all in accordance with GAAP, consistently applied in accordance with past practices.

"**Accounts Receivable**" means any and all accounts, notes, trade and other receivables owed to Seller or any of its Subsidiaries, all in accordance with GAAP, consistently applied in accordance with past practices, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including vendor/supplier, Company Employee and other receivables and all Proceedings pertaining to the collection of amounts that are payable, or that may become payable, to Seller or any of its Subsidiaries with respect to products sold or services performed on or prior to the Closing Date, net of any applicable reserve for returns, discounts, doubtful accounts or other similar deductions reflected thereon in an amount not less than $3,700,000.

"**Acquired Accounts Receivable**" means all Accounts Receivable except for the Excluded Accounts Receivable.

"**Acquired Leased Real Property**" has the meaning set forth in <u>Section 2.01(b)(vii)</u>.

"**Acquired Owned Real Property**" has the meaning set forth in <u>Section 2.01(b)(vii)</u>.

"**Acquired Real Property**" has the meaning set forth in <u>Section 2.01(b)(vii)</u>.

"**Acquired Cash**" means Cash in an amount equal to $11,600,000, excluding any Cash held in the Good Faith Deposit Account.

"**Adequate Protection Liens and Claims**" means the liens and claims granted to the Agent, for the benefit of the TLA Lenders, the TLB Lenders and the RCF Lenders, in each case under the Cash Collateral Order as adequate protection for the diminution in value of the TLA Lenders', TLB Lenders' and RCF Lenders' pre-petition collateral.

"**Administrative Claims**" means a Claim for costs and expenses of administration of the Bankruptcy Cases arising on or prior to the Closing Date allowed pursuant to 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Closing Date of preserving the estates and operating the Debtors' business, (ii) professional fee claims, and (iii) all fees and charges assessed against the estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code specifically set forth on <u>Schedule 2.03(d)</u>.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by or is under common Control with such specified Person; *provided* that none of the equity holders of Borden Dairy Holdings, LLC or creditors of the Selling Entities (other than any equity holder of Seller or creditor of the Selling Entities who is a Subsidiary of any Selling Entity) will be considered an Affiliate of a Selling Entity for purposes of this Agreement.

"**Agent**" means PNC Bank, National Association, in its capacity as administrative agent and collateral agent under the Credit Agreement (or any successor to PNC Bank, National Association, in such capacity).

"**Agent Professional Fee Carveout Obligations**" means the obligations to pay the Agent's professional fees in connection with the RCF Facility or the TLA Facility.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Allocation**" has the meaning set forth in Section 8.02(a).

"**Alternative Offer**" has the meaning set forth in Section 7.06.

"**Anti-Corruption Laws**" has the meaning set forth in Section 5.20.

"**Antitrust Division**" has the meaning set forth in Section 7.04(a).

"**Antitrust Laws**" means, collectively, the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Applicable Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"**Applicable Food Safety Laws**" has the meaning set forth in Section 5.09.

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**Arnold & Porter**" has the meaning set forth in Section 13.16(a).

"**Assets**" has the meaning set forth in Section 2.01(b).

"**Assigned Contracts**" has the meaning set forth in Section 2.01(b)(viii).

"**Assumed Accounts Payable**" means, the Accounts Payable of the Business arising after the Petition Date, to the extent historically included as accounts payable of the Selling Entities prior to the date of this Agreement as reflected in the Financial Statements and, in each case, outstanding as of the Closing Date.

"**Assumed CBAs**" has the meaning set forth in Section 2.01(b)(xvii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Assumed Plans**" has the meaning set forth in Section 2.01(b)(xvi).

"**Available Insurance Policy**" has the meaning set forth in <u>Section 8.09</u>.

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Selling Entities, including any proceeds thereof, under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent conveyance or transfer laws.

"**Balance Sheet**" has the meaning set forth in <u>Section 5.04</u>.

"**Balance Sheet Date**" has the meaning set forth in <u>Section 5.04</u>.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" means Title 11 of the United States Code, sections 101 *et seq.*

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rules**" has the meaning set forth in the recitals.

"**Bidding Procedures**" means the procedures employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities in the form attached to the Bidding Procedures Order.

"**Bidding Procedures Order**" means the Order of the Bankruptcy Court approving the Bidding Procedures [Docket No. 671].

"**Borden Marks**" means those Trademarks containing the words "BORDEN" and "ELSIE" and all derivations thereof, and any other Trademarks owned by Comercializadora de Lacteos y Derivados, S.A. de C.V. and (a) licensed to the Selling Entities pursuant to that certain Trademark License Agreement dated September 4, 1997, amended or otherwise modified as of September 4, 2000, April 25, 2001, January 1, 2004, June 1, 2006, April 13, 2009, January 1, 2010, April 25, 2011, June 27, 2012, October 1, 2012 and July 6, 2017 or (b) sublicensed to the Selling Entities pursuant to the Dean Sublicense Agreement dated June 10, 2002 ((a) and (b) together, the "**Borden Marks Licenses**").

"**Borden Marks Licenses**" has the meaning set forth in the definition of Borden Marks.

"**Business**" means the business of developing, importing, exporting, manufacturing, marketing, labeling, packaging, storing, transporting, distributing and selling certain branded and private label dairy and dairy case products, milk and cream commodities and certain non-dairy products, including fluid milk, cultured dairy products, creams and creamers, ice cream mix, purchased for resale products and other dairy products, and certain juices, teas, flavored drinks, bottled water products and other food and beverage products, in each case to retailers, distributors, food service outlets, educational institutions, food processors and Governmental Authorities, and certain activities ancillary thereto (including the ownership and operation of the Assets).

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in New York City, New York and Dallas, Texas.

"**Business IT Assets**" has the meaning set forth in Section 5.12(i).

"**Buyer**" has the meaning set forth in the introductory paragraph.

"**Buyer Released Parties**" has the meaning set forth in Section 13.12(c).

"**Buyer Releasors**" has the meaning set forth in Section 13.12(b).

"**Cash**" means all cash and cash equivalents of the Seller and its Subsidiaries determined in accordance with GAAP consistent with past practice, but excluding (a) any cash that (i) is collateralizing any letters of credit issued pursuant to any credit agreement or facility or (ii) held in trust or any trust account for or on behalf of any Selling Entity, (b) marketable securities, (c) short term investments, (d) any amounts of any unpaid checks, ACH transactions, drafts and other wire transfers issued by any of Seller or its Subsidiaries, (e) any cash otherwise assumed by, or owed or payable to, Buyer under the Transaction Documents) or (f) any cash in the Good Faith Deposit Account.

"**Cash Collateral Order**" means the Final Order of the Bankruptcy Court authorizing the Selling Entities' use of cash collateral and certain Reserve Account Cash.

"**Casualty Loss**" means any loss, damage or destruction of the Assets that occurs for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, hurricane, tropical storm, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation or ordinary wear and tear.

"**Causes of Action**" has the meaning set forth in Section 13.12(b).

"**Certification**" means any official endorsement, certification, license, permit, authorization, or designation issued, granted, given, or otherwise made available by any Governmental Authority or other Person that sets and/or monitors food preparation, food content, or other standards related to food products.

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 4.01.

"**Closing Date**" has the meaning set forth in Section 4.01.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any written agreement between any Selling Entity with a union representing any Company Employees that governs the terms and conditions of employment, whether or not such agreement is expired by its terms.

"**Company Employees**" means (a) the employees of the Selling Entities and (b) those individual independent contractors who are, in the case of this clause (b), set forth on Schedule 1.01(a).

"**Confidential Business Information**" has the meaning set forth in Section 8.10.

"**Confidentiality Agreement**" has the meaning set forth in Section 7.01(b).

"**Contract**" means any agreement, contract, lease, sublease, agreement to lease, indenture, note, bond, mortgage, loan, purchase order, service agreement, bill of lading, sales order, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, including the Leases, and all amendments or modifications thereto.

"**Control**" or "**Controlled**" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by Contract or otherwise.

"**Copyrights**" means any copyright, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing.

"**Credit Agreement**" means that certain Financing Agreement, dated as of July 6, 2017 (as amended, restated, supplemented, or otherwise modified from time to time), by and among Borden Dairy Company, Borden Dairy Holdings, LLC, each subsidiary of Borden Dairy Holdings, LLC listed as a "Guarantor" on the signature pages thereto, the lenders thereto, and the Agent.

"**Credit Bid**" means a bid by the Sub-Agent, at the direction of the TLB Lenders, in accordance with Section 363(k) of the Bankruptcy Code.

"**Credit Bid Amount**" means a Credit Bid of TLB Claims equal to $110,000,000.

"**Cure Costs**" means an amount for all cure costs that must be paid or otherwise satisfied pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts to Buyer, in each case, as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order, with such amount not to exceed $7,500,000.

"**Current Representation**" has the meaning set forth in Section 13.16(a).

"**Current Government Contracts**" has the meaning set forth in Section 5.11(a).

"**Custom & International Trade Laws**" means any applicable export control, import, customs and trade, and any anti-boycott laws of any jurisdiction in which any Selling Entity is incorporated or formed or does business, including the Tariff Act of 1930, as amended, and other Applicable Laws administered or enforced by the U.S. Department of Commerce, U.S.

International Trade Commission, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and their predecessor or successor agencies; the Export Administration Act of 1979, as amended; the Export Administration Regulations, including related restrictions with regard to transactions involving persons on the U.S. Department of Commerce Denied Persons List, Unverified List or Entity List; the Arms Export Control Act, as amended; the International Traffic in Arms Regulations, including related restrictions with regard to transactions involving persons on the Debarred List; the anti-boycott laws administered by the U.S. Department of Commerce; and the anti-boycott laws administered by the U.S. Department of the Treasury.

"**Damage or Destruction Loss**" has the meaning set forth in <u>Section 7.09</u>.

"**Data**" means customer lists, correspondence, and other data relating to customers of the Business and all other reports, information and documentation collected or maintained by any Selling Entity regarding the visitors to websites owned or controlled such Selling Entity.

"**Data Protection Laws**" means the data protection and privacy laws of each jurisdiction where any Selling Entity is operating the Business and those of each jurisdiction where any Personal Information is collected, transmitted, secured, stored, shared or otherwise processed by or on behalf of a Selling Entity in connection with the operation of the Business, including, to the extent applicable, the General Data Protection Regulation (EU 2016/679) (GDPR), the e-Privacy Directive (Directive 2002/58/EC) and the e-Privacy Regulation (Regulation 2017/003) (once it takes effect), the California Consumer Privacy Act (to the extent in effect), Section 5 of the (U.S.) Federal Trade Commission Act and any and all laws and regulations governing privacy, cybercrime, use of electronic data, or unfair or deceptive trade practices.

"**Deal Communications**" has the meaning set forth in <u>Section 13.16(b)</u>.

"**Debt Commitment Letter**" means any commitment letter provided by a Debt Financing Source, pursuant to which such Debt Financing Source has committed to lend to Buyer the amounts set forth therein for the purposes of, or in connection with, any Debt Financing and any related fees, expenses and liabilities.

"**Debt Financing**" means the credit facilities, issuance of debt securities or other debt financing that may be obtained or consummated by Buyer for the purposes of financing all or any portion of the transactions contemplated hereby.

"**Debt Financing Source**" means, in its capacity as such, any lender or similar debt financing source and their respective Affiliates, and such lender's or other debt financing source's (and their respective Affiliates') equityholders, members, employees, officers, directors, attorneys, agents or advisors, in each case, solely with respect to the Debt Financing. For the avoidance of doubt, neither Buyer nor the TLB Lender (solely in its capacity as lender under the TLB Facility as in effect as of the date hereof) shall  be considered to be a Debt Financing Source (it being understood that the TLB Lender shall be considered a Debt Financing Source to the extent that the TLB Lender serves as a source of Debt Financing, solely in its capacity as such).

"**Designated Assumed Liabilities**" means the specific Assumed Liabilities contained in <u>Section 2.03(c) – (f)</u>.

"**Designated Assumed Liabilities Minimum**" means an amount equal to the face value of $72,100,000, representing the minimum value ascribed to the Designated Assumed Liabilities assumed by Buyer as of the Closing.

"**Designated Person**" has the meaning set forth in Section 13.16(a).

"**Desired 365 Contracts**" has the meaning set forth in Section 2.05(a).

"**DIP Loans**" has the meaning set forth in the debtor-in-possession financing term sheet attached as Exhibit D hereto.

"**DIP Order**" means the Order of the Bankruptcy Court approving the DIP Loans on a final basis, in form and substance reasonably acceptable to Buyer and Seller, in accordance with the terms of the debtor-in-possession financing term sheet attached as Exhibit D hereto.

"**Encumbrance**" means any lien, encumbrance, defect, covenant, hypothecation, interference, preemptive right, community property interest, pledge, mortgage, deed of trust, security interest, charge, interest, debenture, Claim, assignment by way of security or otherwise, conditional sales contract or other title retention agreement, right of first refusal or similar interest or instrument charging, or creating a security interest in the Assets or any part thereof or interest therein, and any agreement, lease, license (except for any license of Intellectual Property), occupancy agreement, option, easement, right of way, restriction, execution or other encumbrance (including notices or other registrations in respect of any of the foregoing) affecting any right or title to the Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, Applicable Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"**Environmental, Health and Safety Laws**" means any and all Applicable Laws concerning worker and occupational health and safety, concerning pollution or relating to the protection of human health and safety (with respect to exposure to Hazardous Substances), the environment or natural resources, or to the use, generation, management, handling, disposal, transportation or Release of, or exposure to, Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity, trade or business (whether or not incorporated) that, together with any other entity, trade or business, is treated as a single employer under section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Excluded Accounts Payable**" means the Accounts Payable that are not Assumed Accounts Payable.

"**Excluded Accounts Receivable**" means the face amount of receivables designated by Buyer and set forth on Schedule 2.02(r) as determined prior to the Closing in an amount equal to $14,200,000.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Contracts**" means all Contracts of each Selling Entity other than the Assigned Contracts.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Records**" means (a) the general corporate files and records of each Selling Entity related to such entity's organization and existence, (b) each Selling Entity's respective federal, state, local or non-U.S. income, franchise or margin tax files and records, (c) employee files (other than files of Transferred Employees that are permitted to be transferred pursuant to Applicable Law), (d) records relating to the sale of the Assets conducted in accordance with the Bidding Procedures, including competing bids (but excluding any Contracts relating to the Assets, including any non-disclosure agreements relating to the Assets), (e) proprietary data (including any engineering studies and forecasts and economic studies) to the extent primarily relating to Excluded Assets, or any privileged information to the extent the transfer pursuant hereto would jeopardize such privilege (it being understood that Seller and its Subsidiaries shall enter in any joint defense or similar agreement as reasonably requested by Buyer to allow for the disclosure of such information to Buyer without the loss of such applicable privileges), (f) information and data that is subject to Third Party contractual restrictions on assignment or disclosure to the extent primarily relating to Excluded Assets, (g) copies of records stored for archival and/or back up purposes to the extent primarily relating to Excluded Assets or Excluded Liabilities, and (h) any other files or records to the extent primarily relating to any Excluded Assets or Excluded Liabilities.

"**Facilities**" has the meaning set forth in Section 2.01(b)(i).

"**FAR**" has the meaning set forth in Section 2.06(b).

"**FDA**" means the United States Food and Drug Administration and any successor agency thereto.

"**FDC Act**" means the United States Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.).

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction has been affirmed by the highest court to which such order was appealed,

or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, will not cause such order not to be a Final Order as long as such motion has not been filed.

"**Final Schedules**" has the meaning set forth in <u>Section 13.15</u>.

"**Financial Statements**" has the meaning set forth in <u>Section 5.04</u>.

"**Food and Beverage Products**" means all food and beverage products of all types (whether branded or private label, finished food or beverages, works in process, or food or beverage ingredients) imported, exported, developed, cultivated, manufactured, processed, labeled, held, packed, packaged, marketed, distributed, transported, or sold, by or for the Business.

"**FTC**" has the meaning set forth in <u>Section 7.04(a)</u>.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Good Faith Deposit Account**" means the bank account established by Seller at Signature Bank that holds the good faith deposits submitted by bidders for the assets of the Selling Entities.

"**Government Contract**" means any Contract, including any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, pricing agreement, letter contract, purchase order, delivery order, task order, or other similar arrangement of any kind between (a) a Selling Entity and (b) any (i) Governmental Authority, (ii) prime contractor to a Governmental Authority with respect to a Contract entered into with a Governmental Authority, or (iii) subcontractor with respect to any Contract described in <u>clause (i)</u> or <u>(ii)</u>, including any closed contract or subcontract as to which the right of a Governmental Authority or a higher-tier contractor to review, audit or investigate has not expired. For the avoidance of doubt, a task, purchase or delivery order under a Government Contract shall not constitute a separate Government Contract, for purposes of this definition, but shall be part of the Government Contract to which it relates.

"**Government Contract Bid**" means each offer, quotation, bid or proposal to sell products or services made by a Selling Entity with respect to the Business to a Governmental Authority or to any prime contractor or higher-tier subcontractor in respect of a Contract with a Governmental Authority.

"**Governmental Authority**" means any court or tribunal in any jurisdiction (domestic or foreign) or any federal, tribal, state, parish, county, municipal or other governmental or quasi-governmental, administrative or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"**Governmental Authorization**" means any approval, consent, license, Permit, waiver permission, clearance, designation, qualification or other authorization issued, granted, given or

otherwise made available by or under the authority of any Governmental Authority or pursuant to Applicable Law.

"**Hazardous Substance**" means any pollutants, contaminants, NORM and other radioactive materials, chemicals, petroleum, petroleum products, or hydrocarbons, asbestos or any asbestos-containing material, per- and polyfluoroalkyl substances, polychlorinated biphenyls or industrial, toxic or hazardous substances and any "contaminant," "pollutant", "hazardous waste," "hazardous material", "hazardous substance", "extremely hazardous substance" or "toxic substance," or words of similar import under any Applicable Law relating to the environment or human health and safety.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Insurance Policies**" has the meaning set forth in <u>Section 5.17</u>.

"**Intellectual Property**" means any Copyright, Patent, Trademark, trade secret, know-how, software, rights in data and databases, inventions (whether patentable or not), or any other similar type of proprietary right or intellectual property right.

"**Inventory**" means all raw milk and cream, raw materials, ingredients, packaging and packaging materials, products in-process and finished products inventories, along with any spare parts, chemicals or other supplies owned or used (or held for use) by Seller or any of its Subsidiaries, whether in transit to or from Seller or any of its Subsidiaries and whether in Seller's or any of its Subsidiaries' warehouses, distribution facilities, held by any Third Parties or otherwise (and whether or not reflected in Seller's or its applicable Subsidiary's balance sheet or other records), and all open purchase orders with suppliers, excluding any products shipped to Third Parties prior to the Closing Date. For purposes of determining the value of acquired Inventory, such amounts shall be valued at the lower of cost or market on a first-in-first-out basis, net of required inventory reserves for obsolete or slow moving items or items not saleable at normal margins, all in accordance with GAAP, consistently applied in accordance with past practices, and (b) acquired Inventory that is of a category that historically has not been reflected on Seller's Balance Sheet shall be assigned no value.

"**IT Assets**" means software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation.

"**Knowledge**" means, with respect to any matter in question, (a) in the case of each Selling Entity, the knowledge, after reasonable inquiry, of any of the individuals listed on <u>Schedule 1.01(b)(1)</u>, and (b) in the case of Buyer, the knowledge, after reasonable inquiry of any of the individuals listed on <u>Schedule 1.01(b)(2)</u> with respect to such matter.

"**Leased Real Property**" has the meaning set forth in <u>Section 5.14(b)</u>.

"**Leases**" has the meaning set forth in <u>Section 5.14(b)</u>.

"**Liability**" means any and all Claims, debts, deficiencies, demands, judgments, interest, fines, penalties, assessments, awards, costs, indebtedness, liens, losses, damages (including incidental and consequential damages), adverse claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Licensed Intellectual Property**" has the meaning set forth in Section 5.12(b), it being acknowledged that the Borden Marks are Licensed Intellectual Property.

"**Major Customers**" has the meaning set forth in Section 5.19(a).

"**Major Suppliers**" has the meaning set forth in Section 5.19(b).

"**Malicious Code**" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware," "vulnerability" or adware (as such terms are commonly understood in the software industry) or any other code, which in each case is designed or intended to have any of the following functions: (a) disrupting, disabling, harming, or otherwise impeding in any unauthorized manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (b) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent.

"**Marketing Material**" means customary bank books (including a customary "public" and "private side" version), information or offering memoranda, rating agency presentations and other information packages regarding the business, operations and financial condition and prospects of the Assets and Assumed Liabilities, including all information relating to the transactions contemplated hereunder.

"**Master Assignment**" means the Master Assignment, Bill of Sale, Deed, and Conveyance substantially in the form attached hereto as Exhibit A.

"**Material Adverse Effect**" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have a material adverse effect on the value, operation or financial condition of the Business or the Assets or Assumed Liabilities, considered as a whole, (b) would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated hereby or (c) is or would reasonably be expected to be materially adverse to the ability of the Business to operate immediately after the Closing substantially in the manner as the Business was operated immediately prior to the Closing; *provided* that, no effect arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect under the foregoing clause (a): (i) any change in the United States or foreign economies, financial markets, credit markets, commodity markets or

political conditions; (ii) any change that generally affects the businesses or areas in which the Business operates, including changes in the prices or industry margins of the products sold, and the raw materials used by, the Business or any increase in operating costs or capital expenses; (iii) any change arising in connection with hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action; (iv) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic (including the COVID-19 pandemic), other outbreak of illness or public health event (whether human or animal) and any other force majeure events; (v) any change or proposed change in Applicable Law or accounting rules (or the interpretation or enforcement thereof); (vi) any action taken or proposed to be taken by Buyer or any of its Affiliates; (vii) any effect resulting from the public announcement of this Agreement or the consummation of the transactions contemplated by this Agreement, the identity of Buyer or any facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's plans or intentions with respect to the conduct of the Business; (viii) any effect resulting from the filing or continuation of the Bankruptcy Cases, including the Selling Entities' inability to pay its obligations as a result of the filing of the Bankruptcy Cases and any Orders of, or action or omission approved by, the Bankruptcy Court (or any other Governmental Authority of competent jurisdiction in connection with any such Proceeding); (ix) any action taken (or omitted to be taken) at the request or with the consent of Buyer or any of its Affiliates; (x) any failure to meet any projections, budgets, forecasts, estimates, plans, predictions, performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (xi) any matter disclosed on Schedule 1.01(c) and (xii) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is required, expressly contemplated by this Agreement; *provided however*, that, in the case of clauses (i), (ii), (iv) and (v), such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such effects have a disproportionate adverse effect on the Business, the Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses in the dairy industry in the United States of comparable size.

"**Material Contracts**" has the meaning set forth in Section 5.10(a).

"**Multiemployer Plan**" means a "multiemployer plan" as defined in section 3(37) of ERISA in which a Selling Entity has an interest or to which a Selling Entity contributes or contributed.

"**Necessary Consent**" has the meaning set forth in Section 2.06(a).

"**Novation Agreement**" means the novation agreement required by the FAR or similar state or local procurement regulations to transfer and assign to Buyer each Government Contract that requires novation to transfer and assign such Government Contract to Buyer.

"**Order**" means any award, writ, injunction, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority or arbitrator.

"**Outside Date**" has the meaning set forth in Section 12.01(b)(i).

"**Owned Intellectual Property**" means all Intellectual Property to the extent owned or purported to be owned by Seller or any of its Subsidiaries and used or held for use in connection with the operation of the Business.

"**Owned Real Property**" has the meaning set forth in Section 5.14(a).

"**Party**" and "**Parties**" each have the meaning set forth in the introductory paragraph.

"**Party Affiliate**" has the meaning set forth in Section 13.12(a).

"**Patents**" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisional, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

"**Pcard Balance Obligations**" means the obligations to repay outstanding pcard balances under the RCF Facility or the TLA Facility as of the Closing Date.

"**Pension Plan**" means any Seller Benefit Plan (other than any Multiemployer Plan) that is subject to Title IV of ERISA, Section 412 of the Code, or Section 302 of ERISA.

"**Permits**" means any approvals, authorizations, consents, licenses, permits, registrations, certificates, waivers, exemptions, variances, privileges, orders, rulings, agreements and other concessions issued by or with any Governmental Authority.

"**Permitted Encumbrances**" means any of the following:

(a)     any rights, obligations, or duties reserved to or vested in any municipality or other Governmental Authority to: (i) control or regulate any Asset in any manner, including all Applicable Laws, (ii) purchase, condemn, expropriate, or recapture any Asset, (iii) consent to a purchase of any Asset, including the Necessary Consents, or (iv) use any Asset in any manner;

(b)     easements, rights-of-way, servitudes, Permits, surface leases, sub-surface leases, grazing rights, logging rights, ponds, lakes, waterways, canals, ditches, reservoirs, equipment, pipelines, utility lines, railways, streets, roads, structures and similar rights on, over or in respect of any of the Assets which, in each case, do not (or could not reasonably be expected to) materially impair the ownership, operation or use of the impacted Asset(s) as currently owned, operated and used;

(c)    immaterial defects or irregularities of title (i) as to which the relevant statute(s) of limitations or prescription would bar any attack or claim against any Selling Entity's title, or (ii) consisting of the failure to recite marital status or omissions of heirship proceedings in documents;

(d)    statutory liens or other Encumbrances for Taxes not yet due and payable or for unpaid Taxes being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP;

(e)    immaterial materialman's, mechanic's, repairman's, employee's, contractor's, operator's and other similar Encumbrances arising in the ordinary course of business;

(f)    any immaterial undetermined or inchoate liens or charges constituting or securing the payment of expenses that were incurred incidental to the operation or use of such Asset;

(g)    Assumed Liabilities;

(h)    Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, if any;

(i)    non-exclusive licenses of Intellectual Property granted in the ordinary course;

(j)    liens of any landlord under any Leases whether arising pursuant to the terms and conditions of the Leases or pursuant to statutory or common law;

(k)    liens created under The Perishable Agricultural Commodities Act (7 U.S.C. §§499a, et seq.) or the Poultry and Stockyards Act (7 U.S.C. §§181 et seq.) or under similar Applicable Law securing payment or performance to customers; and

(l)    any Encumbrances that will be released by the Sale Order.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Personal Information**" means any information that (i) relates to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his or her physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information, and (ii) is defined as "personally identifiable information" (PII), "personal information," "personal data," or other similar term (as applicable), within the meaning of any Applicable Laws in effect prior to, or as of, the Closing.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Post-Closing Covenant**" means any covenant to the extent required to be performed by any Selling Entity or by Buyer, as applicable, under this Agreement following the Closing.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"**Post-Petition KERP/KEIP Motion**" means the "Debtors' Motion for Order, Pursuant to sections 363(b) and 503(c) of the Bankruptcy Code: (I) Approving Key Employee Retention Plan, and Key Employee Incentive Plan, and (II) Granting Related Relief", dated May 8, 2020, that was filed on the docket of the Bankruptcy Cases.

"**Post-Petition KERP/KEIP Plans**" means the "KERP" and "KEIP" (each as defined and as outlined and subsequently approved by the Bankruptcy Court in the Post-Petition KERP/KEIP Motion) for the KERP and KEIP as proposed in the Post-Petition KERP/KEIP Motion.

"**Pre-Closing Tax Period**" means any Tax period ending before or on the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"**Prime State or Local Government Contract**" means a Government Contract directly with a state or local Governmental Authority pursuant to which a Selling Entity is the prime contractor (and not a subcontractor) under such Government Contract.

"**Prime U.S. Government Contract**" means a Government Contract directly with the U.S. Government pursuant to which a Selling Entity is the prime contractor (and not a subcontractor) under such Government Contract.

"**Privacy Policies**" has the meaning set forth in Section 5.12(j).

"**Proceeding**" means any Claim, action, arbitration, audit, appeal, counterclaim, petition, inquiry, investigation, complaint, hearing, litigation, suit, examination or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before (or, in the case of threatened proceedings, that would be commenced, brought, conducted or heard by or before) any Governmental Authority or arbitrator.

"**Property Taxes**" means all real property Taxes, personal property Taxes, similar ad valorem Taxes or other similar periodic Taxes not based on income or receipts.

"**PTO**" means paid vacation, paid sick-leave and other paid time off.

"**Public Software**" means any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, "copyleft," open source code software (e.g., Linux) or similar licensing or distribution models, including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (a) GNU General Public License (GPL) or Lesser/Library GPL (LGPL), (b) the Artistic License, (c) the Mozilla Public License, (d) the Netscape Public License, (e) the Sun Community Source License (SCSL), (f) the Sun Industry Standards Source License (SISSL), (g) the BSD License, (h) the Apache License, or (i) any other license described by the Open Source Initiative as set forth at www.opensource.org.

"**Purchase Price**" has the meaning set forth in <u>Section 3.01</u>.

"**RCF Facility**" means that certain prepetition revolving credit facility under the Credit Agreement in the original aggregate principal amount of up to $60,000,000, which, by amendment, was increased to $70,000,000, and which includes a $25,000,000 subfacility for the issuance of letters of credit, at any time outstanding.

"**RCF Lenders**" means the lenders under the RCF Facility from time to time.

"**Real Property Interests**" has the meaning set forth in <u>Section 2.01(b)(vii)</u>.

"**Records**" has the meaning set forth in <u>Section 2.01(b)(x)</u>.

"**Registered Intellectual Property**" has the meaning set forth in <u>Section 5.12(a)</u>.

"**Related Party Agreement**" means any Contract among any Selling Entity and any of its Affiliates and applicable to the Assets.

"**Release**" means any presence, release, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the environment.

"**Representative**" means, with respect to a particular Person, any director, officer, manager, direct or indirect member, direct or indirect partner, direct or indirect shareholder, employee, agent, consultant, advisor, investor, contractor, subcontractor or other equity holder or representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Information**" means all information with respect to business, operations, financial condition, and prospects of the Assets and Assumed Liabilities as may be reasonably requested by Buyer or the Debt Financing Sources in connection with the preparation of the Marketing Material, information reasonably requested in connection with the preparation of pro forma financial presentations or calculations in connection with the Debt Financing (whether pursuant to the documentation governing the Debt Financing or otherwise), and information as may be required to be delivered to satisfy a condition precedent under the Debt Financing.

"**Reserve Account**" has the meaning set forth in the Cash Collateral Order.

"**Reserve Account Cash**" has the meaning set forth in the Cash Collateral Order.

"**Restricted Name**" means any Borden Mark and any Trademark included in the Assets.

"**Retained Causes of Action**" means certain Causes of Action owned or belonging to the Selling Entities that are set forth in <u>Schedule 1.01(d)</u> delivered in accordance with <u>Section 13.15</u>.

"**Sale Order**" means an Order of the Bankruptcy Court, which Order is substantially in the form attached hereto as <u>Exhibit B</u>, with such changes as are required by the Bankruptcy Court to which Seller, Buyer, the Agent, the RCF Lenders and the TLA Lenders have consented.

"**Schedules Deadline**" has the meaning set forth in <u>Section 13.15</u>.

"**Seller**" has the meaning set forth in the introductory paragraph.

"**Seller Benefit Plans**" any (a) "employee benefit plan" as defined in section 3(3) of ERISA (whether or not subject to ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement or (c) other plan, agreement, policy, program, or arrangement providing for compensation, bonuses, profit-sharing, or other forms of equity, incentive or deferred compensation, PTO benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or post-employment or retirement benefits, in each case that is sponsored, maintained, contributed to or required to be maintained or contributed to or entered into by any Selling Entity for the benefit of any current or former employee, officer, director, or independent contractor of a Selling Entity.

"**Seller Credit Obligations**" has the meaning set forth in <u>Section 8.03(c)</u>.

"**Seller Related Party**" means the Selling Entities and Borden Dairy Holdings, LLC and each of their respective stockholders, partners, members, Affiliates, directors, managers, officers, employees, controlling persons and agents.

"**Seller Released Parties**" has the meaning set forth in <u>Section 13.12(b)</u>.

"**Seller Releasors**" has the meaning set forth in <u>Section 13.12(c)</u>.

"**Selling Entities**" has the meaning set forth in the introductory paragraph.

"**Straddle Period**" means any Tax period beginning before and ending after the Closing Date.

"**Sub-Agent**" means KKR Credit Advisors (US) LLC appointed as sub-agent of Agent pursuant to the Credit Agreement and AAL to submit and facilitate the execution of the Credit Bid.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) (a) has the power, through the ownership of securities or otherwise, to elect a majority of the board of directors or managers or similar managing body or (b) holds a majority of the outstanding equity interest.

"**Target Working Capital Asset Value**" has the meaning set forth in <u>Section 10.05</u>.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**", "**Taxation**" "**Taxing**") means all federal, state, local or non-U.S. taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property, unclaimed property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto, whether disputed

or not, and any obligations for the taxes of another Person, including pursuant to operation of Law or as a transferee or successor.

"**Tax Authority**" means any Governmental Authority charged with the administration of any Applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"**Tax Return**" means any return, declaration, report, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof) with a Tax Authority.

"**Third Party**" means any Person other than the Selling Entities, Buyer or any of their respective Affiliates.

"**TLA Facility**" means that certain prepetition term loan A credit facility under the Credit Agreement in the original aggregate principal amount of up to $30,000,000 at any time outstanding.

"**TLA Lenders**" means the lenders under the TLA Facility from time to time.

"**TLB Claims**" means any Claim held by the TLB Lenders that is derived from or based upon the TLB Facility.

"**TLB Deficiency Claim**" means the amount of the TLB Claims minus the amount set forth in the definition of "Credit Bid Amount".

"**TLB Facility**" means that certain prepetition term loan B credit facility under the Credit Agreement in the original aggregate principal amount of up to $175,000,000 at any time outstanding.

"**TLB Lenders**" means the lenders under the TLB Facility from time to time.

"**Trademark Assignment Agreements**" means the Trademark Assignment Agreement substantially in the form attached hereto as Exhibit C.

"**Trademarks**" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"**Transaction Documents**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement, including the Trademark Assignment Agreement, the Transition Services Agreement and the Master Assignment.

"**Transition Services Agreement**" means that Transition Services Agreement, substantially in the form agreed to by Buyer and Seller in good faith prior to the Closing and

entered into between Buyer and the Seller at the Closing to the extent Buyer and Seller determine one is appropriate.

"**Transfer Taxes**" has the meaning set forth in <u>Section 8.01(a)</u>.

"**Transferred Employees**" has the meaning set forth in <u>Section 8.04(a)</u>.

"**Transferred Permits**" has the meaning set forth in <u>Section 2.01(b)(ix)</u>.

"**Treasury Regulations**" means the regulations promulgated by the U.S. Department of the Treasury pursuant to the Code.

"**Trustee**" has the meaning set forth in <u>Section 13.14</u>.

"**USDA**" means the United States Department of Agriculture and any successor agency thereto.

"**U.S. Government**" means the United States government, including all executive agencies.

"**Working Capital Assets**" means an amount equal to the sum of Acquired Accounts Receivable plus Inventory as of the Closing Date.

Section 1.02    <u>Other Definitions and Interpretive Matters.</u>

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    *Calculation of Time Period*. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(ii)    *Dollars*. Any reference in this Agreement to "**Dollars**" or "**$**" means United States dollars.

(iii)    *Exhibits; Schedules; Disclosure Schedules*. All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)    *Gender and Number*. Any reference in this Agreement to gender includes all genders, and words imparting the singular number also include the plural and vice versa.

(v)  *Headings*. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)  *Accounting Terms*. All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.

(vii)  *Herein*. Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)  *Or*. The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

(ix)  *Including*. The word "including" or any variation thereof means "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)  *Statute*. Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Applicable Law, the reference to such Applicable Law means such Applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xi)  *Contract*. References to a Contract mean such Contract as amended from time to time.

(xii)  *Made Available*. The phrase "made available" means that an accurate and complete copy of the information or documents (for the avoidance of doubt, including all amendments thereto) (x) is available to Buyer in reviewable format in the Project Elsie folder on the electronic documentation site established by SmartRoom on behalf of the Selling Entities or (y) otherwise has been provided to Buyer, its equity holders or one or more of their Affiliates or Representatives, in each case, by 8:00 p.m. ET on the date that is one (1) Business Day prior to the date hereof.

(b)  *No Strict Construction*. Buyer, on the one hand, and the Selling Entities, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Buyer, on the one hand, and the Selling Entities, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

**ARTICLE 2**
**PURCHASE AND SALE**

Section 2.01    <u>Purchase and Sale</u>.

(a)    Upon the terms and subject to the conditions of this Agreement (including <u>Section 2.04</u> below), at the Closing, the Selling Entities will sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer will purchase, acquire and accept, the Assets, free and clear of all Encumbrances (other than items (a) through (k) of the definition of Permitted Encumbrances).

(b)    The "**Assets**" means all right, title and interest of Seller or any of its Subsidiaries, in, to or under all of their respective assets, rights, interests and properties (excluding the Excluded Assets), in each case, as the same exist as of the date of this Agreement and including any replacements of such assets prior to the Closing,  and any such assets acquired by Seller or any of its Subsidiaries after the date hereof, but prior to the Closing, including:

(i)    all plants, offices, and manufacturing, processing, distribution, storage, warehousing, stations, lands, garages, parking lots, docks, vaults and other facilities of Seller or of any of its Subsidiaries (collectively, the "**Facilities**");

(ii)    all equipment, machinery, vehicles, trucks, trailers, fixtures, supplies, furniture, leasehold improvements, and other personal, movable and mixed property of Seller or any of its Subsidiaries;

(iii)    without limiting <u>Section 2.01(b)(ii)</u>, all items of tangible personal property or equipment (including the Business IT Assets) owned, leased, or used (or held for use) by Seller or any of its Subsidiaries in connection with the Business;

(iv)    all inventory (including raw milk and cream, raw materials, ingredients, packaging and packaging materials, products in-process and finished products), along with any spare parts, chemicals or other supplies owned or used (or held for use) by Seller or any of its Subsidiaries, whether in transit to or from Seller or any of its Subsidiaries and whether in Seller's or any of its Subsidiaries' warehouses, distribution facilities, held by any Third Parties or otherwise (and whether or not reflected in Seller's or its applicable Subsidiary's balance sheet or other records), and all open purchase orders with suppliers, excluding any products shipped to Third Parties prior to the Closing Date;

(v)    all Acquired Accounts Receivable;

(vi)    the Acquired Cash;

(vii)    (A) the Owned Real Property set forth on <u>Schedule 2.01(b)(vii)</u> (the "**Acquired Owned Real Property**"), (B) the Leased Real Property set forth on <u>Schedule 2.01(b)(vii)</u> (the "**Acquired Leased Real Property**"), and all other rights-of-way, surface leases, surface use agreements, easements, real property interests, real rights, licenses, servitudes, Permits and privileges owned or held for use by Seller or any of its Subsidiaries prior to Closing, in each case constituting real property or a real property interest, together with the rights, tenements,

appurtenant rights and privileges relating thereto (collectively, the "**Real Property Interests**", together with the Acquired Owned Real Property and the Acquired Leased Real Property, the "**Acquired Real Property**");

(viii)    all Contracts that constitute, as of the Closing, Desired 365 Contracts (including expired and unexpired Leases) (collectively, the "**Assigned Contracts**");

(ix)    all transferable Permits of any Governmental Authority and transferable Orders of any Governmental Authority (in each such case, whether preliminary or final) required of Seller or any of its Subsidiaries for the ownership, operation or use of the Assets, including those Permits and Orders set forth on Schedule 2.01(b)(ix) (collectively, the "**Transferred Permits**");

(x)    all books, databases, files, records, plans, advertising and promotional materials, information, data and other similar items (other than the Excluded Records) in Seller's or any of its Subsidiaries' possession, whether in written or electronic or any other format (and including in each case any originals), and whether or not subject to attorney client privilege or similar protections, including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials, and, to the extent otherwise permitted by Applicable Law, all personnel files relating to the Transferred Employees (collectively, the "**Records**");

(xi)    all (A) rights, claims, accounts and causes of action (including Avoidance Actions and warranty and similar claims) of Seller or any of its Subsidiaries against any Persons other than any Seller Related Party (in each case regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) related to, associated with or arising out of the Assets or any products or services provided in connection therewith, and (B) rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by Seller or any of its Subsidiaries (regardless of whether such rights are currently exercisable) related to, associated with or arising out of the Assets or any products or services provided in connection therewith, in each case (A) and (B) regardless of when such right, claim, account or cause of action arose, other than the Retained Causes of Action;

(xii)    to the extent transferable, all current and prior insurance policies of any of Seller or any of its Subsidiaries relating to the Assets, the Assumed Liabilities, the Transferred Employees or the Business, and all rights and benefits of any of Seller or any of its Subsidiaries of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court relating to any debtor-in-possession financing obtained by the Selling Entities) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case subject to the limitations set forth in Section 8.09(c) and Section 8.09(d) and to the extent they are related to the Assets, the Assumed Liabilities or the operation of the Assets; *provided*, *however*, that the Assets shall not include assets set forth on Schedule 2.02(h);

(xiii)    the amount of and all rights to any proceeds received by Seller or any of its Subsidiaries in respect of (x) the loss, destruction or condemnation of any Assets,

regardless of when such loss, destruction or condemnation occurred, (y) any other damages or other losses involving or otherwise relating to any Asset, any Transferred Employee, or the Business, or (z) any Assumed Liabilities or the operation of such Assets;

(xiv)    all royalties, advance payments, prepayments, prepaid expenses, prepaid assets, security and other deposits or the like (other than income Taxes), in each case, related to the Assets, any Transferred Employee, any Assumed Liability or the Business, and made by or on behalf of Seller or its Subsidiaries before the Closing Date, to the extent related to the period after the Closing;

(xv)    all Owned Intellectual Property, all licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, all income, royalties and payments receivable in respect thereof, all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Owned Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any such Owned Intellectual Property;

(xvi)    the Seller Benefit Plans set forth on Schedule 2.01(b)(xvi) (the "**Assumed Plans**"), and in each case, all assets held with respect to the Assumed Plans, together with all funding arrangements related to such Assumed Plans (including all trusts, annuity contracts and insurance policies) and all related administrative services Contracts;

(xvii)    all Collective Bargaining Agreements (the "**Assumed CBAs**");

(xviii)    all goodwill and other intangible assets owned by the Seller or any of its Subsidiaries to the extent associated with the Assets and the Business, including all customer lists and relationships, all rights under any confidentiality agreements executed by any Third Party for the benefit of Seller or any of its Subsidiaries to the extent related to or associated with the Business, and all information and documents to the extent related thereto (other than the Excluded Records);

(xix)    all rights of Seller or any of its Subsidiaries under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with any current or former employees, or current or former directors, managers, consultants, independent contractors and agents of Seller or any of its Subsidiaries or any of their Affiliates or with Third Parties, in each case, to the extent  related to or associated with the Assets or the Business;

(xx)    all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement or rights of set off, in each case, related to or associated with the Assets or the Business;

(xxi)    any rights, claims or causes of action as of the Closing of Seller or any of its Subsidiaries relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Real Property Interests in respect of the Assets or the Business, as applicable, including without limitation the Borden Marks;

(xxii)   all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like (excluding prepaid income Taxes of Seller or any of its Subsidiaries), in each case, related to the Assets, any Transferred Employee, any Assumed Liability or the Business and made by or on behalf of Seller or its Subsidiaries before the Closing Date, to the extent related to the period after the Closing;

(xxiii)   all outside the ordinary course of business deposits made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Bankruptcy Cases related to the Assets, the Acquired Liabilities or the Business;

(xxiv)   the Post-Petition KERP/KEIP Plans; and

(xxv)    all other assets, rights, interests and properties used or otherwise held by Seller or its Subsidiaries at the Facilities.

Section 2.02   Excluded Assets. Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer, and the Selling Entities will retain all right, title and interest to, in and under the Excluded Assets. The term "**Excluded Assets**" means the following assets, rights, interests and properties of the Selling Entities:

(a)   any amounts (including the Purchase Price) paid or payable to Seller or any of its Subsidiaries pursuant to this Agreement or any other Transaction Document;

(b)   any shares of capital stock or other equity interests of Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries;

(c)   all minute books and other corporate books to the extent relating to a Selling Entity's organization or existence, and all stock ledgers, corporate seals and stock certificates of Seller or any of its Subsidiaries;

(d)   all Excluded Records;

(e)   all Excluded Contracts;

(f)   all rights to any credits, statements, rebates or reimbursement for any costs actually paid by Seller or any of its Subsidiaries, in each case attributable to any Excluded Contracts;

(g)   all rights of the Selling Entities to any income Tax refunds or credits attributable to any period (or portion thereof in the case of a Straddle Period) ending on or prior to the Closing Date;

(h)    (i) all insurance policies and rights to proceeds thereof that are non-transferable or to the extent they are related solely to the Excluded Assets, Excluded Liabilities or the operation of the Excluded Assets and (ii) the assets set forth on Schedule 2.02(h);

(i)    All Cash other than the Acquired Cash and any other cash explicitly assumed by, or otherwise owed or payable to, Buyer under the Transaction Documents (including any Cash payable by Seller to cure any shortfall with respect to the Working Capital Assets pursuant to Section 10.05);

(j)    all bank accounts (including, for the avoidance of doubt, the Reserve Account and the Good Faith Deposit Account), safety deposit boxes, lock boxes and securities accounts of Seller or any of its Subsidiaries, and (subject to Section 2.01(b)) the contents thereof;

(k)    all rights, claims or causes of action by or in the right of Seller or any of its Subsidiaries, on the one hand, against any current or former director or officer of Seller or any of its Subsidiaries, on the other hand;

(l)    the Retained Causes of Action, and all Avoidance Actions, including any rights, claims or causes of action as of the Closing Date of the Selling Entities or any of their Subsidiaries relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Real Property Interest in respect of the Assets, other than those described in Section 2.01(b)(xi);

(m)    any rights, claims or causes of action of Seller or any of its Subsidiaries under this Agreement or any other Transaction Document;

(n)    each 365 Contract that, as of the Closing, is not designated as a Desired 365 Contract;

(o)    the proceeds of the sale of any Excluded Assets;

(p)    all assets held with respect to all Seller Benefit Plans that are not Assumed Plans, together with all funding arrangements related to such Seller Benefit Plans (including all trusts, annuity contracts and insurance policies) and all related administrative services Contracts;

(q)    Excluded Accounts Receivable; and

(r)    those other properties and assets described on Schedule 2.02(r), as may be updated pursuant to Section 2.07.

Section 2.03    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume and agree to discharge, when due (either in accordance with their respective terms and subject to the respective conditions thereof or as otherwise provided herein), only the following Liabilities (collectively, the "**Assumed Liabilities**"), to the extent not paid or discharged prior to the Closing, and no others:

(a)    *Assigned Contract*s. All of the Selling Entities' Liabilities under the Assigned Contracts to the extent arising or attributable to any period after the Closing, and all

deductions and offsets against customer accounts receivables for discounts, returns, spoils, damages, shortages, short pays and promotions arising from sales to customers prior to the Closing Date that are expressly included in Schedule 2.03(d) or arising on or prior to the Closing to the extent requiring performance after the Closing (but excluding any liabilities under the False Claims Act or similar state or local Applicable Laws in connection with any Government Contracts);

(b)    *Cure Costs*. All Cure Costs set forth on Schedule 2.03(b) and required to be paid by Buyer pursuant to Section 2.05;

(c)    *Transferred Employees; Assumed Plans; Assumed CBAs*.  All Liabilities (i) owed to any Transferred Employee or (ii) arising under any Assumed Plans and Assumed CBAs in respect of any Transferred Employees, in each case (i) and (ii) solely, to the extent arising or attributable to any period after the Closing or, solely with respect clause (ii), arising on or prior to the Closing to the extent requiring performance after the Closing;

(d)    *Certain Administrative and Prepetition Claims*. Administrative Claims and other Claims of the Selling Entities (including Transferred Employee Claims related to PTO arising prior to Closing and Assumed Accounts Payable) expressly set forth on Schedule 2.03(d), each in an amount to be agreed upon by the Selling Entities and Buyer prior to the Closing, but in no event, together with the Designated Assumed Liabilities, less than the Designated Assumed Liabilities Minimum;

(e)    *Taxes*. 50% of the Transfer Taxes and all Liabilities for Taxes arising from the ownership or operation of the Assets by Buyer in Post-Closing Tax Periods, including as determined pursuant to Section 8.01(b);

(f)    *Post-Petition KERP/KEIP Plans*.  Any Liability existing as of the Closing under the Post-Petition KERP/KEIP Plans up to (i) $3.9 million minus (ii) any amounts previously paid by the Selling Entities on account of the Post-Petition KERP/KEIP Plans; and

(g)    *RCF and TLA Claims*. All (i) Obligations (as defined in the Credit Agreement), including, without limitation, Bank Product Obligations (as defined in the Credit Agreement), owed to the RCF Lenders arising out of, relating to, or in connection with the Credit Agreement, and other Claims held by the RCF Lenders that are otherwise derived from or based upon the RCF Facility, (ii) all Claims held by the TLA Lenders that are derived from or based upon the TLA Facility, and (iii) all claims and obligations owed to the RCF Lenders and the TLA Lenders under the Cash Collateral Order, collectively in an amount equal to $94,100,000 (it being understood that Pcard Balance Obligations, Agent Professional Fee Carveout Obligations and any other obligations (including any accrued but unpaid interest and associated fees, costs and expenses) required to be discharged in connection with the RCF Facility or the TLA Facility  shall remain obligations of, and shall be discharged at Closing by, the Selling Entities and not be "Assumed Liabilities"); *provided*, that it is understood and agreed that such $94,100,000 for all purposes hereof shall include outstanding letters of credit issued pursuant to the RCF Facility on behalf of the Selling Entities that have not  been drawn by the *beneficiaries* of such letters of credit at or prior to Closing, which letters of credit shall be either (as reasonably agreed to by the Agent) (x) secured at Closing by Buyer with cash collateralizing such letters of credit or (y) replaced at Closing by Buyer with replacement letters of credit issued pursuant to a new credit facility, and in

either case (x) and (y) liens collateralizing any such outstanding letters of credit shall be released as provided in Section 11.06, it being understood that, in the event of assumption and cash collateralization pursuant to clause (x), the assumed undrawn letter of credit may be replaced by Buyer at any time after the Closing by a replacement letter of credit issued pursuant to a new credit facility and upon the issuance of such replacement letter of credit, the requirement for cash collateral from Buyer set forth in clause (x) will cease and any cash collateral provided by Buyer pursuant to clause (x) (net of reasonable, documented fees and expenses incurred by the RCF Lender or the Agent, as applicable, in connection with the release of cash and substitution of a replacement letter of credit) shall be released to Buyer; it being understood that the release of such cash collateral shall not affect the fact that the amount of such letter of credit shall have been discharged at Closing.

Section 2.04   Excluded Liabilities.

(a)   Notwithstanding anything herein to the contrary and regardless of any disclosure to Buyer, Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge or in any other way be liable or responsible for any Liability whatsoever of Seller or any of its Subsidiaries (and Seller shall retain without any recourse whatsoever to Buyer), whether existing on the Closing Date or arising thereafter, or any other Liability arising in connection with any Asset or the Business other than the Assumed Liabilities (such Liabilities, collectively, the "**Excluded Liabilities**");

(b)   Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, which for the avoidance of doubt, include (i) all Liabilities arising, whether prior to, at or after the Closing, under or with respect to (x) any Multiemployer Plan (including any associated withdrawal liability or liability associated with any accumulated funding deficiency or (y) all Seller Benefit Plans (including any Pension Plan) other than any Assumed Plan Liabilities, (ii) any and all Liabilities for Taxes (except as explicitly set forth in Section 2.03(d) or (e)) (x) of or imposed on Seller or any of its Subsidiaries (or any Affiliate thereof) or (y) related or attributable to the Assets or the Business for any Pre-Closing Tax Period, (iii) all Liabilities relating to the Assets or the Business arising from or relating to any Environmental, Health and Safety Laws or the presence or Release of, or exposure to, any Hazardous Substance at, on, under or migrating from any Assets, to the extent arising or attributable to any period on or prior to the Closing including any Proceedings or Orders in respect of the foregoing (and including without limitation all fines, penalties or other obligations arising from or relating to any violation or alleged violation of Environmental, Health and Safety Laws first occurring or arising prior to the Closing), or otherwise relating to any properties at any time owned, leased or operated in respect of the Business that are not included within the definition of Assets, (iv) all accrued expenses related to any Company Employee that is not a Transferred Employee, (v) all Affiliates costs, (vi) all Excluded Accounts Payable, (vii) 50% of Transfer Taxes, (viii) any Administrative Claims not expressly assumed by Buyer pursuant to Section 2.03(d) and (ix) all Liabilities relating to the Excluded Assets.

Section 2.05   Cure Costs; Desired 365 Contracts.

(a)   Schedule 2.05(a) sets forth a complete list as of the date hereof of all 365 Contracts that Buyer intends to be assumed by Seller and assigned to Buyer pursuant to section

365 of the Bankruptcy Code at the Closing (the "**Desired 365 Contracts**"). Upon Closing, subject to the terms and conditions hereof, the Selling Entities will assign the Desired 365 Contracts to Buyer, and Buyer will assume all Assumed Liabilities pursuant thereto, and Buyer will pay or cause to be paid, pursuant to section 365 of the Bankruptcy Code and the Sale Order, all Cure Costs relating thereto as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order. Until after the Closing, the Selling Entities will not reject or seek to reject any 365 Contract without Buyer's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed). The Selling Entities shall, at Buyer's request, facilitate introductions to the counterparties to any 365 Contract, and Buyer may (during the period between the date hereof and Closing) discuss with each counterparty the terms on which Buyer is willing to assume such 365 Contract. Upon an agreement between Buyer and the applicable counterparty to a 365 Contract on the amount of cure costs that shall be payable in connection with Buyer's assumption of such 365 Contract, such amount shall be deemed to be the Cure Costs applicable to such 365 Contract for all purposes hereunder (and the Parties shall update Schedule 2.03(b) accordingly); *provided* that Buyer shall not agree to an amount of cure costs for any 365 Contract that exceed the Cure Costs applicable to such 365 Contract as set forth in (i) *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No.621], (ii) *Notice of Filing of First Amendment to Cure Schedule* [Docket No. 661]; and (iii) *Notice of Filing of Second Amendment to Cure Schedule* [Docket No. 742], without the written consent of Seller.

(b)     At any time prior to the Closing Date, Buyer will have the right, in its sole and absolute discretion, to provide written notice to Seller of Buyer's election to:

(i)     designate a 365 Contract (including any 365 Contract that is a Desired 365 Contract immediately before such designation) as an Excluded Contract, and upon such designation such 365 Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute an Asset); and

(ii)     designate a 365 Contract as a Desired 365 Contract, and upon such designation such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (x) such 365 Contract is added to the Assigned Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract, and (y) the assumption and assignment has been or is approved by the Bankruptcy Court (including through the Sale Order).

(c)     To the extent that Buyer makes a valid designation with respect to any 365 Contracts pursuant to clause (a) above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(d)     If Buyer exercises its rights in clause (a) above to designate a 365 Contract as a Desired 365 Contract or as an Excluded Asset (as the case may be), then the Parties acknowledge and agree that there will be no increase or reduction in the Purchase Price as a result of such designation or change in designation (except solely to the extent of the resulting change in Assumed Liabilities), nor will there be any delay to the Closing.

Section 2.06    <u>Assignment of Assets Subject to Consent Requirements</u>.

(a)    Notwithstanding any other provision of this Agreement to the contrary (but subject to <u>Section 4.03(f)</u>), this Agreement will not constitute an agreement to assign or transfer and will not implement the assignment or transfer of any Asset if such attempted assignment or transfer would not be permitted under Sections 363 or 365 of the Bankruptcy Code, a Third Party whose consent to such assignment or transfer is required objects to the assignment or transfer (solely to the extent such objection is not dismissed or otherwise resolved by the Bankruptcy Court) (such approval of such Third Party, a "**Necessary Consent**"), or it is determined by the Bankruptcy Court that the Seller is incapable as a matter of law of assigning that particular Asset. If the applicable Necessary Consent is not obtained or such assignment is not permitted pursuant to Sections 363 or 365 of the Bankruptcy Code as set forth in the preceding sentence, then such Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Assets, and there will be no reduction in the Purchase Price as a result thereof; *provided*, that for a period of six (6) months after the Closing Date, (x) the Selling Entities and Buyer will use their respective commercially reasonable efforts, at the sole expense of the Selling Entities and at no expense and without any Liability to Buyer, to obtain the Necessary Consents with respect to any such Asset (or any claim, right or any benefit arising thereunder) for the assignment or transfer thereof to Buyer as Buyer may reasonably request, and (y) the Selling Entities and Buyer will cooperate in good faith to, as promptly as practicable, to the extent feasible and without the need for any Necessary Consent, at the sole expense of the Selling Entities and without any Liability to Buyer, to enter into a mutually-acceptable agreement under which Buyer would obtain the benefits and assume the obligations under such Assets that Buyer would have obtained and assumed under this Agreement were it not for the need for the applicable Necessary Consent, including by subcontracting, sub-licensing, or, subject to the terms of the Leases, sub-leasing to Buyer, or by entering into an agreement pursuant to which the Selling Entities would enforce their rights with respect to such Asset for the benefit of Buyer, in each case with Buyer assuming each applicable Selling Entities' obligations with respect to such Asset. Upon the receipt after the Closing of any Necessary Consent applicable to any Asset, the Parties shall cooperate in good faith to transfer such Asset to Buyer as promptly as practicable in accordance with the terms of this Agreement, without any additional payment by Buyer (other than any applicable Cure Costs that would have been payable by Buyer had such Asset been transferred to Buyer at Closing).

(b)    The Parties recognize that, in accordance with the Federal Acquisition Regulation ("**FAR**") Part 42, Subpart 42.12, novation of the Prime U.S. Government Contract pursuant to a Novation Agreement is necessary for the transfer and assignment of the Prime U.S. Government Contracts to Buyer and that application for novation cannot be made until after the Closing and may take a substantial amount of processing time. The Parties also recognize that some state and local Governmental Authorities may have similar novation requirements with respect to Prime State or Local Government Contracts. Buyer and Seller shall each, within a reasonable amount of time after Closing, complete its respective portion of the documentation required for (i) novation of each Prime U.S. Government Contract by FAR 42.1204(c), and Buyer shall deliver its portion to Seller and (ii) novation of each Prime State or Local Government Contract that requires novation by applicable procurement regulations to transfer and assign each such Prime State or Local Government Contract to Buyer.  After Seller and Buyer have completed the novation packages in accordance with FAR 42.1204(c), Seller shall promptly submit the required novation packages to the appropriate contracting officers and provide copies thereof to

Buyer. Buyer and Seller will thereafter, promptly and in coordination with the other parties, respond appropriately to any requests from the contracting officers for additional information or documentation relating to such novation. Buyer and Seller shall keep the other fully informed, on a current and timely basis, as to the progress of the novation process and provide copies of all letters, correspondence, and other material documents to or from any Governmental Authority with respect thereto. Each Party shall use reasonable best efforts to render all reasonably necessary assistance to the other Party, and shall reasonably cooperate with the other Party, in pursuing and obtaining such novation and recognition in such manner as is reasonably requested; provided, however, that in seeking to obtain such novation and recognition, none of the Selling Entities shall be required to make any additional payment, incur any material cost or take any additional action not otherwise required under the terms of the applicable Prime U.S. Government Contract or Prime State or Local Government Contract or required in order to novate each Prime U.S. Government Contract and each Prime State or Local Government Contract. Until such time as the contracting officer for each Prime U.S. Government Contract and Prime State or Local Government Contract recognizes such transfer by entering into a Novation Agreement for such Prime U.S. Government Contract or Prime State or Local Government Contract, nothing in this Agreement will constitute a transfer, assignment, attempted transfer or an attempted assignment thereof.

(c)     Promptly following the Closing, with respect to each Government Contract, the Parties hereby agree to designate Buyer as the applicable Selling Entity's agent thereunder for all purposes such that, to the maximum extent permitted by Applicable Law, Buyer shall assume, agree to be bound by, and undertake to perform the terms and conditions contained in, such Government Contract as if Buyer were the original party thereto; *provided* that nothing herein shall be deemed to amend the terms of such Government Contract, and the designation of Buyer as agent of the applicable Selling Entity under such Government Contracts shall be at no cost to such Selling Entity, and *provided*, *further*, that failure to enter any Novation Agreements or other arrangements referred to in this Section 2.06(c) shall not constitute a cause for termination of this Agreement. Buyer shall, in the first instance, be responsible for communications with the Governmental Authority regarding any Government Contract subject to this Section 2.06(c). Buyer shall (to the extent permitted by Applicable Law) promptly inform Seller of the substance of any such material communications. In the event any Selling Entity has any material communications with a Governmental Authority regarding any Government Contract subject to this Section 2.06(c), Seller will include Buyer in any such communications; *provided* that circumstances may dictate that from time to time the Governmental Authority may initiate communications with a Selling Entity in such a manner that Seller cannot include Buyer from the outset in which cases the applicable Selling Entity shall use commercially reasonable efforts to limit the amount of material communication with the Governmental Authority until Buyer can participate and shall update Buyer promptly. Seller shall promptly forward to Buyer any written communications from a Governmental Authority, as applicable to, referring to or relating to any Government Contract subject to this Section 2.06(c). Buyer recognizes that if any Government Contract involves products, services or technical data subject to any Custom & International Trade Laws, Buyer shall be solely responsible for complying with any and all such Custom & International Trade Laws, including obtaining any registration or licenses required for the lawful export of any such items. The appointment of Buyer as agent with respect to each Government Contract shall be effective and binding upon the occurrence of the Closing and shall remain in full force and effect with respect to such Government Contract until (x) terminated by a Novation Agreement (or other agreement required by a Governmental Authority), at which point such Government Contract shall

be deemed an Assigned Contract assigned and assumed pursuant to this Agreement or (y) terminated by mutual written agreement of the Parties. In the event that any Government Contract does not become subject to a Novation Agreement (or other agreement required by a Governmental Authority), Seller and Buyer shall cooperate reasonably in good faith to, as promptly as practicable, at the sole expense of the Selling Entities and without any Liability to Buyer, enter into a mutually-acceptable arrangement under which Buyer would obtain the benefits and assume the obligations and bear the economic burdens associated with such Government Contract in accordance with this Agreement. For the avoidance of doubt, unless otherwise required by Applicable Law, the Parties agree, in the case of a Government Contract that is the subject of an arrangement described in this Section 2.06(c) to which a Selling Entity and Buyer are parties (x) to treat, for applicable Tax purposes, (A) Seller as the agent of Buyer and (B) Buyer as the owner of such purchased Asset and (y) not to take any position that is inconsistent with such treatment.

Section 2.07    Additional Excluded Assets.

(a)    Notwithstanding any other provision of this Agreement to the contrary, at any time prior to the Closing, Buyer will have the right, in its sole and absolute discretion, to provide written notice to the Selling Entities of Buyer's election to designate any right, property, interest or other asset (or portion thereof) as an Excluded Asset (including any such asset that was immediately prior to such designation an Asset), and upon such designation such asset will constitute an Excluded Asset for all purposes of this Agreement and any Liabilities associated therewith shall be Excluded Liabilities.

(b)    To the extent Buyer makes a valid designation with respect to any asset pursuant to clause (a) above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(c)    If Buyer exercises its rights in clause (a) above to designate an asset as an Excluded Asset, then the Parties acknowledge and agree that there will be no reduction in the Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing; *provided*, that either such designation may increase or decrease (as applicable) the Purchase Price solely to the extent of the Assumed Liabilities.

Section 2.08    Misallocated Assets. If after the Closing (a) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities (or receives any payment relating to any Excluded Asset), or (b) Seller or any Subsidiary of Seller holds any Assets or Assumed Liabilities (or receives any payment relating to any Asset), Buyer or Seller (or the applicable Subsidiary of Seller), as applicable, will promptly transfer (or cause to be transferred) such assets, remit (or cause to be remitted) such payments, or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party. Prior to any such transfer, the Party receiving or possessing any such asset or payment will hold it in trust for the benefit of such other Party.

Section 2.09    Further Assurances. From time to time following the Closing, the Parties will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be

reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Selling Entities and their respective successors and assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby; *provided* that nothing in this Section 2.09 will prohibit Seller or any Subsidiary of Seller from ceasing operations or winding up its affairs following the Closing.

Section 2.10   Withholding. Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Selling Entity or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment; *provided* that Buyer shall provide the Selling Entities notice of any amounts it intends to withhold and Buyer and the Selling Entities shall work together in good faith to minimize any such withholding. To the extent that amounts are so withheld and paid to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE 3
## PURCHASE PRICE

Section 3.01   Purchase Price. The aggregate purchase price for the purchase, sale, assignment and conveyance of the Selling Entities' respective right, title and interest in, to and under the Assets will consist of the following (collectively, the "**Purchase Price**"):

    (a)    the Credit Bid in the amount of the Credit Bid Amount;

    (b)    all of the TLB Lenders' Adequate Protection Liens and Claims;

    (c)    the assumption of the Assumed Liabilities; and

    (d)    without duplication, the assumption of the Cure Costs (to the extent payable under Section 2.05) and of the Administrative Claims set forth on Schedule 2.03(d).

The Purchase Price will be delivered by Buyer as set forth in Section 4.02(a).

## ARTICLE 4
## CLOSING

Section 4.01   Closing Date. Subject to the satisfaction of the conditions set forth in Article 9, Article 10 and Article 11 hereof (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail on the date that is two (2) Business Days after the satisfaction or waiver of the conditions set forth in Article 9, Article 10 and Article 11 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions); *provided* that the Closing shall in any event take place (i) no earlier than July 18, 2020, without the written consent of Buyer in its sole discretion and (ii) on or before

the Outside Date. The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date.**" For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Closing Date.

Section 4.02    Buyer's Deliveries. At the Closing, Buyer will deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)    the Purchase Price, in the form of the Credit Bid, in form reasonably satisfactory to Seller;

(b)    a Master Assignment and each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer;

(c)    the certificates of Buyer to be received by Seller pursuant to Section 11.01 and Section 11.02; and

(d)    such other documents, writings, assignments and other instruments as Seller may reasonably request or as may otherwise be necessary to evidence or effect the sale, assignment, transfer, conveyance and delivery of the Assets to Buyer and assumption of Assumed Liabilities by Buyer.

Section 4.03    The Selling Entities' Deliveries. At the Closing, the Selling Entities will deliver to Buyer:

(a)    a Master Assignment and each other Transaction Document to which a Selling Entity is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by such Selling Entity;

(b)    the certificates of the Selling Entities to be received by Buyer pursuant to Section 10.01 and Section 10.02;

(c)    a copy of the Sale Order as entered by the Bankruptcy Court;

(d)    possession of each Acquired Owned Real Property, together with duly executed special warranty deed (or the equivalent) deeds, or, with the written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, quit-claim (or the equivalent) deeds, in recordable form with regard to Acquired Owned Real Property;

(e)    a certificate of non-foreign status of each Selling Entity (or, if such Selling Entity is a disregarded entity within the meaning of Treasury Regulations section 1.1445-2(b)(2)(iii), the entity that is treated as the transferor of property for U.S. federal income tax purposes) meeting the requirements of Treasury Regulations section 1.1445-2(b)(2);

(f)    all Necessary Consents required for the transfer of the Borden Marks Licenses to Buyer (or Buyer's designee), in each case in form and substance reasonably satisfactory to Buyer;

(g)    all Permits and Certifications of Seller or any of its Subsidiaries, including all Permits related to Environmental, Health and Safety Laws, related to the Business or the ownership, operation or use of the Assets as historically owned, operated, or used (in all cases, other than those Permits that are not material to the operation of the Assets at Closing), which may be transferred or reissued to the Buyer following the use by Buyer and the Selling Entities of reasonable best efforts to cause such transfer or reissuance;

(h)    a certificate, delivered five (5) days prior to the Closing Date, duly executed by the chief financial officer and the chief executive officer of the Seller, given by him or her on behalf of Seller and not in his or her individual capacity, certifying as to Seller's good faith estimate of Working Capital Assets; and

(i)    such other documents, writings, assignments and other instruments as Buyer may reasonably request or as may otherwise be necessary to evidence or effect the sale, assignment, transfer, conveyance and delivery of the Assets to Buyer and assumption of Assumed Liabilities by Buyer.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Except as set forth in the Disclosure Schedules, each Selling Entity jointly and severally represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

Section 5.01    <u>Organization and Good Standing</u>. Each Selling Entity is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the limitations imposed on a Selling Entity as a result of having filed a petition for relief under the Bankruptcy Code, each Selling Entity has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Each Selling Entity is duly qualified, licensed or otherwise authorized to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification, licensing or authorization necessary, except for such failures to be so qualified, licensed, authorized or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    <u>Authority; Validity</u>. Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Selling Entity has the requisite power and authority necessary to enter into, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery and performance of this Agreement and such other Transaction Documents and the consummation by such Selling Entity of the transactions contemplated herein and therein have been duly and validly authorized and approved by the board of directors or other governing body, as applicable, of such Selling Entity and no other corporate proceedings on the part of such Selling Entity or vote of such Selling Entity's stockholders or members are necessary to authorize the execution and delivery by such Selling Entity of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by such Selling Entity and each other Transaction Document required to be executed and delivered by such Selling Entity at the

Closing will be duly and validly executed and delivered by such Selling Entity at the Closing. Subject to entry of the Sale Order and assuming the due authorization, execution and delivery by the other Parties, no other action on the part of such Selling Entity, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which such Selling Entity is or will be a party and this Agreement and such other Transaction Documents, when so executed and delivered, will constitute the legal, valid and binding obligations of such Selling Entity, enforceable against such Selling Entity in accordance with their respective terms, and, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

Section 5.03    Governmental Approvals; No Conflict. Except for (a) entry of the Sale Order, (b) notices, filings and consents required in connection with the Bankruptcy Cases, (c) any applicable notices, filings, consents, or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act, and (d) items listed on Disclosure Schedule 5.03, no Selling Entity is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Selling Entity of this Agreement and the other Transaction Documents to which it is or will be a party or the consummation or performance by such Selling Entity of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. When the consents and other actions described in the preceding sentence, including entry of the Sale Order, have been obtained and taken, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Selling Entity under (i) the certificate of incorporation, bylaws or other governing documents of such Selling Entity, (ii) any Order applicable to such Selling Entity or any of the Assets owned or held by it or on its behalf, (iii) any Applicable Law, or (iv) require any consent under, or give any Third Party any rights of termination, amendment, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities is a party as of the Closing and which constitutes an Asset or Assumed Liability, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation as a result of such Encumbrance will not be (x) material or (y) enforceable against such Asset or Assumed Liability following the Closing in accordance with the Sale Order.

Section 5.04    Financial Statements. Set forth on Disclosure Schedule 5.04 are copies of (x) audited consolidated balance sheet as of December 31, 2018 and January 4, 2020 and the related audited consolidated statements of operations, comprehensive income (loss), members' equity and cash flows for the fiscal years then ended, in each case, of Borden Dairy Holdings, LLC and its Subsidiaries, and (y) unaudited consolidated balance sheet (the "**Balance Sheet**") and the

26699695.1

167880993

related unaudited consolidated statements of operations and cash flows as of April 25, 2020 (the "**Balance Sheet Date**"), ((x) and (y), collectively, the "**Financial Statements**"). The Financial Statements fairly present in conformity with GAAP applied on a consistent basis, the consolidated financial position of Borden Dairy Holdings, LLC and its Subsidiaries as of the dates thereof and their consolidated results of operations, members' equity and cash flows for the periods then ended, subject, in the case of clause (y), to normal year-end adjustments that are immaterial.

Section 5.05    No Undisclosed Material Liabilities. As of the date hereof, there are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business, other than (a) Liabilities provided for in the Balance Sheet as of the Balance Sheet Date or disclosed in the notes thereto; (b) Liabilities incurred in the ordinary course of business, consistent with past practice, since the Balance Sheet Date (none of which is a material Liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation); (c) Liabilities incurred in connection with the transactions contemplated by this Agreement or disclosed in Disclosure Schedule 5.05; and (d) Liabilities that will constitute Excluded Liabilities. There are no obligations under leases that are Assigned Contracts and that are required to be capitalized in accordance with GAAP.

Section 5.06    Absence of Certain Changes. Except as set forth on Disclosure Schedule 5.06, from the Balance Sheet Date, the Business has been conducted, and the Assets have been maintained and operated, in the ordinary course and consistent in all material respects with past practices and there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.07    Legal Proceedings. Except for the Bankruptcy Cases and any adversary Proceedings or contested motions commenced in connection therewith, after giving effect to the Sale Order, there is no Proceeding or Order pending, outstanding or, to the Knowledge of each Selling Entity, threatened by any Person (or to the Knowledge of each Selling Entity, pending or threatened, against any of the officers, managers, directors or Company Employees of the Selling Entities with respect to their business activities on behalf of the Selling Entities), or to which the Selling Entities are otherwise a party, relating to the Business, the Assets or Assumed Liabilities (a) that is material to the Business or the Assets or that would reasonably be expected to give rise to any material Liability of Buyer or be materially adverse to the ownership or use by Buyer of the Assets after the Closing, as such Assets are presently owned and used (or held for use) by Seller and/or its Subsidiaries, as applicable, (b) that would challenge the validity or enforceability of the obligations of any Selling Entity under this Agreement and the other Transaction Documents to which it is or will be a party or (c) that is against any Selling Entity and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the other Transaction Documents. There is no Order enjoining any Selling Entity from engaging in or continuing any conduct or practice, or requiring such Selling Entity to take any material action, in connection with the ownership, lease, possession, use or operation of the Assets owned or held by such Selling Entity, and such Selling Entity is not, nor are any of its respective Affiliates, is subject to any outstanding Order relating to the Business, the Assets, or Assumed Liabilities other than, in each case, Orders of general applicability.

Section 5.08    <u>Compliance with Laws; Permits</u>.

(a)    The ownership and operation of the Business and the Assets by the Selling Entities is, and since January 1, 2017, has been, in compliance with all Applicable Laws, except as would not be material to the Business (*provided*, *however*, that the foregoing shall not be construed as a representation or warranty of non-infringement, misappropriation, or other violation of any Intellectual Property).  To the Knowledge of the Selling Entities, since January 1, 2017, none of the Selling Entities, nor any executive officer, member of the board of directors or member of the board of managers of the Selling Entities, has received any written notice of a material violation of any Applicable Laws by the Selling Entities or any written inquiry from any Governmental Authority regarding any such potential violation, the subject of which has not been substantially resolved.

(b)    (i) The Selling Entities have obtained all necessary material Permits, including Permits required under Environmental, Health and Safety Laws and Applicable Food Safety Laws, with regard to the ownership or operation of the Assets and the conduct of the Business, all such Permits are listed on <u>Disclosure Schedule 5.08(b)(i)</u>, and the Selling Entities have maintained such Permits in accordance with Applicable Law, (ii) since January 1, 2017, neither Seller nor any of its Subsidiaries has received written notice of material default under any such Permit, the subject of which has not been substantially resolved, or any pending or threatened cancellation of any such Permit and (iii) no material violations exist in respect of such Permits, except for such non-compliance and such facts, conditions or circumstances, the subject of which have been substantially resolved (including completion of all cure obligations on the part of Seller and any of its Subsidiaries).

Section 5.09    <u>Food Safety Matters</u>. Except as otherwise set forth on <u>Disclosure Schedule 5.09</u>, the Business is, and has been since January 1, 2017, conducted in material compliance with all Applicable Laws related to the development, cultivation, manufacture, production, import, export, packaging, packing, labeling, handling, storage, transportation, distribution, purchase, sale, advertising or marketing of food and related products (collectively, "**Applicable Food Safety Laws**"), except as would not be material individually or in the aggregate to the Business.  Without limiting the generality of the immediately preceding statement, since January 1, 2017, and except as otherwise set forth on <u>Disclosure Schedule 5.09</u>, and except as would not be material individually or in the aggregate to the Business:

(a)    neither Seller nor any of its Subsidiaries has sold or distributed any Food and Beverage Products, and there are not any Food and Beverage Products currently in inventory, which, in any material respect, are or were "adulterated," "misbranded," not permitted to be introduced into interstate commerce or otherwise violative within the meaning of the FDC Act, and/or under any other Applicable Food Safety Law;

(b)    all of the operations of the Business are and have been in compliance in all material respects with all Applicable Laws issued or implemented by the FDA, USDA, FTC, state departments of health, state departments of agriculture, and any other comparable Governmental Authority, including those related to recordkeeping, prior notice of imported food, food safety, hazard analysis and preventive controls, sanitary transportation, food additives, food contact substances, supplier verification, food facility registration, current good manufacturing practices,

allergen control, juice processing, food labeling and advertising, and the production, processing, and packaging of Grade A milk and milk products;

(c)      all of the operations of the Business are and have been in compliance with all Permits and Certifications that are currently held by Seller or any of its Subsidiaries or which are otherwise necessary for the operation of the Business or required pursuant to any Applicable Laws or which are necessary due to the packaging or labeling of any products;

(d)      neither Seller nor any of its Subsidiaries has been subject to any inspection identifying material violations of Applicable Food Safety Laws, FDA Form 483, warning letter, untitled letter, investigation, facility suspension, import refusal, or any other compliance or enforcement Proceeding, or other correspondence or notice alleging or asserting material noncompliance with any Applicable Food Safety Law, Permit or Certification, from or by any Governmental Authority (including the FDA, USDA, FTC, state departments of health, and state departments of agriculture) with respect to the Business or any Food and Beverage Product, nor are there any such Proceedings pending or threatened in writing or, to the Knowledge of the Selling Entities, facts or circumstances in existence that would reasonably be expected to result in any such notice or any such violation or liability;

(e)      since January 1, 2017, neither Seller nor any of its Subsidiaries has been excluded, suspended or debarred from participation under any government program with respect to the Business pursuant to any Applicable Food Safety Law;

(f)      since January 1, 2017, there have been no mandatory or voluntary product recalls, product withdrawals, field notifications or other notices of action relating to any lack of safety or regulatory compliance of or regarding any Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business, whether ordered by a Governmental Authority or undertaken voluntarily by any Selling Entity, and there have been no claims or other instances of the material presence of or exposure to any food contaminants or adulterants, food borne pathogens, food poisoning, pests, or other Hazardous Substance in or related to any such products, nor any other food-related conditions with respect to the Business;

(g)      since January 1, 2017, each Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, marketed, distributed or sold by or on behalf of the Business conforms in all material respects to any promises, claims or affirmations of fact made on the container or label for such product, in any advertising, marketing, or other related materials, or otherwise in connection with its distribution or sale (including, without limitation, all nutrition facts, ingredient statements, nutrient content claims, structure/function claims, health claims and to the extent that such products are being marketed as such, "non-GMO," "fresh," "organic," "all natural" or "natural," "sustainable," "U.S. grown," "Made in USA,"  "made with natural ingredients," "gluten free," "made with rBST-free milk," "kosher," "no corn syrup," "no artificial colors, flavors, or sweeteners," "nutritious" or with similar claims) and the Selling Entities possess appropriate certifications or scientifically reliable materials to substantiate all such promises, claims and affirmations of fact; and

(h)    each Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, marketed distributed or sold by or on behalf of the Business complies in all material respects with FDA's requirements in Title 21 of the Code of Federal Regulations section 100.100 for nonfunctional slack fill and with any other similar state or local requirements, and, to the Knowledge of the Selling Entities, no Selling Entity has received any written correspondence from any Person or Governmental Authority alleging that any Food and Beverage Product's container and/or packaging is deceptive because of nonfunctional slack fill.

Section 5.10    Material Contracts.

(a)    Disclosure Schedule 5.10 sets forth a complete list of 365 Contracts identified as of the date hereof that fall within the following categories (collectively, the "**Material Contracts**"):

(i)    any material lease or sublease of real property included as an Asset (whether a Selling Entity is lessor, sublessor, lessee or sublessee), to the extent such lease or sublease is in written form;

(ii)    other than purchase orders issued in the ordinary course of business, consistent with past practices, any Contract for the purchase or supply of goods or services providing for either (A) annual payments by the Business of $5,000,000 or more; or (B) annual receipts by the Business of more than $20,000,000 in any calendar year;

(iii)    any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement, or limited liability company agreement;

(iv)    any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which a Selling Entity or Buyer would have continuing obligations applicable to the Business or the Assets following the date of this Agreement;

(v)    any Contract where the Business is, and Buyer would be required to become, obligor or guarantor relating to indebtedness, except for any Related Party Agreements;

(vi)    any Contract containing covenants expressly limiting, individually or in the aggregate, in any material respect the freedom of the Business or Assets to compete with any Person in a product or line of business or operate in any jurisdiction;

(vii)    any Contract that contains exclusivity, requirements or similar provisions binding on the Business or the Assets;

(viii)    any Contract containing "most favored nation" provisions applicable to the Business or the Assets;

(ix)    each Collective Bargaining Agreement and each other Contract with any labor organization;

(x)     any Contract pursuant to which any of Seller or its Subsidiaries (A) licenses or is otherwise permitted by a Third Party to use any Intellectual Property material to the Business (other than any "shrink wrap," "commercially available software package" or "click through" license that is generally available on and actually licensed under standard terms) or (B) licenses any material Owned Intellectual Property to a Third Party (in each case (A) and (B), other than non-exclusive licenses contained in private label contracts or orders, non-disclosure agreements, distribution agreements, customer agreements, contract manufacturing agreements, material sponsorship agreements, advertising agency agreements, or insertion orders, in each case entered into in the ordinary course of business); or

(xi)    any Related Party Agreement.

(b)     Each Material Contract is a legal, valid and binding obligation of the Selling Entity party thereto and, to the Knowledge of such Selling Entity, the other parties thereto in accordance with its terms and conditions, and is enforceable against such Selling Entity except as such legality, validity and enforceability may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (iii) the obligation to pay Cure Costs. Except as caused solely by the commencement of the Bankruptcy Cases, to the Knowledge of each Selling Entity, no event has occurred or not occurred and no circumstance or condition exists, as a result of the action or inaction of any Selling Entity or the action or inaction of any Third Party which, with the passage of time or the giving of notice, or both, will, or would reasonably be expected to, (A) constitute a material default under or a material violation of any Material Contract, (B) cause the acceleration of any obligation of any Selling Entity or, to the Knowledge of each Selling Entity, any other party thereto or the creation of an Encumbrance upon any Asset or (C) give any Person the right to cancel, terminate or modify any Material Contract.

Section 5.11   Government Contracts.

(a)     Disclosure Schedule 5.11(a) sets forth, as of the date hereof, a correct and complete list of all (i) Prime U.S. Government Contracts, the period of performance of which has not yet expired or terminated or for which final payment has not yet been received, or for which the right of any Governmental Authority or higher tier contractor to review, audit or investigate has not expired; (ii) Government Contract Bids submitted to the U.S. Government; and (iii) Government Contracts pursuant to which Seller is currently or is reasonably likely to experience cost, schedule, technical or quality problems that could result in claims against Seller, any of its Subsidiaries, or any of their respective successors in interest, by a Governmental Authority, a prime contractor or a higher-tier subcontractor.  Seller has delivered, or timely will deliver, to Buyer true and complete copies of all active Government Contracts and of all Government Contract Bids, including any and all amendments and other modifications thereto, and has provided, or timely will provide, Buyer with access to true and correct copies of all documentation related thereto requested by Buyer. With respect to each Current Government Contract, Disclosure Schedule 5.11(a) additionally identifies: (1) the contract number; (2) the contracting agency, instrumentality or department of a Governmental Authority; and (3) the contract award date.

(b)       Except as set forth in Disclosure Schedule 5.11(b), (i) neither Seller nor any of its Subsidiaries has received any written or oral show cause, cure, deficiency, default or similar notice relating to Government Contracts, the period of performance of which has not yet expired or terminated or for which final payment has not yet been received, or for which the right of any Governmental Authority or higher tier contractor to review, audit or investigate has not expired ("**Current Government Contracts**"); (ii) no termination for default, cure notice or show cause notice has been issued or threatened and remains unresolved with respect to any Current Government Contract or Government Contract Bid; and (iii) no event, condition or omission has occurred or exists that would constitute grounds for any such actions. The representations and warranties in this paragraph are not limited to those contracts identified in Schedule 5.11(a).

(c)       (i) Seller and its Subsidiaries have fully complied with all terms and conditions of each Current Government Contract and Government Contract Bid to which it is a party, and has performed all obligations required to be performed by it thereunder; (ii) Seller and its Subsidiaries have complied with all statutory and regulatory requirements, including, without limitation, the FAR and any applicable agency-specific acquisition regulation and related cost principles, where and as applicable to Current U.S. Government Contract and the Government Contract Bids; (iii) the representations, certifications and warranties made by Seller and its Subsidiaries with respect to the Government Contracts or Government Contract Bids were accurate as of their effective dates, and Seller and its Subsidiaries have fully complied with all such certifications; and (iv) no Governmental Authority, prime contractor or higher-tier subcontractor under a Government Contract or any other Person has notified Seller or any of its Subsidiaries of any actual or alleged violation or breach of any statute, regulation, representation, certification, disclosure obligation, contract term, condition, clause, provision or specification.    The representations and warranties in this paragraph are not limited to those contracts identified in Schedule 5.11(a).

(d)       Neither Seller nor its Subsidiaries have taken any action or are a party to any dispute, claim or litigation, that could reasonably be expected to give rise to, or has received any allegations from employees, consultants or independent contractors with respect to any alleged act or omission arising under or relating to, (i) liability under the False Claims Act or similar state or local Applicable Laws, if any; (ii) a claim for price adjustment under the Truthful Cost or Pricing Data statutes or similar state or local Applicable Laws, if any; or (iii) any other request for a reduction in the price of any Current Government Contracts.  There exists no basis for a claim of any liability of any of Seller or any of its Subsidiaries by any Governmental Authority as a result of defective cost and pricing data submitted to any Governmental Authority.  The representations and warranties in this paragraph are not limited to those contracts identified in Schedule 5.11(a).

(e)       Except as set forth in Disclosure Schedule 5.11(e), (i) since January 1, 2017, neither Seller nor any of its Subsidiaries have undergone, and none of Seller or any of its Subsidiaries are currently undergoing, any audit, review, inspection, investigation, survey or examination of records relating to any Government Contracts; (ii) neither Seller nor any of its Subsidiaries has received written notice that it is or was the subject of, or has undergone, any investigation or review relating to any Government Contract; and (iii) no such audit, review, inspection, investigation, survey or examination of records is threatened or pending.

(f)    Neither Seller nor any of its Subsidiaries has any Federal Supply Service Multiple Award Schedule Current Government Contracts or similar state Multiple Award Schedule Current Government Contracts.

Section 5.12    Intellectual Property.

(a)    Disclosure Schedule 5.12(a)(i) sets forth a list of all registrations and applications for registration of the Owned Intellectual Property as of the date hereof (collectively, "**Registered Intellectual Property**"), setting forth for each item (i) the record owner, and, if different, the legal owner and beneficial owner of such item; (ii) the jurisdiction in which such item is issued, registered or pending; (iii) the issuance, registration, filing or application date and serial or identification number of such item; (iv) for domain names, the registrant, the registrar, and the expiration date, and (v) all payments and filings that are due, and all actions that must be taken, within three (3) months after the date hereof with respect to registering or maintaining each item of Registered Intellectual Property. The Registered Intellectual Property (x) has not been nor been instructed by any Selling Entity to be abandoned or canceled; and (y) has been maintained effective by all requisite filings and renewals.

(b)    The Selling Entities are the sole and exclusive owners of the Owned Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances). The Registered Intellectual Property that is the subject of a registration is subsisting and, to the Knowledge of each Selling Entity, valid and enforceable. Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, to the Knowledge of the Selling Entities, the Selling Entities possess rights to use all material Intellectual Property (other than Owned Intellectual Property) used or held for use in connection with the operation of the Business as currently conducted under valid and subsisting license agreements (the "**Licensed Intellectual Property**") free and clear of all Encumbrances (other than items (a) through (k) of the definition of Permitted Encumbrances), it being acknowledged by Buyer that the legality, validity and enforceability of any such license agreements may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally, or (ii) equitable principles of general applicability, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity. To the Knowledge of the Selling Entities, the Owned Intellectual Property together with the Licensed Intellectual Property constitutes all of the Intellectual Property necessary for the operation of the Business as currently conducted in all material respects.

(c)    No Proceedings are pending or threatened in writing against Seller or any of its Subsidiaries before a Governmental Authority with regard to the ownership or use by any Selling Entity of any Owned Intellectual Property, or the use or sublicense by Seller or any of its Subsidiaries of any Licensed Intellectual Property, or challenging the ownership, the right to use, sell, distribute, license or sublicense, or the validity, scope or enforceability of, any Registered Intellectual Property. To the Knowledge of each Selling Entity, the operation of the Business by Seller and its Subsidiaries does not infringe, misappropriate or otherwise violate, and, since January 1, 2017, has not infringed, misappropriated or otherwise violated, any Intellectual Property of any Person in any material respect. There are no judgments, orders or decrees to which Seller or any of its Subsidiaries is a party or, to the Knowledge of each Selling Entity, by which Seller or

any of its Subsidiaries is bound, that involve indemnification by Seller or any of its Subsidiaries with respect to infringement or misappropriation of any Intellectual Property by the development, marketing, sale, licensing or distribution of any products or services by the Business, or otherwise by the conduct of the Business. Neither Seller nor any of its Subsidiaries has received any written notice since January 1, 2017 alleging that the operation of the Business infringes, misappropriates, or otherwise violates the Intellectual Property of any other Person (including any notice inviting Seller or such Subsidiary to take a license under any Intellectual Property of any other Person or consider the applicability of any Intellectual Property of any other Person to the conduct of the Business).

(d)      To the Knowledge of each Selling Entity, no material Trademark that is Owned Intellectual Property infringes upon any Trademark owned, by any other Person for the same class of goods or services. To the Knowledge of each Selling Entity, no event or circumstance (including a failure to exercise adequate quality controls and an assignment in gross without the accompanying goodwill) has occurred or exists that has resulted in, or would reasonably be expected to result in, the abandonment of any material Trademark that is Owned Intellectual Property (whether registered or unregistered) used by Seller or any of its Subsidiaries in connection with the Business as currently conducted.  No Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property to the Knowledge of each Selling Entity, and no such actions are currently being asserted or threatened in writing against any Person by Seller or any of its Subsidiaries and neither Seller nor any of its Subsidiaries has sent any written notice since January 1, 2017 alleging that a Person has infringed, misappropriated or otherwise violated any Owned Intellectual Property that has not been resolved to Seller's reasonable satisfaction.

(e)      To the Knowledge of the Selling Entities, all former and current employees, consultants, advisors, agents and independent contractors employed or engaged by any Selling Entity in connection with the Business who have been involved in the creation, development, enhancement, improvement or modification of any material Owned Intellectual Property have entered into valid and binding agreements in which they have expressly assigned all of their rights, title and interest in and to such Owned Intellectual Property to the applicable Selling Entity, except as their legality, validity or enforceability may be limited by (1) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally, or (2) equitable principles of general applicability, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered at law or in equity. To the Knowledge of the Selling Entities, except as set forth in Disclosure Schedule 5.12(e), at no time during and in the course of the conception of or reduction to practice of any material Owned Intellectual Property was any developer, inventor or other contributor to such Owned Intellectual Property operating under any grants from any Governmental Authority, educational institution or private Third Party source; performing research sponsored by any Governmental Authority, educational institution or private Third Party source; utilizing the facilities of any Governmental Authority or educational institution; or subject to any employment agreement or invention assignment agreement or similar obligation with any Person other than the applicable Selling Entity or any of its Affiliates with respect to such conception or reduction to practice activities such that any such Governmental Authority, educational institution or private Third Party source has any ownership interest or exclusive rights to any such Owned Intellectual Property.

(f)    The Selling Entities have taken commercially reasonable steps to protect and maintain the confidentiality of any material trade secrets and know-how included in the Owned Intellectual Property or Licensed Intellectual Property, and to the Knowledge of the Selling Entities, there are no unauthorized uses or disclosures by the Selling Entities of any such trade secrets or know-how.

(g)    Except as set forth in Disclosure Schedule 5.12(g), no Selling Entity owns any proprietary software that is material to the operation of the Business. To the Knowledge of the Selling Entities, no Public Software is incorporated into or integrated with any proprietary software that is Owned Intellectual Property that (i) requires the licensing, disclosure or distribution of any source code of such software that is Owned Intellectual Property (other than source code that is a part of such Public Software), (ii) prohibits or limits the receipt of consideration in connection with licensing or otherwise distributing such software that is Owned Intellectual Property, (iii) except as specifically permitted by Law, allows any Person to decompile, disassemble or otherwise reverse-engineer such software that is Owned Intellectual Property, or (iv) requires the licensing or other distribution of such software that is Owned Intellectual Property (other than source code that is a part of such Public Software) to any other Person for the purpose of making derivative works.

(h)    Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, as set forth in Disclosure Schedule 5.12(h), or as otherwise stated in this Agreement or the Transaction Agreements, the execution and delivery by each Selling Entity of this Agreement, the Trademark Assignment Agreement and the other Transaction Documents to which it is or will be a party and the consummation of the transactions provided for herein and therein will not (i) result in the loss, limitation, termination or other impairment of, or give rise to any right of any Third Party to cancel, limit, terminate or otherwise impair in any material respect the right the operators of the Business currently have with respect to any Owned Intellectual Property or Licensed Intellectual Property; or (ii) violate any Data Security Requirements in any material respect.

(i)    To the Knowledge of each Selling Entity, the IT Assets that are owned or leased by any Selling Entity and used (or held for use) by each Selling Entity in connection with the Business (the "**Business IT Assets**") (i) since January 1, 2017, operate and perform and have been maintained in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted, in each case, in all material respects; (ii) since January 1, 2017, have not malfunctioned or failed in any material respect; and (iii) do not contain any Malicious Code in any material respect. Each Selling Entity has taken technical, physical and organizational steps reasonable in accordance with customary industry standards and practices to protect the confidentiality, integrity and security of material Business IT Assets (and all information and transactions stored or contained therein or transmitted thereby) from Malicious Code and from unauthorized use, access, interruption, modification or corruption in all material respects. Except as set forth in Disclosure Schedule 5.12(i), each Selling Entity has in place commercially reasonable data backup, data storage, material system redundancy and disaster avoidance recovery plans, as well as a commercially reasonable business continuity plan (whether or not in writing), in each case consistent with customary industry practices. To the Knowledge of each Selling Entity, since January 1, 2017, there have been no material and unauthorized intrusions or breaches of security with respect to the Business IT Assets, or, except for the Bankruptcy Cases and any adverse Proceedings or contested motions

commenced in connection therewith,  any claims or Proceedings initiated or threatened against any Selling Entity with regard to the use or maintenance of its Business IT Assets.

(j)       Each of the Internet websites owned or operated by the Selling Entities in connection with the Business and any other mechanism through which the Selling Entities collect Personal Information maintains a  publicly posted privacy statement or policy (the "**Privacy Policies**")  that accurately describes such Selling Entity's practices with respect to the collection, use and disclosure of Personal Information in all material respects and that complies in all material respects with all Applicable Laws, including, without limitation, Data Protection Laws. To the Knowledge of the Selling Entities, each Selling Entity's privacy practices conform and, since January 1, 2017, have conformed to the Privacy Policies and its own internal privacy policies, terms of use and guidelines related to information privacy and security, including with respect to the collection, use, disposal, disclosure, maintenance and transmission of Personal Information at the time such policies, terms of use or guidelines were in effect, in each case in all material respects. The Privacy Policies comply in all material respects with the Data Protection Laws with respect to the information regarding what Personal Information is collected, how it is used, how it is shared, how it is secured, and what (if any) preferences or choices users or data subjects have with regard to their Personal Information.

(k)       The Selling Entities take and have taken, since January 1, 2017, reasonable measures to ensure that Personal Information collected, stored or used by or on behalf of the Business is protected against unauthorized access, loss, damage use, sharing, modification, or other misuse in all material respects, and, since January 1, 2017, to the Knowledge of the Selling Entities, there has been no material unauthorized access, loss, damage use, sharing, modification, or other misuse of any such Personal Information by any Selling Entity in the conduct of the Business. Since January 1, 2017, no complaint or Proceeding relating to an improper use, unauthorized access or disclosure of, or a breach in the security of, any Personal Information with respect to the Business has been made or, is threatened in writing against any Selling Entity. Since January 1, 2017, no Selling Entity has been notified or, to the Knowledge of each Selling Entity, has been required by any Data Protection Laws or Privacy Policies to notify in writing, any Person of any material security breach or material unauthorized use or disclosure of Personal Information with respect to the Business. Since January 1, 2017, no Selling Entity has received any written notice of any claims, investigations (including investigations by a Governmental Authority) or alleged violations of Data Protection Laws with respect to Personal Information processed by such Selling Entity in the conduct of the Business.

(l)       Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which any of them is or will be a party and the consummation of the transactions provided for herein and therein will, to the Knowledge of the Selling Entities, comply with all Data Protection Laws and the Privacy Policies. To the Knowledge of the Selling Entities, no Selling Entity is prohibited by any applicable regulations or any Privacy Policy from providing Buyer with the Data (including the Personal Information) that has been, or will be, provided to Buyer on or after the Closing Date, in connection with the transactions contemplated by this Agreement.

Section 5.13    Environmental, Health and Safety Matters. Except as set forth in Disclosure Schedule 5.13:

(a)    The Assets and Business are, and since January 1, 2017 have been, in compliance with applicable Environmental, Health and Safety Laws in all material respects.

(b)    The Selling Entities hold all material Permits required under Environmental, Health and Safety Laws in connection with the ownership and operation of the Assets and Business, all such Permits are in full force and effect, and the Selling Entities are, and since January 1, 2017 have been, in compliance with such Permits in all material respects, and, to the Knowledge of the Selling Entities, no Legal Proceeding is pending or threatened to modify, terminate or revoke any such Permit.

(c)    No Selling Entity, with respect to the Assets or its operation of the Business, has received any written notice in the past three years alleging noncompliance with or violation of or material Liability under applicable Environmental, Health and Safety Law from any Governmental Authority or other Third Party, the subject of which has not been resolved and no Selling Entity, with respect to the Assets or the operation of the Business, has, since January 1, 2017, received any written request for information under or written notice alleging liability under the Comprehensive Environmental Response, Compensation and Liability Act or analogous Applicable Law.

(d)    Except as set forth in Disclosure Schedule 5.13(d), there is no Proceeding or Order pending, outstanding, or, to the Knowledge of the Selling Entities, threatened in writing against any Selling Entity, with respect to the Assets or its operation of the Business, pursuant to Environmental, Health and Safety Law.

(e)    There has been no Release by the Selling Entities of Hazardous Substances on, under, in, at, to or from any Owned Real Property or Leased Real Property or during the terms of such ownership, operation or lease, any property formerly owned, operated or leased by any Seller Entity in connection with the Assets or the operation of the Business, in each case in any amounts that would reasonably be anticipated to result in a requirement to take remedial action or to result in a material Liability under Environmental, Health and Safety Laws.

Section 5.14    Title.

(a)    Disclosure Schedule 5.14(a) sets forth a complete and accurate list of all of the Real Property Interests owned in fee by Seller or any of its Subsidiaries as of the date hereof (the Real Property Interests listed or required to be listed on Disclosure Schedule 5.14(a), the "**Owned Real Property**"), specifying the street address, current owner, and current use of each parcel of Owned Real Property. Each Selling Entity has good and valid fee simple title to all Owned Real Property identified on Disclosure Schedule 5.14(a), and, subject to the entry of the Sale Order, free and clear of all Encumbrances, except for Permitted Encumbrances. Except as set forth in Disclosure Schedule 5.14(a), no Selling Entity currently leases any parcel or any portion of any parcel of any Owned Real Property to any other Person.

(b)    Disclosure Schedule 5.14(b) sets forth a list of all Real Property Interests that are leased or otherwise occupied by Seller or any of its Subsidiaries as of the date hereof (the

Real Property Interests listed or required to be listed on Disclosure Schedule 5.14(b), the "**Leased Real Property**"), specifying the street address of each parcel of Leased Real Property. All written agreements for those parcels of Leased Real Property for which there are written leases are disclosed on Disclosure Schedule 5.14(b) (such written agreements, together with all amendments and modifications thereto, the "**Leases**"). Each of the Leases which are set forth in Disclosure Schedule 5.14(b) constitutes the legal, valid, binding and enforceable obligation of the applicable Selling Entity and is in full force and effect in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Applicable Laws relating to or affecting creditors' rights generally or general principles of equity (regardless of whether enforcement is sought in a Proceeding in equity or at law). The applicable Selling Entity has good and valid leasehold title to all of the Leased Real Property subject to Leases listed on Disclosure Schedule 5.14(b), and, subject to the entry of the Sale Order, free and clear of all Encumbrances, except for Permitted Encumbrances. Except as set forth in Disclosure Schedule 5.14(b), there is not any current sublease or assignment entered into by any Selling Entity in respect of the Leased Real Property or any portion thereof. The Selling Entities have made available to Buyer true, correct and complete copies of each Lease, including any and all amendments, modifications, renewals, extensions, commencement letters or related agreements thereto to the extent in the possession or control of the Selling Entities.

(c)     The Acquired Real Property constitute all of the real property rights owned, leased or occupied by the Selling Entities in connection with the ownership, operation and conduct of the Assets and the Business as currently owned, operated and conducted by the Selling Entities. All of the Acquired Real Property has access to a public road or right of way.

(d)     Except as set forth in Disclosure Schedule 5.14(d), there are no Permit, condemnation, expropriation, eminent domain or other Proceedings pending or, to the Knowledge of each Selling Entity, threatened, with respect to any Real Property Interest.

(e)     There are no assets or properties that are used in or necessary for the use or maintenance of the Acquired Real Property and the operation of the Business as currently operated that are not included in the Assets.

(f)     All water, sewer, gas, electric and telephone and all other utilities required for the use of the Acquired Owned Real Property are installed and serve the Acquired Owned Real Property.

Section 5.15    Matters Related to Assets; Casualty Losses.

(a)     All of the rights, properties, interests, equipment and other tangible and intangible assets that constitute personal property Assets are owned, leased or used (or held for use) by the Selling Entities and, subject to the entry of the Sale Order, are free and clear of all Encumbrances (other than items (a) through (k) of the definition of Permitted Encumbrances).

(b)     Except as set forth on Disclosure Schedule 5.15(b), all of the equipment, machinery, vehicles and other tangible assets that constitute Assets (other than Acquired Real Property Interests) are: (i) in good condition and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and

usage, (ii) not in need of any repairs, which, if not made, would materially and adversely affect the integrity or safety of such Assets, and (iii) suitable for use by the Selling Entities to conduct the Business as currently conducted by the Selling Entities with respect to such Assets, in each case in all material respects.

(c)    The Assets owned or used (or held for use) by the Selling Entities constitute all assets, properties, rights, privileges and interests of whatever kind or nature, real or personal or mixed, tangible or intangible, used or necessary, and such assets are sufficient, to operate the Facilities and conduct the Business as currently conducted by the Selling Entities, in all material respects, other than the operations and business conducted with respect to the Excluded Assets.

(d)    There has been no Casualty Loss (whether or not covered by insurance) materially affecting any of the Assets owned or used (or held for use) by Seller or any of its Subsidiaries that has not subsequently been completely repaired, replaced or restored.

Section 5.16    Inventory; Accounts Receivable and Payable.

(a)    The Inventory is in good and marketable condition and is saleable in the ordinary course of business, other than for normal discounts in the ordinary course of business and except that milk products are perishable, in each case, for which adequate reserves have been established in accordance with GAAP. The inventory set forth on the Balance Sheets was stated therein in accordance with GAAP applied on a consistent basis with the preparation of the Balance Sheets and present fairly, in all material respects, the inventory of each Facility as of the respective dates thereof.

(b)    All Accounts Receivable and Accounts Payable are reflected on the Balance Sheet and have arisen in the ordinary course of business. The Accounts Receivable (net of any allowances for doubtful accounts and reserves for discounts, returns, spoils, damages, shortages, short pays and promotions) and the Accounts Payable are reflected on the Balance Sheet in accordance in accordance with GAAP, consistently applied, in accordance with past practices, through the periods indicated and have arisen in the ordinary course of business and present fairly, in all material respects, the consolidated Accounts Receivable and Accounts Payable of the Selling Entities.

Section 5.17    Insurance. A true, correct and complete list of the material insurance policies related to the Business currently conducted by Seller and its Subsidiaries with respect to the Assets owned or held by Seller and its Subsidiaries (including policy periods and the amounts of coverage, limits and deductibles) as of the date hereof is attached hereto as Disclosure Schedule 5.17 (collectively, the "**Insurance Policies**"). To the Knowledge of the Selling Entities, all of the Insurance Policies are in full force and effect. To the Knowledge of the Selling Entities, no event has occurred, including the failure by Seller or if applicable, any such Subsidiary of Seller, to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which materially limits or impairs the rights of Seller or any of its Subsidiaries under any of the Insurance Policies. No material claim is outstanding under any of the Insurance Policies, and no carrier of any insurance policy of Seller or any such Subsidiary has asserted in writing any denial of coverage of any material claim.

Section 5.18    <u>Security Arrangements</u>. All of the bonds, letters of credit and guarantees posted by Seller or any of its Subsidiaries with Governmental Authorities or Third Parties and relating to the Assets owned or held by Seller or any Subsidiary are described on <u>Disclosure Schedule 5.18</u>.

Section 5.19    <u>Customers and Suppliers</u>.

(a)    <u>Disclosure Schedule 5.19(a)</u> contains a list of the ten (10) largest customers, including distributors, of the Business, taken as a whole, for the twelve (12) months ended May 31, 2020 (determined on the basis of the total dollar amount of sales) (collectively, the "**Major Customers**"), showing the total dollar amount of gross sales to each such Major Customer during such period.

(b)    <u>Disclosure Schedule 5.19(b)</u> contains (i) a list of the ten (10) largest suppliers of the Business, taken as a whole, for the twelve (12) months ended May 2020 (determined on the basis of the total dollar amount of purchases) (collectively, the "**Major Suppliers**"), in each case showing the total dollar amount of purchases by the Business with respect to milk or other products, as applicable, from each such Major Supplier during such period.

(c)    From the Balance Sheet Date through the date of this Agreement, no Major Customer or Major Supplier has terminated, materially reduced, or otherwise materially changed its business with the Selling Entities or, to the Knowledge of the Selling Entities, provided written notice to any Selling Entity stating that it intends to terminate, materially reduce or otherwise materially change its business with the Selling Entities.

Section 5.20    <u>Anti-Corruption</u>.

(a)    No Selling Entity, nor any of their respective Representatives or other Persons that act for or on behalf of any Selling Entity has, since January 1, 2017, in connection with or relating to the Business or the Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act or any other Applicable Law relating to anti-bribery (collectively, the "**Anti-Corruption Laws**"). The Selling Entities have in place and maintain policies, procedures and controls with respect to the Business that are reasonably designed to promote and ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any offense or alleged offense under Anti-Corruption Laws. To the Knowledge of each Selling Entity, none of the current officers, directors or employees of any Selling Entity is an employee of any Governmental Authority or of any instrumentality of a Governmental Authority.

(b)    The Business has been conducted and the Assets have been operated in compliance in all material respects with all applicable anti-money laundering and financial record-keeping and reporting laws. The Selling Entities have maintained and currently maintain (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific

authorization. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any actual or possible violation of any Applicable Law relating to anti-money laundering or financial record-keeping and reporting, and since January 1, 2017 there has been no such Proceeding.

Section 5.21    Brokers or Finders. Except for fees and expenses payable to PJT Partners, Inc. no Selling Entity has incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

Section 5.22    Employee Benefit Plans; Labor and Employment Matters.

(a)    Disclosure Schedule 5.22(a) contains a complete and accurate list of each material Seller Benefit Plan as of the date hereof. Seller has made available to Buyer a copy of, to the extent applicable, each material Seller Benefit Plan, and, to the extent applicable, (i) each trust, insurance, annuity or other funding Contract related thereto, (ii) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, (iii) the three (3) most recent annual reports on Form 5500 required to be filed with the Department of Labor with respect thereto, (iv) the most recent summary plan description and any summary of material modification with respect thereto, and (v) the most recent determination, advisory or opinion letter received from the Internal Revenue Service with respect to each Seller Benefit Plan intended to qualify under section 401 of the Code.

(b)    Each Seller Benefit Plan (and any related trust or other funding vehicle) has been maintained, operated and administered in material compliance with Applicable Laws and with the terms of such Seller Benefit Plan. There are no pending or, to the Knowledge of each Selling Entity, threatened in writing material investigations by any Governmental Authority with respect to, or termination proceedings or other material claims, suits or proceedings (except routine claims for benefits payable in the ordinary course) against or involving any Seller Benefit Plan.

(c)    Except pursuant to the Seller Benefit Plans or other agreements or arrangements listed on Disclosure Schedule 5.22(c), true and complete copies of which have been made available to Buyer, none of the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby (alone or in conjunction with any other event, including any termination of employment on or following the Closing) will (i) entitle any current or former Company Employee to any compensation or benefit, (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any material compensation or benefits for any current or former Company Employee or trigger any other material obligation under any Seller Benefit Plan, (iii) result in any material breach or violation of or default under, or limit Seller's or Buyer's right (with respect to any Assumed Plan or any Assumed Liabilities related thereto), to amend, modify or terminate, any material Seller Benefit Plan, or (iv) result in the payment of any "excess parachute payment" (as defined in Section 280G(b)(1) of the Code). No current or former Company Employee is entitled to receive any gross-up or additional payment in connection with the Tax required by Section 409A or Section 4999 of the Code.

(d)     Except as set forth on <u>Disclosure Schedule 5.22(d)</u>, with respect to each Pension Plan or any Multiemployer Plan that is or is required to be sponsored, maintained or contributed to, or has been sponsored, maintained or contributed to or required to be maintained or contributed to within the six years prior to the date of this Agreement, by Seller or any of its current ERISA Affiliates, (i) no withdrawal liability, within the meaning of Section 4201 of ERISA and which could reasonably be expected to result in Buyer or any of its Affiliates incurring any Liability, has been incurred, and (ii) no condition exists or event or transaction has occurred with respect to any such plan that could reasonably be expected to result in Buyer or any of its Affiliates incurring any Liability or a lien attaching to the Assets.

(e)     There are no material controversies, strikes, slowdowns, work stoppages or any other material labor disputes involving any Company Employee or the Business pending or, to the Knowledge of each Selling Entity, threatened in writing, nor have there been any such controversies, strikes, slowdowns, work stoppages or other material labor disputes in the past one (1) year. There are no (i) unfair labor practice charges or complaints or (ii) material grievances pending against any of Seller or its Subsidiaries before the National Labor Relations Board, any arbitrator, or any Governmental Authority with respect to any Company Employee or the Business.

(f)     <u>Disclosure Schedule 5.22(f)</u> contains a complete and accurate list of all Collective Bargaining Agreements. All Selling Entities and their respective Subsidiaries are in compliance in all material respects with all Applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the ordinary course of business of the Selling Entities), or any Taxes or penalties for failure to comply with any of the foregoing. All current and former Company Employees classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. Except as set forth in <u>Disclosure Schedule 5.22(f)</u>, there is no material employment- or labor-related claim pending against any Selling Entity or any of their Subsidiaries brought by or on behalf of any Company Employee or any Governmental Authority, and to the Knowledge of each Selling Entity, no such claim is threatened in writing. No Company Employee has been improperly excluded from participation in any Seller Benefit Plan, and, to the Knowledge of any Selling Entity, no Selling Entity nor any of their Subsidiaries has any material Liability with respect to the misclassification of any Person as an independent contractor rather than as a Company Employee. To the Knowledge of any Selling Entity, in the last three years, no allegations of sexual or other unlawful harassment or discrimination have been made against any Company Employee at a level of Vice President or above.

(g)     No later than ten (10) Business Days following the date hereof, but no later than five (5) Business Days prior to the Closing, Seller shall make available to Buyer a complete and correct list of all Company Employees as follows: (i) for Company Employees who are employees: name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether

paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; start date; service reference date (if different from the start date); work location (city and state); amount of accrued but unused paid vacation, paid sick leave and other paid time off by category; and an indication of whether or not such employee is on leave of absence; and (ii) for Company Employees who are independent contractors: name; job position or function; work location (city and state); hourly pay rate or other compensatory arrangement; hire date; regular hours per work week; term of engagement; and the total amount paid by the Selling Entities to such Person in 2019. All Company Employees are authorized to work in the United States.

Section 5.23    Taxes.

(a)    Seller and its Subsidiaries have timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed. All such Tax Returns are complete and accurate in all material respects. All material Taxes owed by any Selling Entity (whether or not shown on any Tax Return) have been paid. No material claim has ever been made (and remains unsolved) by any Tax Authority in a jurisdiction in which Seller or a Seller Subsidiary does not file Tax Returns that Seller or such Subsidiary is or may be subject to Taxation by that jurisdiction.

(b)    Except as set forth on Disclosure Schedule 5.23(b), there are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any liability for any material Taxes of Seller and its Subsidiaries. Neither Seller nor any of its Subsidiaries has waived any statute of limitations in respect of Taxes that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency.

(c)    No Asset (i) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the Code, (ii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iii) secures any debt the interest of which is tax-exempt under Section 103(a) of the Code or (iv) is subject to a 467 rental agreement as defined in Section 467 of the Code.

(d)    Neither Seller nor any of its Subsidiaries has been a party to a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or non-U.S. Tax law.

**ARTICLE 6**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.01    Organization and Good Standing. Buyer is a Delaware limited liability company, duly organized, validly existing and in good standing under the laws of its jurisdiction of formation. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Buyer is (or at the Closing will be) duly qualified, licensed or otherwise authorized to do business and is in good standing in the state(s) where the Assets are located and Buyer or Buyer's Affiliates will be duly

qualified, licensed or otherwise authorized to own or lease and to operate and use the Assets in the state(s) where the Assets are located other than where failure to be so qualified would not reasonably be expected to materially and adversely affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby. Buyer has made available to Seller true and correct copies of Buyer's certificate of formation as in effect as of the date hereof and as of the Closing, as applicable.

    Section 6.02 <u>Authority; Validity; Consents</u>. Buyer has the requisite power and authority necessary to enter into, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and such other Transaction Documents to which it is a party and the consummation by Buyer of the transactions contemplated herein and therein have been duly, validly authorized and approved by all necessary company action of Buyer and no other entity proceedings on the part of Buyer or vote of Buyer's equity holders are necessary to authorize the execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party that is required to be executed and delivered by Buyer at the Closing will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. No other action on the part of Buyer, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which Buyer is a party and this Agreement and the other Transaction Documents to which Buyer is a party constitute (or upon execution will constitute) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

    Section 6.03 <u>Governmental Approvals; No Conflict</u>. Except for (a) any applicable notices, filing, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act and (b) any items listed on <u>Disclosure Schedule 6.03</u>, Buyer is not and will not be required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to adversely affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby. When the consents and other actions described in the preceding sentence have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Buyer under (i) the certificate of formation, limited liability company agreement or other governing documents of Buyer, (ii) any

Order applicable to Buyer or its assets, (iii) any Applicable Law, or (iv) any agreement, indenture, bond, debenture, note, mortgage or other instrument to which it or its assets is bound, except in the case of (iii) and (iv)  as would not, individually or in the aggregate, reasonably be expected to materially and adversely affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby

Section 6.04    Legal Proceedings. There are no Proceedings or Orders pending or outstanding or, to the Knowledge of Buyer, threatened by any Person, that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to delay the Closing or have an adverse effect on Buyer's performance of any of its obligations and covenants under this Agreement and the other Transaction Documents to which it is a party that are to be performed prior to, at or after Closing.

Section 6.05    Bankruptcy. There are no bankruptcy, reorganization or arrangement Proceedings pending, being contemplated by or, to the Knowledge of Buyer, threatened against Buyer.

Section 6.06    Brokers or Finders. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller or any of it is Subsidiaries is or will become liable.

Section 6.07    Financing. Buyer will have available to it at the Closing sufficient cash or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

Section 6.08    Independent Evaluation. Buyer is (a) experienced in the evaluation, purchase, ownership and operation of assets of the types and natures consistent with those used in the operations of the Business and the Assets and aware of the risks associated with the purchase, ownership and operation of such assets and interests related thereto, (b) capable of evaluating, and hereby acknowledges that it has so evaluated, the merits and risks of the Assets, ownership and operation thereof and its obligations hereunder, and (c) able to bear the economic risks associated with the Assets, ownership and operation thereof and its obligations hereunder. Buyer acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and the other Transaction Documents and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of the transactions contemplated by this Agreement

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01    Access and Reports.

(a)    From the date hereof through Closing, subject to Applicable Laws, upon the reasonable request from Buyer of any such activities, each Selling Entity will afford Buyer's officers and other authorized Representatives reasonable access, during normal business hours,

(i) to its officers, employees, consultants and authorized Representatives (including its legal advisors and accountants), (ii) to all books, records and other documents and data in the locations in which they are normally maintained, and to make copies of all such books, records, and other documents to the extent relating to the Assets or the Assumed Liabilities, (iii) to any reasonably available financial and operating data and other information in connection with the Assets or the Business and (iv) to all offices, plants, buildings, facilities and other physical locations and properties included in the Assets, to make such investigation and physical inspection of the Assets and the Assumed Liabilities as it reasonably requests; *provided* that, in connection with such access, Buyer's authorized Representatives will (x) abide by any reasonable health or safety rules, regulations and operating policies provided in writing by Seller or its Representatives in advance of such visit and (y) at Seller's option, be accompanied by at least one (1) Representative of Seller, and that any such investigation or physical inspection shall not be invasive in any respect (unless Buyer obtains Seller's prior written consent, which shall not be unreasonably, withheld, conditioned or delayed), and in any event shall be conducted in accordance with standards customarily employed in the industry and in compliance with all Applicable Laws. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would unreasonably interfere with the conduct of the business of the Selling Entities or would require a Selling Entity to disclose information that would violate the attorney-client privilege or any other applicable privileges or immunities; *provided* that the Selling Entities use reasonable effort to disclose such information without disclosing the privileged information (for example, by redacting such information as reasonably necessary to avoid such violation) or to enter into a mutually-agreeable joint defense agreement or similar agreement to allow for the disclosure of such information without the loss of such applicable privileges or immunities.

(b)     Buyer acknowledges that information provided to it in connection with this Agreement, including under Section 7.01(a), may be subject to applicable contractual confidentiality obligations, and shall be subject to the terms of the confidentiality agreement, dated April 3, 2020 between Seller and Capitol Peak Partners (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference. Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or pursuant to other applicable contractual confidentiality obligations, or otherwise.  Notwithstanding the foregoing, nothing in this Section 7.01(b) shall prevent a Party from disclosing information to (i) its legal, accounting, financial or tax advisors, (ii) its existing and prospective direct and indirect partners, stockholders and members, its existing and prospective lenders and investors, or to its managers or (iii) to the extent permitted in accordance with, the Confidentiality Agreement or other applicable contractual confidentiality obligations.

Section 7.02   Operations Prior to the Closing Date. Except (a) as otherwise expressly contemplated by this Agreement, (b) as set forth on Schedule 7.02, (c) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed), or (d) as otherwise required by Applicable Laws or any Governmental Authority, from

the date hereof until the Closing Date or the earlier termination of this Agreement in accordance with its terms:

      (i)    Seller will, and will cause its Subsidiaries to, operate the Facilities and other Assets operated by Seller and its Subsidiaries in the ordinary course of business, consistent with past custom and practice, in all material respects and to maintain, or cause to be maintained, all Assets in good working order and condition (ordinary wear and tear excepted) (including, without limitation, conducting all inspections and acts of service and repair with at least the level of care and frequency required to comply with (x) manufacturer recommendations or guidelines or (y) customary and generally accepted industry practice for similar assets as the applicable Asset), and Seller shall, and shall cause each of its Subsidiaries to, use reasonable best efforts to (A) maintain books, accounts and records relating to such Assets in accordance with past custom and practice in all material respects, (B) preserve intact the business organizations of Seller and its Subsidiaries, (C) preserve its current relationships with Third Parties, including suppliers, vendors, customers, clients and contractors, in each case to the extent related to the Assets or related to the Business (including with respect to sales of products and volumes of production) and keep available the services of Company Employees who are employed as of the date hereof, consultants and agents of the Selling Entities in connection with the services such persons provide in respect of the Assets and the Business in the ordinary course of business, and (D) comply with all Applicable Laws and Orders applicable to the Assets or the Business and give prompt notice to Buyer of any notice of any material damage or any material Casualty Loss and any notice received or made by Seller of any claim asserting any material tort or violation of Applicable Law or any new Proceeding that (in each case) relates to such Assets or the Business; and

      (ii)    without limiting the foregoing, Seller will not, and will cause its Subsidiaries not to, do any of the following solely with respect to the Assets or the Business without the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned):

      (A)    liquidate, dissolve, recapitalize or otherwise wind up its operations related to the Assets or of the Business;

      (B)    terminate, cancel, materially amend or modify, grant a waiver or consent with respect to or extend any Material Contract or any contract identified in Schedule 5.11(a), or enter into any Contract that would be a Material Contract or a contract identified in Schedule 5.11(a), in each case other than in the ordinary course of business consistent with past practice;

      (C)    (1) sell, lease, transfer, abandon, permit to lapse, fail to maintain, exclusively license, assign or otherwise dispose of any Assets, except for the sale of inventory to a Third Party in the ordinary course of business consistent with past practice; or (2) effect any sale (whether by merger, consolidation, acquisition of stock or assets or otherwise) of the Business;

(D) disclose or allow to be disclosed to any Third Party any material confidential information included in the Assets, other than to employees of the Selling Entities subject to a confidentiality or non-disclosure covenant protecting against further disclosure thereof;

(E) acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any assets, securities, properties, interests or businesses for the conduct of the Business, in each case other than pursuant to existing Contracts or in the ordinary course of business consistent with past practice;

(F) other than as permitted by Section 7.02(ii)(E), make any material loans, advances or capital contributions to, or investments in, any other Person (other than any Subsidiary of Seller) with respect to the Business, other than advances to employees in the ordinary course of business consistent with past practice;

(G) subject any of the Assets to any Encumbrances, except for Permitted Encumbrances;

(H) enter into any agreement or arrangement that materially limits or otherwise restricts in any respect the conduct of the Business or the use or saleability of the Assets or that would reasonably be expected to, after the Closing Date, limit or restrict in any material respect the Business or Buyer's use of the Assets;

(I) change its accounting methods, policies or practices, in each case as they relate to the Assets;

(J) commence, settle or propose to settle any Proceedings that could reasonably be expected to materially diminish the value of the Assets or impair title thereto;

(K) other than as required by Applicable Law or by the terms of any Seller Benefit Plan or Collective Bargaining Agreement as in effect on the date hereof, (1) hire or promote or terminate the employment (other than for cause or due to elimination of a position) of any Company Employee with annual salary in excess of $150,000, (2) grant or increase any severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Company Employee, (3) establish, adopt, materially amend, or terminate any Collective Bargaining Agreement (other than as contemplated under this Agreement) or Seller Benefit Plan or (4) grant, pay or increase the compensation, bonus or other benefits of (or materially amend any existing compensation, bonus or other benefits) or make a loan

to any Company Employee or accelerate the vesting or payment of any compensation, bonus or other benefit to any Company Employee;

(L)     except as required by Applicable Law, (1) make, revoke or change any material Tax election with respect to the Assets, (2) settle or compromise any material Tax liability relating to the Assets, (3) consent to any extension or waiver of the limitation period applicable to any material Tax claim or assessment with respect to the Assets (other than as a result of requesting an extension of time to file a Tax Return), or (4) amend any material Tax Return relating to the Assets, in each case, to the extent such action could adversely affect the Assets or the Business in a Post-Closing Tax Period;

(M)    fail to keep in force, cancel or modify any Insurance Policy, except where replaced with a substantially similar policy;

(N)     make any material change in the customary methods of operations of the Business, including practices and policies relating to manufacturing, purchasing, inventories, marketing, selling, credit and pricing;

(O)     fail to maintain inventory to and including the Closing Date of a quality usable and salable in the ordinary course of business and in sufficient quantities to operate the Business as it is and has been historically conducted in all material respects taking into account the then-current level of business;

(P)     write down or write up (or fail to write down or write up in accordance with GAAP consistent with past practice) the value of any inventories or revalue any of the Assets other than in the ordinary course of business consistent with past practice and in accordance with GAAP;

(Q)     take any action that could cause any material asset that is an Asset as of the date hereof to no longer be an Asset as of Closing, except for the sale of inventory to a Third Party in the ordinary course of business consistent with past practice; or

(R)     agree or commit to do any of the foregoing.

*provided*, that the Selling Entities may, in good faith, (A) take any action or omit to take any action during any period of suspension of operations related to the coronavirus (COVID-19) pandemic, or in connection with the coronavirus (COVID-19) pandemic, as is reasonably necessary to protect the health and safety of the Company Employees and other individuals having business dealings with the Selling Entities and (B) respond in a commercially reasonable manner to third-party supply or service disruptions caused by the coronavirus (COVID-19) pandemic; *provided*, *further*, that following any such suspension, to the extent that any Selling Entity took any actions pursuant

to the immediately preceding proviso that caused deviations from its business being conducted in the ordinary course of business consistent with past practice, such Selling Entity shall resume conducting its business in the ordinary course of business consistent with past practice in all material respects as soon as is reasonably practicable.

For purposes of any consent by Buyer under this Section 7.02, (x) such consent may be requested by Seller and given by Buyer by email or otherwise in accordance with Section 13.02, and (y) Buyer will give or deny consent within five (5) Business Days of the request, *provided* that in no case shall Buyer be deemed to have given consent in the absence of having actually given express written consent.

Section 7.03    Reasonable Best Efforts. Subject to Section 7.04, the Selling Entities, on the one hand, and Buyer, on the other hand, will use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (a) the taking of all reasonable acts necessary to cause the conditions precedent to the other party's obligations to consummate the Closing set forth in Article 9, Article 10 and Article 11 to be satisfied in a timely manner so the Closing may occur on July 20, 2020, with July 18, 2020 being deemed to be the Closing Date for all accounting purposes, (b) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (c) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Nothing in this Section 7.03 will require Buyer, the Selling Entities or any of their respective Subsidiaries to pay any consideration to any Third Party, to initiate any Proceedings, to incur any obligation or to waive any right under this Agreement or to assist any Party in connection with the transactions contemplated hereby.

Section 7.04    Regulatory Approvals.

(a)    Buyer and Seller will (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Applicable Laws with respect to the transactions contemplated hereby, as and if required, as promptly as practicable and, in any event, within ten (10) Business Days after the date of this Agreement in the case of all filings required under the HSR Act or any other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Applicable Laws for additional information, documents or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "**FTC**"), the Antitrust Division of the United States Department of Justice (the "**Antitrust Division**") or any other Governmental Authority in respect of such filings or such transactions, and (iii) cooperate with each other in connection with (A) any such filing (including, to the extent practicable and otherwise permitted by Applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering in good faith all reasonable additions, deletions or changes suggested in connection therewith), (B) resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other

Governmental Authority under any Applicable Laws with respect to any such filing or any such transaction, and (C) updating, transferring, replacing, cancelling or obtaining (1) the Permits and Certifications set forth in Schedule 7.04 and (2) applicable registrations with the FDA. Each such Party will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated by this Agreement. To the extent permitted under Applicable Law, each such Party will promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction. To the extent practicable and otherwise permitted by Applicable Law, no Party hereto will independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other Parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate. Subject to Applicable Law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to Proceedings under the HSR Act or other Applicable Laws. Seller and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.04 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Buyer, as the case may be).

(b)     Buyer understands and agrees that Buyer will use its commercially reasonable efforts to take, and will cause its Affiliates to use their respective commercially reasonable efforts to take, all actions necessary or appropriate to obtain all Governmental Authorizations and to avoid or eliminate each and every impediment under any Applicable Law or otherwise so as to enable the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to occur as soon as possible (and in any event prior to the Outside Date), including by using commercially reasonable efforts to (i) defend any Proceeding (including by appeal if necessary) that challenges any of the transactions contemplated by this Agreement or which would otherwise prohibit, materially delay or materially impair the consummation of the transactions contemplated by this Agreement or the other Transaction Documents, and (ii) seek to have lifted, vacated or reversed any Order entered by any Governmental Authority with respect to this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby. Notwithstanding anything in this Agreement to the contrary, neither Buyer nor any of its Affiliates will be required to (or required to commit to), and without the prior written consent of Buyer, no Selling Entity will (and no Selling Entity will commit to): (x) (A) enter into any settlement, undertaking, consent decree, stipulation or agreement with or required by any Governmental Authority in connection with the transactions contemplated hereby; (B) propose, negotiate, commit to or effect, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of businesses, product lines or assets, including the assets of Buyer or any of its Affiliates or the Assets; (C) terminate existing relationships, contractual rights or obligations of Buyer or its Affiliates, or any contractual rights or obligations that constitute or otherwise relate to any Asset; and (D) otherwise take or commit to take actions that after the Closing would limit Buyer's or its Affiliates' freedom of action with respect to, or its ability to retain or exercise rights of ownership or control with respect to, one or more of the

businesses, product lines or assets of Buyer or its Affiliates (including the Assets), in each case in this clause (x), including to the extent required or proposed by any Governmental Authority in connection with the transactions contemplated hereby; or (y) refrain from taking any action (including the acquisition by it or any of its Affiliates of any interest in any Person) if such action would make it more likely that there would arise any impediments under any Applicable Law that may be asserted by any Governmental Authority to the consummation of the transactions contemplated by this Agreement or the other Transaction Documents as promptly as reasonably practicable or that would result in any delay of the Closing.

Section 7.05    Bankruptcy Court Approval.

(a)    The Selling Entities and Buyer each acknowledge that this Agreement and the sale of the Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court approval pursuant to the Sale Order. Buyer acknowledges that (i) to obtain such approval, the Selling Entities must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, consistent with, and subject to, the Bidding Procedures and the Bidding Procedures Order, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

(b)    Buyer agrees that it will promptly take such actions as are reasonably requested by the Selling Entities to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

(c)    Seller will give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court unless such advance notice is impossible or impracticable under the circumstances, in which case the Selling Entities will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court, and will consider in good faith any and all comments of Buyer or of its counsel to such drafts.

Section 7.06    Alternative Proposals. The Selling Entities shall not (and shall cause each of their respective Affiliates and Representatives to not), directly or indirectly: (i) solicit, encourage, authorize, recommend, propose or initiate any other proposals or offers from any Person (A) relating to any direct or indirect acquisition or purchase of all or any portion of the capital stock or other equity or ownership interest of any Company, or any portion of the Assets, other than sales of inventory to any Person other than Buyer (or Buyer's assignee or designee) in the ordinary course of business, (B) to enter into any merger, consolidation or other business combination relating to any of their respective Subsidiaries, or (C) to enter into a recapitalization, reorganization or any other extraordinary business transaction involving or otherwise relating to

the Business or any of the Assets (any such proposal or offer, an "**Alternative Offer**"); (ii) knowingly participate in any discussions, negotiations or other communications regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, assist or participate in, facilitate or encourage any effort or attempt by any other Person to seek to do any of the foregoing, or (iii) participate in any discussions, negotiations or other communications regarding, or furnish to any other Person any information in connection with, any Alternative Offer, in each case, other than with the Next-Highest Bidders (as defined in the Bidding Procedures). Each Selling Entity shall immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any Persons conducted prior to the date hereof with respect to any of the foregoing, other than with the Next-Highest Bidders (as defined in the Bidding Procedures).

Section 7.07    Buyer Efforts to Obtain Financing.

(a)    From and after the date hereof, Buyer shall use its commercially reasonable efforts to take, or cause to be taken, all actions that are necessary, proper, advisable to obtain the Debt Financing on the terms and conditions described in the Debt Commitment Letter or any alternative financing documents in the event the Debt Commitment Letter is terminated prior to Closing.

(b)    Without limiting the foregoing, Buyer shall use commercially reasonable efforts to (i) negotiate and enter into definitive agreements with respect to the Debt Financing contemplated by the Debt Commitment Letter on the terms and conditions (including any flex provisions) contained in the Debt Commitment Letter; (ii) satisfy (or obtain a waiver thereof with regard to) all conditions applicable to the funding of the Debt Financing that are within Buyer's control; (iii) assuming that all conditions to the Debt Commitment Letter are satisfied or waived by the Debt Financing Sources, consummate the Debt Financing at or prior to the Closing, in any case, subject to the terms and conditions of the Debt Commitment Letter; and (iv) enforce its rights under the Debt Commitment Letter to draw upon and consummate the Debt Financing, subject to the terms and conditions of the Debt Commitment Letter. Buyer shall keep Seller reasonably informed on a reasonably current basis and in reasonable detail with respect to all material activity concerning the status of its efforts to arrange the Debt Financing contemplated by the Debt Commitment Letter and shall give Seller notice of any material adverse change with respect to the Debt Financing as promptly as practicable.

Section 7.08    Cooperation with Financing.

(a)    Prior to the Closing, the Selling Entities shall use commercially reasonable efforts to provide to Buyer all customary cooperation that is reasonably requested by Buyer in connection with the Debt Financing, including: (i) assisting with the preparation and delivery of the Marketing Material; (ii) facilitating the pledging of collateral on the Assets, provided that no pledge shall be effective until the Closing; (iii) delivery to Buyer and its Debt Financing Sources of Required Information and other deliverables, in each case, as promptly as reasonably practicable following Buyer's request therefor; (iv) assisting in the negotiation of definitive financing documents, including guarantee and collateral documents, and customary closing certificates as may be required by the Debt Financing Sources; (v) taking such actions as are reasonably requested by Buyer to facilitate the satisfaction on a timely basis of all conditions precedent to obtaining the

Debt Financing that are within the Seller's control; and (vi) providing, no later than three (3) Business Days prior to the Closing Date, all documentation and other information about the Selling Entities required under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, that in each case has been requested in writing by Buyer at least ten (10) Business Days prior to the Closing Date; *provided, however*, that nothing in this Agreement shall require such cooperation to the extent it would interfere unreasonably with the business or operations of the Selling Entities; and *provided, further*, that notwithstanding anything in this Agreement to the contrary, the Selling Entities shall not (A) be required to incur or pay any costs or expenses related to the cooperation provided pursuant to this Section 7.08 or pay any fees (including commitment or other similar fees) or to give any indemnities or incur any liabilities prior to the Closing, (B) have any liability or obligation under any loan agreement, debt security or any related document or any other agreement or document related to the Debt Financing, (C) be required to provide access to or disclose information where such access or disclosure would (or would be reasonably expected to) jeopardize the attorney-client privilege or contravene any Applicable Law or violate any Contract, agreement or confidentiality obligation binding on the Selling Entities or their Affiliates, (D) take any action in respect of the Debt Financing to the extent that such action would cause any condition to Closing to fail to be satisfied by the Outside Date or otherwise result in a breach of this Agreement by any of the Selling Entities or their Affiliates, (E) subject any of the Selling Entities or their Subsidiaries, or any of its or their respective directors, managers, officers or employees to any actual or potential personal liability, (F) waive or amend any terms of this Agreement or any other Contract to which any Selling Entity is a party, (G) take any action that would subject it to actual or potential Liability, to bear any cost or expense or to make any other payment or agree to provide any indemnity in connection with the Debt Financing, the definitive documents related to the Debt Financing or any information utilized in connection therewith or (H) be required to execute any document, certificate or instrument, or make any representation or warranty, in connection with the Debt Financing, except for customary authorization letters and any such document, certificate or instrument that is conditioned upon, and not effective until, the consummation of the Closing.

(b)     Notwithstanding any other provision set forth herein or in any other agreement between the Selling Entities and Buyer (or, in each case, their Affiliates), the Selling Entities and their Affiliates shall be deemed to have complied with their obligations under this Section 7.08 for all purposes of this Agreement unless the applicable Debt Financing has not been obtained primarily as a result of the Selling Entities' or any of their Affiliates' intentional and material breach of their obligations under this Section 7.08.

(c)     Notwithstanding any other provision set forth herein or in any other agreement between the Selling Entities and Buyer (or, in each case, their Affiliates), the Selling Entities agree that Buyer may share non-public or confidential information regarding the Assets and the Assumed Liabilities with the Debt Financing Sources, and that Buyer, its Affiliates and such Debt Financing Sources may share such information with potential financing sources in connection with any Marketing Efforts (including any syndication) in connection with the Debt Financing, provided that all such recipients are subject to confidentiality obligations at least as restrictive as those applicable to Buyer under this Agreement and the Confidentiality Agreement.

Section 7.09    Damage or Destruction. Until the Closing, the Assets shall remain at the risk of the Selling Entities. In the event of any material damage to or destruction of any of

the Assets after the date hereof and prior to the Closing (in any such case, a "**Damage or Destruction Loss**"), Seller shall give prompt written notice thereof to Buyer. If any such Damage or Destruction Loss is covered by insurance policies and, if such damage or destruction is to a facility, is not repaired or replaced by a similar facility in reasonable proximity to any former facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing in accordance with Section 2.01(b)(xiii).

Section 7.10    Additional Selling Entities. If, at any time after the date of this Agreement either Party discovers that any of the rights, interests, properties, or other assets constituting the Assets is owned by a Subsidiary of Seller who is not a Selling Entity, Seller shall promptly cause such Subsidiary to become a Selling Entity hereunder as if an original party hereto, to deliver to Buyer a joinder in form and substance reasonably acceptable to Buyer and, subject to Section 2.06, to promptly transfer (or cause to be transferred) such assets (including any payment or other benefit received by such Subsidiary following the Closing Date in respect of such asset) to Buyer. Prior to any such transfer, the applicable Subsidiary of Seller possessing any such asset (and any such associated benefit received following the Closing Date) will hold it in trust for the benefit of Buyer, in each case at no additional cost to Buyer.

Section 7.11    Public Announcements; Filings. No Party nor any of its Affiliates shall make any public announcement or issue any press release or make any filings at any time concerning this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby, without the prior written approval of, in the case of Buyer, Seller, and in the case of any Selling Entity, Buyer, in each case not to be unreasonably withheld, delayed or conditioned. Notwithstanding the immediately preceding sentence, in the event any Party reasonably determines, on advice of counsel, that any such filing is required by the Bankruptcy Court or otherwise under Applicable Law, such Party shall give, in the case of Buyer, Seller, and in the case of any Selling Entity, Buyer, advance written notice of, and a meaningful opportunity (as practicable under the circumstances) to review and comment on, the proposed form and substance of any such filing, but prior written approval shall not be required. The Party whose proposed filing is the subject of review shall consider carefully and in good faith all comments timely received from Buyer, in the case of a Selling Entity, and Seller, in the case of Buyer.

Section 7.12    Collective Bargaining Agreements. The Selling Entities shall use commercially reasonable efforts to participate in coordination with Buyer in its negotiations with any union with respect to any of the Collective Bargaining Agreements.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

Section 8.01    Taxes.

(a)    *Transfer Taxes*. Buyer and Seller shall each be responsible for one half of all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from or

relating to the consummation of the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), regardless of the party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes. Seller and Buyer will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes.

(b)     *Straddle Periods*. In the case of any Straddle Period, (i) all Property Taxes for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis and (ii) all other Taxes shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period as if the Pre-Closing Tax Period ended at the close of business on the Closing Date.

(c)     *Cooperation*. Buyer and its Affiliates, and Seller and its Affiliates will cooperate on a reasonable basis with each other regarding Tax matters governed by this Agreement and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement and the filing of Tax Returns until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

(d)     *Bulk Sales*. All matters relating to bulk sales and transfers shall be as set forth in the Sale Order.

Section 8.02    Allocation of Purchase Price.

(a)     The Purchase Price (plus any Assumed Liabilities and any other amounts required to be taken into account under the Code) shall be allocated among the Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state, local or non-U.S. law, as appropriate) (the "**Allocation**"). The Allocation shall be delivered by Buyer to Seller within sixty (60) days after the Closing Date.

(b)     Seller and Buyer will file (and will cause their respective Affiliates to file) Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation.

Section 8.03    Assigned Contracts; Adequate Assurance and Performance.

(a)     With respect to each Assigned Contract, Buyer will deliver within seventy-two (72) hours of approval of this Agreement by the Bankruptcy Court information it reasonably believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Assigned Contract as required under section 365 of the Bankruptcy Code, which information Seller or if applicable, Seller's Subsidiaries, will be permitted to disseminate to any Third Party that is a party to any 365 Contract, in each case on a confidential basis. In the event that the Bankruptcy Court determines by Final Order that Buyer cannot demonstrate adequate assurance of future performance with respect to an Assigned Contract, at Buyer's election, such Assigned Contract shall become an Excluded Contract.

(b)    From and after Closing, Buyer will pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)    Without limiting the provisions of Section 8.03(a), Buyer acknowledges that, neither Seller nor any Subsidiary of Seller will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance to secure performance or payment under any Assigned Contracts (collectively, "**Seller Credit Obligations**") after the Closing or otherwise with respect to the Business. On or before the Closing, Buyer will use commercially reasonable efforts to obtain from the creditor or other counterparty (or, in the case of letters of credit, bonds or other similar Seller Credit Obligations, the issuing bank (or similar entity) thereof) a full release (in a form and substance reasonably satisfactory to Seller) of all parties liable, directly or indirectly, for reimbursement to the creditor or issuing bank (or similar entity), as applicable, or fulfillment of other obligations to a counterparty or issuing bank (or similar entity), as applicable, under the Seller Credit Obligations (including any lenders or other financing parties participating in such letters of credit, bonds or similar Seller Credit Obligations); provided, that obtaining such releases shall not be a condition to the Closing.

Section 8.04    Employee Matters.

(a)    *Transferred Employees*. Prior to but effective upon the Closing, Buyer will offer employment to each of the Company Employees except for those Company Employees set forth on Schedule 8.04(a), on employment terms that are substantially similar to the employment terms offered to such Company Employees as of the Closing Date, as such schedules may be updated by Buyer prior to the Closing.  Such individuals who accept such offers by the Closing Date and who actually commence employment with Buyer or one of its Affiliates are hereinafter referred to as the "**Transferred Employees.**"

(b)    *No Obligations*. No provision in this Section 8.04 or otherwise in this Agreement, whether express or implied, will (i) create any third-party beneficiary or other rights in any current or former employee of any Selling Entity (including any Company Employee or any beneficiary or dependent thereof), any other participant in any Seller Benefit Plan or any other Person; (ii) create any rights to employment or continued employment with Seller, Buyer or any of their respective Subsidiaries or Affiliates or in any way limit the ability of Seller, Buyer or any of their respective Subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason or for no reason, except as otherwise prohibited by Applicable Law; or (iii) constitute or be deemed to constitute an amendment to any Seller Benefit Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Seller, Buyer or any of their respective Subsidiaries or Affiliates.

(c)    *Accrued Wages and Paid Time Off*. To the extent not required by Applicable Law to be paid by a Selling Entity to the Transferred Employees upon termination of employment or otherwise limited by Applicable Law, Buyer shall assume and recognize the Assumed Liabilities with respect to each Transferred Employee any accrued but unused PTO for periods prior to the Closing Date, in each case only to the extent set forth on Disclosure Schedule 5.22(a), and shall seek the consent of such Transferred Employees if required by Applicable Law. Each Selling Entity shall as soon as administratively practicable following the Closing Date, but in no

event later than the date required by Applicable Law, pay each Transferred Employee all earned but unpaid salary, wages, short-term incentives and, to the extent required by Applicable Law, accrued but unused PTO as of the Closing Date.

Section 8.05    Post-Closing Books and Records.

(a)    Until the earlier of the closure of the Bankruptcy Cases and two (2) years after the Closing Date, (i) Buyer will use commercially reasonable efforts not to dispose of or destroy any of the Records received by Buyer as Assets and (ii) Buyer will allow such Selling Entity (including, for clarity, any trust established under a chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, managers officers, employees, counsel, Representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to any Records included in the Assets for purposes relating to the Bankruptcy Cases, the wind-down of the operations of such Selling Entity or any such trusts or successors and such Selling Entity (including any such trust or successors) and such directors, managers, officers, employees, counsel, Representatives, accountants and auditors will have the right to make copies of any such Records for such purposes (at its sole cost and expense). Until the liquidation and winding up of each Selling Entity's estate, such Selling Entity may keep a copy of the Records. Until the earlier of the liquidation and winding up of each Selling Entity's estate and seven (7) years after the Closing Date, each Selling Entity will use commercially reasonable efforts not to dispose of or destroy any copies of the Records within its possession or control and, upon written request by Buyer, shall promptly transfer such copies to Buyer pursuant to Section 2.08. Except as required by Applicable Laws or to the extent required to enforce its rights with respect to the Excluded Liabilities, from and after the Closing, the Selling Entities will treat both the Records and any Excluded Records as Confidential Business Information (it being understood and agreed that the Selling Entities may use the Records and the Excluded Records to the extent necessary for compliance with its obligations and enforcement of its rights hereunder.

(b)    Until the earlier of the liquidation and winding up of each Selling Entity's estate and ten (10) years after the Closing Date, each Selling Entity will use commercially reasonable efforts not to dispose of or destroy any copies of the Records within its possession or control and, upon written request by Buyer, shall promptly transfer such copies to Buyer pursuant to Section 2.08.

Section 8.06    Intellectual Property Licenses.

(a)    Each Selling Entity agrees that, from and after the Closing, except as expressly permitted or otherwise provided pursuant to this Section 8.06(a) (including for the avoidance of doubt, all subparts thereof) it shall and shall cause each of its Subsidiaries to cease use of all Owned Intellectual Property and all Licensed Intellectual Property. Without limiting the foregoing, as soon as practicable after Closing, but in no event longer than three (3) months after the Closing Date, Seller shall, and shall cause each of its Subsidiaries to, (i) take all action necessary to change the name of all such entities that includes a Restricted Name to a name that is not confusingly similar to any Restricted Name, (ii) take all actions and execute all documents as may be necessary to evidence any such name changes, (iii) cease and discontinue all uses of the Restricted Names except as otherwise provided in this Section 8.06(a) (including for the avoidance

of doubt, all subparts thereof), and (iv) eliminate the Restricted Names from, revise, or otherwise permanently obscure the Restricted Names on any signage or other public-facing materials (including any publicly distributable documents and other digital or physical public-facing materials bearing such Restricted Names) owned or controlled by Seller or any of its Subsidiaries, except as otherwise provided in this <u>Section 8.06(a)</u> (including for the avoidance of doubt, all subparts thereof).

(b)      Effective as of the Closing, Buyer, on behalf of itself and its Affiliates, hereby grants to Seller and its Subsidiaries non-exclusive, irrevocable, worldwide, fully transferrable, fully sublicensable (through multiple tiers of sublicensees), royalty-free, fully paid-up right and license to use any and all Intellectual Property included in the Assets (other than any Trademarks) following the Closing solely in connection with the Excluded Assets and solely to the extent and in the same manner in which such Intellectual Property was used by Seller or any of its Subsidiaries in connection with such Excluded Assets as of the Closing.

(c)      Effective as of the Closing, Buyer, on behalf of itself and its Affiliates, hereby grants to Seller and its Subsidiaries a non-exclusive, irrevocable, worldwide, fully transferrable, fully sublicensable (through multiple tiers of sublicensees), royalty-free, fully paid-up right and license to use any and all Trademarks included in the Assets and rights to use the Borden Marks (the "**Transferred Trademark Rights**") for a period beginning on the Closing Date and ending eighteen (18) months following the Closing Date (the "**Transition Date**") solely in connection with the operation of the Excluded Assets relating to the respective businesses of Seller and its Subsidiaries, including as part of the corporate names of Seller and its Subsidiaries to the extent incorporating such Transferred Trademark Rights as of the Closing.

(d)      Notwithstanding anything in this Agreement to the contrary, following the Transition Date, (i) with respect to any inventories of products bearing any of the Transferred Trademark Rights as of the Transition Date, Seller and its Subsidiaries shall be permitted to sell such inventories of products until the expiration of their applicable shelf lives and (ii) Seller and its Subsidiaries shall be permitted to continue to use in perpetuity any and all documents, vehicles, signage, equipment and other assets and materials amongst the Excluded Assets bearing the Transferred Trademark Rights that exist as of the Transition Date so long as all references to the Transferred Trademark Rights are deleted, struck over, stickered over, or otherwise removed or covered therefrom. Seller, on behalf of itself and its Subsidiaries, acknowledges and agrees that any and all use by Seller and its Subsidiaries of the Transferred Trademark Rights, and all goodwill associated therewith, shall at all times inure to the sole benefit of Buyer.

(e)      Seller, on behalf of itself and its Subsidiaries, acknowledges and agrees that (i) any and all uses of the Transferred Trademark Rights by Seller and its Subsidiaries pursuant to this Agreement shall be in a manner and form substantially similar to the use of such Transferred Trademark Rights as of immediately prior to the Closing, (ii) Seller and its Subsidiaries shall maintain quality control standards in respect of their use of the Transferred Trademark Rights substantially consistent with that maintained by Seller and its Subsidiaries in respect of the Business immediately prior to the Closing, and (iii) Seller and its Subsidiaries shall manufacture, market and sell inventory of products bearing the Transferred Trademark Rights in accordance with all Applicable Laws.

(f)        Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be construed as preventing, restricting or otherwise limiting Seller or any of its Subsidiaries or their respective successors or assigns from (i) stating the historical relationship between Seller and its Subsidiaries, on the one hand, and Buyer, on the other hand, with respect to the Business and the Transferred Trademark Rights for informational purposes, (ii) describing the transaction contemplated by this Agreement as a factual matter, or (iii) making any use of any of the Transferred Trademark Rights that would constitute "fair use" under Applicable Law.

Section 8.07    Title Matters. The Selling Entities will deliver, or cause to be delivered, to Buyer, at or prior to the Closing all copies of existing surveys, legal descriptions and title policies relating to any Real Property Interests, in each case, to the extent in any Selling Entities' possession or control. The Selling Entities will also deliver, or cause to be delivered, to Buyer at or prior to Closing such bills of sale, deeds and other customary instruments of conveyance and transfer with regard to Acquired Owned Real Property in form and substance reasonably satisfactory to Buyer, as Buyer may reasonably request in order to vest in Buyer all of the applicable Selling Entity's right, title and interests in, to or under any or all Real Property Interests, in accordance with the terms of this Agreement.

Section 8.08    Permit Matters. Seller will use reasonable best efforts to provide notice of the transactions contemplated herein to the permitting authority for each Permit and Certification of Seller or any of its Subsidiaries related to the Business or the ownership, operation or use of the Assets as historically owned, operated, or used (in all cases, other than those Permits that are not material to the operation of the Assets) at Closing and the intent to transfer each such Permit and Certification to Buyer as of the Closing.

Section 8.09    Insurance Access. Following the Closing Date, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, losses, damages and Liabilities which occurred or are alleged to have occurred, or were incurred or claimed to have been incurred, with respect to the Assets or the Assumed Liabilities prior to the Closing Date, Seller will provide Buyer with access to, and Buyer may, upon prior written notice to Seller, make claims under Seller's and its Subsidiaries' non-transferable third-party insurance policies (excluding any self-insurance policies or programs, or any insurance policies or programs that are substantially similar in effect to self-insurance) that are "occurrence based" insurance policies in place immediately prior to the Closing (each such policy, an "**Available Insurance Policy**"); *provided* that such access to, and the right to make claims under, such insurance policies, shall be subject to the terms and conditions of such insurance policies, including any restrictions on coverage or scope, any deductibles, retentions or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(a)        In the event that Available Insurance Policy does not permit Buyer access thereto, or the right to make a claim thereunder, Seller shall make the applicable claim on Buyer's behalf, and pay over any recovery to Buyer, under such Available Insurance Policy as completed by this Section 8.09;

(b)        Any recovery under any Available Insurance Policy shall be net of all premium increases, fees and expenses, in each case to the extent documented, reasonably incurred by Seller or any of its Subsidiaries and resulting from any access to, or any claims made by Buyer

or any of its Affiliates under, any Available Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Buyer, its Affiliates or its or their respective Representatives;

(c)      Claims made by Buyer pursuant to this Section 8.09 will be subject to (and recovery thereon will be reduced by the amount of) any applicable deductibles, retentions, or self-insurance provisions under the Available Insurance Policies. With respect to any deductibles, retentions or self-insurance provisions described in the immediately preceding sentence that require a payment by Seller or any of its Subsidiaries, Buyer shall reimburse Seller or such Subsidiary for such payment; and

(d)      Without limiting Buyer's right to make claims directly against the applicable insurance policies, in no event shall any Selling Entity be required to provide Buyer access under this Section 8.09 after such entity's Bankruptcy Case has been closed.

Section 8.10    Confidentiality. From and after the Closing, Seller agrees that it will, and will cause its Affiliates and its and their respective Representatives to, keep confidential all information relating to the Business, the Assets and the Assumed Liabilities (the "**Confidential Business Information**"), and that it will, and will cause its Affiliates and its and their respective Representatives to, not use or disclose any Confidential Business Information to any Person, except with the specific prior written consent of Buyer, which may be withheld for any reason or no reason. For purpose of this Section 8.10, Confidential Business Information shall not include information that (i) is publicly available as of the date hereof, (ii) later becomes known to the public generally through no fault of Seller or its Affiliates, (iii) is independently developed by Seller or its Affiliate without reference to or reliance on any information referenced hereunder or (iv) is required to be disclosed by law or the order of any Governmental Authority under color of law, provided, that prior to any such disclosure by the applicable Party under this clause (iv), Seller shall give prior written notice thereof to Buyer and provide Buyer with the opportunity to contest that disclosure (in either case to the extent allowable by the applicable law or order).

Section 8.11    Disclaimers.

(a)      *General Disclaimer*. To the extent required by Applicable Laws to be operative, the disclaimers of certain warranties contained in this Section 8.11 are "conspicuous disclaimers" for purposes of any Applicable Laws.

(b)      **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THE TRANSACTION DOCUMENTS (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO (INCLUDING THE DISCLOSURE SCHEDULES) OR OTHERWISE AS PROVIDED HEREIN), (I) NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED OR OTHERWISE, WITH RESPECT TO, OR IN RELATION TO, ANY OF THE ASSETS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND BUYER EXPRESSLY WAIVES AND ACKNOWLEDGES THAT NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKES ANY SUCH WARRANTY OR REPRESENTATION, AND BUYER IS NOT RELYING ON ANY SUCH**

**WARRANTY OR REPRESENTATION, (II) SELLER, ON BEHALF OF ITSELF AND ITS SUBSIDIARIES, EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY, IN WRITING OR OTHERWISE) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY STATEMENT, OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF EACH SELLER OR ANY OF ITS RESPECTIVE AFFILIATES) AND (III) ALL PROPERTIES INCLUDED IN THE ASSETS WILL BE CONVEYED BY SELLER OR ITS APPLICABLE SUBSIDIARIES AND ACCEPTED BY BUYER PRECISELY AND ONLY AS IS, WHERE IS, AND WITH ALL DEFECTS AND FAULTS WITHOUT RECOURSE AND WITHOUT WARRANTY (INCLUDING WITHOUT ANY WARRANTY OF TITLE, EXCEPT AS MAY BE EXPRESSLY PROVIDED IN ANY SPECIAL WARRANTY DEED OR OTHER CONVEYANCE DOCUMENT), IN EACH CASE OTHER THAN IN THE EVENT OF FRAUD.**

**(c)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN <u>ARTICLE 5</u> OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO (INCLUDING THE DISCLOSURE SCHEDULES) OR AS OTHERWISE PROVIDED HEREIN), BUYER ACKNOWLEDGES AND AGREES THAT SELLER AND SELLER'S SUBSIDIARIES ARE CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH SELLER HEREBY DISCLAIMS), RELATING TO (I) TITLE, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (III) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (IV) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (V) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE ASSETS (SURFACE AND SUBSURFACE), (VI) COMPLIANCE WITH APPLICABLE LAWS, (VII) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM OR MANAGEMENT PRESENTATION, (VIII) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (IX) CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION AND/OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (X) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (XI) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIII) ANY IMPLIED WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOATION OR**

**(XIV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST SELLER OR ANY SUBSIDIARY OF SELLER ASSOCIATED WITH SAME. NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS <u>SECTION 8.11</u> OR ELSEWHERE IN THIS AGREEMENT SHALL LIMIT BUYER'S RECOVERY RIGHTS IN THE EVENT OF FRAUD.**

Section 8.12    <u>Collection of Accounts Receivable</u>.

(a)    As of the Closing Date, each Selling Entity hereby (i) authorizes Buyer to open any and all mail addressed to any Selling Entity relating to the Assets and delivered to any Facility or any other office of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to all Accounts Receivable including, for the avoidance of doubt, the Excluded Accounts Receivable.

(b)    Following the Closing, Buyer shall (i) for a period of 120 days, use its reasonable best efforts to collect the Excluded Accounts Receivable on behalf of the Seller, and (ii) remit to the Seller, on a weekly basis, any payments actually received by Buyer that relate to the Excluded Accounts Receivable.

(c)    As of the Closing Date, each Selling Entity agrees that any monies, checks, rebates or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to accounts receivable included in the definition of Assets or relating to products sold by Buyer after the Closing, as the case may be, shall be held in trust by such Selling Entity for Buyer's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.

(d)    As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable relating to products sold by Buyer after the Closing.

Section 8.13    <u>Excess Cash and Accounts Receivable</u>. All proceeds in the Carve-Out Account (as defined in the Sale Order) and Excluded Accounts Receivable and proceeds from the collection of Excluded Accounts Receivable that remain after satisfaction of (a) all Allowed Professional Fees (as defined in the Cash Collateral Order), up to the Carve-Out Amount (as defined in the Sale Order), in connection with the Professionals' (as defined in the Cash Collateral Order) final fee applications and pursuant to order of the Bankruptcy Court, (b) the DIP Loans and

(c) all Administrative Claims that were not Assumed Liabilities, shall be promptly conveyed and delivered to Buyer by the Selling Entities at such time.

## ARTICLE 9
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

The respective obligations of Buyer and the Selling Entities to consummate the Closing are subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in a joint writing by Buyer and the Selling Entities, at or prior to the Closing, of each of the following conditions:

Section 9.01    No Order. There will not be in effect any Order by any Governmental Authority of competent jurisdiction prohibiting the Closing.

Section 9.02    Sale Order. The Sale Order will be a Final Order in full force and effect, and will not have been amended, modified, stayed or vacated as of the Closing Date except for such amendments or modifications acceptable to the Agent, the RCF Lenders and the TLA Lenders; *provided*, *however*, that the condition that such Order be a Final Order may be waived by Buyer unilaterally and in its sole discretion.

Section 9.03    Successor Liability. The Sale Order shall provide that no successor liability, including any successor liability with respect to any Multiemployer Plan and/or with respect to any Seller Benefit Plan other than Assumed Plan Liabilities, shall be transferred to Buyer.

Section 9.04    Antitrust Laws. All waiting periods applicable to the transactions contemplated by this Agreement under the applicable Antitrust Laws will have expired or early termination will have been granted.

## ARTICLE 10
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligation of Buyer to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

Section 10.01    Accuracy of Representations. (a) The representations and warranties of the Selling Entities contained in Section 5.01 (solely the first sentence thereof) and Section 5.02 will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, (b) the other representations and warranties of Seller contained in this Agreement (without giving effect to any qualifications or exceptions as to "materiality" or "Material Adverse Effect" set forth therein) will be true and correct at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, except for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (c) Buyer will have received a certificate of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 10.02 <u>Selling Entities' Performance</u>. (a) No Selling Entity will have breached the covenants that such Selling Entity is required to perform pursuant to this Agreement prior to the Closing in any material respect (or will have cured any such breach to the extent necessary to satisfy this condition), and (b) Buyer will have received a certificate of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 10.03 <u>Seller's Deliveries</u>. Each of the deliveries required to be made to Buyer pursuant to <u>Section 4.03</u> will have been delivered (or the applicable Selling Entity will make such deliveries at the Closing).

Section 10.04 <u>Material Adverse Effect</u>. Since the date hereof, there shall have been no event, condition, circumstance, development, change or effect that has had or could reasonably be expected to result in a Material Adverse Effect.

Section 10.05 <u>Working Capital Assets At Closing</u>. The Seller shall deliver Working Capital Assets to the Buyer in an amount not less than $95,800,000 (the "**Target Working Capital Asset Value**"); *provided*, *however*, that if the Seller is unable to deliver the Target Working Capital Asset Value to Buyer at Closing, Seller shall cure any shortfall with additional cash until the value of Working Capital Assets plus the additional cash equals the Target Working Capital Asset Value.

Section 10.06 [Intentionally omitted.]

Section 10.07 <u>Release of Liens</u>. All obligations retained by the Selling Entities pursuant to <u>Section 2.03(g)</u> with respect to the TLA Lenders under the TLA Facility and the RCF Lenders under the RCF Facility shall be satisfied in full and completely discharged such that, upon the satisfaction by Buyer of its obligations under <u>Section 2.03(g)</u>, all liens and claims of the TLA Lenders under the TLA Facility and the RCF Lenders under the RCF Facility against the assets and properties of the Selling Entities shall be completely satisfied, discharged, released and terminated, in either case, concurrently with the Closing; *provided*, that Buyer may not waive this condition without the prior written consent of the Agent.

# ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE

The Selling Entities' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Seller, at or prior to the Closing, of each of the following conditions:

Section 11.01 <u>Accuracy of Representations</u>. (a) The representations and warranties of Buyer contained in <u>Article 6</u> of this Agreement that are not qualified by materiality will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, (b) the representations and warranties of Buyer contained in this Agreement that are qualified by materiality will be true and correct in all respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier

date and (c) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.02 <u>Buyer's Performance</u>. (a) Buyer will not have breached its covenants that it is required to perform pursuant to this Agreement prior to the Closing in any material respect (or will have cured any such breach to the extent necessary to satisfy this condition) and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.03 <u>Buyer's Deliveries</u>. Each of the deliveries required to be made to Seller pursuant to <u>Section 4.02</u> will have been delivered (or Buyer will make such deliveries at the Closing).

Section 11.04 <u>DIP Order</u>. The DIP Order will be in full force and effect and will not have been amended, modified, stayed or vacated.

Section 11.05 <u>DIP Financing</u>. The DIP Loans will have been funded in accordance with the terms set forth in the debtor-in-possession credit agreement attached as an exhibit to the DIP Order.

Section 11.06 <u>Release of Liens</u>. (a) All obligations assumed by Buyer pursuant to <u>Section 2.03(g)</u> with respect to the TLA Lenders under the TLA Facility and the RCF Lenders under the RCF Facility shall be satisfied in full and completely discharged (in the case of undrawn letters of credit, such discharge may be accomplished as provided in <u>Section 2.03(g)</u>) such that, upon the satisfaction by the Selling Entities of their obligations under <u>Section 2.03(g)</u>, all liens and claims of the TLA Lenders under the TLA Facility and the RCF Lenders under the RCF Facility against the assets and properties of the Selling Entities shall be completely satisfied, discharged, released and terminated, in either case, concurrently with the Closing and (b) all liens of the TLB Lenders under the TLB Facility against the assets and properties of the Selling Entities shall be released and terminated, in either case, concurrently with the Closing; *provided*, that the Selling Entities may not waive this condition without the prior written consent of the Agent.

## ARTICLE 12
## TERMINATION

Section 12.01 <u>Termination Events</u>.

Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Buyer;

(b)    by written notice of either Seller or Buyer to such other Party if:

(i)    the Closing has not occurred by the close of business on July 31, 2020 (the "**Outside Date**"); *provided*, *further*, that a Party may not terminate this Agreement pursuant to this <u>Section 12.01(b)(i)</u> if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein;

(ii)     there is in effect a Final Order by any court of competent jurisdiction in the United States restraining, enjoining or otherwise prohibiting the Closing; *provided* that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(ii) if such party is in material breach of any of its representations, warranties, covenants or agreements contained herein; or

(iii)     if either the Bidding Procedures Order or, after its entry, the Sale Order ceases to be in full force and effect;

(c)     so long as Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein, by Buyer by written notice to Seller if (i) any Selling Entity breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such breach would result in a failure of a condition set forth in Article 9 or Article 10 and (iii) such breach has not been cured by the earlier of (x) ten (10) Business Days after the giving of written notice by Buyer to Seller of such breach and (y) the Outside Date;

(d)     so long as no Selling Entity is in material breach of any of its representations, warranties, covenants or agreements contained herein, by Seller by written notice to Buyer if (i) Buyer breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such breach would result in a failure of a condition set forth in Article 9 or Article 11 and such breach has not been cured by the earlier of (x) ten (10) Business Days after the giving of written notice by the Selling Entities to Buyer of such breach and (y) the Outside Date;

(e)     by Seller by written notice to Buyer if Buyer fails to consummate the transactions contemplated hereby, including satisfaction of the Purchase Price, as and when required by Article 4 hereof; or

(f)     by Buyer by written notice to Seller if (i) the Sale Order is not entered by June 26, 2020, or (ii) within one (1) day after entry of the Sale Order, all Selling Entities have not executed and delivered this Agreement;

(g)     by Buyer by written notice to Seller if any creditor of a Selling Entity or its Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Assets;

(h)     by Seller by written notice to Buyer if (i) the Bankruptcy Cases are, without Seller's consent, converted into cases under chapter 7 of the Bankruptcy Code or dismissed, or (ii) without Seller's consent, a trustee under chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Cases; or

(i)     by Seller by written notice to Buyer if both (i) the DIP Order is not entered by July 10, 2020 and (ii) the Bankruptcy Court has denied a motion to enter a DIP Order that was reasonably acceptable to both the Selling Entities and the lenders under the DIP Loans.

Section 12.02 Effect of Termination. In the event of a valid termination of this Agreement by Buyer or Seller pursuant to this Article 12, all rights and obligations under this

Agreement will terminate without any Liability of any Party or Person to any other Party or Person; *provided* that nothing herein will relieve any Party from Liability for any failure to consummate the transactions contemplated hereby when required pursuant to this Agreement or any willful and material breach of this Agreement prior to such termination; and *provided*, *further*, that the provisions of this <u>Section 12.02</u>, <u>Section 12.03</u>, <u>Section 7.01(b)</u>, and <u>Section 13.08</u> (and, to the extent applicable to the interpretation or enforcement of such provisions, <u>Article 1</u> and <u>Article 13</u>) will survive the termination of this Agreement.  Notwithstanding anything to the contrary in this Agreement, in the event of any termination of this Agreement, the Debt Financing Sources will have no liability to any Seller Releasor under this Agreement, under any Debt Commitment Letter, or otherwise relating to or arising out of the transactions contemplated by such agreements (including for any willful and material breach); *provided*, that the foregoing shall not preclude any liability of a Debt Financing Source to the Buyer (or to any applicable Affiliate of the Buyer) under any Debt Commitment Letter provided by such Debt Financing Source (and the related fee letters) or the Debt Financing.

Section 12.03  <u>Procedure Upon Termination</u>. In the event of termination pursuant to <u>Section 12.01</u>, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to <u>Section 12.02</u>) and the purchase of the Assets hereunder will be abandoned without further action by Buyer or Seller.

# ARTICLE 13
# GENERAL PROVISIONS

Section 13.01  <u>No Survival of Representations and Warranties</u>. The representations and warranties contained herein and in any certificate or other Transaction Document delivered by any Party pursuant to this Agreement will terminate upon and not survive the Closing and there will be no Liability thereafter in respect thereof. Each Party's covenants and other agreements contained in this Agreement will terminate upon the Closing, except the Post-Closing Covenants applicable to such Party, which will survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, ninety (90) days following the expiration of the time period for such performance, or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant will survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 13.02  <u>Notices</u>. All notices, consents, waivers and other communications under this Agreement must be in writing and shall in all cases be delivered by email (with read receipt or other written confirmation received, in which case such notice shall be deemed received on the date such email was sent), but may also be delivered (a) by hand, (b) by overnight courier (with written confirmation of receipt), or (c) by registered or certified mail (postage prepaid, return receipt requested) and shall in each case (a) through (c) be deemed delivered on the date on which such notice is actually received by the individual to whom it is delivered, *provided*, that any such delivery pursuant to <u>clauses (a)</u> through <u>(c)</u> made on a day that is not a Business Day or after

26699695.1

167880993

5:00 p.m. on a Business Day shall be deemed to be given on the following Business Day. Any such delivery shall be addressed to appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties):

(i)    If to any Selling Entity, then to:

Borden Dairy Company
8750 North Central Expressway, Suite 400
Dallas, TX 75231
Attn: Alex Madrazo
Email: alex.madrazo@bordendairy.com

with a copy (which will not constitute notice) to:

Arnold & Porter Kaye Scholer LLP
70 W. Madison Street, Suite 4200
Chicago, IL 60602
Attn:    Tyler Nurnberg
         Seth Kleinman
Email:   tyler.nurnberg@arnoldporter.com
         seth.kleinman@arnoldporter.com

Arnold & Porter Kaye Scholer LLP
250 W. 55th Street
New York, NY 10019
Attn:    Mark Kingsley
Email:   mark.kingsley@arnoldporter.com

(ii)    If to Buyer:

New Dairy Opco, LLC
250 Fillmore Street
Suite 525
Denver, CO 80206
Attn: Ed Fugger
Email: Ed.Fugger@capitolpeakpartners.com

with a copy (which will not constitute notice) to:

Haynes and Boone, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Attn:    Janice V. Sharry
Email:   Janice.Sharry@haynesboone.com

Haynes and Boone, LLP
1050 17th Street
Suite 1800
Denver, CO 80265
Attn:    Daniel P. Malone, Jr.
Email:  Dan.Malone@haynesboone.com

Haynes and Boone, LLP
301 Commerce Street
Suite 2600
Fort Worth, TX 76102
Attn:    Stephen M. Pezanosky
Email:  Stephen.Pezanosky@haynesboone.com

and a copy (which will not constitute notice) to:

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Attn:    Roger G Schwartz
         Peter Montoni
Email:  rschwartz@kslaw.com
         pmontoni@kslaw.com

Section 13.03  Waiver. Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by Applicable Laws, (a) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party will be deemed to be a waiver of any right of the party hereto that gives such notice or demand to take further action without notice or demand.

Section 13.04  Entire Agreement; Amendment. This Agreement (including the Schedules, Disclosure Schedules and the Exhibits), the other Transaction Documents and the Confidentiality Agreement supersede all prior agreements between Buyer and the Selling Entities with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and the Selling Entities with respect to the subject matter hereof and thereof. Except as permitted under Section 2.05(c), this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by all of the Parties. Notwithstanding anything to the contrary herein, Section 7.08 (*Cooperation with Financing*), Section 12.02 (*Effect of Termination*), Section 13.03 (*Waiver*), this Section 13.04, Section 13.08 (*Specific Performance*), Section 13.09(c) and (d) (*Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*), Section 13.11 (*Parties in Interest; No Third Party Beneficiaries*), and Section 13.17 (*Non-Recourse*) (and any other provision of this Agreement or definition in this Agreement to the extent an amendment,

26699695.1

80

167880993

termination, supplement, waiver or other modification of such provision or definition would modify the substance of such Sections) may not be amended, terminated, supplemented, waived or otherwise modified without the prior written consent of the Debt Financing Sources.

Section 13.05 <u>Assignment</u>. This Agreement, and the rights, interests and obligations hereunder, may not be assigned by any Party (by operation of law or otherwise) without the express written consent of the other Parties; *provided* that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer, without the prior written consent of any Selling Entity, to one or more of Buyer's Affiliates (which for purposes of this <u>Section 13.05</u> shall be deemed to include KKR Credit Advisors (US), LLC, any Affiliate thereof, and any fund that is managed by any Affiliate thereof), so long as (a) such assignee is designated in writing by Buyer to Seller prior to the Closing, (b) Buyer continues to remain obligated in full hereunder, and (c) any such assignment would not reasonably be expected to impede or delay the Closing; *provided, further* that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court, so long as such assignee becomes a Selling Entity hereunder as if an original party hereto and delivers to Buyer a joinder in form and substance reasonably acceptable to Buyer. Any attempted or purported assignment in violation of this <u>Section 13.05</u> will be deemed void *ab initio*. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 13.06 <u>Severability</u>. The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

Section 13.07 <u>Expenses</u>. Except as expressly set forth herein, each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; *provided* that  Buyer shall pay all filing fees and expense of the Parties required in connection with any HSR Act filing or any other filing in connection with any Antitrust Laws.

Section 13.08 <u>Specific Performance</u>. The Parties agree that irreparable damage could occur in the event that any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement in accordance with its specified terms and that monetary damages, even if available, would not be an adequate remedy and therefor. Accordingly, and notwithstanding anything herein to the contrary, the Parties explicitly agree that:

(a)     Each Party will be entitled to seek an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, including specific performance of

the covenants, promises or agreements contained in this Agreement or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such Party's covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which the non-breaching Party is entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude any Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

(b)    The right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.

(c)    Notwithstanding the foregoing and subject to the rights of the parties to the Debt Commitment Letters under the terms thereof, no Seller Releasor will have any rights or claims (whether in contract, in tort, in strict liability or otherwise) against a Debt Financing Source, solely in their respective capacities as the same.

Section 13.09 <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a)    **Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.**

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties each consent to service of process by mail (in accordance with <u>Section 13.02</u>) or any other manner permitted by Applicable Law.

(c)    Notwithstanding anything in this <u>Section 13.09</u> to the contrary, any disputes under this Agreement, any Debt Commitment Letter, or otherwise relating to or arising out of the transactions contemplated by such agreements involving the Debt Financing Sources in their same capacity as the same will be (i) governed by and construed in accordance with the laws of the State

of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable thereto, and (ii) any and all claims relating to the foregoing will be filed and maintained only in a federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any stated court located in the City and County of New York and the Bankruptcy Court, and any appellate court from any thereof, and the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of such courts for the resolution of any such claim or dispute and hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding.

(d)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) (A) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF, OR (B) ARISING OUT OF OR RELATING TO ANY DISPUTES UNDER THIS AGREEMENT, ANY DEBT COMMITMENT LETTER, OR OTHERWISE RELATING TO OR ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY SUCH AGREEMENTS INVOLVING THE DEBT FINANCING SOURCES.

Section 13.10  Counterparts.

This Agreement and any amendment hereto may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.02, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 13.11  Parties in Interest; No Third Party Beneficiaries.

This Agreement will inure to the benefit of and be binding upon Buyer, Seller and their respective successors and permitted assigns. This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that Section 13.12 is intended for the benefit of and is enforceable by the Party Affiliates; *provided* that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a Party hereunder. Notwithstanding the foregoing, (i) the Debt Financing Parties shall be express third party beneficiaries of, and shall have the right to enforce, Section 7.08 (*Cooperation with Financing*), Section 12.02 (*Effect of Termination*), Section 13.03 (*Waiver*), Section 13.04 (*Entire Agreement; Amendment*), Section 13.08 (*Specific Performance*), Section 13.09(c) and (d) (*Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*) and Section 13.11 (*Parties in Interest; No Third Party Beneficiaries*), and Section 13.17 (*Non-Recourse*) (and any other provision of this Agreement or definition in this Agreement to the extent an amendment, termination, supplement, waiver or other modification of such provision or

definition would modify the substance of such Sections), and (ii) the Agent shall be an express third party beneficiary of, and shall have the right to enforce, Section 10.07 (*Release of Liens*) and Section 11.06 (*Release of Liens*) (and any other provision of this Agreement or definition in this Agreement to the extent an amendment, termination, supplement, waiver or other modification of such provision or definition would modify the substance of such Sections).

Section 13.12  No Recourse.

(a)    Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, and notwithstanding the fact that any party to any Transaction Document may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Persons that are expressly parties to each Transaction Document will have any obligation thereunder and that it has (on behalf of itself and its Subsidiaries) no rights of recovery thereunder against, and no recourse thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or direct or indirect equity holder of any Party (or any of their successors or permitted assignees) (other than a Party) (each, a "**Party Affiliate**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Person under any Transaction Document or the transaction contemplated thereby, under any documents or instruments delivered contemporaneously therewith, in respect of any oral representations made or alleged to be made in connection therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

(b)    Effective as of the Closing (but only if the Closing actually occurs), except for any rights or obligations under this Agreement and the other Transaction Documents, Buyer, on behalf of itself and each of its Affiliates and each of its and their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Buyer Releasors**"), hereby irrevocably and unconditionally releases and forever discharges each Selling Entity, each other Subsidiary of Seller, their respective Affiliates and each of the foregoing's respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Seller Released Parties**") of and from any and all actions, causes of action, suits, Proceedings, executions, Orders, duties, debts, dues, accounts, bonds, Liabilities, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon contract, tort or otherwise) (collectively "**Causes of Action**"), which any of the Buyer Releasors may have against any of the Seller Released Parties, now or in the future, in each case in respect

of any cause, matter or thing relating to the Assets, the Business or any action taken or failed to be taken by any of the Seller Released Parties in any capacity related to the Selling Entities, the Assets or the Business occurring or arising on or prior to the Closing Date; *provided*, *however*, that notwithstanding the foregoing, no Seller Released Party shall be released or discharged by any Buyer Releasor from any Cause of Action related to any act or omission that constitutes actual fraud, gross negligence, or willful misconduct. From and after the Closing and notwithstanding any applicable statute of limitations, Buyer will not and will cause each of the other Buyer Releasors not to, bring any action, suit or Proceeding against Seller or any of the other Seller Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by Buyer on behalf of itself and the other Releasors hereunder; *provided further*, that nothing herein shall operate to waive or release any (i) TLB Deficiency Claim or (ii) any Cause of Action, including, without limitation, the TLB Lender Contribution (as defined in the Sale Order), that any TLA Lender, TLB Lender or RCF Lender may, in such capacity, have against any Seller Released Party.

(c)      Effective as of the Closing (but only if the Closing actually occurs), except for any rights or obligations under this Agreement and the other Transaction Documents, the Selling Entities, in each case on behalf of itself and each of its respective Affiliates and each of its and their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Seller Releasors**"), hereby irrevocably and unconditionally releases and forever discharges Buyer, each Subsidiary of Buyer, and their respective Affiliates and each of the foregoing's respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Buyer Released Parties**") of and from any and all Causes of Action, which any of the Seller Releasors may have against any of the Buyer Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to the Assets, the Business or any action taken or failed to be taken by any of the Buyer Released Parties in any capacity related to the Selling Entities, the Assets or the Business occurring or arising on or prior to the Closing Date; *provided*, *however*, that notwithstanding the foregoing, no Buyer Released Party shall be released or discharged by any Buyer Releasor from any Cause of Action related to any act or omission that constitutes actual fraud, gross negligence, or willful misconduct; *provided further*, that nothing herein shall operate to waive or release any Cause of Action that any Seller Releasor may have against any TLB Lender, solely to the extent such Cause of Action is against such TLB Lender in its capacity as TLB Lender. From and after the Closing and notwithstanding any applicable statute of limitations, Seller will not and will cause each of the other Seller Releasors not to, bring any action, suit or Proceeding against Buyer or any of the other Buyer Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by Seller on behalf of itself and the other Seller Releasors hereunder.

Section 13.13  <u>Disclosure Schedules; Materiality</u>. The inclusion of any matter in any Disclosure Schedule will be deemed to be a disclosure in all other Disclosure Schedules, without the need for repetition or cross reference, to the extent that the relevance of such disclosure

to the other Disclosure Schedules is readily apparent on its face. The inclusion of any matter in any Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 13.14  <u>Liquidating Trustee</u>. If at any time Seller liquidates, the Bankruptcy Cases are converted to chapter 7, or the Seller otherwise has a trustee or other Representative appointed by the Bankruptcy Court (as applicable, a "**Trustee**"), then (a) such Trustee will be bound to perform the obligations of Seller and will be entitled to exercise the rights of Seller under this Agreement, and (b) with respect to all of Seller's or its Subsidiaries' assets that are abandoned (if any) following the date hereof, Seller grants to such Trustee a power of attorney for purposes performing Seller's obligations under <u>Section 2.06</u> with respect to such abandoned assets. Seller acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b) is coupled with an interest and will be irrevocable. Further, such power of attorney will also be granted to Buyer for purposes of performing Seller's obligations under <u>Section 2.06</u> with respect to such abandoned assets, as determined by Buyer, and in the event Buyer exercises such power of attorney, the Trustee will not commit any act or take any action that is inconsistent with such exercise by Buyer, except as requested in writing by Buyer.

Section 13.15  <u>Final Schedules</u>. The Selling Entities acknowledge that, as of the date of this Agreement, Buyer has not had sufficient opportunity to finalize the Schedules (except for the Disclosure Schedules delivered by Seller which shall for all purposes be considered final as of the date hereof) identified in, required by or otherwise necessary under this Agreement (collectively, once finalized and agreed by Buyer in accordance with this Agreement, the "**Final Schedules**"). The Selling Entities shall each use reasonable best efforts and cooperate with Buyer in good faith to finalize such Schedules (except for the Disclosure Schedules delivered by Seller which shall for all purposes be considered final as of the date hereof) hereto as soon as practicable but in any event on or before 5:00 pm Eastern Standard Time on the date that is five (5) Business Days prior to the Closing Date ("**Schedules Deadline**"); *provided* that the schedules shall be consistent with the terms set out in <u>Annex 1</u>. Other than such mutually acceptable Schedules, the Parties hereby further agree that in no event shall any of the other Final Schedules be considered final and appended hereto and incorporated herein unless and until such other Final Schedules are approved by Buyer in its sole discretion.

Section 13.16  <u>Conflicts; Privileges</u>.

(a)  It is acknowledged by each of the parties that Seller has retained Arnold & Porter Kaye Scholer LLP ("**Arnold & Porter**") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "**Current Representation**"), and that no other party has the status of a client of Arnold & Porter for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that after the Closing, Arnold & Porter may represent Seller or any of its Affiliates or any of their respective Representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt

any Proceeding between or among Buyer or any of its Affiliates, and any Designated Person, even though the interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Arnold & Porter may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters. Buyer hereby waives and agrees not to assert (i) any claim that Arnold & Porter has a conflict of interest in any representation described in this Section or (ii) any confidentiality obligation with respect to any communication between Arnold & Porter and any Designated Person occurring during the Current Representation.

(b)     Buyer hereby agrees that all communications (whether before, at or after the Closing) between Arnold & Porter and any Designated Person that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Representatives.

(c)     Notwithstanding the foregoing, in the event that a dispute arises between Buyer, on the one hand, and a Third Party other than any Selling Entity, on the other hand, Buyer may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such Third Party; *provided*, *however*, that Buyer may not waive such privilege without the prior written consent of the Selling Entities (which such consent shall not be unreasonably withheld, conditioned or delayed). In the event that Buyer or any of its respective directors, officers, employees or other representatives is legally required by governmental order or otherwise to access or obtain a copy of all or a portion of the Deal Communications, Buyer shall, to the extent legally permissible, (i) reasonably promptly notify the Selling Entities in writing (including by making specific reference to this Section 13.16(c)), (ii) agree that the Selling Entities may seek a protective order and (iii) use, at the Selling Entities' sole cost and expense, commercially reasonable efforts to assist therewith.

Section 13.17  Non-Recourse. Notwithstanding anything to the contrary contained herein, each Selling Entity (in each case, on behalf of itself and its associated Seller Releasors) irrevocably waives any rights or claims against any Debt Financing Source in its capacity as the same in connection with this Agreement, the Debt Financing, or any of the transactions contemplated hereby, and each Seller Releasor agrees not to commence or support any action, cause of action, claim, cross-claim, third-party claim or proceeding of any kind or description against any Debt Financing Source  in its capacity as the same in connection with, or in any way relating to, this Agreement, the Debt Financing, or any of the transactions contemplated hereby or thereby, including any dispute arising out of or relating in any way to any Debt Commitment Letter, the Debt Financing or the definitive agreements executed in connection therewith or the performance thereof, whether at law, in equity, in contract, in tort, in strict liability or otherwise, and agrees to cause any such action, cause of action, claim, cross-claim, third-party claim or proceeding of any kind or description asserted by any Seller Releasor against a Debt Financing Source , to the extent asserted against a Debt Financing Source acting in its capacity as the same, in connection with this Agreement, the Debt Financing, or any of the transactions contemplated hereby or thereby, including any dispute arising out of or relating in any way to any Debt Commitment Letter, the Debt Financing or the definitive agreements executed in connection therewith or the performance thereof, to be dismissed or otherwise terminated. In furtherance and

not in limitation of the foregoing waiver, it is acknowledged and agreed that no Debt Financing Source shall have any liability for any action, cause of action, claim, cross-claim, third-party claim, or damages of any kind or description to any Seller Releasor in any way relating to this Agreement, the Debt Financing, or the transactions contemplated hereby or thereby, including any dispute arising out of or relating in any way to any Debt Commitment Letter, the Debt Financing or the definitive agreements executed in connection therewith or the performance thereof, whether at law, in equity, in contract, in tort, in strict liability or otherwise, in each case whether arising, in whole or in part, out of comparative, contributory or sole negligence.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

**BORDEN DAIRY COMPANY**

By: _____
Name: _____
Title: _____

**SELLING ENTITIES:**

**BORDEN DAIRY HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

**NATIONAL DAIRY, LLC**

By: _____
Name: _____
Title: _____

**BORDEN DAIRY COMPANY OF ALABAMA, LLC**

By: _____
Name: _____
Title: _____

**BORDEN DAIRY COMPANY OF CINCINNATI, LLC**

By: _____
Name: _____
Title: _____

26699695.1

*[Signature Page to Asset Purchase Agreement]*

**BORDEN TRANSPORT COMPANY OF CINCINNATI, LLC**

By: _____
Name: _____
Title: _____


**BORDEN DAIRY COMPANY OF FLORIDA, LLC**

By: _____
Name: _____
Title: _____


**BORDEN DAIRY COMPANY OF KENTUCKY, LLC**

By: _____
Name: _____
Title: _____


**BORDEN DAIRY COMPANY OF LOUISIANA, LLC**

By: _____
Name: _____
Title: _____


**BORDEN DAIRY COMPANY OF MADISONVILLE, LLC**

By: _____
Name: _____
Title: _____

*[Signature Page to Asset Purchase Agreement]*

**BORDEN DAIRY COMPANY OF OHIO, LLC**

By: _____
Name: _____
Title: _____

**BORDEN TRANSPORT COMPANY OF OHIO, LLC**

By: _____
Name: _____
Title: _____

**BORDEN DAIRY COMPANY OF SOUTH CAROLINA, LLC**

By: _____
Name: _____
Title: _____

**BORDEN DAIRY COMPANY OF TEXAS, LLC**

By: _____
Name: _____
Title: _____

**CLAIMS ADJUSTING SERVICES, LLC**

By: _____
Name: _____
Title: _____

**GEORGIA SOFT SERVE DELIGHTS, LLC**

26699695.1

*[Signature Page to Asset Purchase Agreement]*

By: _____
Name: _____
Title: _____


**NDH TRANSPORT, LLC**


By: _____
Name: _____
Title: _____


**RGC, LLC**


By: _____
Name: _____
Title: _____

26699695.1

**NEW DAIRY OPCO, LLC**

By: _____
Name: _____
Title: _____

*[Signature Page to Asset Purchase Agreement]*

## Annex 1

## Terms of Schedules

**Schedule 1.01(a)**　　　　　**Independent Contractors**

1.　　James Blosser

2.　　Pete Hyatt

3.　　Nikolos Locke Tesseyman

4.　　Jackie L Merck

5.　　Terry Gage Heard

6.　　Ocleta Young

7.　　John Reese

8.　　Paul Boxley

9.　　Charles Odums

10.　　Esperanza Flores

11.　　Adam E. Gonzales


**Schedule 1.01(b)(1)**　　　　　**Seller Knowledge Parties**

1.　　Tony Sarsam, Chief Executive Officer of Seller

2.　　Jason Monaco, Chief Financial Officer of Seller

3.　　Alex Madrazo, Chief Legal Officer of Seller


**Schedule 1.01(b)(2)**　　　　　**Buyer Knowledge Parties**

1.　　Gregg Engles

2.　　Ed Fugger

3.　　Lauren Krueger

**Schedule 1.01(c)**          **Matters Not Constituting a Material Adverse Effect**[1]


**Schedule 1.01(d)**          **Retained Causes of Action**

Retained Causes of Action to be determined, but to include actions against, without limitation, equity holders and former and current officers and directors.


**Schedule 2.02(h)**          **Certain Insurance Policies**

Executive Risk Package (D&O/EPL/Fiduciary) - Westchester Surplus Lines Ins. Co.[2]


**Schedule 7.02**          **Operation Prior to Close**[3]

---

[1] **Note to Draft**: To discuss.

[2] The D&O Insurance Policy includes a six year reporting tail purchased to the policy.

[3] **Note to Draft**: To discuss.

**<u>EXHIBIT 2</u>**

**DIP TERM SHEET**

Exhibit 2 to Sale Order

_____

## BORDEN DAIRY COMPANY

## SUPERPRIORITY SECURED
## DEBTOR-IN-POSSESSION CREDIT FACILITY
## TERM SHEET

_____

### Summary of Terms and Conditions[1]

| | |
|---|---|
| **Parties:** | Borrower: Borden Dairy Company, the borrower (the "<u>Borrower</u>"), in its capacity as debtor and debtor-in-possession in Chapter 11 Cases (the "<u>Chapter 11 Cases</u>") commenced on January 5, 2020 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), main case No. 20-10010 (CSS) (jointly administered). |
| | Guarantors: The Guarantors under the Prepetition Credit Agreement[2] and other Loan Documents, which shall include all debtors and debtors-in-possession in Chapter 11 Cases (the "<u>DIP Guarantors</u>"). |
| | Agent:  KKR Loan Administrative Services LLC ("<u>KKR</u>"), as administrative and collateral agent (in such capacity, the "<u>DIP Agent</u>"). |
| **DIP Loan Facility:** | A senior secured debtor-in-possession term loan credit facility (the "<u>DIP Loan Facility</u>") provided by KKR or its respective affiliates and certain funds advised by KKR Credit Advisors (US) LLC (the "<u>DIP Lenders</u>") in a principal amount of $[_____][3] (the loans thereunder, the "<u>DIP Loans</u>") to be made available in a |

---

[1] This Summary of Terms and Conditions (this "<u>Term Sheet</u>") outlines certain terms of the DIP Loan Facility (as defined herein) to be provided under a credit agreement for the DIP Loan Facility (the "<u>DIP Credit Agreement</u>") proposed to be provided by the DIP Lenders (as defined herein) subject to the conditions herein and as set forth below. This Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to outline certain basic items around which the DIP Lenders and Borden Dairy Company and its affiliated debtors and debtors-in-possession (together, the "<u>Debtors</u>") in cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") believe a financing could be structured.

[2] Reference is hereby made to that certain Financing Agreement dated as of July 6, 2017 between Borden Dairy Company, as borrower, Borden Dairy Holdings, LLC, as parent, the other borrowers thereto, the guarantors thereto, the lenders thereto (the "<u>Prepetition Lenders</u>"), and PNC Bank, National Association, a national banking association, as collateral agent and administrative agent for the lenders thereto (the "<u>Prepetition Agent</u>"; together with the Prepetition Lenders, collectively, the "<u>Prepetition Secured Parties</u>") (as amended, modified, restated or otherwise supplemented from time to time, the "<u>Prepetition Credit Agreement</u>").

[3] Sizing of the facility shall be negotiated in connection with evaluation of Remaining Carve-Out Obligations (as defined below) and wind down budgeted amounts set forth in the Debtor's Wind Down Budget (as defined below). Quantum to reflect an amount equal to the Carve-Out (as defined in the Final DIP Order not to exceed [$11,300,000] which amount may be increased for forecasted Carve-Out professional fees set forth in the Applicable Budget to the extent not paid in cash as contemplated by the Applicable Budget) *plus* amounts needed as reflected in the final Wind Down Budget *minus* cash and cash equivalents on hand (including all cash and cash equivalents held in the

single draw on the Closing Date (as defined below), in each case, subject to the terms and conditions described herein and in the DIP Credit Agreement and related documents and agreements contemplated therein and the entry of a final order of the Bankruptcy Court acceptable to the DIP Lenders in their sole discretion authorizing and approving the DIP Loan Facility (the "<u>Final DIP Order</u>"). Amounts drawn and repaid under the DIP Loan Facility may not be reborrowed.

Subject to the terms and conditions of the DIP Credit Agreement and the Final DIP Order, the proceeds of the DIP Loan Facility shall be used to fund (i) the interest, fees and expenses associated with the DIP Loan, (ii) the amount by which the Carve-Out Cap Amount (as defined in the Cash Collateral Order[4], such Carve-Out Cap Amount not to exceed $[11,300,000] which amount may be increased for forecasted Carve-Out (as defined in the Cash Collateral Order) professional fees set forth in the Applicable Budget (as defined in the Cash Collateral Order) to the extent not paid in cash as contemplated by the Applicable Budget; <u>provided</u> that, as set forth below, the cash balance of the Carve-Out Cash Account has been increased by the amount of any such forecasted Carve-Out cash professional fee payment not made as contemplated by the Applicable Budget ) exceeds the amount of cash maintained in the Carve-Out Cash Account immediately prior to such determination, which amount shall include any forecasted Carve-Out cash professional fee payment not made as contemplated by the Applicable Budget (such excess, the "<u>Remaining Carve-Out Obligations</u>") and (iii) other administrative claims set forth in the Wind Down Budget (as defined below).

On the Closing Date, the Borrower shall deposit into the Carve-Out Cash Account (i) all cash and cash equivalents on hand of the Borrower and the DIP Guarantors, other than (x) from the collection of Excluded Accounts Receivable (as defined in the Asset Purchase Agreement, dated as of June [___], 2020 (the "<u>APA</u>"), by and among the Debtors and New Dairy Opco, LLC pursuant to section 363 of the Bankruptcy Code (the "<u>Sale</u>")) and (y) any Qualified Bidder Good Faith Deposits (as defined in the Bidding Procedures approved by the Bankruptcy Court on May 22, 2020), and (ii) proceeds from the DIP Loan made on the Closing Date in an amount equal to the Remaining Carve-Out Obligations (such deposited amounts in the aggregate, the "<u>Deposit Cash</u>").

| | |
|---|---|
| **Carve-Out Cash Account:** | Commencing on the Closing Date and pursuant to the terms of the Sale Order [to be defined], the Borrower and the DIP Guarantors shall continue to maintain that certain deposit account created pursuant to the Sale Order (the "<u>Carve-Out Cash Account</u>") (which account shall either (at the option of the DIP Agent) be (i) subject to a control agreement in favor of the DIP Agent granting the DIP Agent "control" under the applicable uniform commercial code or (ii) perfected under the Final DIP Order in a manner acceptable to the DIP Agent) into which shall be deposited (immediately upon receipt) all Deposit Cash. Funds held in the Carve- |

---

Carve-Out Cash Account which amount shall include any forecasted Carve-Out cash professional fee payment not made as contemplated by the Applicable Budget, and excluding Good Faith Deposits) as of the closing date.

[4] The "Cash Collateral Order" is that certain Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Authorizing Use of Reserve Account Cash, and (D) Granting Related Relief [D.I. 369], entered by the Bankruptcy Court on March 4, 2020.

Out Cash Account shall not be withdrawn other than to pay for (i) any allowed professional fees included in the Carve-Out Cap Amount and (ii) mandatory prepayments of the DIP Loans as set forth below in Mandatory Prepayments. The DIP Agent and the DIP Lenders agree that the DIP Agent shall not enforce remedies against the Carve-Out Cash Account until the Carve-Out professional fees are paid in full up to the Carve-Out Cap Amount.

**A/R Cash Account:**  Commencing on the Closing Date and pursuant to the term of the Sale Order, the Borrower and the DIP Guarantors shall be required to maintain a deposit account (the "A/R Cash Account") with a financial institution reasonably acceptable to the DIP Agent (which account shall either (at the option of the DIP Agent) be (i) subject to a control agreement in favor of the DIP Agent granting the DIP Agent "control" under the applicable uniform commercial code or (ii) perfected under the Final DIP Order in a manner acceptable to the DIP Agent) into which the Borrower shall deposit, or have deposited, promptly upon receipt all collections from Excluded Accounts Receivable (as defined in the APA) received after the Closing Date in accordance with the Sale Order. Funds held in the A/R Cash Account shall not be withdrawn by the Borrower or any DIP Guarantor, other than first to pay for mandatory prepayments of the DIP Loans as set forth below in Mandatory Prepayments, second to pay the unassumed administrative claims as of the Closing Date and third, subject to the Wind Down Budget, remaining unpaid administrative expenses of the Debtors.

**Wind Down Budget:**  The Debtors shall provide a proposed wind down budget to the DIP Agent, and the Debtors and the DIP Agent shall negotiate in good faith to reach an agreement on such budget on or before July 3, 2020, but in any event no later than the Closing Date (the "Wind Down Budget").

**Closing Date:**  The date of (i) the satisfaction or waiver of the Exclusive Funding Conditions (as defined below), (ii) the funding of the DIP Loan Facility and (iii) the consummation of the Sale pursuant to the APA.

**Court Approval:**  The Debtors shall promptly file a motion for entry of a final order approving the DIP Loan Facility on the terms and conditions outlined herein, and the Bankruptcy Court shall enter the order (the "Final DIP Order"), in form and substance acceptable to the Debtors and the DIP Agent and DIP Lenders, on or before July 7, 2020.

**Conditions to Close:**  The DIP Loan Facility will contain the following conditions precedent to closing, each of which shall be subject to waiver with the consent of the Debtors and the DIP Agent (the following conditions, the "Exclusive Funding Conditions"):

1. All documentation relating to the DIP Loan Facility (the "DIP Credit Documentation") shall be in form and substance reasonably satisfactory to the Debtors, the DIP Agent and the DIP Lenders, and shall have been duly executed and delivered by the Debtors.

2. All documentation relating to the Sale, including the APA and the definition (and schedule) of Excluded Accounts Receivable set forth therein, shall have been completed in form and substance reasonably satisfactory to the Debtors, the DIP Agent and the DIP Lenders. All

conditions precedent to the Sale shall have been met and the Sale shall have been consummated in accordance with the terms of the APA (without any amendment, modification or waiver of any of the provisions thereof that would be adverse to the DIP Lenders without the consent of DIP Agent and the DIP Lenders) and all requirements of law.

3. The Debtors and the DIP Agent shall have agreed on the terms of the Wind Down Budget.

4. All Deposit Cash shall be deposited into the Carve-Out Cash Account. After funding the Carve-Out Cash Account in an amount equal to the Carve-Out Cap Amount, all cash and cash equivalents of the Borrower and the DIP Guarantors shall be deposited into the A/R Cash Account.

5. The Final DIP Order shall have been entered by the Bankruptcy Court and be in full force and effect.

6. Other than the Final DIP Order, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Loan Facility or the exercise by the DIP Agent at the direction of the Required DIP Lenders of its rights as a secured party with respect to the DIP Collateral (as defined below).

7. Other than as a result of or in connection with the Chapter 11 Cases, all governmental and third party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Loan Facility, if any, shall have been obtained (without the imposition of any conditions that are not acceptable to the DIP Agent at the direction of the Required DIP Lenders in their reasonable discretion) and shall remain in effect.

8. Subject to the entry of the Final DIP Order, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid and perfected lien on and security interest in the DIP Collateral on the basis and with the priority set forth herein.

9. The DIP Agent shall have received, at least three (3) Business Days, prior to the Closing Date, all documentation and other information required by the DIP Agent and regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act. For all such documentation and information, the DIP Agent shall make a request [no later than five (5) Business Days] prior to the deadline to deliver such documentation or information.

10. Payment of fees and expenses due to the DIP Agent and the DIP Lenders incurred in connection with this Term Sheet and the transactions contemplated hereby, to the extent invoiced at least one (1) Business Day prior to the Closing Date (except as otherwise reasonably agreed by the

26674124.1

074658.16108/122467469v.2

Borrower), and required to be paid on the Closing Date (which amounts shall be offset against the cash proceeds of the DIP Loan Facility).

11. The Excluded Accounts Receivable shall be acceptable to the DIP Agent and the DIP Lenders in their sole discretion.

12. The representations and warranties set forth in the DIP Credit Agreement and the other DIP Credit Documentation shall be usual and customary for a loan of this nature and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date.

| | |
|---|---|
| **Interest:** | L + 7.25% per annum. |
| **Fees:** | Upfront fee in an amount equal to 1.00% of the DIP Loan Facility. |
| **Maturity:** | The earliest of (i) any date on which all of the outstanding principal amount of any DIP Loans and any other amounts due and owing under the DIP Credit Agreement and the other DIP Credit Documentation shall be paid in full in cash, (ii) 75 days following entry of the Final DIP Order, (iii) the acceleration of the DIP Loans and the termination of all commitments under the DIP Loan Facility in accordance with the terms thereof, and (iv) the effective date of any liquidating chapter 11 plan that pays all obligations of the Debtors under the DIP Loan Facility in full. |
| **DIP Loan Liens and Claims:** | All obligations of the Debtors under the DIP Loan Facility shall (the assets secured as described below, the "<u>DIP Collateral</u>"): |

i.    ***364(d) Liens***: be secured by first priority perfected senior priming lien on, and security interest in, the Collateral (as defined in the Prepetition Credit Agreement), which shall prime all prepetition liens on the Collateral (subject to Permitted Liens pursuant to, and as defined in, the Prepetition Credit Agreement).

ii.   ***364(c)(2) Liens***:  be secured by first priority perfected security interests on all of the Debtors' unencumbered property, including without limitation all cash on hand, the Carve-Out Cash Account, the A/R Cash Account, all Excluded Accounts Receivable, all Avoidance Actions, all causes of action retained by the Debtors and not sold pursuant to the APA and all other assets of the estate.

iii.  ***364(c)(1) Claims***: constitute allowed superpriority administrative claims which shall have priority over all administrative claims, priority claims and all other claims against the Debtors subject only to payment of the Remaining Carve-Out Obligations.

iv.   ***Information and Access Rights:*** Information rights and the provision of documents and information, in each case as reasonably requested by the DIP Agent, and reasonable access to the Debtors and their management.

| | |
|---|---|
| **Replacement Carve-Out:** | The foregoing liens and claims granted to secure the DIP Loan shall be subject to a carve-out from the DIP Collateral for the benefit of the Carve-Out professionals |

26674124.1

074658.16108/122467469v.2

in an amount equal to the Carve-Out Cap Amount, which shall replace the Carve-Out established for such professionals by the Cash Collateral Order.

| | |
|---|---|
| **Liquidating Plan:** | No later than three days after entry of the Final DIP Order, the Debtors shall amend the plan and disclosure statement on file with the Bankruptcy Court to be a plan of liquidation, each in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders (as so amended, the "Plan" and "Disclosure Statement"). |
| **Amortization and Mandatory Prepayments**: | The DIP Loans shall be repaid on a weekly basis in an amount equal to the collections of the Excluded Accounts Receivable for such week ending [_____] from cash amounts maintained in the A/R Cash Account *plus* any excess cash or cash equivalents remaining in the Carve-Out Cash Account after payment of the Carve-Out professional fees up to the Carve-Out Cap Amount. |
| | The DIP Loan Facility will contain mandatory prepayment provisions customarily found in loan agreements for similar debtor in possession financings and similar provisions acceptable to the Debtors, the DIP Agent and the DIP Lenders |
| **Representations and Warranties; Affirmative and Negative Covenants:** | The DIP Loan Facility will contain representations and warranties, affirmative covenants and negative covenants customarily found in loan agreements for similar debtor in possession financings and other representations and warranties, affirmative covenants, and negative covenants acceptable to the Debtors, DIP Agent and the DIP Lenders. |
| **Reporting Requirements:** | The Debtors shall provide the DIP Agent evidence of cash balances in the Carve-Out Cash Account and the A/R Cash Account as of the close of business on a daily basis. |
| **Events of Default:** | The DIP Loan Facility will contain customary and usual events of default for financings of this type, including, without limitation, failure to (i) make payments when due or (ii) file the Plan and Disclosure Statement by the date set forth above. |
| **Required DIP Lenders:** | DIP Lenders holding a majority of the DIP Loans. |
| **Expenses:** | Debtors shall pay all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent and DIP Lenders (including (without limitation) all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of King & Spalding LLP and Morris, Nichols, Arsht & Tunnell LLP, as counsel to certain of the DIP Lenders, and FTI Consulting, as financial advisor retained by the DIP Agent and/or DIP Lenders incurred in connection with this DIP Facility). |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the laws of the State of New York. |

26674124.1

074658.16108/122467469v.2