**Exhibit A**

**The Combined Disclosure Statement and Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BDC Inc., *et al.*, | Case No. 20-10010 (CSS) |
| Debtors.[1] | (Jointly Administered) |

**SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND
JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
BORDEN DAIRY COMPANY AND ITS AFFILIATED DEBTORS**

**ARNOLD & PORTER KAYE
SCHOLER LLP**
D. Tyler Nurnberg (admitted *pro hac vice*)
Seth J. Kleinman (admitted *pro hac vice*)
Sarah Gryll (admitted *pro hac vice*)
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Telephone:  (312) 583-2300
Facsimile:  (312) 583-2360
tyler.nurnberg@arnoldporter.com
seth.kleinman@arnoldporter.com
sarah.gryll@arnoldporter.com

*Co-Counsel to the Debtors
and Debtors in Possession*

Dated: December 11, 2020

**YOUNG CONAWAY STARGATT & TAYLOR,
LLP**
M. Blake Cleary (No. 3614)
Kenneth J. Enos (No. 4544)
Betsy L. Feldman (No. 6410)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
mbcleary@ycst.com
kenos@ycst.com
bfeldman@ycst.com

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BDC Inc. (1509); BDC Holdings, LLC (8504); ND, LLC (9109); BDC of Alabama, LLC (5598); BDC of Cincinnati, LLC (1334); BTC of Cincinnati, LLC (3462); BDC of Florida, LLC (5168); BDC of Kentucky, LLC (7392); BDC of Louisiana, LLC (4109); BDC of Madisonville, LLC (7310); BDC of Ohio, LLC (2720); BTC of Ohio, LLC (7837); BDC of South Carolina, LLC (0963); BDC of Texas, LLC (5060); CAS, LLC (9109); GSSD, LLC (9109); NDHT, LLC (7480); and BDC of Madisonville Sub, LLC (0314).  The location of the Debtors' service address is: 2807 Allen Street, Box 833, Dallas, TX 75204-4062.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ...................................... 1

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES ............................................................................................................ 15

    2.1    Classification ..................................................................................... 15

ARTICLE III BACKGROUND AND DISCLOSURES ............................................... 17

    3.1    General Background. ......................................................................... 17
    3.2    Prepetition Capital Structure.............................................................. 19
    3.3    Events Leading To the Chapter 11 Cases. ......................................... 22
    3.4    The Chapter 11 Cases. ...................................................................... 23

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES ............................. 30

    4.1    Confirmation Procedure.................................................................... 30
    4.2    Procedure for Objections .................................................................. 30
    4.3    Requirements for Confirmation ........................................................ 31
    4.4    Classification of Claims and Interests............................................... 31
    4.5    Impaired Claims or Interests. ........................................................... 32
    4.6    Confirmation without Necessary Acceptances; Cramdown. ............. 32
    4.7    Feasibility........................................................................................ 33
    4.8    Best Interests Test and Liquidation Analysis..................................... 34
    4.9    Acceptance of the Plan...................................................................... 35

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING.......... 35

    5.1    The Plan May Not Be Accepted. ...................................................... 35
    5.2    The Plan May Not Be Confirmed. .................................................... 36
    5.3    Nonconsensual Confirmation............................................................ 36
    5.4    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections. ............................................................ 36
    5.5    Objections to Classification of Claims. ............................................. 36
    5.6    Failure to Consummate the Plan........................................................ 37
    5.7    Plan Releases May Not Be Approved................................................ 37
    5.8    Reductions to Estimated Creditor Recoveries. .................................. 37
    5.9    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan. ................................................................................. 38
    5.10    No Legal or Tax Advice is Provided in this Combined Disclosure Statement and Plan............................................................................ 38
    5.11    No Admission Made. ........................................................................ 38
    5.12    Failure to Identify Litigation Claims or Projected Objections............ 38
    5.13    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ............................................................................ 38

5.14    No Representations Outside this Combined Disclosure Statement and Plan Are Authorized. ......................................................................... 39

5.15    Certain Tax Considerations ....................................................................... 39

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS ......................................... 39

6.1    Administrative Claims ............................................................................... 39
6.2    Priority Tax Claims ................................................................................... 41

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS.......................... 41

7.1    Class 1: Other Secured Claims ................................................................. 41
7.2    Class 2: Other Priority Claims ................................................................. 41
7.3    Class 3: TLB Deficiency Claim. ............................................................... 41
7.4    Class 4: General Unsecured Claims.......................................................... 42
7.5    Class 5: Intercompany Claims .................................................................. 42
7.6    Class 6: Intercompany Interests ............................................................... 42
7.7    Class 7: Interests in Holdings. .................................................................. 42
7.8    Reservation of Rights Regarding Claims and Interests ............................ 42

ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN.................................... 42

8.1    Class Entitled to Vote .............................................................................. 42
8.2    Acceptance by Impaired Classes of Claims or Interests ......................... 43
8.3    Presumed Acceptance by Unimpaired Classes ....................................... 43
8.4    Presumed Rejection by Impaired Classes ............................................... 43
8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ........ 43
8.6    Controversy Concerning Impairment ...................................................... 43
8.7    Elimination of Vacant Classes ................................................................ 43
8.8    Subordinated Claims. ............................................................................... 43

ARTICLE IX IMPLEMENTATION OF THE PLAN................................................... 44

9.1    Funding of Plan........................................................................................ 44
9.2    Substantive Consolidation. ...................................................................... 44
9.3    Post-Effective Date Debtors; Wind-Down Administrator. .................... 46
9.4    Wind-Up and Dissolution of the Debtors ............................................... 49
9.5    Operating Reports ................................................................................... 49
9.6    Post-Effective Date Professional Fees and Expenses ........................... 50
9.7    Disposition of Books and Records........................................................... 50
9.8    Corporate Action...................................................................................... 50

ARTICLE X PROVISIONS GOVERNING DISTRIBUTIONS ....................................... 50

10.1    Establishment of Reserves. ...................................................................... 50
10.2    Disbursing Agent. .................................................................................... 51
10.3    Distributions by Wind-Down Administrator. .......................................... 51
10.4    Waterfall. .................................................................................................. 51
10.5    Timing of Distributions. .......................................................................... 51
10.6    Distributions upon Allowance of Disputed Claims. ............................... 52
10.7    Undeliverable and Unclaimed Distributions............................................ 52

27405501.4

10.8    Interest on Claims. ................................................................................... 52
10.9    No Distribution in Excess of Allowed Amount of Claim. .................................. 52
10.10   Means of Cash Payment. ........................................................................... 52
10.11   Delivery of Distribution. ........................................................................... 52
10.12   Record Date for Distributions. .................................................................... 53
10.13   No Distributions Pending Allowance. ............................................................ 53
10.14   Withholding and Reporting Requirements. ..................................................... 53
10.15   Setoffs and Recoupment. .......................................................................... 53
10.16   *De Minimis* Distributions. ........................................................................ 53
10.17   Extensions of Time ................................................................................... 53
10.18   Allocation Between Principal and Interest ...................................................... 54
10.19   Surrender of Cancelled Instruments or Securities. ........................................... 54

ARTICLE XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF
CLAIMS ................................................................................................................. 54

11.1    Allowance of Claims and Interests ............................................................... 54
11.2    Claims Administration Responsibility. ........................................................... 54
11.3    Claims Objections..................................................................................... 54
11.4    Estimation of Contingent or Unliquidated Claims............................................. 55
11.5    Claims Paid and Payable by Third Parties ...................................................... 55
11.6    Adjustment to Claims without Objection ........................................................ 55
11.7    Disallowance of Claims. ............................................................................ 55
11.8    Amendments to Proofs of Claim.................................................................. 56

ARTICLE XII EXECUTORY CONTRACTS ................................................................. 56

12.1    Executory Contracts Deemed Rejected ......................................................... 56
12.2    Asset Purchase Agreement ........................................................................ 56
12.3    Rejection Claims. ..................................................................................... 56
12.4    Insurance Contracts.................................................................................. 56

ARTICLE XIII CONFIRMATION AND CONSUMMATION OF THE PLAN ..................... 57

13.1    Conditions Precedent to the Effective Date .................................................... 57
13.2    Notice of Effective Date ............................................................................ 57
13.3    Waiver of Conditions Precedent to the Effective Date ...................................... 57
13.4    Effect of Non-Occurrence of Effective Date ................................................... 58
13.5    Substantial Consummation. ........................................................................ 58

ARTICLE XIV EFFECTS OF CONFIRMATION ........................................................ 58

14.1    Compromise and Settlement of Claims, Interests, and Controversies. ................... 58
14.2    Release of Liens. ..................................................................................... 59
14.3    Exculpation, Releases, and Injunctions. ........................................................ 59
14.4    Term of Bankruptcy Injunction or Stays ....................................................... 62
14.5    Defined Benefit Pension Plan ..................................................................... 62
14.6    Vesting Provision..................................................................................... 63
14.7    Recoupment. .......................................................................................... 63
14.8    Reimbursement or Contribution. ................................................................. 63

ARTICLE XV RETENTION OF JURISDICTION ....................................................................... 64

    15.1    Jurisdiction of Bankruptcy Court............................................................................. 64

ARTICLE XVI MISCELLANEOUS PROVISIONS ...................................................................... 66

    16.1    Modification of the Plan ........................................................................................... 66
    16.2    Effect of Confirmation on Modifications. ............................................................... 66
    16.3    Revocation, Withdrawal, or Non-Confirmation of the Plan ................................... 66
    16.4    Binding Effect.......................................................................................................... 66
    16.5    Subordination Rights ............................................................................................... 66
    16.6    Severability of Plan Provisions ............................................................................... 67
    16.7    Payment of Statutory Fees; Filing of Quarterly Reports........................................ 67
    16.8    Dissolution of the Committee. ................................................................................. 67
    16.9    Exemption from Section 1146 ................................................................................. 68
    16.10   Closing of Chapter 11 Cases; Caption Change ...................................................... 68
    16.11   Filing of Additional Documents ............................................................................. 68
    16.12   Successors and Assigns ........................................................................................... 68
    16.13   Exhibits and Schedules ........................................................................................... 68
    16.14   Reservation of Rights............................................................................................... 69
    16.15   Entire Agreement..................................................................................................... 69
    16.16   Votes Solicited in Good Faith................................................................................. 69
    16.17   Waiver or Estoppel ................................................................................................. 69
    16.18   Further Assurances ................................................................................................. 70

ARTICLE XVII RECOMMENDATION ...................................................................................... 70

27405501.4

## **EXHIBITS**

EXHIBIT A          Liquidation Analysis

EXHIBIT B          Disclosure Statement Order

## DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF BORDEN DAIRY COMPANY AND ITS AFFILIATED DEBTORS.  NOTHING IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE V HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

FACTUAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OR UPON THE MERITS OF THE PLAN.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***").  SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS.  FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.  MAKING INVESTMENT DECISIONS BASED ON THE

INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE WIND-DOWN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS COMBINED DISCLOSURE STATEMENT AND PLAN IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN FROM TIME TO TIME.

CONFIRMATION AND CONSUMMATION OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XIII OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN. THERE IS NO ASSURANCE THAT THIS COMBINED DISCLOSURE STATEMENT AND PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

IF THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THIS COMBINED DISCLOSURE STATEMENT AND PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THIS COMBINED DISCLOSURE STATEMENT AND PLAN) WILL BE BOUND BY THE TERMS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

27405501.4

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND, AS FURTHER SET FORTH HEREIN, URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

27405501.4

**INTRODUCTION**[2]

The Debtors hereby jointly propose the following combined Disclosure Statement and Plan for the liquidation of the Debtors' remaining Assets and Distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtors as set forth herein.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of the Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

**ARTICLE I**
**DEFINED TERMS AND RULES OF INTERPRETATION**

**Defined Terms**

**1.1**    "***503(b)(9) Claims***" shall mean Claims arising under section 503(b)(9) of the Bankruptcy Code.

**1.2**    "***Administrative Claim***" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date and allowed pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**1.3**    "***Administrative Claims Objection Deadline***" shall mean the date that is 45 days after the Post-Effective Date Administrative Claims Bar Date.

**1.4**    "***Affiliate***" shall mean "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.

**1.5**    "***Allowed***" shall mean, with respect to any Claim or Interest, all or that portion, as applicable, of any Claim against or Interest in any Debtor that (a) has been listed in the Schedules (as such Schedules may be amended by the Debtors from time to time) as liquidated in amount and not "Disputed" or "Contingent," and for which no contrary or superseding Proof of Claim has been timely Filed or that the Debtors do not timely object to in accordance with the terms of the Plan, (b) has been expressly allowed by Final Order or under the Plan, (c) has been compromised, settled or otherwise resolved pursuant to the terms of the Plan, the Bankruptcy Rules, the Local Rules, or another Final Order of the Bankruptcy Court, or (d) is evidenced

---

[2]    Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, the General Bar Date Order, Pre-Confirmation Administrative Claims Bar Date Order, or another Final Order of the Bankruptcy Court a Proof of Claim or request for payment is not and shall not be required to be Filed) that the Debtors or any other party in interest do not timely object to in accordance with the terms of the Plan; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein.  Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court or as otherwise agreed by the Debtors, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees, or charges on such Claims from and after the Petition Date, and no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Post-Effective Date Debtor, as applicable.  For the avoidance of doubt, (i) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim, and (ii) a Disputed Claim shall not become an Allowed Claim unless as otherwise provide for in the Plan.  "***Allow***" and "***Allowing***" shall have correlative meanings.

1.6      "***Assets***" shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records.

1.7      "***Asset Purchase Agreement***" shall mean that certain Asset Purchase Agreement, dated as of July 1, 2020, by and among Borden, each of the subsidiaries of Borden party thereto, and the Purchaser.

1.8      "***Avoidance Actions***" shall mean any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 105(a), 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code, or any similar federal, state, or common law causes of action, including, without limitation, Preference Actions.

1.9      "***Ballot***" shall mean the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject the Plan.

1.10     "***Bankruptcy Code***" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.11     "***Bankruptcy Court***" shall mean the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of any withdrawal of the reference under section 157(d) of the Judicial Code, the United States District Court for the District of Delaware.

1.12     "***Bankruptcy Rules***" shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, the Local Rules, or the general and chambers rules of the Bankruptcy Court, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.13     "***Bar Date***" shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing Proofs of Claim, motions for allowance of Administrative Claims, or proofs of Interest against the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

1.14     "***Borden***" shall mean BDC Inc. (f/k/a Borden Dairy Company).

**1.15** "*Business Day*" shall mean any day, other than a Saturday, Sunday, or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

**1.16** "*Carve-Out Account*" shall mean the account, established pursuant to the Sale Order.

**1.17** "*Cash*" shall mean money that is legal tender of the United States of America.

**1.18** "*Cash Collateral Order*" shall mean the *Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Authorizing Use of Reserve Account Cash, and (D) Granting Related Relief* [D.I. 369], entered by the Bankruptcy Court on March 4, 2020, as amended from time to time.

**1.19** "*Causes of Action*" shall mean, without limitation, any actions, Claims, interests, controversies, causes of action, crossclaims, counterclaims, third-party claims, recoupments, demands, rights, actions, suits, rights of setoff, claims for breach of duty imposed by law or in equity, damages, remedies, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, judgments, accounts, debts, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. For the avoidance of doubt, "Causes of Action" includes, without limitation: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) Avoidance Actions; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

**1.20** "*Chapter 11 Cases*" shall mean (a) when used in reference to a particular Debtor, the chapter 11 case Filed for such Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used in reference to all the Debtors, the jointly administered chapter 11 cases for all of the Debtors in the Bankruptcy Court and currently styled *In re BDC Inc.*, Case No. 20-10010 (CSS) (Jointly Administered).

**1.21** "*Claim*" shall mean a claim against any Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

**1.22** "*Claims Agent*" shall mean the Debtors' claims agent, Donlin, Recano & Company, Inc.

**1.23** "*Claims Objection Deadline*" shall mean the deadline for objecting to a Claim, which shall be ninety (90) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided, however*, that the Wind-Down Administrator may seek extensions of this date from the Bankruptcy Court.

**1.24** "*Claims Register*" shall mean the official register of Claims maintained by the Claims Agent.

**1.25** "*Class*" shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article II of this combined Disclosure Statement and Plan.

**1.26** "*Committee*" shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.27** "*Confirmation*" shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.28** "*Confirmation Date*" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.29** "*Confirmation Hearing*" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.30** "*Confirmation Order*" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

**1.31** "*Consummation*" shall mean the occurrence of the Effective Date.

**1.32** "*Contingent*" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.33** "*Creditor*" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.34** "*Debtor*" shall mean one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

**1.35** "*Debtors*" shall mean, collectively, BDC Inc. (f/k/a Borden Dairy Company); BDC Holdings, LLC (f/k/a Borden Dairy Holdings, LLC); ND, LLC (f/k/a National Dairy, LLC); BDC of Alabama, LLC (f/k/a Borden Dairy Company of Alabama, LLC); BDC of Cincinnati, LLC (f/k/a Borden Dairy Company of Cincinnati, LLC); BTC of Cincinnati, LLC (f/k/a Borden Transport Company of Cincinnati, LLC); BDC of Florida, LLC (f/k/a Borden Dairy Company of Florida, LLC); BDC of Kentucky, LLC (f/k/a Borden Dairy Company of Kentucky, LLC); BDC of Louisiana, LLC (f/k/a Borden Dairy Company of Louisiana, LLC); BDC of Madisonville, LLC (f/k/a Borden Dairy Company of Madisonville, LLC); BDC of Ohio, LLC (f/k/a Borden Dairy Company of Ohio, LLC); BTC of Ohio, LLC (f/k/a Borden Transport Company of Ohio, LLC); BDC of South Carolina, LLC (f/k/a Borden Dairy Company of South Carolina, LLC); BDC of Texas, LLC (f/k/a Borden Dairy Company of Texas, LLC); CAS, LLC (f/k/a Claims Adjusting Services, LLC); GSSD, LLC (f/k/a Georgia Soft Serve Delights, LLC); NDHT, LLC (f/k/a NDH Transport, LLC); and BDC of Madisonville Sub, LLC (f/k/a RGC, LLC).

**1.36** "*Disallowed*" shall mean, with respect to any Claim or Interest or portion of a Claim or Interest, any Claim against any Debtor that (a) has been Disallowed by a Final Order of the Bankruptcy Court, (b) has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as $0.00, Contingent, Disputed, or unliquidated and as to which no Proof of Claim has been Filed by the applicable Bar Date or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court, (c) has been agreed to by the Holder of such Claim and the applicable Debtor to be equal to $0.00 or to be expunged, (d) has been reclassified, expunged, subordinated, or estimated to the extent that such reclassification, expungement, subordination, or estimation results in a reduction in the Filed amount of any Proof of Claim, or (e) has not been listed by such Debtor on the Schedules and as to which no Proof of Claim has been Filed by the applicable Bar Date or deemed timely or properly Filed pursuant to any Final Order of the Bankruptcy Court.  In each case, a Disallowed Claim is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.37** "*Disbursing Agent*" shall mean the Wind-Down Administrator; *provided, however*, that the Wind-Down Administrator may, in its discretion, retain a third party to act as Disbursing Agent.

**1.38** "*Disclosure Statement*" shall mean the disclosure statement, including all exhibits and schedules thereto and references therein (as amended, supplemented, or modified from time to time), that is embodied within this combined Disclosure Statement and Plan and prepared and distributed in accordance with, among others, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

**1.39** "*Disputed*" shall mean, with respect to any Claim or Interest, (a) any Claim or Interest, proof of which was timely and properly Filed, which is disputed under the terms of the Plan or as to which the Debtors have interposed and not withdrawn an Objection or request for estimation (pursuant to the terms of the Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed, (c) any Claim that is listed in the Schedules as unliquidated, Contingent, or Disputed, or (d) any Claim or Interest that is otherwise disputed by any of the Debtors, the Wind-Down Administrator, or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court. For the avoidance of doubt, if no Proof of Claim has been Filed by the applicable Bar Date and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0.00, Disputed, Contingent, or unliquidated, such Claim shall be Disallowed and shall be expunged from the Claims Register without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

**1.40** "*Distribution*" shall mean a delivery of Cash by the Disbursing Agent to the Holders of Allowed Claims pursuant to the Plan.

**1.41** "*Distribution Date*" shall mean the date on which a Distribution is made pursuant to the Plan.

**1.42** "*Distribution Proceeds*" shall mean all Cash remaining in the Distribution Reserve after payment in full or satisfaction of the (i) First Tier Claims, and (ii) the payment of, and reserving for, expenses of the Wind-Down Administrator.

**1.43** "*Distribution Record Date*" shall mean the date established for determining the Holders of Claims entitled to Distributions pursuant to the Plan, which shall be the Confirmation Date, or such other date established in the Confirmation Order.

**1.44** "*Distribution Reserve*" shall mean the reserve(s) established for maintaining Cash or other assets from time to time necessary to satisfy payments on and after the Effective Date to Holders of Allowed Claims. The Distribution Reserve shall be funded from the Excess Cash and the proceeds of Retained Assets.

**1.45** "*Effective Date*" shall mean the first Business Day after the later of the date on which (a) all conditions in Article XIII of the Plan have been satisfied or waived in accordance with that Article, and (b) no stay of the Confirmation Order is in effect.

**1.46** "*Effective Date Notice*" shall mean the notice of the Effective Date.

**1.47** "*Entity*" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

**1.48** "*Estate*" shall mean, as to each Debtor, the estate created for such Debtor in its Chapter 11 Cases pursuant to sections 301 and 541 of the Bankruptcy Code.

**1.49** "*Excess Cash*" shall mean any Cash held by the Post-Effective Date Debtors as of the Effective Date.

**1.50** "*Exculpated Parties*" shall mean, collectively, and in each case in its capacity as such, each of: (a) the Debtors; (b) the Committee and any member thereof; (c) each current and former Affiliate of each Entity in clause (a) through clause (b); and (d) each Related Party of each Entity in clause (a) through clause (c); *provided*, *however*, that the Related Parties of each of the Debtors shall not include the Existing Equity Holders.

**1.51** "*Executory Contract*" shall mean a contract or unexpired lease to which a Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.52** "*Existing Equity Holders*" shall mean the Holders of Interests in Holdings, including, without limitation, Laguna and ACON Dairy Investors, L.L.C.

**1.53** "*File*," "*Filed*," or "*Filing*" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.54** "*Final Order*" shall mean an order, ruling, or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument, or rehearing shall be pending, or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided*, that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

**1.55** "*First Day Declaration*" shall mean the *Declaration of Jason Monaco in Support of Chapter 11 Petitions and First Day Motions* [D.I. 15].

**1.56** "*First Tier Claims*" shall mean all Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Other Priority Claims, and Other Secured Claims.

**1.57** "*General Bar Date Order*" shall mean the *Order (I) Establishing Bar Dates For Filing Proofs of Prepetition Claims, Including 503(b)(9) Claims, and (II) Approving the Form of and Manner of Notice Thereof* [D.I. 435], entered by the Bankruptcy Court on March 20, 2020.

**1.58** "*General Unsecured Claim*" shall mean an unsecured Claim against a Debtor, but excluding any Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Other Priority Claims, Intercompany Claims, Intercompany Interests, Interests in Holdings, and the TLB Deficiency Claim.

**1.59** "*Governmental Unit*" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.60** "*Holder*" shall mean any Entity holding a Claim or Interest.

**1.61** "*Holdings*" shall mean BDC Holdings, LLC (f/k/a Borden Dairy Holdings, LLC), a Delaware limited liability company and the ultimate parent of all of the Debtors.

**1.62** "*Impaired*" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.63** "*Impaired Class*" shall mean a Class of Claims or Interests that is Impaired.

**1.64** "*Intercompany Claim*" shall mean a Claim by a Debtor against another Debtor.

**1.65** "*Intercompany Interest*" shall mean an Interest in a Debtor held by another Debtor.

**1.66** "*Interests*" shall mean any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership or profits interests of the Debtors, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any of the Debtors, whether or not arising under or in connection with any employment agreement, and whether or not certificated, transferable, preferred, common, voting, or denominated "stock," or similar security, that existed immediately before the Effective Date.

**1.67** "*Insurance Contracts*" (each an "*Insurance Contract*") shall mean all insurance policies that have been issued at any time to or provide coverage to any of the Debtors and all agreements, documents or instruments relating thereto that were not transferred to the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order (as supplemented through D.I. 987), including, but not limited to, any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies.

**1.68** "*Insurer*" shall mean any company or other Entity that issued an Insurance Contract, including any third party administrator, and any respective predecessors and/or affiliates thereof.

**1.69** "*Interim Compensation Order*" shall mean the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 372], entered by the Bankruptcy Court on March 4, 2020.

**1.70** "*Internal Revenue Code*" shall mean the United States Internal Revenue Code 1986, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

**1.71** "*IRS*" shall mean the Internal Revenue Service.

**1.72** "*Judicial Code*" shall mean title 28 of the United States Code, 28 U.S.C. §§ 1–5001.

**1.73**    "*Laguna*" shall mean, collectively, Laguna Dairy, S. de R.L. de C.V. (f/k/a Laguna Dairy, S.A. de C.V.) ("*Laguna Dairy*"), New Laguna, LLC ("*New Laguna*"), and each of their respective subsidiaries and affiliates.

**1.74**    "*LALA*" shall mean, collectively, Grupo LALA S.A.B. de C.V. and Comercializadora de Lacteos y Derivados, S.A. de C.V. ("*COMLADE*"), and each of their respective subsidiaries and affiliates.

**1.75**    "*LALA/Laguna Entities*" shall mean, collectively, Laguna and LALA.

**1.76**    "*Lien*" shall mean a lien as such term is defined in section 101(37) of the Bankruptcy Code.

**1.77**    "*Local Rules*" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.78**    "*Objection*" shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

**1.79**    "*OCP Order*" shall mean the *Order, Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code, (I) Authorizing the Debtors to Retain and Compensate Certain Professionals Utilized in the Ordinary Course of Business, and (II) Waiving Certain Information Requirements of Local Rule 2016-2 [D.I. 373]*, entered by the Bankruptcy Court on March 4, 2020.

**1.80**    "*Other Priority Claim*" shall mean any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**1.81**    "*Other Secured Claim*" shall mean any Secured Claim against the Debtors other than any claims arising under the Prepetition Credit Agreement.

**1.82**    "*Paid in Full*," "*Payment in Full*," **or** "*Pay in Full*" shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.83**    "*Person*" shall mean a person as such term is defined in section 101(41) of the Bankruptcy Code.

**1.84**    "*Petition Date*" shall mean January 5, 2020.

**1.85**    "*Plan*" shall mean this second amended joint plan of liquidation under chapter 11 of the Bankruptcy Code, and all exhibits, supplements, appendices, and schedules, as each may be altered, amended, supplemented or other modified from time to time, including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

**1.86**    "*Plan Supplement*" shall mean the ancillary documents necessary to the implementation and effectuation of the Plan, which shall be Filed on or before the date that is fourteen (14) days prior to the Voting Deadline; *provided*, *however*, that the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement, in accordance with the terms of the Plan.

**1.87**    "*Post-Effective Date Administrative Claims Bar Date*" shall mean the first Business Day that is thirty (30) days after the Effective Date; *provided*, *however*, that, for the avoidance of doubt, the Bar Date for Administrative Claims arising prior to August 6, 2020 is the Pre-Confirmation Administrative Claims

Bar Date, and the Bar Date for Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code is the date as established in the General Bar Date Order.

1.88    "*Post-Effective Date Debtors*" shall mean the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.89    "*Pre-Confirmation Administrative Claims Bar Date*" shall mean September 4, 2020, as the Bar Date for Administrative Claims arising prior to August 6, 2020.

1.90    "*Pre-Confirmation Administrative Claims Bar Date Order*" shall mean the *Order (I) Establishing a Deadline for Filing Requests for Allowance of Administrative Expense Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 1025], entered by the Bankruptcy Court on August 6, 2020.

1.91    "*Preference Actions*" shall mean any Causes of Action arising under section 547 of the Bankruptcy Code or similar preference-related actions arising under the Bankruptcy Code or applicable non-bankruptcy law.

1.92    "*Prepetition Agent*" shall mean PNC Bank, National Association, in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement (or any successor to PNC Bank, National Association, in such capacity).

1.93    "*Prepetition Credit Agreement*" shall mean that certain Financing Agreement, dated as of July 6, 2017 (as amended, restated, supplemented, or otherwise modified from time to time), by and among Borden, Holdings, each subsidiary of Holdings listed as a "Guarantor" on the signature pages thereto, the Prepetition Lenders, and the Prepetition Agent.

1.94    "*Prepetition Lenders*" shall mean, collectively, the RCF Lenders, the TLA Lenders, and the TLB Lenders.

1.95    "*Prepetition Loan Documents*" shall mean the "Loan Documents" as defined in the Prepetition Credit Agreement.

1.96    "*Priority Tax Claim*" shall mean a Claim or a portion of a Claim of a Governmental Unit for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

1.97    "*Professional*" shall mean an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, including Entities retained in accordance with the OCP Order; or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.98    "*Professional Fee Claims*" shall mean all Claims for accrued, contingent, and/or unpaid fees and expenses (including, but not limited to, transaction fees and success fees) for compensation for services rendered or reimbursement of expenses incurred by a Professional in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.99** "***Professional Fee Claims Bar Date***" shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Wind-Down Administrator Files and serves the Effective Date Notice.

**1.100** "***Professional Fee Reserve***" shall mean the reserve account holding funds in an amount equal to the total Professional Fee Reserve Amount to be funded by the Debtors with Cash on or prior to the Effective Date.

**1.101** "***Professional Fee Reserve Amount***" shall mean the aggregate amount of Professional Fee Claims that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates the Professionals shall deliver to the Debtors as set forth in section 6.1(c) of the Plan.

**1.102** "***Proof of Claim***" shall mean a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

**1.103** "***Pro Rata***" shall mean the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests, as applicable, in that Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan.

**1.104** "***Purchased Assets***" shall mean the "Assets" as defined in the Asset Purchase Agreement.

**1.105** "***Purchaser***" shall mean New Dairy OpCo, LLC.

**1.106** "***RCF Claim***" shall mean all Obligations (as defined in the Prepetition Credit Agreement), including, without limitation, all Bank Product Obligations (as defined in the Prepetition Credit Agreement), owed to the RCF Lenders arising out of, relating to, or in connection with the Prepetition Credit Agreement, and any other Claim held by the RCF Lenders that is otherwise derived from or based upon the RCF Facility.

**1.107** "***RCF Facility***" shall mean that certain prepetition revolving credit facility under the Prepetition Credit Agreement in the original aggregate principal amount of up to $60,000,000, which, by amendment, was increased to $70,000,000, and which included a $25,000,000 subfacility for the issuance of letters of credit, at any time outstanding.

**1.108** "***RCF Lenders***" shall mean the lenders under the RCF Facility from time to time.

**1.109** "***RCF/TLA Claims***" shall mean, collectively, the RCF Claim and the TLA Claim.

**1.110** "***RCF/TLA Lenders***" shall mean, collectively, the RCF Lenders and the TLA Lenders.

**1.111** "***Rejection Claims***" shall mean any Claim arising from, or relating to, the rejection of an Executory Contract.

**1.112** "***Related Parties***" shall mean, collectively, current and former officers, directors, managers, members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, management

companies, fund advisors, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

**1.113** "*Release Opt-Out Election*" shall mean the timely election to "opt-out" of being a Releasing Party by (a) submitting a Ballot by the Voting Deadline that (i) does not vote to accept the Plan, and (ii) selects the option set forth on the Ballot to not grant the releases set forth in section 14.3(c) of the Plan, or (b) Filing a written objection to the releases set forth in section 14.3(c) of the Plan by the objection deadline established by the Solicitation Procedures Order.

**1.114** "*Released Parties*" shall mean, collectively, in each case in its capacity as such: (a) each of the Debtors; (b) each of the Post-Effective Date Debtors; (c) the Wind-Down Administrator; (d) the Prepetition Agent; (e) the Prepetition Lenders; (f) the Committee; (g) the Purchaser; (h) each current and former Affiliate of each Entity in clauses (a) through (g); and (i) each Related Party of each Entity in clauses (a) through (h); *provided*, *however*, that the Related Parties of each of the Debtors shall not include the Existing Equity Holders; *provided*, *further*, that any Holder of a Claim or Interest in the Debtors that timely elects to "opt-out" of granting releases in accordance with the Release Opt-Out Election shall not be a "Released Party."

**1.115** "*Releasing Parties*" shall mean, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Post-Effective Date Debtors; (c) the Wind-Down Administrator; (d) the Prepetition Agent; (e) the Prepetition Lenders; (f) the Committee; (g) the Purchaser; (h) all Holders of Claims against or Interests in the Debtors that (x) vote to accept the Plan, (y) are deemed to accept the Plan and do not opt-out of being a Releasing Party by exercising the Release Opt-Out Election, or (z) vote to reject the Plan, or receive a Ballot, but do not vote to accept or reject the Plan, and, in either case, do not affirmatively elect to opt-out of being a Releasing Party by exercising the Release Opt-Out Election; (i) each current and former Affiliate of each Entity in clauses (a) through (h); and (j) each Related Party of each Entity in clauses (a) through (i); *provided*, *however*, that the Related Parties of each of the Debtors shall not include the Existing Equity Holders.

**1.116** "*Reserves*" shall mean, collectively, the Professional Fee Reserve, the Distribution Reserve, the Wind-Down Expense Reserve, and any other reserves established by the Wind-Down Administrator pursuant to Article X of the Plan.

**1.117** "*Retained Assets*" shall mean, collectively, any Assets that remain property of the Estates after the closing of the Sale.

**1.118** "*Retained Causes of Action*" shall mean certain Causes of Action owned and/or belonging to the Debtors that are not waived, relinquished, exculpated, released, compromised, transferred, or settled pursuant to the Plan or a Final Order of the Bankruptcy Court, as the same may be amended, modified, or supplemented from time to time by the Debtors; *provided*, that Retained Causes of Action shall not include any Causes of Action against any Released Party.  The Debtors shall include a description of Retained Causes of Action in the Plan Supplement.

**1.119** "*Sale*" shall mean the sale of the Purchased Assets approved by the Court pursuant to the *Order Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [D.I. 918].

**1.120** "*Secured Claim*" shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or

upon any right, title or interest of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order).  The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

**1.121**    "*Schedules*" shall mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.122**    "*Solicitation Procedures Order*" shall mean that certain order conditionally approving the Disclosure Statement, scheduling the Confirmation Hearing, and establishing procedures for solicitation and tabulation of votes on the Plan.

**1.123**    "*Taxes*" shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.124**    "*TLA Claim*" shall mean any Claim held by the TLA Lenders that is derived from or based upon the TLA Facility.

**1.125**    "*TLA Facility*" shall mean that certain prepetition term loan A credit facility under the Prepetition Credit Agreement in the original aggregate principal amount of up to $30,000,000 at any time outstanding.

**1.126**    "*TLA Lenders*" shall mean the lenders under the TLA Facility from time to time.

**1.127**    "*TLB Claim*" shall mean any Claim held by the TLB Lenders that is derived from or based upon the TLB Facility.

**1.128**    "*TLB Deficiency Claim*" shall mean any portion of the TLB Claim constituting a general unsecured claim under section 506(a) of the Bankruptcy Code.

**1.129**    "*TLB Facility*" shall mean that certain prepetition term loan B credit facility under the Prepetition Credit Agreement in the original aggregate principal amount of up to $175,000,000 at any time outstanding.

**1.130**    "*TLB Lenders*" shall mean the lenders under the TLB Facility from time to time.

**1.131**    "*Unclassified Claims*" shall mean any Administrative Claims (including Professional Fee Claims) and Priority Tax Claims.

**1.132**    "*Unimpaired*" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.133**    "*U.S. Trustee*" shall mean the United States Trustee for the District of Delaware.

**1.134** "***U.S. Trustee Fees***" shall mean fees payable pursuant to 28 U.S.C. § 1930 and any interest accruing thereon pursuant to 31 U.S.C. § 3717.

**1.135** "***Voting Deadline***" shall mean **December 8, 2020, at 4:00 p.m. (prevailing Eastern Time)**, the date and time by which Ballots to accept or reject the Plan must be actually received by the Claims Agent to be counted, as set forth by the Solicitation Procedures Order.

**1.136** "***Wind-Down Administrator***" shall mean the Person or Entity, selected by the Debtors, with the consent of the Committee, who will serve as the sole officer and director and/or manager, as applicable, of each of the Post-Effective Date Debtors until their formal dissolution, and shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms of the Plan.

**1.137** "***Wind-Down Expenses***" shall mean the reasonable fees, costs and expenses of the Wind-Down Administrator, and the Wind-Down Administrator's retained professionals, as determined in the reasonable discretion of the Wind-Down Administrator.  For the avoidance of doubt, U.S. Trustee Fees shall be considered a Wind-Down Expense.

**1.138** "***Wind-Down Expense Reserve***" shall mean the reserve established pursuant to Article X of the Plan (which shall not exceed $1.275 million) for payment of the Wind-Down Expenses, which may be replenished or adjusted from time to time by Cash held by the Post-Effective Date Debtors, other than funds in the other Reserves.

**1.139** "***Wind-Down Protected Parties***" shall mean, collectively, the Post-Effective Date Debtors, the Wind-Down Administrator, and each of their Related Parties.

**Rules of Interpretation**

For purposes of this combined Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, of this combined Disclosure Statement and Plan; (f) all references herein to exhibits are references to exhibits in the Plan Supplement; (g) the words "herein," "hereof," and "hereto" refer to this combined Disclosure Statement and Plan in its entirety rather than to a particular portion of this combined Disclosure Statement and Plan; (h) any effectuating provisions may be interpreted by the Post-Effective Date Debtors or the Wind-Down Administrator, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; (i) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (j) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (k) unless otherwise specified herein, the rules

of construction set forth in section 102 of the Bankruptcy Code shall apply; (l) references to docket numbers are references to the docket numbers of documents Filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (n) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (o) the words "include," "includes," and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (p) references to "shareholders," "directors," and/or "officers" shall also include "members," "partners," and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (q) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (r) unless otherwise specified herein, references from or through any date mean from and including or through and including; and (s) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

**Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided*, that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Post-Effective Date Debtor, as applicable.

**Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**References to the Debtors, the Post-Effective Date Debtors, and the Wind-Down Administrator**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Post-Effective Date Debtors mean the Debtors and the Post-Effective Date Debtors, as applicable, to the extent the context requires.

Any references herein to rights or actions of "the Debtors or the Wind-Down Administrator" shall refer to the Debtors up through and until the Effective Date, and the Post-Effective Date Debtors or the Wind-Down Administrator upon or after the Effective Date.

**Controlling Document**

In the event of an inconsistency between the Plan and any document, schedule, or exhibit contained in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document, schedule, or exhibit, or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.  In the event of an inconsistency between the Confirmation Order and the Sale Order, the Sale Order shall control.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**2.1**    **Classification**.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Holders of Allowed Claims.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in this combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such Unclassified Claims is set forth below in Article VI of the Plan.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/ Designation | Plan Treatment | Estimated Amount of Claims | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 1**: Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for such | $0.00 | Unimpaired/ Deemed to Accept | 100% |

27405501.4

| Class/ Designation | Plan Treatment | Estimated Amount of Claims | Status | Projected Recovery |
|---|---|---|---|---|
| | Allowed Other Secured Claim either: (A) return of the collateral securing such Allowed Other Secured Claim; (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment that the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing. | | | |
| **Class 2**: Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for such Allowed Other Priority Claim either: (A) Cash equal to the amount of such Allowed Other Priority Claim; or (B) such other treatment that the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Other Priority Claim have agreed upon in writing. | $226,000– $404,000 | Unimpaired/ Deemed to Accept | 100% |
| **Class 3**: TLB Deficiency Claim | Each Holder of an Allowed TLB Deficiency Claim shall receive in exchange for such Allowed TLB Deficiency Claim, such Holder's Pro Rata share of the Distribution Proceeds as follows: (A) following the Initial Distribution (as defined below) and prior to any subsequent Distributions to Holders of Allowed General Unsecured Claims, the portion of the Initial Distribution that the TLB Lenders would have otherwise been entitled to on account of the TLB Deficiency Claim if they were Holders of Allowed General Unsecured Claims, shall be distributed to the TLB Lenders from the remaining Distribution Proceeds after the Initial Distribution; and (B) any further Distributions on account of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims shall be distributed Pro Rata to all Holders of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims. | $65,000,000 | Impaired/ Entitled to Vote | 1.5%– 3.0% |
| **Class 4**: General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive in exchange for such Allowed General Unsecured Claim, such Holder's Pro Rata share of the Distribution Proceeds as follows: (A) the first $1,000,000 in Distribution Proceeds shall be distributed Pro Rata to all Holders of Allowed General Unsecured Claims (such Distribution, the **"*Initial Distribution*"**); (B) prior to any subsequent Distributions to Holders of Allowed General Unsecured Claims, the portion of the Initial Distribution that the TLB Lenders would have | $64,614,000– $97,132,000 | Impaired/ Entitled to Vote | 1.9%– 3.8% |

27405501.4

| Class/ Designation | Plan Treatment | Estimated Amount of Claims | Status | Projected Recovery |
|---|---|---|---|---|
| | otherwise been entitled to on account of the TLB Deficiency Claim, absent the foregoing clause (A), shall be distributed to the TLB Lenders from the remaining Distribution Proceeds after the Initial Distribution; and (C) any further Distributions on account of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims shall be distributed Pro Rata to all Holders of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims. | | | |
| **Class 5**: Intercompany Claims | Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims and such Claims shall be cancelled and discharged on and as of the Effective Date. | N/A | Impaired/ Deemed to Reject | 0% |
| **Class 6:** Intercompany Interests | On the Effective Date, all Intercompany Interests shall be extinguished as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/ Deemed to Reject | 0% |
| **Class 7:** Interests in Holdings | Holders of Interests in Holdings shall receive no Distribution on account of their Interests in Holdings and such Interests shall be deemed automatically cancelled, released, and extinguished on and as of the Effective Date. | N/A | Impaired/ Deemed to Reject | 0% |

## ARTICLE III
## BACKGROUND AND DISCLOSURES

### 3.1    General Background.

(a)    **Borden's Historical Operations**

Borden is one of the oldest and largest processors and direct-to-store distributors of fresh fluid milk, dairy case products, and other beverages in the United States. The Borden brand name has a rich history that traces its roots back to Gail Borden who, shortly after receiving a patent for processing condensed milk in 1856, founded the New York Condensed Milk Company and opened the first successful condensed milk processing plant in 1861. During the late 1800s, the New York Condensed Milk Company both continued producing new products and added processed milk and evaporated milk to its offerings and pioneered the use of glass milk bottles.

In 1919, the New York Condensed Milk Company changed its name to Borden Company. Over the course of the next decade, the Borden Company expanded rapidly by acquiring two of the largest ice cream manufacturers in the U.S., adding cheese to its product offerings, and acquiring a chemicals company. By 1930, Borden Company had bought more than 200 companies around the U.S. and became the nation's largest distributor of fluid milk. In 1936, "Elsie the Cow" was introduced as the Borden Company's dairy mascot. Elsie was an advertising fixture throughout the 1940s and was officially

trademarked in 1951. Elsie became an American icon, bringing Borden nationwide recognition through contests and campaigns throughout subsequent decades, and was ultimately named one of the top 10 advertising icons of the 20th century by AdAge in 2000.

Borden Company continued to expand throughout the 20th century, with Borden Company's chemical division becoming particularly successful. In 1958, this division was renamed Borden Chemical, which specialized in the manufacturing of adhesives, plastics and resins. Borden Company's expansion into chemicals and other non-dairy industry segments resulted in Borden Company's evolution into Borden Inc., a large conglomerate serving as the gold standard for a variety of industry segments. For example, from a regulatory perspective, Borden Inc. became the first U.S. dairy producer to use the U.S. Department of Agriculture Inspection Shield. In addition, Borden Inc.'s food division acquired companies specializing in the creation of pastas and sauces, bakery products, snacks, jams and jellies and, of course, cheese, milk, and ice cream.

By the 1980s, Borden Inc. was the world's largest dairy operator, with sales exceeding $7.2 billion. It was also the nation's most active participant in the M&A market in 1987 after making 23 acquisitions totaling $442.6 million. Before the end of the decade, Borden acquired an additional 39 operations. By the early 1990s, however, Borden Inc. began experiencing financial distress, resulting in a number of its business units being divested. In 1995, Borden Inc. was sold to Kohlberg Kravis Roberts & Co. ("**KKR**") for $2 billion, and became a private company. Over the next decade, Borden Inc. underwent a series of reorganizations, which ultimately resulted in KKR selling off many of the divisions and brands of Borden Inc. to various buyers.

      (b)      **Borden's Operations**

As of the closing of the Sale, Borden was one of the largest processors and distributors of fresh fluid milk, dairy case products, and other beverages in the United States, retaining over 3,000 employees and independent contractors. They maintained 11 manufacturing facilities and more than 75 distributions centers, primarily located in the Southeastern United States.

      i.      Products and Brands

The Debtors produced and distributed a wide variety of branded and private label traditional, flavored and specialty milk, buttermilk, dips and sour cream, juices, tea, and flavored drinks (collectively, the "**Customer Products**") to mass merchandisers, educational institutions, food service retailers, grocery stores, drug stores, convenience stores, food and beverage wholesale distributors, and retail warehouse club stores (e.g., Sam's Club, Costco Wholesale Corporation, etc.) (collectively, the "**Customers**") across the United States. In 2018, aggregate sales were divided by product line as follows: (i) fluid milk & cream (inclusive of traditional, protein enhanced, flavored, buttermilk and lactose free fluid milks)—92 percent of total revenue; (ii) juices and drinks (including teas, and fruit drinks)—5 percent of total revenue; (iii) ice cream—2 percent of total revenue; and (iv) cultured products (such as sour creams and cottage cheese)—1 percent of total revenue.

The primary ingredient used in most of the Customer Products was conventional raw milk (which contains both raw skim milk and butterfat) that is purchased from independent farmers and cooperatives. For the trailing twelve months ending in December 2019, the Debtors processed and distributed approximately 400 million gallons of milk, dairy, and other products. Other significant raw materials used by the Debtors include (a) resin, which is a fossil fuel-based product used to make plastic bottles, (b) corrugate and cardboard, a paper-based packaging material, and (c) sweeteners, flavorings, and juice concentrates. Other commodities used by the Debtors also included diesel fuel, which was used to operate their extensive truck fleet and DSD system (as defined below).

27405501.4

ii.     Pricing

The Debtors increased or decreased the prices of their fluid dairy products on a monthly basis in connection with fluctuations in the costs of raw materials (largely driven by Class 1 Federal Market Order prices for raw milk).  The Debtors managed the pricing of their branded fluid milk products on a longer-term basis, balancing consumer demand with net price realization but, in some cases, pricing was subject to the terms of sales agreements with respect to the means and/or timing of price increases.  The pricing by government entities fluctuates monthly based on the Federal Market Order system, and required the Debtors to be cognizant of such fluctuations when negotiating long-term sales agreements with Customers.

The price of resin fluctuates based on changes in crude oil and natural gas prices.  Similarly, the Debtors sought to protect themselves from these price fluctuations through customer pricing, supplier contract management, and customer cost of living adjustments where available.

iii.    Supply Chain

The Debtors produced and distributed Customer Products from their 121 manufacturing facilities and more than 75 distribution centers, with sales predominantly located in the Southeastern region of the United States.  Due to the perishable nature of the Customer Products, the majority of products were directly delivered to Customers via a fleet of approximately 2,800 refrigerated trucks or trailers that the Debtors owned or leased.  This form of delivery is called a "direct-to-store delivery" or "DSD" system.  Borden had one of the most extensive refrigerated DSD systems in the United States.  Borden made approximately 54,000 service calls to its Customers each week.

iv.     Customers

The Customers were largely composed of household retail names including large format retailers such as Walmart, Sam's Club, Food Lion, and Kroger; wholesale distributors such as Sysco, US Foods, and Gordon Foodservice; small format retailers such as Circle K, 7-Eleven, CVS, and Walgreens; fast food chains such as Dairy Queen, Dunkin, and Starbucks; and educational institutions ranging from elementary schools to universities and colleges.  Approximately 90% of the Debtors' total annual sales were derived from the foregoing Customers.

v.      Employees

The Debtors employed approximately 3,156 employees (collectively, the "***Employees***") across several states, approximately 524 of which were salaried individuals on a full-time or part-time basis, and approximately 2,632 of which were paid hourly on either a full-time or part-time basis.  Approximately 21 percent of the Employees participated in at least one of a multitude of collective bargaining agreements with the Debtors of varying duration and terms.  In addition to the Employees, the Debtors also regularly and continuously used the services of independent contractors to complete discrete projects, as well as temporary workers sourced periodically from various staffing agencies to fulfill certain duties on a short-term basis.  In addition to the Employees, the Debtors used approximately two Independent Contractors and approximately sixteen Temporary Staffing Agencies, although this number fluctuated based on the Debtors' specific needs at any given time.  The Independent Contractors and the temporary workers supplied by the Temporary Staffing Agencies were a critical component of the Debtors' workforce.

**3.2     Prepetition Capital Structure**.

As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $255.8 million, consisting of the RCF Facility, the TLA Facility, and the TLB Facility.  The following table summarizes the Debtors' funded-debt obligations as of the Petition Date:

| Funded Debt | Principal Amount Outstanding as of the Petition Date |
|:---:|:---:|
| RCF Facility | $56.7 million |
| TLA Facility | $24.1 million |
| TLB Facility | $175.0 million |
| **Total** | $255.8 million |

(a)      **2017 Transaction**

In 2017, the Company and certain of its subsidiaries entered into a Reorganization and Subscription Agreement (as amended, modified, restated, amended and restated, and/or supplemented from time to time, the "*2017 RSA*"), pursuant to which Borden reorganized under a new holding company and the existing equity holder at the time, Laguna Dairy, sold just less than half of its equity position to a new investor, ACON Dairy Investors, L.L.C. ("*ACON*").  Following consummation of the 2017 RSA (together with the transactions consummated in connection therewith, the "*2017 Restructuring*"), Borden and its sixteen direct and indirect subsidiaries are each wholly owned, directly or indirectly, by Holdings.

(b)      **Prepetition Credit Facility**

On July 6, 2017, Borden, as borrower, the other Loan Parties (as defined in the Prepetition Credit Agreement) party thereto (together with Borden, the "*Prepetition Loan Parties*"), the Prepetition Lenders, the L/C Issuer (as defined in the Prepetition Credit Agreement), and the Prepetition Agent (together with the Prepetition Lenders, the L/C Issuer, and each other Secured Party (as defined in the Prepetition Credit Agreement), the "*Prepetition Secured Parties*"), entered into the Prepetition Credit Agreement, which provided the Debtors with a $275 million credit facility (the "*Prepetition Credit Facility*").  The Prepetition Credit Facility consisted of (a) the TLA Facility held by PNC, (b) the TLB Facility now held by certain affiliates of KKR Credit Advisors (US) LLC and/or Franklin Square Holdings, L.P., and (c) the RCF Facility[3] provided by PNC, which includes a $25 million subfacility for the issuance of letters of credit ("*Letters of Credit*").

Borrowings under the TLA Facility and the TLB Facility bear interest for the interest period in effect, at either the reference rate, plus an applicable margin of 6.5 percent per annum, or LIBOR, plus an applicable margin of 7.5 percent per annum.  The effective interest rate on both facilities on December 31, 2019 was 9.3 percent.

Pursuant to the Second Amendment to the Prepetition Credit Agreement, borrowings under the RCF Facility may bear interest at different rates during the Revolving Credit Increase Period (as defined in the Second Amendment to the Prepetition Credit Agreement).  Specifically, the first $10 million of borrowings outstanding during the Revolving Credit Increase Period that are LIBOR Rate Loans (as defined in the Prepetition Credit Agreement) bear interest for the interest period in effect at LIBOR plus an applicable margin of 4.0 percent per annum; all other borrowings under the RCF Facility that are LIBOR

---

[3]     Pursuant to the Second Amendment and Waiver to Financing Agreement, dated November 20, 2019 (the "*Second Amendment to the Prepetition Credit Agreement*"), between Borden and PNC, the RCF Facility was temporarily increased from $60 million to $70 million through February 18, 2020.  Subject to availability under the borrowing base, the total available amount to be drawn down under the RCF Facility, inclusive of letter of credit amounts, is $70 million.  For the avoidance of doubt, the principal amounts under the RCF Facility as of the Petition Date exclude (i) committed (but undrawn) Letters of Credit against the RCF Facility in the amount of $12.6 million, and (ii) $500,000 for lease liabilities in connection with the Debtors' corporate office.

27405501.4

Rate Loans during the Revolving Credit Increase Period bear interest for the interest period in effect at LIBOR plus an applicable margin of 2.0 percent per annum; and all borrowings that are Reference Rate Loans (as defined in the Prepetition Credit Agreement) bear interest for the interest period in effect at a reference rate.  The RCF Facility is also subject to an unused commitment fee of 0.25 percent per annum of the average excess of the revolving loan commitment over the average principal balance of revolving loans and letter of credit obligations.  The effective interest rate on revolving loans for the period ended December 31, 2019 was 4.95 percent per annum.

Pursuant to the Prepetition Credit Agreement and the Security Documents (as defined in the Prepetition Credit Agreement), the Prepetition Loan Parties secured their obligations under the Prepetition Loan Documents by granting the Collateral Agent (as defined in the Prepetition Credit Agreement), for the benefit of itself and the other Prepetition Secured Parties, a (a) security interest in and lien on outstanding Interests (as defined in the Security Agreement (as defined in the Prepetition Credit Agreement)) and indebtedness owned by the Debtors or in which the Debtors have an interest, and (b) security interest in substantially all of the Debtors' other personal property and fixtures (subject to customary exclusions), including cash collateral (as defined in section 363(a) of the Bankruptcy Code, "***Cash Collateral***").

In connection with the Prepetition Credit Agreement, certain of the Prepetition Lenders and the Prepetition Agent entered into that certain Agreement Among Lenders, dated as of July 6, 2017 (as amended, modified, restated, amended and restated, and/or supplemented from time to time, the "***AAL***").  The AAL sets forth certain of the Prepetition Lenders' respective rights and obligations under the Prepetition Credit Agreement.

(c)    **Pension Settlements**

Prior to the Petition Date, the Company made periodic payments on account of settlement agreements they entered into with respect to certain withdrawal liabilities related to two pension plans: (i) Central States, Southeast and Southwest Areas Pension Fund ("***Central States***"), which was terminated in 2014; and (ii) the Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Funds (the "***RWDSU***" and together with Central States, the "***Pension Plans***"), which was terminated in 2016.

In connection with the 2017 Restructuring, Laguna agreed to deposit $30 million into an account established by the Debtors at JPMorgan Chase Bank, N.A. and, pursuant to the 2017 RSA, subsequently transferred to PNC (the "***Reserve Account***").  The Reserve Account was established to provide a reserve from which the Company could continue to fund settlement payments to Central States and RWDSU—principally, monthly installments of $183,225 payable by the Debtors to Central States and quarterly installments of approximately $6,000 payable by the Debtors to RWDSU pursuant to the settlements referred to above.  The terms governing establishment of the Reserve Account were set forth in the 2017 RSA.  Following its move to PNC, the Reserve Account subsequently became managed by PNC Institutional Asset Management Group ("***PIAM***"), with the Debtors' and Laguna's consent, and the Debtors required that PIAM employ a conservative investment strategy focused on U.S. Treasuries and comparable fixed income products.  As of the Petition Date, the Reserve Account had a value of approximately $26.6 million.

(d)    **Existing Equity**

As of the Petition Date, New Laguna held 49.36 percent of the Interests in Holdings and ACON directly held 46.79 percent of the Interests in Holdings. Tony Sarsam, the Debtors' chief executive officer, held the remaining Interests in Holdings.

27405501.4

**3.3**    **Events Leading To the Chapter 11 Cases**.

(a)    **Prepetition Challenges**

As of the Petition Date, Borden was coping with a host of industry challenges that had rendered its debt structure no longer sustainable. In 2018, the Debtors reported consolidated net sales of $1.181 billion with gross profit of $292 million. For the same period, the Debtors experienced an income loss from operations of $2.6 million and a total net income loss of $14.2 million. In 2019, the Debtors reported consolidated net sales of $1.4 billion with a gross profit of $274 million. For the same period, the Debtors experienced an income loss from operations of $81.0 million and a total net income loss of $93.3 million.

(b)    **Unsustainable Obligations and Liabilities**

Borden's obligations under the Prepetition Credit Agreement impaired its ability to produce positive net income. The Debtors were paying cash interest of approximately $21 million per year, which they could no longer service from earnings and cash flow. The Prepetition Credit Agreement also required Borden to make quarterly payments totaling $2.35 million each year on the TLA Facility. These liabilities and their impact on net income impaired Borden's ability to raise capital or pursue other strategic alternatives. Borden had insufficient liquidity to run its business, to invest in core elements of its operations to mitigate market headwinds, or to make necessary investments to sustainably grow earnings.

(c)    **Industry Headwinds**

The Debtors' financial performance is directly correlated to the milk processing industry's highly competitive environment, rapidly changing landscape, and dynamic retail environment. In recent years, dairy products have faced competition from non-dairy nutritional products and beverages for consumer sales, which has contributed to demand decreases. In addition, the growth of discount grocery retailers has intensified competition and reduced the margin over milk at retail, making it difficult to retain margin while pricing products to appeal to consumer price sensitivities.

While milk remains a household item in the United States, people are drinking less of it. Aggregate U.S. consumption of conventional dairy milk has declined approximately 6 percent since 2015. In parallel, since the turn of the century, the number of U.S. dairy farms has declined. From 1992 to 2018, over 94,000 family dairies closed their doors at the rate of ten dairy farms per day. In the past year and a half alone, over 2,730 dairy farms have gone out of business. Concurrent to the decline of the number of milk producers, dairy processers have seen bottling margins decline due to competitive pressures. That confluence of factors has had a negative impact on domestic dairy processors across the industry.

The decline in dairy sales has occurred in conjunction with the rise of oat, nut, soy, and other alternative "milk" products at retailers and food service locations across the country. Options like almond, soy, rice, coconut, and hemp beverages are beginning to demand more space on grocery store shelves as consumers have grown to embrace new flavors and alternative diets. Sales of nut and plant beverages grew by 9% in 2018 and had sales of $1.6 billion, according to the Plant Based Foods Association.

(d)    **Restructuring Negotiations**

In January 2019, Borden engaged with key stakeholders on the financial issues facing the Debtors and the need for relief under the Debtors' secured loans. As the year progressed, the Debtors implemented a number of customer growth initiatives, overhead cost reductions, and input cost savings initiatives. However, these initiatives were not enough to offset the industry factors described above, including the rise in raw milk prices, compression of bottling margins, and an aggressive competitive environment. On

27405501.4

October 1, 2019, the Debtors reengaged with certain key stakeholders to explore restructuring alternatives that would allow the Debtors to reduce debt and obtain liquidity relief. Following those discussions, the Debtors retained a financial advisory firm, Conway MacKenzie, LLC, to assist with cash management practices and to evaluate company cost structure.

These conversations ultimately resulted in a forbearance agreement, dated November 27, 2019, whereby the Prepetition Agent and the Prepetition Lenders agreed to forbear from exercising certain remedies under the Prepetition Loan Documents until January 6, 2020, while the parties worked to document and consummate a potential out-of-court restructuring. In connection with the forbearance, the borrowing amount available to the Debtors under the RCF Facility was increased from $60 million to $70 million to provide the Debtors with additional liquidity. Ultimately, the parties did not finalize an out-of-court restructuring prior to the forbearance termination date, and the Debtors Filed these Chapter 11 Cases.

**3.4    The Chapter 11 Cases**.

(a)    **First Day Pleadings and Other Case Matters**

i.    <u>First Day and Second Day Relief</u>

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors Filed several motions (the "***First Day Motions***") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees and vendors following the commencement of the Chapter 11 Cases. On January 8, 2020, the Bankruptcy Court granted the majority of the relief requested in the First Day Motions including, among other things: (a) an order directing joint administration of the Chapter 11 Cases [D.I. 47]; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions on an interim basis [D.I 48]; (c) an order granting authority to pay employees' wage claims and related obligations in the ordinary course of business and continue certain employee benefit programs [D.I. 49]; (d) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance on an interim basis [D.I. 51]; (e) an order authorizing the Debtors to pay certain prepetition taxes and fees on an interim basis [D.I. 52]; (f) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreements and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business on an interim basis [D.I. 53]; (g) an order authorizing the Debtors to honor certain prepetition obligations to customers and otherwise continue customer programs in the ordinary course of business [D.I. 54]; and (h) an order authorizing the Debtors to make payment on account of prepetition claims of certain critical vendors, lien claimants, and 503(b)(9) claimants on an interim basis [D.I. 55, 59]. The following day, January 9, 2020, the Bankruptcy Court entered an order authorizing the interim use of cash collateral [D.I. 69] (the "***First Interim Cash Collateral Order***").

A subsequent hearing on the First Day Motions took place on January 23, 2020, at which hearing the Debtors were granted final relief with respect to several of the First Day Motions. Additionally, the Debtors reached an agreement with their secured lenders, leading to the entry of the following orders by the Bankruptcy Court on January 24, 2020: (a) an order providing for further interim use of cash collateral [D.I. 205]; (b) an order authorizing the Debtors to continue to maintain their cash management system on

a further interim basis [D.I. 202]; and (c) an order authorizing the Debtors to continue to pay prepetition critical vendor claims on a further interim basis [D.I. 199].

        ii.      <u>Further Relief</u>

There followed a series of negotiations and mediation sessions between the Debtors, the Committee, the Prepetition Agent, the RCF/TLA Lenders, the TLB Lenders, and the Existing Equity Holders. Following a hearing which took place on March 3, 2020, the Bankruptcy Court entered the following orders on March 4, 2020: (a) the Cash Collateral Order; (b) an order authorizing the Debtors to pay critical vendor claims on a final basis [D.I. 371]; (c) an order authorizing the Debtors to maintain their cash management system on a final basis [D.I. 374]; (d) an order establishing procedures for interim compensation and reimbursement of professionals [D.I. 372]; and (e) the OCP Order. The Cash Collateral Order included certain milestones (the "***Milestones***") set forth on an exhibit that was Filed under seal with the Bankruptcy Court, including milestones with respect to the marketing process for a sale of the Debtors' Assets and/or the Filing of a plan of reorganization and confirmation thereof

        iii.     <u>Retention of Chapter 11 Professionals</u>

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders authorizing the Debtors to retain and employ the following professionals: (a) Arnold & Porter Kaye Scholer LLP, as counsel [D.I. 287]; (b) Young Conaway Stargatt & Taylor LLP, as co-counsel [D.I. 278]; (c) AP Services, LLC and designation of Kent Percy as Chief Restructuring Officer [D.I. 286]; (d) KPMG LLP, as tax consultant [D.I. 436]; (e) RSM US LLP, as provider of audit services [D.I. 437]; and (f) PJT Partners LP ("***PJT***"), as investment banker [D.I. 505].

        iv.     <u>Appointment of Official Committee of Unsecured Creditors</u>

On January 15, 2020, the Office of the U.S. Trustee appointed the Committee [D.I. 108]. The members of the Committee are: (a) Central States; (b) Tetra Pak, Inc.; (c) Packaging Corporation of America; (d) Silgan White Cap LLC; and (e) International Brotherhood of Teamsters.[4] The Bankruptcy Court entered Final Orders approving the Committee's applications seeking to retain certain professionals, including Sidley Austin LLP [D.I. 408] and Morris James LLP [D.I. 321] as counsel, and Berkeley Research Group, LLC as financial advisor [D.I. 409].

        (b)     **Schedules and Statements**

On March 3, 2020, the Debtors Filed their Schedules [D.I. 328–363]. On April 9, 2020, the Debtors Filed amended Schedules with respect to certain claims [D.I. 507–513].

        (c)     **Bar Dates**

The Bankruptcy Code allows the Bankruptcy Court to fix the time within which Proofs of Claim must be Filed in the Chapter 11 Cases. Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as Disputed, Contingent, or unliquidated must File a Proof of Claim.

On March 20, 2020, the Bankruptcy Court entered the General Bar Date Order [D.I. 435] approving, among other things: (1) May 6, 2020, at 4:00 p.m., prevailing Eastern Time as the Bar Date for

---

[4]    On May 25, 2020, Silgan White Cap LLC resigned from the Committee, and on September 22, 2020, the International Brotherhood of Teamsters resigned from the Committee. *See First Amended Verified Statement of the Official Committee of Unsecured Creditors Pursuant to Bankruptcy Rule 2019.* [D.I. 1176].

all non-Governmental Units to File Claims in the Chapter 11 Cases; (2) July 3, 2020, at 4:00 p.m., prevailing Eastern Time as the Bar Date for all Governmental Units to File Claims in the Chapter 11 Cases; (3) procedures for Filing Proofs of Claim; and (4) the form and manner of notice of the Bar Dates.

On August 5, 2020, the Bankruptcy Court entered the Pre-Confirmation Administrative Bar Date Order [D.I. 1025] approving, among other things, September 4, 2020, as the Bar Date for Administrative Claims arising prior to August 6, 2020.

(d)     **Lien Litigation**

In connection with the First Interim Cash Collateral Order, the Debtors were authorized to liquidate the securities in the Reserve Account and transfer $10 million from the Reserve Account to the Debtors' operating account maintained at PNC, and the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, was granted an adequate protection lien on the remaining $16.6 million in the Reserve Account.

The Debtors and a number of their stakeholders assert competing claims against the Reserve Account.  The Debtors contend that the Reserve Account is unencumbered property of their Estates.  The Prepetition Agent and the Prepetition Lenders assert that the Reserve Account is subject to a valid, first-priority lien in favor of the Prepetition Agent, for the benefit of itself and the Prepetition Lenders.  Laguna contends that the Bankruptcy Court should impose a constructive trust on the Reserve Account in Laguna's favor.

At a hearing on January 23, 2020, the Bankruptcy Court heard oral argument from the parties regarding their respective competing claims to the Reserve Account.  Based on such arguments of counsel and the record before it, which consisted principally of certain operative documents relating to the Reserve Account, the Bankruptcy Court determined that the Prepetition Agent had not satisfied its burden of establishing a lien on the Reserve Account and that a further evidentiary hearing would be required.

On February 4, 2020, the Prepetition Agent Filed a complaint commencing an adversary proceeding against Borden and Laguna, *PNC Bank, National Association v. Borden Dairy Company; Laguna Dairy, S. de R.L. de C.V.; and New Laguna, LLC (In re Borden Dairy Company, et al.,)*, Adv. Pro. No. 20-50450 (CSS) (Bankr. D. Del.) (the "***Lien Litigation***"), seeking a declaratory judgment that the Prepetition Agent had and continues to have a prepetition valid, perfected first priority security interest in and lien on the Reserve Account.  On March 26, 2020, Laguna Filed its answer to the complaint (ECF No. 3), on April 3, 2020, Borden Filed its answer, counterclaims, and cross-claims to the complaint (ECF No. 7), on April 24, 2020, Laguna Filed its answer to Borden's cross-claim (ECF No. 14), on May 6, 2020, the Prepetition Agent Filed its answer to Borden's counterclaim (ECF No. 19), and on June 30, 2020, Borden Filed its motion for judgment on the pleadings (ECF No. 20) and memorandum of law in support thereof (ECF No. 21).  The Committee Filed a motion to intervene in the Lien Litigation on March 20, 2020 (ECF No. 4), which was granted by the Bankruptcy Court on April 17, 2020 (ECF No. 13).

As set forth in greater detail in section 3.4(f) *infra*, the claims asserted by the Prepetition Agent and the Prepetition Lenders in the Lien Litigation were resolved in connection with the Sale, and the claims asserted by Laguna in the Lien Litigation were resolved by the Laguna Settlement Agreement (as defined below).  The adversary proceeding for the Lien Litigation was closed on July 16, 2020, and the proceeds from the Reserve Account were subsequently transferred to the Debtors' operating account.

(e)     **Key Employee Retention and Key Employee Incentive Plan**

The Debtors filed a motion [D.I. 586] seeking approval of a key employee retention plan ("***KERP***") and key employee incentive plan ("***KEIP***") to retain and incentivize certain key employees during the

pendency of the Chapter 11 Cases. Generally, the purpose of the KERP and the KEIP was to incentivize the Debtors' employees to maximize the value of the Assets and combat, among other things, the negative employee morale that typically results from the uncertainties and increased burdens of an employer's debtor-in-possession status.

Following contested hearings on May 28, 2020 and June 8, 2020, the Court entered an order approving revised versions of the KERP and the KEIP [D.I. 840]. There are currently 32 KERP Participants, and the total potential aggregate payout under the KERP is approximately $1.208 million, inclusive of a $250,000 discretionary pool. There are currently eighteen (18) KEIP Participants, and the total potential aggregate payout under the KEIP is approximately $2.747 million. The amount of the award earned and payable under the KEIP will be based upon achievement of a specified consolidated EBITDAR target as of the most recent period-end prior to consummation of a sale or plan of reorganization. All obligations arising under the KERP and KEIP were assumed by the Purchaser.

    (f)    **Marketing and Sale Process**

        i.    Marketing the Purchased Assets, Filing the Bid Procedures Motion and the Original Plan and Disclosure Statement

The Debtors' Assets are primarily the national, local, and regional proprietary and licensed brands under which the Customer Products are sold along with the underlying operational infrastructure that supports the production and distribution of the Customer Products.

On March 16, 2020, with the assistance of PJT, the Debtors' investment banker, the Debtors commenced a marketing process to solicit bids from potential purchasers of the Debtors' business or assets or potential plan investors. PJT contacted over 100 potential bidders, representing both financial and strategic buyers/investors. In connection with this solicitation, the Debtors and their advisors prepared, among other things, a confidential information memorandum ("*CIM*") to provide potential investors with adequate information upon which to make a proposal. The Debtors executed confidentiality agreements with multiple parties, who were subsequently granted access to the CIM and a virtual data room containing additional diligence from the Debtors. By the April 17, 2020 deadline to submit indications of interest, the Debtors received indications of interest from four (4) parties. On April 22, 2020, the Debtors, in consultation with the Prepetition Agent, the Prepetition Lenders, and the Committee, notified three (3) of these parties that they were invited to submit final round bids pursuant to the proposed Bidding Procedures. The Debtors' management team and PJT continued to facilitate further diligence of the Assets and negotiate with the remaining bidders to obtain the highest bid for the Assets.

On May 5, 2020, the Debtors Filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets; (B) Scheduling an Auction for and Hearing to Approve the Sale of Substantially All of the Debtors' Assets; (III) Approving Notice of the Respective Date, Time, and Place for the Auction and for Hearing on Approval of Sale; (D) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (E) Approving Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) an Order Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [D.I. 564] (the "***Bid Procedures Motion***"). Shortly thereafter, on May 8, 2020, the Debtors Filed the *Joint Chapter 11 Plan of Borden Dairy Company and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "***Original Plan***") [D.I. 590], and related disclosure statement (the "***Original Disclosure Statement***") [D.I. 591]. The Original Plan contemplated either a standalone reorganization or a sale of the Assets if a purchaser preferred to acquire the Assets pursuant to a plan. These Filings satisfied the Milestone in the

27405501.4

Cash Collateral Order, which required that the Debtors File a bid procedures motion or a proposed plan of reorganization acceptable to the Prepetition Agent and the Prepetition Lenders. As set forth in greater detail below, following the conclusion of the auction, the Purchaser elected to proceed with its acquisition of the Purchased Assets pursuant to section 363 of the Bankruptcy Code.

      ii.      Sale of Purchased Assets to New Dairy[5]

On May 22, 2020, the Bankruptcy Court entered an order (the "***Bid Procedures Order***") approving the relief requested in the Bid Procedures Motion and establishing, among other things, June 1, 2020, at 12:00 p.m. (ET) as the bid deadline (the "***Bid Deadline***"), June 3, 2020, at 10:00 a.m. (ET) as the auction date, and June 4, 2020, as the date of the hearing to approve the Sale. The auction date and date of the hearing to approve the Sale were subsequently extended to June 5, 2020, at 10:00 a.m. (ET) and June 10, 2020, at 2:00 p.m. (ET), respectively.

Following entry of the Bid Procedures Order, the Debtors notified Potential Bidders of the Bid Deadline of June 1, 2020, and invited them to continue discussing the acquisition of the Assets. Based on feedback that the Debtors and their advisors received from Potential Bidders through the sale process, the Debtors determined that it was likely that they would receive both Bids for all or substantially all of the Assets ("***WholeCo***") and plant-level Bids for certain of the Assets.

By the Bid Deadline on June 1, 2020, the Debtors had received six (6) Bids: two (2) Bids for WholeCo; one (1) Bid for WholeCo excluding the Assets with respect to four geographic locations; one (1) Bid for the Assets with respect to the London, Kentucky facilities; one (1) Bid for the Assets with respect to the Winter Haven, Florida facilities; and one (1) Bid for the Assets with respect to the real estate at the Austin, Texas facility.

One of the Bids received by the Debtors by the Bid Deadline represented an exercise by the TLB Lenders (already deemed a Qualified Bidder pursuant to the Bidding Procedures) of their right to credit bid for the Assets in coordination with the Purchaser. The Debtors determined, in consultation with the Consultation Parties, that four (4) Potential Bidders had submitted Qualified Bids in accordance with the Bidding Procedures and could participate in the Auction.

Commencing on June 4, 2020 through June 13, 2020, the Debtors conducted the Auction pursuant to the Bidding Procedures. Following the receipt of "final and best" bids from each of the Qualified Bidders, the Debtors determined, in their business judgment and in consultation with the Consultation Parties, that the Purchaser's Bid was the Successful Bid. Under the terms of the Successful Bid, among other things, there was total distributable value to the Debtors' Estates of $306.5 million, $110 million in TLB Claims were satisfied as a consequence of the credit bid, the TLB Lenders released any remaining Liens on the Retained Assets, including the claims asserted in the Lien Litigation, the Purchaser will satisfy in cash at closing the obligations of the Prepetition Agent and the RCF/TLA Lenders, and assume substantially all go-forward liabilities of the Debtors' business and certain cure costs associated with the Debtors' existing business arrangements. The Successful Bid also included the commitment to provide the Debtors with debtor-in-possession financing in an amount sufficient to fund the professional fee carve-out and certain administrative claims. Ultimately, however, the Debtors chose not to obtain approval of such debtor-in-possession financing.

On June 26, 2020, the Court entered its *Order Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other*

---

[5]    Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bid Procedures Order.

*Interests; (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [D.I. 918] (the "*Sale Order*").

On July 17 and July 20, 2020, respectively, the Court entered the *First Order Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* [D.I. 980] and the *Second Order Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* [D.I. 982]. On July 21, 2020, the Court entered the *Order Approving Stipulation by and Between Debtors, C.K.S. Packaging, Inc., and New Dairy OpCo, LLC Regarding (I) Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Amounts in Connection Therewith* [D.I 986] and the *Supplemental Order Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests; (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [D.I. 987].

      iii.      <u>Sale Closing Issues</u>

Following the entry of the Sale Order, the Debtors had two matters that needed to be addressed before the Sale would be able to close: (i) the assumption and assignment of certain licensed trademarks (the "*Licensed Trademarks*") owned by COMLADE (the "*License Dispute*"); and (ii) the claims asserted by Laguna in the Lien Litigation.

Following lengthy negotiations between the Debtors, the Purchaser, the Committee, the Prepetition Agent, the Prepetition Lenders, and the LALA/Laguna Entities (the "*Laguna Settlement Agreement Parties*"), the License Dispute and the claims asserted by Laguna in the Lien Litigation were resolved through a settlement agreement by and between the Laguna Settlement Agreement Parties executed on July 16, 2020 (the "*Laguna Settlement Agreement*"). The Laguna Settlement Agreement included, among other things, the following terms and conditions: (i) COMLADE consented to assumption and assignment of the Licensed Trademarks to the Purchaser, and the Purchaser shall pay COMLADE the amount of $685,000 as cure costs to resolve the License Dispute; (ii) the Laguna Entities will release and waive all of their claims in the Lien Litigation so that the full $17 million of proceeds in the Reserve Account are available to the Debtors; (iii) the Debtors shall assume and assign to the Purchaser a separate license agreement with LALA U.S., Inc.; (iv) the Laguna Entities will contribute $2,500,000 to the Estates; and (v) the Estates and the other Laguna Settlement Agreement Parties shall provide full releases in favor of the LALA/Laguna Entities.

On July 16, 2020, the Court entered its order approving the Laguna Settlement Agreement [D.I. 970]. The Sale closed effective as of July 20, 2020.

For the avoidance of doubt, this combined Disclosure Statement and Plan incorporates and adopts the terms of the Laguna Settlement Agreement as if fully set forth herein.

      (g)      **<u>D&O Insurance</u>**

As of the Petition Date, Borden held a $5,000,000 primary D&O policy (the "*Primary D&O Policy*") provided by Westchester Fire Insurance Company covering the period November 30, 2019 through November 30, 2020. Borden purchased the Primary D&O Policy through its principal insurance broker, Willis Towers Watson ("*Willis*"). In July 2020, the Debtors purchased an endorsement that provided six years of run-off coverage under the Primary D&O Policy, including coverage for eighteen months of wind-down operations, at a cost of $188,912, after application of $60,532 in applied unearned premium (plus applicable taxes and fees). The additional coverage provided by the foregoing endorsement became effective upon the closing of the Sale on July 20, 2020.

In addition to the Primary D&O Policy, the Debtors had obtained the following binders (the "***Binders***") from Willis relating to the same period of November 30, 2019 through November 30, 2020: (i) a binder purporting to show that QBE Specialty Insurance Company ("***QBE***") bound a $5,000,000 limits policy, providing D&O coverage excess of the $5,000,000 limits Primary D&O Policy (the "***Excess D&O Policy***"), on a follow form basis; (ii) a binder purporting to show that Hudson Insurance Group bound a Side A Difference In Conditions Insurance policy (the "***Side A Excess D&O Policy***"), providing $10,000,000 of Side A DIC D&O coverage excess of the $5,000,000 limits Excess D&O Policy, which in turn was purportedly excess of the $5,000,000 limits Primary D&O Policy; and (iii) a binder purporting to show that National Union Fire Insurance Company of Pittsburgh, PA bound a $5,000,000 limits commercial crime policy (the "***Crime Policy***").

In July 2020, Willis notified the Debtors in writing of its determination that the Binders had never actually been quoted or bound, that the Willis representative who managed the Debtors' account was no longer employed by Willis, and that Willis was conducting an investigation. The Debtors' insurance counsel, Locke Lord LLP, subsequently commenced discussions with Willis.

Pursuant to those discussions, on September 17, 2020, Willis successfully placed a replacement Excess D&O Policy with QBE and a replacement Side A Excess D&O Policy with Berkley Professional Liability. The coverage terms of the two replacement policies are consistent with the coverage terms represented by the original binders for the Excess D&O Policy and Side A Excess D&O Policy. The Committee reviewed and approved the terms of the two replacement policies and that coverage has been bound. The two replacement policies include six years of run-off coverage.

The premiums for the two replacement policies, with the six-year run-off coverage, were $425,000 and $200,000. Prior to the closing of the Sale, Borden deposited approximately $380,040 with Willis to purchase run-off D&O coverage. Of that amount, approximately $188,912 was applied to purchase the run-off coverage for the Primary D&O Policy, and the balance of $191,129 was applied in partial payment of the replacement Excess D&O Policy premium. Willis has paid the remaining balance due for the replacement Excess D&O Policy and the total balance due for the replacement Side A Excess D&O Policy at a combined payment of approximately $433,872.

Following discussions with Willis to resolve any remaining issues between them relating to the Excess D&O Policy, the Excess Side A D&O Policy, and the Crime Policy, the Debtors, in consultation with the Committee, entered into a settlement agreement with Willis (the "***Insurance Settlement Agreement***"). On November 24, 2020, the Court entered its order approving the Insurance Settlement Agreement [D.I. 1283]. On November 17, 2020, the Debtors filed an amendment to their Initial Monthly Operating Report [D.I. 1266] to amend certain insurance certificates related to the Excess D&O Policy, the Excess Side A D&O Policy, and the Crime Policy.

(h)    **Equity Settlement**

The Debtors filed the initial Combined Disclosure Statement and Plan on August 6, 2020 [D.I. 1030] (the "***Initial Plan***"). The Initial Plan proposed releases and exculpation in favor of Borden's current and former directors and officers. The Committee [D.I. 1124] and KKR [D.I. 1095] objected, arguing, among other things, that such releases and exculpation were not supported by adequate consideration. At the Committee's suggestion, the Debtors, the Committee, KKR, and ACON agreed to mediate certain of the objections before Judge Shannon, who has served as a plan mediator during these Chapter 11 Cases.

With substantial assistance from the mediator Judge Shannon, the Debtors, the Committee, and ACON agreed to a settlement in principle, supported by Judge Shannon, pursuant to which ACON agreed to contribute $1,000,000 to the Debtors' Estates (the "***Settlement Consideration***") and waive its

27405501.4

administrative claim in the amount of $401,282.17 in exchange for a general release in favor of ACON and releases and exculpation in favor of the current and former directors appointed by ACON (including the two independent directors) and the Debtors' current and former officers (collectively, the "***Equity Settlement***"). The Debtors, the Committee, and ACON entered into a settlement agreement memorializing the Equity Settlement (the "***Equity Settlement Agreement***"). On November 16, 2020, the Court entered its order approving the Equity Settlement Agreement [D.I. 1264]. The Debtors believe that the Equity Settlement will (i) materially increase the consideration available under the Plan for Distribution to Creditors holding Allowed Claims in Class 3 (TLB Deficiency Claim) and Class 4 (General Unsecured Claims), and (ii) avoid potential costly and time-consuming litigation that will diminish, and potentially exhaust, the assets available for Distribution to such Creditors.

For the avoidance of doubt, this combined Disclosure Statement and Plan incorporates and adopts the terms of the Equity Settlement Agreement as if fully set forth herein.

(i)        **The Wind-Down of the Estates**

Following the Sale, the Debtors are focused principally on efficiently winding down their Estates, preserving Cash held in the Estates, and monetizing the Retained Assets. The Retained Assets include, among other things, Cash, accounts receivable, certain deposits, prepayments, credits and refunds, insurance policies or rights to proceeds thereof, and certain Retained Causes of Action.

This combined Disclosure Statement and Plan provides for the Retained Assets, to the extent not already liquidated, to be liquidated over time and the proceeds thereof to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan and the treatment of Allowed Claims described more fully herein. The Wind-Down Administrator will effect such liquidation and Distributions. The Debtors will be dissolved as soon as practicable after the Effective Date.

## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

**4.1    Confirmation Procedure**.

The Solicitation Procedures Order, among other things, conditionally approves this combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled virtually or telephonically for December 15, 2020 at 10:00 a.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

**4.2    Procedure for Objections**.

Any objection to final approval of this combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code or confirmation of the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the basis and nature of any objection to this combined Disclosure Statement and Plan and, if practicable, a proposed modification to this combined Disclosure Statement and Plan that would resolve such objection; and (d) be Filed with the Bankruptcy Court (contemporaneously with a proof of

service) and served upon: (i) counsel to the Debtors, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, Illinois 60602, Attn: Tyler Nurnberg, Seth Kleinman, and Sarah Gryll, and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary and Kenneth Enos; (ii) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy Fox, Jr.; (iii) counsel to the Committee, Sidley Austin LLP, 787 7th Avenue, New York, New York 10019, Attn: Michael G. Burke, and Morris James, LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Eric J. Monzo; and (iv) counsel to the TLB Lenders, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036, Attn: Roger Schwartz and Peter Montoni, so as to be **actually received** no later than December 1, 2020 at 4:00 p.m. (ET). **Unless an objection to this combined Disclosure Statement and Plan is timely Filed and served, it may not be considered by the Bankruptcy Court**.

**4.3    Requirements for Confirmation**.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

**4.4    Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could

adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 4.5    Impaired Claims or Interests.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 3 and Class 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 5, 6 and 7 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4.**

### 4.6    Confirmation without Necessary Acceptances; Cramdown.

27405501.4

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly," and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 5, 6 and 7 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 5, 6 and 7 is entitled to receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(a) **Secured Creditors**. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) **Unsecured Creditors.** Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) **Interests**. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

**4.7    Feasibility**.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any

successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Assets have been, or will be, liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Assets to Holders of Claims that are Allowed in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Wind-Down Administrator to meet its obligations under the Plan. Based on the Debtors' analysis, the Wind-Down Administrator will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**4.8     Best Interests Test and Liquidation Analysis.**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

As described in more detail in the liquidation analysis attached hereto as Exhibit A, because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be substantial additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate Distribution of the Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

27405501.4

**4.9**     **Acceptance of the Plan**.

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Solicitation Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan.  At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AGENT AT BORDEN DAIRY COMPANY BALLOT PROCESSING, C/O DONLIN RECANO & COMPANY, INC., P.O. BOX 199043, BLYTHEBOURNE       STATION,       BROOKLYN,       NY       11219       OR       AT BORDENINFO@DONLINRECANO.COM.  THE CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4 WHO DO NOT WISH TO PROVIDE THE RELEASES SET FORTH IN SECTION 14.3(c) HEREIN MUST AFFIRMATIVELY INDICATE SO BY CHECKING THE "OPT-OUT" BOX ON THEIR BALLOT.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4 THAT (I) VOTE TO ACCEPT THE PLAN; OR (II) VOTE TO REJECT THE PLAN, OR DO NOT VOTE, BUT DO NOT AFFIRMATIVELY MAKE THE OPT-OUT ELECTION ON THEIR BALLOT SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN SECTION 14.3(c) HEREIN.**

## ARTICLE V
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**5.1     The Plan May Not Be Accepted**.

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative

restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**5.2     The Plan May Not Be Confirmed**.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that this combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to this combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what Distribution the Holders of Allowed Claims would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' Creditors as those proposed in the Plan.

**5.3     Nonconsensual Confirmation**.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors intend to request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code, to the extent necessary. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

**5.4     Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected recoveries are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.5     Objections to Classification of Claims**.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such

Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation, and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with this requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

**5.6    Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

**5.7    Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article XIV of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in the Plan not being confirmed or in a plan of liquidation that differs from the Plan.

**5.8    Reductions to Estimated Creditor Recoveries**.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of Distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the liquidation of the Debtors' remaining assets could be less than anticipated, which could cause the amount of Distributions to creditors to be reduced substantially.

**5.9    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**.

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect Distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

The estimated Claims and Creditor recoveries set forth in this combined Disclosure Statement and Plan are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this combined Disclosure Statement and Plan. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**5.10    No Legal or Tax Advice is Provided in this Combined Disclosure Statement and Plan**.

This combined Disclosure Statement and Plan is not legal advice to any Person or Entity. The contents of this combined Disclosure Statement and Plan should not be construed as legal, business, or tax advice. Each Entity should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This combined Disclosure Statement and Plan may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

**5.11    No Admission Made**.

The information and statements contained in this combined Disclosure Statement and Plan will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Post-Effective Date Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

**5.12    Failure to Identify Litigation Claims or Projected Objections**.

No reliance should be placed on the fact that a particular litigation claim or projected Objection to a particular Claim is, or is not, identified in this combined Disclosure Statement and Plan. The Wind-Down Administrator may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this combined Disclosure Statement and Plan identifies such Claims or Objections to Claims.

**5.13    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this combined Disclosure Statement and Plan. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this combined Disclosure Statement and Plan and the exhibits to this combined Disclosure Statement and Plan, they have not independently verified the information contained in this combined Disclosure Statement and Plan or the information in the exhibits to this combined Disclosure Statement and Plan.

**5.14** **No Representations Outside this Combined Disclosure Statement and Plan Are Authorized**.

NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS COMBINED DISCLOSURE STATEMENT AND PLAN, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.  VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE.

**5.15** **Certain Tax Considerations**.

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described in this combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1** **Administrative Claims**.  Except as otherwise set forth in this Article VI, as soon as practicable after the Post-Effective Date Administrative Claims Bar Date, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) shall receive in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other treatment as to which the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(a) **Post-Effective Date Administrative Claims Bar Date.** Holders of Administrative Claims arising on or after August 6, 2020, shall File with the Claims Agent and serve on the Wind-Down Administrator requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Post-Effective Date Administrative Claims Bar Date.  The Effective Date Notice shall set forth the Post-Effective Date Administrative Claims Bar Date and shall constitute notice of such Bar Date.  Absent further Bankruptcy Court order, any Administrative Claim arising on or after August 6, 2020 and not Filed by the Post-Effective Date Administrative Claims Bar Date shall be deemed waived and the Holder of such Administrative Claim shall be forever barred, estopped and enjoined from asserting such claims and receiving payment on account thereof.

Objections to requests for payment of any Administrative Claim, if any, must be Filed and served on the Wind-Down Administrator and the requesting party no later than the Administrative Claims

Objection Deadline. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

(b)     **Objections by the Wind-Down Administrator**. Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Administrative Claims Objection Deadline.

(c)     **Professional Fee Claims**. All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Reserve up to the full Allowed amount. To the extent that funds held in the Professional Fee Reserve are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Wind-Down Administrator shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

On or prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Reserve shall first be funded from the funds remaining in the Carve Out Account, and then, if there is a shortfall, from the Excess Cash. The Professional Fee Reserve shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all Allowed amounts owing to the Professionals have been Paid in Full, any amount remaining in the Professional Fee Reserve shall promptly be paid to the Post-Effective Date Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Reserve is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Post-Effective Date Debtors.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and shall deliver such estimate to the Debtors and the Committee no later than five (5) days before the anticipated Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Wind-Down Administrator may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)     **Post-Confirmation Date Fees and Expenses**. Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Post-Effective Date Debtors, as applicable. If the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, dispute the reasonableness of any such invoice, the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the

reasonableness of any such invoice. The undisputed portion of such invoice shall be paid in the ordinary course of business, and the disputed portion of such invoice shall not be paid until the dispute is resolved. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(e)     **U.S. Trustee Fees**. All fees payable on or before the Effective Date, pursuant to United States Code title 28 section 1930, shall be Paid in Full in Cash by the Debtors on or before the Effective Date. All fees payable after the Effective Date shall be Paid in Full in cash by the Wind-Down Administrator until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to File a request for Administrative Claims.

**6.2     Priority Tax Claims**.

Within the time period provided in Article X of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other treatment as to which the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

# ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Unless the Holder of an Allowed Claim and the Debtors or the Wind-Down Administrator, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Plan:

**7.1     Class 1:  Other Secured Claims**.

Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for such Allowed Other Secured Claim either: (A) return of the collateral securing such Allowed Other Secured Claim; (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment that the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing.

**7.2     Class 2: Other Priority Claims**.

Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for such Allowed Other Priority Claim either: (A) Cash equal to the amount of such Allowed Other Priority Claim; or (B) such other treatment that the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Other Priority Claim have agreed upon in writing.

**7.3     Class 3: TLB Deficiency Claim**. Each Holder of an Allowed TLB Deficiency Claim shall receive in exchange for such Allowed TLB Deficiency Claim, such Holder's Pro Rata share of the Distribution Proceeds as follows: (A) following the Initial Distribution (as defined below) and prior to any subsequent Distributions to Holders of Allowed General Unsecured Claims, the portion of the Initial Distribution that

the TLB Lenders would have otherwise been entitled to on account of the TLB Deficiency Claim if they were Holders of Allowed General Unsecured Claims, shall be distributed to the TLB Lenders from the remaining Distribution Proceeds after the Initial Distribution; and (B) any further Distributions on account of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims shall be distributed Pro Rata to all Holders of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims.   On the Effective Date, the TLB Deficiency Claim shall be Allowed as a TLB Deficiency Claim in the aggregate amount of $65,000,000.

**7.4**     **Class 4: General Unsecured Claims**.  Each Holder of an Allowed General Unsecured Claim shall receive in exchange for such Allowed General Unsecured Claim, such Holder's Pro Rata share of the Distribution Proceeds as follows: (A) the first $1,000,000 in Distribution Proceeds shall be distributed Pro Rata to all Holders of Allowed General Unsecured Claims (such Distribution, the "***Initial Distribution***"); (B) prior to any subsequent Distributions to Holders of Allowed General Unsecured Claims, the portion of the Initial Distribution that the TLB Lenders would have otherwise been entitled to on account of the TLB Deficiency Claim, absent the foregoing clause (A), shall be distributed to the TLB Lenders from the remaining Distribution Proceeds after the Initial Distribution; and (C) any further Distributions on account of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims shall be distributed Pro Rata to all Holders of Allowed TLB Deficiency Claims and Allowed General Unsecured Claims.

**7.5**     **Class 5: Intercompany Claims**.

Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims and such Claims shall be cancelled and discharged on and as of the Effective Date.

**7.6**     **Class 6: Intercompany Interests**.

On the Effective Date, all Intercompany Interests shall be extinguished as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests.

**7.7**     **Class 7: Interests in Holdings**.  Holders of Interests in Holdings shall receive no Distribution on account of their Interests in Holdings and such Interests shall be deemed automatically cancelled, released, and extinguished on and as of the Effective Date.

**7.8**     **Reservation of Rights Regarding Claims and Interests**.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF THE PLAN

**8.1**     **Class Entitled to Vote**.

Because Claims in Class 3 and Class 4 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only Holders of Claims in Class 3 and Class 4 shall be entitled to vote to accept or reject the Plan.

**8.2    Acceptance by Impaired Classes of Claims or Interests**.

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**8.3    Presumed Acceptance by Unimpaired Classes**.

Because Claims in Classes 1 and 2 are Unimpaired pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

**8.4    Presumed Rejection by Impaired Classes**.

Because Holders of Claims or Interests in Classes 5, 6 and 7 are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, such Holders of Claims or Interests are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6    Controversy Concerning Impairment**.

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.7    Elimination of Vacant Classes**.

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be considered vacant and deemed eliminated from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

**8.8    Subordinated Claims**.  The allowance, classification, and treatment of all Allowed Claims and Allowed Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general

principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE IX
## IMPLEMENTATION OF THE PLAN

**9.1     Funding of Plan** The Plan will be funded by Cash and Cash equivalents held by the Debtors and Post-Effective Date Debtors and the Settlement Consideration.

**9.2     Substantive Consolidation**.  The Plan contemplates and is predicated upon entry of an order substantively consolidating the Estates and the Chapter 11 Cases as set forth below.

(a)     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates for the purposes of confirming and consummating the Plan, including, but not limited to, voting, Confirmation and Distributions.

(b)     On and after the Effective Date, (i) all Assets and liabilities of the Debtors shall be treated as though they were pooled, (ii) each Claim Filed or to be Filed against any Debtor, as to which two or more Debtors are co-liable as a legal or contractual matter, shall be deemed Filed as a single Claim against, and a single obligation of, the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) all Interests shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any Interest held by a Debtor in any other Debtor, (vii) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof executed by any other Debtor shall be treated as one Claim against the substantively-consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the substantively-consolidated Debtors.

(c)     The substantive consolidation of the Debtors under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Post-Effective Date Debtors on or after the Effective Date, (iv) except as otherwise provided in the Plan, the Debtors' or the Post-Effective Date Debtors' ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (v) any Retained Causes of Action, or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the Debtors, and (vi) Distributions to the Debtors or the Post-Effective Date Debtors from any insurance policies or the proceeds thereof.  Notwithstanding the substantive consolidation called for herein, each and every Debtor shall remain responsible for the payment of U.S. Trustee Fees until its particular case is closed (pursuant to Section 16.10 of the Plan or otherwise), dismissed or converted.

(d)     This combined Disclosure Statement and Plan shall serve as, and shall be deemed to be, a motion for entry of an order of the Bankruptcy Court approving the substantive consolidation of the Estates and the Chapter 11 Cases.  If no objection to the Plan is timely Filed and served by any

Holder of an Impaired Claim affected by the Plan as provided herein on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Plan, including the substantive consolidation of the Estates and the Chapter 11 Cases, may be approved by the Bankruptcy Court as part of the Confirmation Order. If any such objections are timely Filed and served, the Plan and the objections thereto shall be considered by the Bankruptcy Court at the Confirmation Hearing.

(e)       Nothing in this section 9.2 shall augment or increase the property that constitutes collateral or any offset or similar right securing any Claim or otherwise increase the secured portion of any Claim under section 506(a) of the Bankruptcy Code.

The Debtors believe that substantive consolidation is fair, appropriate and necessary and should be approved. Although the power to substantively consolidate bankruptcy estates is not explicitly authorized by any provision of the Bankruptcy Code, it is well established that bankruptcy courts may use their equitable powers under section 105 of the Bankruptcy Code to consolidate cases involving related debtors. *See, e.g., Eastgroup Props. v. Southern Motel Assoc.*, 935 F.2d 245, 248 (11th Cir. 1991); *In re Stone & Webster, Inc.*, 286 B.R. 532, 539 (Bankr. D. Del. 2002); *In re Leslie Fay Cos.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); *Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am. (In re Orfa Corp. of Phila.)*, 129 B.R. 404, 413–14 (Bankr. E.D. Pa. 1991) ("the court's power to substantively consolidate cases is derived from its general equitable powers under 11 U.S.C. § 105").

The Third Circuit in *In re Owens Corning* held that the criteria utilized to permit substantive consolidation, absent consent of the parties, include prepetition disregard of corporate separateness or postpetition scrambling of assets and liabilities. *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) ("Substantive consolidation . . . emanates from equity [and] 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities'") (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005)).

The Debtors do not believe that parties will be prejudiced by the proposed substantive consolidation. "Substantive consolidation, a construct of federal common law, emanates from equity. It 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.'" *In re Owens Corning*, 419 F.3d at 205 (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d at 423). The Third Circuit has stated that this remedy is not limited to any particular form of entity—if substantive consolidation is appropriate, it can be invoked with respect to a limited liability company, a corporation, or other form of entity. *See id.* at 208 n.13. Above all else is a simple principle: "Substantive consolidation at its core is equity. Its exercise must lead to an equitable result." *Id.* at 216.

To establish that substantive consolidation is appropriate under *Owens Corning*, "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Owens Corning*, 419 F.3d at 211. The Third Circuit explained that the first rationale is meant to protect the prepetition expectations of creditors that have been intentionally or inadvertently misled. *See id.* at n.19. The second rationale, by contrast, "is at bottom one of practicality when the entities' assets and liabilities have been 'hopelessly commingled.' Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, e*ven if so, the effort will threaten to reprise Jarndyce and Jarndyce, the fictional suit in Dickens' Bleak House where only the professionals profited*)." *Id.* at n.20 (emphasis added) (internal citations omitted). In other words, a debtors' affairs are so tangled, and "the cost of untangling them is so

high relative to their assets" that all creditors will benefit from substantial cost savings, which savings are above and beyond the normal administrative convenience that would likely be created by substantive consolidation in all sets of related chapter 11 bankruptcy cases. *Id.* at 214–15.

Both rationales for substantive consolidation are established and supported by the facts and circumstances surrounding the Chapter 11 Cases.

*First*, the Debtors believe that Creditors, particularly the parties holding General Unsecured Claims in Class 4, identified the Debtors and dealt with them as one aggregated entity, rather than on the basis of separate corporate identities. The Debtors also believe that these Creditors viewed the Debtors as one single entity when extending trade credit and other credit terms, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value.

*Second*, with limited exceptions primarily related to employee obligations, all of the Debtors' bank accounts are held in the name of Borden, and Borden collected all receivables into, and made all disbursements from, such accounts in the name of Borden, notwithstanding the fact that separate entities may be the beneficiaries or obligors under such disbursements or payments. Such transactions were recorded as intercompany claims among the Debtors, generally without the knowledge of the parties receiving such disbursements.

*Third*, there is no clear apportionment of the value of the Purchased Assets, and apportioning value of the Purchased Assets and associated liabilities with respect to these and other Assets would be an exceedingly difficult, time consuming and expensive task and could lead to prolonged disputes or litigation among the individual Debtors and their Estates.

*Fourth*, and relatedly, all of the Debtors were either primarily or secondarily liable under the Prepetition Credit Agreement. All RCF/TLA Claims and $110 million of TLB Claims were satisfied in connection with the Sale. Absent substantive consolidation, there is no clear answer concerning how much value each Estate received as a result of the satisfaction of these Claims. Without this answer, it is impossible to determine how the proceeds of the Sale should be allocated among the Estates.

*Fifth*, as permitted by section 1123(a)(5)(C) of the Bankruptcy Code, one basis for substantive consolidation in these Chapter 11 Cases is the vote of the Classes of Creditors entitled to vote in favor of such treatment. The Plan does not propose substantive consolidation to deprive a specific Creditor or group of Creditors of their rights while providing a windfall to other Creditors. Rather, given the limited amount available for distribution to Holders of Claims in Class 3 and Class 4, and the expense involved in allocating the remaining Cash held by the Debtors among the Estates, the recovery by Creditors will be maximized by consolidating the assets and liabilities of each of the Debtors.

Accordingly, the Debtors believe that substantive consolidation of the Debtors, as set forth herein, is in the best interest of the Estates and parties in interest.

**9.3    Post-Effective Date Debtors; Wind-Down Administrator**.

(a)    **Post-Effective Date Debtors.** The Debtors shall continue in existence after the Effective Date as the Post-Effective Date Debtors for purposes of (1) winding down the Estates as expeditiously as reasonably possible and liquidating any non-Cash Retained Assets held by the Post-Effective Date Debtors after the Effective Date, (2) resolving any Disputed Claims, (3) paying Allowed Claims in accordance with the Plan, (4) enforcing and prosecuting claims, interests, rights, and privileges under any Retained Causes of Action in an efficacious manner and only to the extent

the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Administrator to File motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any Estate Retained Assets shall vest in the Post-Effective Date Debtors for the purpose of liquidating the Estates and Consummating the Plan. All Liens on any such Retained Assets shall be automatically released, and all guarantees of any of the Debtors or the Post-Effective Date Debtors shall be automatically discharged and released, and the Retained Assets shall be held free and clear of all Liens, Claims, and Interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any Distributions to be made under the Plan from such Retained Assets shall be made by the Wind-Down Administrator or its designee. The Post-Effective Date Debtors and the Wind-Down Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

(b)     **Wind-Down Administrator**. The appointment of the Wind-Down Administrator shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date.

The Wind-Down Administrator shall act for the Post-Effective Date Debtors in the same capacity and with the same authority as applicable to a board of directors and/or managers, as applicable, and officers, subject to the provisions hereof (and all corporate governance documents are deemed amended by the Plan to permit and authorize the same). On and after the Effective Date, the Wind-Down Administrator shall hold all privileges (including attorney-client privileges) of the Debtors and Post-Effective Date Debtors, and shall have exclusive right and authority to waive any such privileges. As of the Effective Date, each member of the existing board of directors or managers, as applicable, of each of the Debtors shall be deemed to have been removed without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members. On the Effective Date, the Wind-Down Administrator shall be appointed as the sole director and/or manager, as applicable, and the sole officer of the Post-Effective Date Debtors and shall succeed to the powers and privileges of the Debtors' directors, managers, and officers. From and after the Effective Date, the Wind-Down Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors, and shall constitute the sole representative of the Estates for all purposes pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. For the avoidance of doubt, the foregoing shall not limit the authority of the Post-Effective Date Debtors or the Wind-Down Administrator, as applicable, to continue the employment of any former director, manager, or officer.

The powers of the Wind-Down Administrator shall include any and all powers and authority to implement the Plan and to make Distributions thereunder and wind-down the Estates and the Post-Effective Date Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the Retained Assets, including the Retained Causes of Action; (2) taking all steps to execute all instruments and documents necessary to effectuate the Distributions to be made under the Plan; (3) making Distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-

Effective Date Debtors; (7) administering and paying Taxes of the Post-Effective Date Debtors, including filing Tax returns; (8) representing the interests of the Post-Effective Date Debtors before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to an order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.  In addition, the Wind-Down Administrator shall at all times enforce the terms of the Asset Purchase Agreement, including the Debtors' rights and the Purchaser's obligations thereunder.

The Wind-Down Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided*, that such resignation shall only become effective upon the appointment of a permanent or interim successor Wind-Down Administrator.  In the event no successor Wind-Down Administrator is appointed by the Post-Effective Date Debtors within thirty (30) days of the written notice of resignation, the resigning Wind-Down Administrator may seek such appointment by application to the Bankruptcy Court.  Upon its appointment, the successor Wind-Down Administrator, without any further act other than the Filing of a notice with the Bankruptcy Court, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Wind-Down Administrator relating to the Post-Effective Date Debtors shall be terminated.

The Wind-Down Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Wind-Down Administrator, are necessary to assist the Wind-Down Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Post-Effective Date Debtors, upon the monthly submission of statements to the Wind-Down Administrator.  The payment of the reasonable fees and expenses of the Wind-Down Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

Notwithstanding anything to the contrary herein, all fees, expenses, and disbursements of the Wind-Down Administrator in connection with the wind-down and dissolution of the Debtors' Estates and the Post-Effective Date Debtors, as applicable, shall be funded from the Wind-Down Expense Reserve.  For the avoidance of doubt, the Wind-Down Administrator's compensation, and the payment of Wind-Down Expenses, shall be funded from the Wind-Down Expense Reserve.

(c)     **Wind-Down**.  On and after the Effective Date, the Wind-Down Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Administrator shall have the power and authority to take any action necessary to wind-down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Wind-Down Administrator shall take any and all actions as the Wind-Down Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date the Post-Effective Date Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar Taxes accruing on or after the Effective Date.

(d)    **Wind-Down Administrator Exculpation, Indemnification, Insurance, and Liability Limitation.**  The Wind-Down Administrator and the Wind-Down Protected Parties, each in their capacities as such, shall be deemed exculpated and indemnified, except for actions that are finally determined to be fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors.  The Wind-Down Administrator may obtain, at the expense of the Post-Effective Date Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Wind-Down Protected Parties may rely upon written information previously generated by the Debtors.

(e)    **Tax Returns.**  After the Effective Date, the Wind-Down Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

(f)    **Expenses of Wind-Down Administrator**.  Fees and expenses incurred by the Wind-Down Administrator shall be paid from the Wind-Down Expense Reserve in accordance with Article X below.

(g)    **Bonding of Wind-Down Administrator.**  The Wind-Down Administrator shall not be obligated to obtain a bond but may do so, in his or her sole discretion, in which case the expense incurred by such bonding shall be paid by the Wind-Down Expense Reserve.

(h)    **Fiduciary Duties of the Wind-Down Administrator.**  Pursuant to the Plan, the Wind-Down Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive Distributions pursuant to the terms of the Plan.

**9.4    Wind-Up and Dissolution of the Debtors**.

From and after the Effective Date, the Debtors shall continue in existence pursuant to the terms of this combined Disclosure Statement and Plan.  The Wind-Down Administrator is authorized and empowered to effect the dissolution of any of the Debtors as soon as practicable after the Effective Date without the need for any company action or approval, and neither the Debtors nor the Wind-Down Administrator shall be required to pay any Taxes or fees to cause such dissolution.  On the Effective Date or as soon thereafter as is reasonably practicable, the Wind-Down Administrator shall wind-up the affairs of the Debtors and file final tax returns for the Debtors.  All company governance activities of a Debtor shall be exercised by the Wind-Down Administrator and the Wind-Down Administrator shall be authorized and empowered to take or cause to be taken all company actions necessary or appropriate to implement and consummate the Plan.

**9.5    Operating Reports**.

Prior to the Effective Date, the Debtors shall timely File all reports, including without limitation, monthly operating reports required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules, or the U.S. Trustee.  On and after the Effective Date, the Wind-Down Administrator shall timely File all reports, including without limitation, quarterly operating reports as required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules, or the U.S. Trustee until entry of an order closing or converting the Chapter 11 Cases.

**9.6**    **Post-Effective Date Professional Fees and Expenses**.

Professionals that perform post-Effective Date services for the Wind-Down Administrator shall provide monthly invoices to the Wind-Down Administrator describing the services rendered, and the fees and expenses incurred in connection therewith.  Post-Effective Date professionals of the Wind-Down Administrator who timely tender such invoices shall be paid by the Wind-Down Administrator for such services, subject to Article X herein, not less than ten (10) days after the submission to the Wind-Down Administrator by such professionals of said monthly invoices, unless, within such ten (10) day period, a written objection to such payment is made by the Wind-Down Administrator.  To the extent a written objection to such professional's monthly invoice cannot be resolved by the professional and the Wind-Down Administrator, payment of such invoice shall be made only upon Final Order of the Bankruptcy Court.

**9.7**    **Disposition of Books and Records**.

After the Effective Date, the Debtors shall transfer all of the Debtors' books and records in their possession, if any, relating to the conduct of the Debtors' business prior to the Effective Date to the Wind-Down Administrator.  From and after the Effective Date, the Wind-Down Administrator shall continue to preserve and maintain all documents and electronic data transferred to the Wind-Down Administrator by the Debtors and the Wind-Down Administrator shall not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Court after a hearing upon thirty (30) days' notice to parties-in-interest.

**9.8**    **Corporate Action**.

On the Effective Date, all matters expressly provided for under the Plan that would otherwise require approval of the shareholders or directors and/or managers, as applicable, of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to have occurred and shall be in effect upon the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated without any requirement of action by the shareholders or directors and/or managers, as applicable, of the Debtors.

## ARTICLE X
## PROVISIONS GOVERNING DISTRIBUTIONS

**10.1**    **Establishment of Reserves**.    On or prior to the Effective Date, and prior to making any Distributions, the Debtors or the Wind-Down Administrator shall establish:

(a)    The Professional Fee Reserve, and shall transfer thereto the Professional Fee Reserve Amount.  The Professional Fee Reserve shall first be funded from the funds remaining in the Carve-Out Account, and then, if there is a shortfall, from the Excess Cash. The Professional Fee Reserve shall be maintained in trust solely for the Professionals.  Once all Professional Fee Claims been resolved, and paid, as appropriate, the Professional Fee Reserve shall be dissolved.

(b)    The Distribution Reserve, and shall transfer thereto the Excess Cash (less any Excess Cash needed to fund the Professional Fee Reserve and the Wind-Down Expense Reserve).  The Distribution Reserve shall be funded from the Excess Cash.

(c)    The Wind-Down Expense Reserve, and shall transfer thereto the amount of Excess Cash as deemed necessary to fund the expenses of the Wind-Down Administrator in accordance with the provisions of the Plan.  Once all Wind-Down Expenses have been Paid in Full in Cash and the

Post-Effective Date Debtors have been dissolved, the Wind-Down Expense Reserve shall be dissolved.

Any Cash remaining in the Reserves after all First Tier Claims have been resolved, and paid, as appropriate, and the Wind-Down Expenses have been fully paid, shall be available for Distributions to General Unsecured Creditors in accordance with the waterfall in section 10.4 hereof.

**10.2    Disbursing Agent**.  The Wind-Down Administrator may employ or contract with other Persons or Entities to assist in or make the Distributions required by the Plan.

**10.3    Distributions by Wind-Down Administrator**.  The Wind-Down Administrator shall make periodic and final Distributions as provided in this Article X, except that the Wind-Down Administrator shall reserve such amounts as are necessary to maintain the Reserves in accordance with the terms of the Plan.  The Wind-Down Administrator may withhold from amounts distributable to any Person any and all amounts, determined in the Wind-Down Administrator's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive, or other governmental requirement.The Wind-Down Administrator shall require any Holder of an Allowed Claim or other distributee to furnish to the Wind-Down Administrator in writing an Employer Identification Number or Taxpayer Identification Number as assigned by the Internal Revenue Service and the Wind-Down Administrator may condition any Distribution to any Holder of an Allowed Claim or other distributee upon receipt of such identification number.  If the Employer Identification Number or Taxpayer Identification Number are not provided by the required deadline established by the Wind-Down Administrator, which shall be no less than thirty (30) days after the date that the Wind-Down Administrator makes such request, the Claim of any such Holder may be expunged and no Distribution will be issued by the Wind-Down Administrator to such Holder or distributee.

**10.4    Waterfall**.  The Wind-Down Administrator shall pay from the Distribution Reserve (to the extent that such Claims have not been paid on or prior to the Effective Date):

(a)    first, to satisfy all Allowed Administrative Claims (including Allowed Professional Fee Claims to the extent of any shortfall in the Professional Fee Reserve);

(b)    second, to satisfy all Allowed Other Secured Claims and Allowed Priority Tax Claims;

(c)    third, to satisfy the Allowed Other Priority Claims; and

(d)    fourth, to satisfy Allowed General Unsecured Claims and Allowed TLB Deficiency Claims.

**10.5    Timing of Distributions**.  Subject to the waterfall set forth in section 10.4, the Debtors shall pay each Allowed Administrative Claim (including Allowed Professional Fee Claims), Allowed Priority Tax Claim, Allowed Other Secured Claim, and Allowed Other Priority Claim as soon as is reasonably practicable after the Effective Date or on the later of:

(a)    the date on which such Claim becomes an Allowed Claim by Final Order,

(b)    the date on which, in the ordinary course of business, such Allowed Claim becomes due, or

(c)    such other date as may be agreed upon by the Debtors or the Wind-Down Administrator, as applicable, and the Holder of such Allowed Claim.

**10.6    Distributions upon Allowance of Disputed Claims**.  The Holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall, subject to sections 10.4 and 10.5, receive a Distribution, in accordance with Article VII of the Plan, as soon as reasonably practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order or by agreement of the parties.  Such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such Holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.  No Holder of a Disputed Claim shall have any Claim against the Wind-Down Administrator, the Debtors, the Post-Effective Date Debtors, or the Estates with respect to such Claim until such Disputed Claim becomes an Allowed Claim, and no Holder of a Disputed Claim shall have any right to interest, dividends, or other Distributions on such Disputed Claim except as provided in the Plan.

**10.7    Undeliverable and Unclaimed Distributions**.

(a)    **Holding Undeliverable and Unclaimed Distributions.**  If the Distribution to any Holder of an Allowed Claim is returned to the Wind-Down Administrator as undeliverable or is otherwise unclaimed, no additional Distributions shall be made to such Holder unless and until the Wind-Down Administrator is notified in writing of such Holder's then-current address.  Nothing contained in the Plan shall require the Debtors or the Post-Effective Date Debtors, as applicable, or the Wind-Down Administrator to attempt to locate any Holder of an Allowed Claim.

(b)    **After Distributions Become Deliverable.**  The Wind-Down Administrator shall make all Distributions that have become deliverable or have been claimed on and after the Distribution Date as soon as reasonably practicable after such Distribution has become deliverable or has been claimed.

(c)    **Failure to Claim Unclaimed/Undeliverable Distributions.**  Notwithstanding section 10.7(a), any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed Distribution within three (3) months after the Distribution Date shall be deemed to have forfeited its right to such undeliverable or unclaimed Distribution and any subsequent Distribution on account of its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed Distribution or any subsequent Distribution on account of its Allowed Claim against the Debtors, their Estates, the Post-Effective Date Debtors, or their property.  In such cases, Unclaimed Distributions shall re-vest in the Post-Effective Date Debtors within the time periods provided in this Article X of the Plan, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

**10.8    Interest on Claims**.  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition and/or default interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or interest at the contract default rate, as applicable.

**10.9    No Distribution in Excess of Allowed Amount of Claim**.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim will receive, in respect of such Claim, Distributions under the Plan in excess of the Allowed amount of such Claim.

**10.10    Means of Cash Payment**.  Cash payments made pursuant to the Plan shall be in U.S. funds, by the means, including by check or wire transfer, determined by the Disbursing Agent.

**10.11    Delivery of Distribution**.  Except as otherwise set forth in the Plan, Distributions to Holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim Filed by such Holders

(or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Disbursing Agent has been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent, or (c) if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, at the addresses reflected in the Schedules, if any.

**10.12    Record Date for Distributions**.  The Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register as of the close of business on the Distribution Record Date.

**10.13    No Distributions Pending Allowance**.  Notwithstanding any other provision of the Plan, no payments or Distributions by the Disbursing Agent shall be made with respect to all or any portion of a Disputed Claim unless and until all Objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; *provided*, *however*, that the Debtors, or the Wind-Down Administrator, may in their discretion, pay any undisputed portion of a Disputed Claim.

**10.14    Withholding and Reporting Requirements**.  In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent shall be authorized to take any and all actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

**10.15    Setoffs and Recoupment**.  The Debtors or the Wind-Down Administrator, as applicable, may, but shall not be required to, setoff or recoup against any Allowed Claim and the payment or other Distribution to be made pursuant to the Plan in respect of such Allowed Claim, any claims, rights, and Causes of Action of any nature whatsoever that a Debtor may have against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, of any such claim that such party may have against such Holder, unless otherwise agreed to in writing by such Holder and the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable.

**10.16    *De Minimis* Distributions**.  Notwithstanding any provision in the Plan to the contrary, no payment of less than fifty dollars ($50.00) shall be made on account of any Allowed Claim.  Any Distribution not made pursuant to this section 10.16 shall be treated as an Unclaimed Distribution and is subject to section 10.7 hereof, without regard to any time limits in section 10.7(c).

**10.17    Extensions of Time**.  The Wind-Down Administrator may File a motion to extend any deadlines for the making of Distributions or the establishment of Reserves hereunder prior to the occurrence of any such deadlines, to the extent necessary, which deadlines shall be deemed automatically extended after the Filing of such motion, and pending the entry of an order by the Bankruptcy Court extending any such deadline.

**10.18    Allocation Between Principal and Interest**.  Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

**10.19    Surrender of Cancelled Instruments or Securities**.  On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Post-Effective Date Debtors.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights, and obligations which expressly survive the Effective Date.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

# ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1    Allowance of Claims and Interests**.

After the Effective Date, each of the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to a Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against or Interest in any Debtor shall become an Allowed Claim or an Allowed Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases Allowing such Claim or Interest.

**11.2    Claims Administration Responsibility**.  Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Administrator shall have the sole authority to (a) File, withdraw, or litigate to judgment Objections to Claims, (b) settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) amend the Schedules in accordance with the Bankruptcy Code, and (d) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Any agreement entered into by the Wind-Down Administrator with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim; *provided*, *however*, that the U.S. Trustee's rights to object to Professional Fee Claims are reserved.

**11.3    Claims Objections**.

All Objections to Claims shall be Filed by the Wind-Down Administrator on or before the Claims Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion Filed by the Wind-Down Administrator on or before the Claims Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the Filing of such motion. If a timely Objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as Contingent, unliquidated, or Disputed, then the Claim to which the Proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.4    Estimation of Contingent or Unliquidated Claims**.

The Wind-Down Administrator may, at any time, request that the Bankruptcy Court estimate any Contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such Objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any Objection to any Claim, including during the pendency of any appeal relating to any such Objection. In the event the Bankruptcy Court so estimates any Contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. All of the aforementioned Claims Objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.5    Claims Paid and Payable by Third Parties**.

A Claim shall be Disallowed without an Objection thereto having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives Payment in Full on account of such Claim from a party that is not the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator. To the extent that a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, a Post-Effective Date Debtor, or the Wind-Down Administrator on account of such Claim, such Holder shall repay, return, or deliver any Distribution held by or transferred to the Holder to the applicable Post-Effective Date Debtor or the Wind-Down Administrator to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such Distribution under the Plan. Distributions under the Plan shall be made on account of any Allowed Claim that is payable pursuant to one of the Insurance Contract(s) solely up to the amount of the portion of such Allowed Claim that is (i) within the self-insured retention under such Insurance Contract(s), and/or (ii) in excess of any aggregate limits under such Insurance Contract(s). No Entity, other than an Insurer under an applicable Insurance Contract, shall have any other recourse against the Debtors, the Estates, the Post-Effective Date Debtors, or any of their respective properties or assets on account of a self-insured retention under an Insurance Contract; *provided*, *however*, that, except as otherwise required under the applicable Insurance Contracts and applicable non-bankruptcy law, an Insurer shall not be obligated to pay amounts within any self-insured retention or other self-insured layer.

**11.6    Adjustment to Claims without Objection**.

Any Claim that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Wind-Down Administrator by the Filing of a Notice of Satisfaction by the Wind-Down Administrator, and without any further notice to or action, order, or approval of the Bankruptcy Court.

**11.7    Disallowance of Claims**. Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable. Except as otherwise provided herein or as agreed

to by the Post-Effective Date Debtors or the Wind-Down Administrator, as applicable, any and all Proofs of Claim Filed after the applicable Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.

**11.8     Amendments to Proofs of Claim**.  On or after the Effective Date, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, and any such new or amended Proof of Claim or Proof of Interest filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court, to the maximum extent provided by applicable law.

# ARTICLE XII
## EXECUTORY CONTRACTS

**12.1     Executory Contracts Deemed Rejected**.

On the Effective Date, except to the extent otherwise set forth herein, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract, or (b) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and sections 365(a) and 1123 of the Bankruptcy Code.

**12.2     Asset Purchase Agreement**.

To the extent executory, the Asset Purchase Agreement, and any other documents related to the Sale, shall be assumed.

**12.3     Rejection Claims**.

In the event that the rejection of an Executory Contract by any of the Debtors pursuant to the Plan results in a Rejection Claim in favor of a counterparty to such Executory Contract, such Rejection Claim, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Post-Effective Date Debtors unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel to the Wind-Down Administrator on or before the date that is twenty-one (21) days after the Effective Date.  All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Plan.

**12.4     Insurance Contracts**

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases): (a) on the Effective Date, all of the Debtors' Insurance Contracts shall be assumed and assigned to the Post-Effective Date Debtors in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (b) nothing shall alter, modify, amend, affect,

impair or prejudice either (i) the legal, equitable or contractual rights, obligations, and defenses of the Debtors, the Post-Effective Date Debtors, the Wind-Down Administrator, the Insurers, or any non-Debtor beneficiaries of or covered Persons or Entities under the Insurance Contracts other than that on and after the Effective Date, the Post-Effective Date Debtors shall become and remain liable in full for all of their and the Debtors' obligations under the Insurance Contracts, or (ii) that certain Assumption and Assignment Agreement dated July 20, 2020, by and between the Debtors, the Purchaser and the Chubb Companies (as defined therein), which shall be assumed pursuant to section 12.2 of the Plan; (c) nothing shall alter or modify the duty, if any, that the Insurers have to pay claims covered by the Insurance Contracts and their rights, if any, under the Insurance Contracts to seek payment or reimbursement from the Debtors (or after the Effective Date, the Post-Effective Date Debtors), and the Insurers shall not need to or be required to file or serve any objection to a Cure Notice or a request, application, claim, proof or motion for payment or allowance of any Administrative Claim and shall not be subject to any bar date or similar deadline governing cure claims, Proofs of Claim, or Administrative Claims; and (d) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XIV of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim and all costs in relation thereto; and (III) the Insurers to cancel any Insurance Contracts, and take other actions relating to the Insurance Contracts (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

## ARTICLE XIII
## CONFIRMATION AND CONSUMMATION OF THE PLAN

**13.1    Conditions Precedent to the Effective Date**.  Each of the following is a condition precedent to the occurrence of the Effective Date:

(a)    the Confirmation Order shall have become a Final Order in full force and effect with no stay or vacation thereof then in effect;

(b)    all actions, documents, and agreements necessary to implement this combined Disclosure Statement and Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this combined Disclosure Statement and Plan, shall have been effectuated or executed; and

(c)    the Reserves shall have been established and funded.

**13.2    Notice of Effective Date**.

On or before five (5) Business Days after the Effective Date, the Wind-Down Administrator shall mail or cause to be mailed to all Holders of Claims a notice that informs such Entities of (a) the Confirmation of the Plan and occurrence of the Effective Date, (b) notice of the Post-Effective Date Administrative Claims Bar Date and Professional Fee Claims Bar Date, and (c) such other matters as the Wind-Down Administrator deems appropriate or as may be ordered by the Bankruptcy Court.

**13.3    Waiver of Conditions Precedent to the Effective Date**.

The Debtors may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Entity; *provided, however*, that the condition specified in section 13.1(a) may not be waived.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

**13.4     Effect of Non-Occurrence of Effective Date**.

If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within ninety (90) calendar days after the Confirmation Date, then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

**13.5     Substantial Consummation**.  "Substantial Consummation" of the Plan, as such term is defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**ARTICLE XIV**
**EFFECTS OF CONFIRMATION**

**14.1     Compromise and Settlement of Claims, Interests, and Controversies**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies (other than the Retained Causes of Action) among the of the Debtors, their Estates, the Committee, and the Existing Equity Holders.  The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan and the good faith compromise and settlement of all of the Claims, Interests and controversies (other than the Retained Causes of Action) described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements, as well as a finding by the Bankruptcy Court that the compromises and settlements are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Administrator may compromise and settle any Claims against, and Interests in, the Debtors and their Estates and Retained Causes of Action against other Entities.

For the avoidance of doubt, this combined Disclosure Statement and Plan incorporates and adopts the terms of: (i) the Laguna Settlement Agreement as if fully set forth herein, and, to the extent of any inconsistency between the Laguna Settlement Agreement and this combined Disclosure Statement and Plan, the Laguna Settlement Agreement shall control; and (ii) the Equity Settlement Agreement as if fully set forth herein, and, to the extent of any inconsistency between the Equity Settlement Agreement and this combined Disclosure Statement and Plan, the Equity Settlement Agreement shall control.

27405501.4

**14.2    Release of Liens**.  To the extent not already effectuated pursuant to the Sale, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their respective successors and assigns without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Post-Effective Date Debtors, as applicable.

**14.3    Exculpation, Releases, and Injunctions**.Nothing contained in section 14.3 of the Plan shall prohibit the Holder of a Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of the Plan, or enjoin or prohibit the enforcement by the Holder of such Claim of any of the obligations of the Wind-Down Administrator under the Plan.  The exculpations, releases, and injunctions provided for in section 14.3 of the Plan shall be effective upon the Effective Date and shall be in addition to, and in no manner shall limit, the releases granted in the Laguna Settlement Agreement and the Equity Settlement Agreement.

(a)    **Exculpation and Limitation of Liability.**  Notwithstanding any other provision of the Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission occurring on or after the Petition Date and before the Effective Date relating to, in any way, or arising from (i) the Chapter 11 Cases, (ii) the RCF Facility, the TLA Facility, and the TLB Facility, (iii) formulating, negotiating or implementing this combined Disclosure Statement and Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with this combined Disclosure Statement and Plan; (iv) the Sale, the Asset Purchase Agreement, the Laguna Settlement Agreement, and the Equity Settlement Agreement; (v) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors; (vi) the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan; or (vii) the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.  The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to section 14.3(a) of the Plan.

(b)    **Releases by the Debtors.**  Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party shall hereby be expressly, unconditionally, irrevocably, generally, individually and collectively, released, acquitted,  and discharged by the Debtors, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any

Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the RCF Facility, the TLA Facility, the TLB Facility, the Cash Collateral Order, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the Plan, the Sale, the Asset Purchase Agreement, the Laguna Settlement Agreement, the Equity Settlement Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Sale, the Asset Purchase Agreement, the Laguna Settlement Agreement, the Equity Settlement Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place or existing on or prior to the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (2) any Retained Causes of Action other than any preference actions under section 547(b) of the Bankruptcy Code, which shall be deemed released and waived by the Debtors, the Post-Effective Date Debtors, and/or the Wind-Down Administrator, as applicable, as of the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth above, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that the releases set forth above are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases set forth above; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases set forth above against any of the Released Parties.

(c)     **Consensual Third-Party Releases by Holders of Claims and Interests.**  Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, each Post-Effective Date Debtor, their Estates, the Wind-Down Administrator, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors, the Post-Effective Date Debtors, their Estates, or the Wind-Down Administrator, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the RCF Facility, the TLA Facility, the TLB Facility, the Cash Collateral Order, the

Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the Plan, the Sale, the Asset Purchase Agreement, the Laguna Settlement Agreement, the Equity Settlement Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Sale, the Asset Purchase Agreement, the Laguna Settlement Agreement, the Equity Settlement Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place or existing on or prior to the Effective Date; *provided, however*, that nothing in this section shall operate as a release, waiver, or discharge of any causes of action or liabilities unknown to such Entity as of the Petition Date arising out of gross negligence, willful misconduct, fraud, or criminal acts of any such Released Party as determined by a Final Order.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that (1) such releases were disclosed and explained on the Ballots, in the notice of the Confirmation Hearing, and in this Combined Disclosure Statement and Plan; (2) are consensual under applicable law because such releases are being provided only by parties who failed to exercise the Opt-Out Election, and (3) are given in exchange for and are supported by fair, sufficient, and substantial consideration.

Notwithstanding anything to the contrary contained in the Plan (including, but not limited to, section 14.1, section 14.3(a), and the foregoing provisions of this section 14.3(c)) or any order confirming the Plan, any claim or liability (including, but not limited to, any liability or claim for withdrawal liability under 29 U.S.C. §§ 1383 and 1385) against one or more non-Debtors, including Affiliates and any other Person or Entity that is not a Debtor, by Central States is left Unimpaired, shall not be discharged, released, or exculpated, and shall continue unaltered as if these Chapter 11 Cases had not been commenced.

(d)    **Non-Discharge of the Debtors; Injunction.**   In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan, the Laguna Settlement Agreement, the Equity Settlement Agreement, or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, from:

(1) commencing or continuing in any manner any action or other proceeding of any kind against any of the Estates, the Post-Effective Date Debtors, their successors and assigns, and any of their assets and properties;

(2) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Estate, the Post-Effective Date Debtors, their successors and assigns, and any of their assets and properties;

(3) creating, perfecting or enforcing any encumbrance of any kind against any Estate, the Post-Effective Date Debtors, their successors and assigns, and any of their assets and properties;

(4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Estate, the Post-Effective Date Debtors or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely Filed Proof of Claim; or

(5) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV of the Plan.

Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their Related Parties shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, Distributions on account of such Claim or Interest hereunder shall be deemed to have consented to the injunction provisions set forth in this section 14.3(d) of the Plan.

**14.4 Term of Bankruptcy Injunction or Stays**.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

**14.5 Defined Benefit Pension Plan**.

(a) Debtor Borden Dairy of Kentucky, LLC sponsors the Borden Dairy Company of Kentucky, LLC Retirement Plan (the "***Defined Benefit Pension Plan***"), a defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"). The Defined Benefit Pension Plan provides retirement benefits to certain of the Debtors' former employees and their beneficiaries.

(b) To the extent they constitute members of the same controlled group with the Defined Benefit Pension Plan's sponsor under ERISA, the Debtors are jointly and severally liable for contributions to the Defined Benefit Pension Plan necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code. *See* 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430. To the extent they constitute members of the same controlled group with the Defined Benefit Pension Plan's sponsor under ERISA, the Debtors are also jointly and severally liable for

insurance premiums owed to the Pension Benefit Guaranty Corporation ("**PBGC**"), the federal government agency that administers the pension insurance program under Title IV of ERISA.  *See* 29 U.S.C. §§ 1306, 1307.  When an underfunded pension plan terminates with insufficient assets to pay benefits, PBGC generally becomes statutory trustee of the plan and pays benefits to the plan's participants up to statutory limits.  The exclusive means of terminating a pension plan are through a standard termination, a distress termination or a PBGC initiated termination. 29 U.S.C. §§ 1341, 1342. If the Defined Benefit Pension Plan is terminated, the Debtors, to the extent they constitute members of the same controlled group with the Defined Benefit Pension Plan's sponsor under ERISA, will also be jointly and severally liable for the unfunded benefit liabilities of the Defined Benefit Pension Plan.

(c)    Notwithstanding any provision to the contrary, no provision contained in the Plan, including sections 14.3 and 14.4 or the Confirmation Order shall be construed as discharging, releasing, or relieving the Debtors or any party, Person or Entity from any liability or responsibility with respect to the Defined Benefit Pension Plan under any law, governmental policy, or regulatory provision.  The PBGC and the Defined Benefit Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against the Debtors or any party, Person or Entity as a result of any of the provisions of the Plan or the Confirmation Order.  The Debtors reserve the right to argue that any and all Claims of the PBGC against the Debtors, to the extent Allowed, shall be fully satisfied by the treatment of such Allowed Claims as Allowed General Unsecured Claims in Class 4 under the Plan.  The PBGC reserves the right to argue that any and all Claims of the PBGC against the Debtors, to the extent Allowed, shall be fully satisfied by the treatment of such Allowed Claims as Allowed Administrative Claims, Allowed Other Priority Claims in Class 2 and/or Allowed General Unsecured Claims in Class 4 under the Plan, as applicable.

**14.6    Vesting Provision**.

Any and all Retained Assets accruing to the Debtors or assertable as accruing to the Debtors shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall be transferred to and vest in the Post-Effective Date Debtors.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Administrator shall have the right to liquidate any Retained Assets, and to pursue or not to pursue or settle any Retained Causes of Action, rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Administrator after the Effective Date, except as otherwise expressly provided in the Plan.  Other than as set forth herein, no other Person may pursue such Retained Assets after the Effective Date.

**14.7    Recoupment**.  In no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**14.8    Reimbursement or Contribution**.  If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is Contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer Contingent.

## ARTICLE XV
## RETENTION OF JURISDICTION

**15.1    Jurisdiction of Bankruptcy Court**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether Filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

(b)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

(d)    determine and resolve any matters related to (i) the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom; and (ii) any dispute regarding whether a contract or lease is or was executory or expired;

(e)    ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(f)    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

(g)    determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(h)    modify this combined Disclosure Statement and Plan or the Confirmation Order before or after the Effective Date, pursuant to section 1127 of the Bankruptcy Code, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the

Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this combined Disclosure Statement and Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(i)      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)      determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this combined Disclosure Statement and Plan or the Confirmation Order;

(l)      determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)      hear and determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(o)      determine and resolve controversies related to the Estates, the Debtors, or the Post-Effective Date Debtors from and after the Effective Date;

(p)      hear and determine any other matter relating to this combined Disclosure Statement and Plan;

(q)      hear any other matter not inconsistent with the Bankruptcy Code; and

(r)      enter a final decree closing any or all the Chapter 11 Cases.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, or the Plan Supplement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XV, the provisions of this Article XV shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

27405501.4

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

# ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    Modification of the Plan**.

The Debtors may alter, amend, or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan; *provided*, *however*, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan.  Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**16.2    Effect of Confirmation on Modifications**.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**16.3    Revocation, Withdrawal, or Non-Confirmation of the Plan**.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan is not confirmed by the Bankruptcy Court, then:

(a)    the Plan shall be null and void in all respects, and

(b)    nothing contained in this combined Disclosure Statement and Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**16.4    Binding Effect**.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and upon the occurrence of the Effective Date, the provisions of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan, all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.

**16.5    Subordination Rights**.

The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto,

whether arising under contract, general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently. The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Wind-Down Administrator on behalf of the Estates after the occurrence of the Effective Date. Without limitation hereunder, the Wind-Down Administrator, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under section 510 of the Bankruptcy Code, which rights are deemed transferred to, remain and are preserved in the Post-Effective Date Debtors, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.6    Severability of Plan Provisions**.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Post-Effective Date Debtors, as applicable; and (iii) non-severable and mutually dependent.

**16.7    Payment of Statutory Fees; Filing of Quarterly Reports**.

Notwithstanding any other provision of the Plan to the contrary, all U.S. Trustee Fees, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be Paid in Full in Cash on or before the Effective Date. On and after the Effective Date, the Wind-Down Administrator shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee for each Debtor until its case is close, dismissed, or converted. All U.S. Trustee Fees that arise after the Effective Date shall be Paid in Full in Cash by the Post-Effective Date Debtors when due. The Post-Effective Date Debtors shall have the obligation to pay U.S. Trustee Fees pursuant to United States Code title 28 section 1930 for each and every Debtor until its particular case is closed, dismissed, or converted. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to File any proofs of Claim with respect to U.S. Trustee Fees.

**16.8    Dissolution of the Committee.** The Committee shall dissolve automatically on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee. The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or Filed thereafter, the outcome of which could affect the treatment of prepetition unsecured creditors (including Holders of Allowed Priority Claims and 503(b)(9) Claims), including, but not limited to, any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order that could affect the treatment of prepetition unsecured creditors. The Professionals retained by the Committee shall not be entitled to assert

any Administrative Claims nor shall they have an Allowed Administrative Claim for any services rendered or expenses incurred after the Effective Date.

**16.9    Exemption from Section 1146**.

Pursuant to section 1146(a) of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto (including to the Post-Effective Date Debtors and by the Wind-Down Administrator) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases or by the Wind-Down Administrator shall be deemed to be or have been done in furtherance of the Plan.

**16.10    Closing of Chapter 11 Cases; Caption Change**.

As of the Effective Date, the Wind-Down Administrator may submit separate orders to the Bankruptcy Court under certification of counsel closing the Chapter 11 Cases of all of the Debtors.  Nothing in the Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the closing of the Chapter 11 Cases of all of the Debtors the Wind-Down Administrator shall File a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**16.11    Filing of Additional Documents**.

On or before the Effective Date, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

**16.12    Successors and Assigns**.

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.13    Exhibits and Schedules**.

All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of the Plan as if set forth in full herein.  Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors' counsel or by downloading such exhibits and documents from the Debtors' restructuring website at

27405501.4

https://www.donlinrecano.com/Clients/borden/index  or  the  Bankruptcy  Court's  website  at www.deb.uscourts.gov.  Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. To the extent any exhibit or schedule annexed hereto is inconsistent with the Plan, the contents of the Plan shall control.  The documents comprising the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**16.14    Reservation of Rights**.

The Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  The Filing of this combined Disclosure Statement and Plan, any statement or provision contained in this combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to the Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

**16.15    Entire Agreement**.  Except with respect to consummation of the Sale, including, but not limited to the Asset Purchase Agreement, the Laguna Settlement Agreement, and the Equity Settlement Agreement, or as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  The Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to the Plan and the documents comprising the Plan Supplement are part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

**16.16    Votes Solicited in Good Faith**.  Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Post-Effective Date Debtors, or the Wind-Down Administrator, as applicable, will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of any securities offered and sold under the Plan and any previous plan.

**16.17    Waiver or Estoppel**.  Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors

or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

**16.18  Further Assurances**.  On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Post-Effective Date Debtors, the Wind-Down Administrator, all Holders of Allowed Claims or Allowed Interests receiving Distributions pursuant to the Plan, and all other parties in interest may and shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## ARTICLE XVII
## RECOMMENDATION

In the opinion of the Debtors, the Plan is superior and preferable to the alternatives described herein. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation.

\*        \*        \*        \*        \*

Dated:   December 11, 2020


**Borden Dairy Company, et al.**

*/s/ Kent Percy*
Name: Kent Percy
Title: Chief Restructuring Officer

27405501.4

**Exhibit A**
**Liquidation Analysis**

Borden Dairy Company
Liquidation Analysis
Summary of Key Assumptions

This liquidation analysis (this "***Liquidation Analysis***") provides a current estimate of anticipated ranges of recoveries available to creditors under two scenarios—confirmation of the Plan[1] and a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.

General Assumptions

This analysis assumes that the Plan would be confirmed on November 15, 2020, and uses that same date for the hypothetical conversion to Chapter 7 of the Bankruptcy Code.

The "Low Case" assumes that no contingent assets are liquidated and that the high-end estimate for claims in each class have not been fully reconciled. The "High Case" assumes the successful liquidation of all contingent assets and the low-end estimate for claims in unreconciled classes.

The Total Liquidation Proceeds, including cash and accounts receivable, was estimated from the Debtors' cash flow projections. Cash is assumed as of November 15, 2020.

Distribution Proceeds

1)   The Debtors estimate that they will have between approximately $12.8 million to $13.1 million in Cash as of November 15, 2020, which assumes full recovery of all remaining accounts receivable belonging to the Estates following the Sale.

   a)   Cash—Residual cash from the asset sale after paying liabilities that came due prior to the conversion date.
   b)   Deposits and Prepayments—The Debtors believe that they have liquidated substantially all of their deposits and prepayments, including the outstanding P-card deposit.
   c)   Contingent Assets—The Debtors estimate that they may be eligible for a net federal tax refund of approximately $800,000, following setoff of certain amounts owed to the USDA and the EPA. The collectability of these tax refunds is uncertain and contingent on, among other things, decisions made by the Internal Revenue Service.
   d)   Settlement Proceeds—The Debtors estimate that they will have received $1.0 million pursuant to the Equity Settlement if approved by the Bankruptcy Court.

Post-Effective Date/Conversion Costs

2)   Costs projected to be incurred post-Effective Date/conversion, include the following:

   a)   Chapter 7 Trustee Fees—The Liquidation Analysis assumes that liquidation takes place over 90 days. The Chapter 7 trustee is assumed to be paid the maximum fee

---

[1]   All capitalized terms not otherwise defined herein shall be given the meanings ascribed to such terms in the Plan.

Borden Dairy Company
Liquidation Analysis
Summary of Key Assumptions

for one quarter (3% of total recoverable value). Chapter 7 trustee fees are not applicable if the Plan is confirmed.

b) Estate Wind-Down Costs—Both Chapter 11 and Chapter 7 scenarios assume $463,000 of wind-down costs associated with tax compliance, claims agent fees, and U.S. Trustee fees.

c) Estate Wind-Down Professional Fees—Both Chapter 11 and Chapter 7 scenarios assume that professionals will be retained to assist the Wind-Down Administrator with administration of the bankruptcy cases, claims objections, and other wind-down activities. The institutional case knowledge of the Professionals would likely result in a faster process and lower overall professional fees under the Plan. The cost for these Professionals is estimated to be approximately $250,000 in the Chapter 11 scenario. The analysis assumes that an additional $150,000 in incremental wind-down professional fees would be required in the Chapter 7 scenario, as said professionals would need to spend time and effort to learn the case and its outstanding issues. The Liquidation Analysis assumes that claims reconciliation work will be limited.

## Chapter 11 Administrative Claims

3) The Liquidation Analysis estimates that Administrative Claims will be between $7.7 million and $8.9 million, based on the following:

a) Chapter 11 Professional Fees—The Debtors estimate that approximately $1.2 million in Professional Fee Claims will be outstanding as of the Effective Date/conversion. That estimate could increase or decrease materially if the anticipated scope of work required changes or there is contested litigation.

b) 503(b)(9) Claims—The Debtors have continued to communicate with vendors to reconcile 503(b)(9) Claims, and currently estimate that the range of 503(b)(9) Claims is between $3.3 million and $4.5 million. This range assumes that the amounts negotiated between the Debtors and their vendors to date result in stipulations or amended Claims that match these agreed-upon amounts, and that any redundant or duplicative claims are successfully objected to and expunged.

c) Ordinary Course Administrative Claims—The Debtors estimate that they have incurred approximately $3.1 million in ordinary course Administrative Claims that remain unpaid, including approximately between $2.2 million in trade payables and fees and $0.9 million in 2020 franchise and motor vehicle taxes.

## Priority Claims

4) The Debtors have estimated the range of Priority Tax and Other Priority Claims to be between $226,000 and $404,000, based on the difference between the Filed Claims and what the Debtors have on their books and records. The Filed Claims exclude redundant and duplicative Claims, as well as Priority Tax Claims that the Debtors believe have either been paid or are not yet due and owing (*e.g.*, Priority Tax Claims for 2020 that are not due until 2021).

Borden Dairy Company
Liquidation Analysis
Summary of Key Assumptions

TLB Deficiency Claims

5)  In accordance with the Asset Purchase Agreement, this analysis assumes that the TLB Deficiency Claim will be allowed in the amount of $65.0 million.

General Unsecured Claims

6)  The estimated amount of General Unsecured Claims is based on a review of the Schedules and Proofs of Claim, after taking into account the TLB Deficiency Claim, Rejection Claims, and a reasonable estimate for other General Unsecured Claims. The Debtors currently estimate that General Unsecured Claims range between $64.6 million and $97.1 million.  This includes approximately $37.2 million to $43.5 million in Claims (net of duplicate and redundant Claims) filed by certain pension funds, approximately $7.8 million in Rejection Claims, approximately $7.2 million in contingent, unliquidated, and disputed litigation and employee Claims, and $12.4 million to $38.6 million in trade payables.  The range reflects the difference between the Debtors' books and records and Filed Claims (net of redundant/duplicative Claims).  The Debtors assume in all cases that the Internal Revenue Service will setoff certain unsecured claims owed to government agencies prior as part of its calculation of any federal tax refund owed to the Debtors' estates.

**Borden Dairy - Liquidation Analysis**
October 20, 2020
*Amounts in USD thousands*

| | Chapter 11 Plan | | Chapter 7 Liquidation | |
|---|---|---|---|---|
| | Low Case | High Case | Low Case | High Case |
| **Total Liquidation Proceeds** | $ 12,787 | $ 13,053 | $ 12,787 | $ 13,053 |
| | | | | |
| **Liquidation Costs** | | | | |
| Chapter 7 Trustee Fees (3% of Total) | – | – | (384) | (392) |
| Estate Wind-Down Costs | (463) | (463) | (463) | (463) |
| Estate Wind-Down Professional Fees | (250) | (250) | (400) | (400) |
| **Total Liquidation Costs** | $ (713) | $ (713) | $ (1,247) | $ (1,255) |
| | | | | |
| **Net Liquidation Proceeds Available for Distribution** | $ 12,074 | $ 12,340 | $ 11,541 | $ 11,798 |
| | | | | |
| **Estimated Allowed Claims** | | | | |
| Chapter 11 Administrative Claims | $ 8,865 | $ 7,685 | $ 8,865 | $ 7,685 |
| Other Secured Claims | – | – | – | – |
| Other Priority Claims | 404 | 226 | 404 | 226 |
| TLB Deficiency Claims | 65,000 | 65,000 | 65,000 | 65,000 |
| General Unsecured Claims | 97,132 | 64,614 | 97,132 | 64,614 |
| Intercompany Claims | – | – | – | – |
| Intercompany Interests | – | – | – | – |
| Interests in Holdings | – | – | – | – |
| | | | | |
| **Estimated Recovery ($)** | | | | |
| Chapter 11 Administrative Claims | $ 8,865 | $ 7,685 | $ 8,865 | $ 7,685 |
| Other Secured Claims | – | – | – | – |
| Other Priority Claims | 404 | 226 | 404 | 226 |
| TLB Deficiency Claims | 964 | 1,969 | 911 | 1,949 |
| General Unsecured Claims | 1,841 | 2,459 | 1,361 | 1,938 |
| Intercompany Claims | – | – | – | – |
| Intercompany Interests | – | – | – | – |
| Interests in Holdings | – | – | – | – |
| | | | | |
| **Estimated Recovery (%)** | | | | |
| Chapter 11 Administrative Claims | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Secured Claims | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% |
| TLB Deficiency Claims | 1.5% | 3.0% | 1.4% | 3.0% |
| General Unsecured Claims | 1.9% | 3.8% | 1.4% | 3.0% |
| Intercompany Claims | 0.0% | 0.0% | 0.0% | 0.0% |
| Intercompany Interests | 0.0% | 0.0% | 0.0% | 0.0% |
| Interests in Holdings | 0.0% | 0.0% | 0.0% | 0.0% |

**Exhibit B**
**Disclosure Statement Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 20-10010 (CSS) |
| BDC Inc., *et al.*, | (Jointly Administered) |
| Debtors.[1] | **Ref. Docket No. 1031** |

**ORDER (I) APPROVING THE COMBINED DISCLOSURE STATEMENT AND PLAN ON AN INTERIM BASIS FOR SOLICITATION PURPOSES ONLY; (II) ESTABLISHING SOLICITATION AND TABULATION PROCEDURES; (III) APPROVING THE FORM OF BALLOTS AND SOLICITATION MATERIALS; (IV) ESTABLISHING THE VOTING RECORD DATE; (V) FIXING THE DATE, TIME, AND PLACE FOR THE COMBINED HEARING AND THE DEADLINE FOR FILING OBJECTIONS THERETO; AND (VI) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession for entry of an order: (i) approving the Combined Disclosure Statement and Plan, on an interim basis and for solicitation purposes only; (ii) establishing procedures for the solicitation and tabulation of votes to accept or reject the Combined Disclosure Statement and Plan; (iii) approving the form of Ballots and solicitation materials; (iv) establishing a voting record date; (v) fixing the date, time, and place for the Confirmation Hearing and the deadline for filing objections related thereto; and (vi) granting related relief; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and this

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BDC Inc. (1509); BDC Holdings, LLC (8504); ND, LLC (9109); BDC of Alabama, LLC (5598); BDC of Cincinnati, LLC (1334); BTC of Cincinnati, LLC (3462); BDC of Florida, LLC (5168); BDC of Kentucky, LLC (7392); BDC of Louisiana, LLC (4109); BDC of Madisonville, LLC (7310); BDC of Ohio, LLC (2720); BTC of Ohio, LLC (7837); BDC of South Carolina, LLC (0963); BDC of Texas, LLC (5060); CAS, LLC (9109); GSSD, LLC (9109); NDHT, LLC (7480); and BDC of Madisonville Sub, LLC (0314).  The location of the Debtors' service address is: 2807 Allen Street, Box 833, Dallas, TX 75204-4062.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Combined Disclosure Statement and Plan, as applicable.

Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court

being able to issue a final order consistent with Article III of the United States Constitution; and

this Court having found that venue of this proceeding and the Motion in this District is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion

having been given; and it appearing that no other or further notice is required; and this Court having

found that the relief requested in the Motion is in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.      The form of ballots attached hereto as **Exhibit 1-A** and **Exhibit 1-B**, respectively

(the "**Ballots**"): (i) are consistent with Official Form No. 14; (ii) adequately address the particular

needs of these chapter 11 cases; (iii) are appropriate for the Voting Class; and (iv) comply with

Bankruptcy Rule 3017(d).

B.      The Ballots need not be provided to Holders of Claims or Interests in the following

Classes, as such Non-Voting Classes are either (i) unimpaired and conclusively presumed to have

accepted the Combined Disclosure Statement and Plan in accordance with section 1126(f) of the

Bankruptcy Code, or (ii) impaired but will neither retain nor receive any property under the

Combined Disclosure Statement and Plan and, thus, are conclusively deemed to have rejected the

Combined Disclosure Statement and Plan under section 1126(g) of the Bankruptcy Code:

| Class | Type | Status Under Plan | Voting Status |
|-------|------|-------------------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Interests | Impaired | Deemed to Reject |
| 7 | Interests in Holdings | Impaired | Deemed to Reject |

C.     The period during which the Debtors may solicit votes to accept or reject the Combined Disclosure Statement and Plan, as established by this Order, provides sufficient time for the Holders of Claims in the Voting Classes to make informed decisions to accept or reject the Combined Disclosure Statement and Plan and submit a Ballot in a timely fashion, and the solicitation provided by this Order is consistent with section 1126 of the Bankruptcy Code.

D.     The Tabulation Procedures for the solicitation and tabulation of votes to accept or reject the Combined Disclosure Statement and Plan, as approved herein, provide a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

E.     The contents of the Solicitation Packages and the procedures for providing notice of the Confirmation Hearing and the other matters set forth in the Confirmation Notice, under the circumstances, constitute sufficient notice to all interested parties in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The relief requested in the Motion is granted as set forth herein.

**<u>Combined Disclosure Statement and Plan</u>**

2.     The Combined Disclosure Statement and Plan is approved on an interim basis for solicitation purposes under sections 105 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

3.     The Ballots, substantially in the form attached hereto as **<u>Exhibit 1-A</u>** and **<u>Exhibit 1-B</u>**, respectively, are approved.

4.     To be counted as votes to accept or reject the Combined Disclosure Statement and Plan, a Ballot must be properly executed, completed, and delivered, by mail, overnight courier, electronic mail, or personal delivery to the Voting Agent in accordance with the instructions on

3

the Ballot so that it is actually received no later than **4:00 p.m. (prevailing Eastern Time) on**

**December 8, 2020** (the "**Voting Deadline**").

     5.    The following procedures shall be used in tabulating the votes to accept or reject

the Combined Disclosure Statement and Plan (the "**Tabulation Procedures**"):

    (a)    except as otherwise ordered by the Court, any Ballot received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion);

    (b)    any Ballot that is illegible or contains insufficient information to permit the identification of the Holder will not be counted;

    (c)    any Ballot cast by a Person or Entity that does not hold a Claim in the Voting Classes will not be counted;

    (d)    any unsigned Ballot will not be counted;

    (e)    any Ballot that does not contain an original signature (for the avoidance of doubt, a Ballot submitted by electronic mail shall be deemed to bear an original signature);

    (f)    except in the Debtors' sole discretion, any Ballot transmitted to the Voting Agent by facsimile will not be counted;

    (g)    any Ballot that does not indicate an acceptance or rejection of the Combined Disclosure Statement and Plan, or that indicates both an acceptance and rejection of the Combined Disclosure Statement and Plan, will not be counted;

    (h)    whenever a Holder casts more than one Ballot voting the same Claim prior to the Voting Deadline, only the latest-dated Ballot timely received and properly completed will be deemed to reflect the Holder's intent and, thus, will supersede any prior Ballots;

    (i)    if a Holder casts simultaneous duplicative Ballots that are voted inconsistently, such Ballots will not be counted.

    (j)    each Holder will be deemed to have voted the full amount of its Claim as set forth on its Ballot;

    (k)    For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular class will be aggregated as if such creditor held one Claim against the Debtors in such class, and the votes related to such Claims will be treated

as a single vote to accept or reject the Combined Disclosure Statement and Plan;

(l) Holders may not split their vote within a Class; thus, each Holder will be required to vote all of its Claims within the Class either to accept or reject the Combined Disclosure Statement and Plan; and

(m) subject to any contrary order of the Court, the Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.

6. The Confirmation Hearing is hereby scheduled for **December 15, 2020 at 10:00 a.m. (prevailing Eastern Time)**. The Confirmation Hearing may be adjourned or continued from time to time by the Debtors, without further notice other than by (a) announcing any adjourned date at the Confirmation Hearing (or any continued hearing), or (b) filing a notice on the docket of these chapter 11 cases.

7. Objections to approval and confirmation of the Combined Disclosure Statement and Plan on any grounds, including adequacy of the disclosures therein, if any, must (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, and (c) be filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, with a copy served upon the following (collectively, the "**Notice Parties**"): (i) counsel to the Debtors, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, Illinois 60602, Attn: Tyler Nurnberg, Seth Kleinman, and Sarah Gryll, and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary and Kenneth Enos; (ii) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy Fox, Jr.; (iii) counsel to the Committee, Sidley Austin LLP, 787 7th Avenue, New York, New York 10019, Attn: Michael G. Burke, and Morris James, LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Eric J. Monzo; and (iv) counsel to the TLB Lenders, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor,

New York, New York 10036, Attn: Roger Schwartz and Peter Montoni, by no later than **4:00 p.m. (prevailing Eastern Time) on December 1, 2020.**

8.      The Debtors shall, if they deem necessary in their discretion, file a consolidated reply to any objections or brief in support of approval of the Combined Disclosure Statement and Plan by no later than **12:00 p.m. (prevailing Eastern Time) on December 11, 2020** (or two (2) business days prior to the date of any Confirmation Hearing).

9.      The Confirmation Notice, in substantially the form attached hereto as **Exhibit 2**, is approved.

10.     Pursuant to Bankruptcy Rule 3017(d), October 21, 2020 at 4:00 p.m. (prevailing Eastern Time) shall be the record date for purposes of determining which Holders of Claims are entitled to receive Solicitation Packages and vote on the Combined Disclosure Statement and Plan (the "**Record Date**").

11.     With respect to any transferred Claim, the transferee shall only be entitled to receive and cast a Ballot on account of such transferred Claim if: (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed by the Record Date (including, without limitation, the passage of any applicable objection period), or (b) the transferee files, no later than the Record Date, (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer, and (ii) a sworn statement of the transferor supporting the validity of the transfer.

12.     On or prior to the date that is three (3) business days after the entry of this Order (the "**Service Date**"), the Voting Agent shall mail the Solicitation Packages to the Voting Classes containing copies of: (a) the Confirmation Notice; (b) either a paper copy or a copy in "pdf" format on CD-ROM or flash drive of the Combined Disclosure Statement and Plan; (c) either a paper

copy or a copy in "pdf" format on CD-ROM or flash drive of this Order, without exhibits (d) the applicable Ballot; and (e) a pre-paid, pre-addressed return envelope.

13.     On or prior to the Service Date, the Voting Agent shall mail the Confirmation Notice to the following parties, to the extent such parties are not otherwise entitled to receive a Solicitation Package: (a) all Persons or Entities that have Filed, or are deemed to have Filed a Proof of Claim or request for allowance of Claim as of the Record Date; (b) all Persons or Entities listed on the Schedules as holding a Claim or potential Claim; (c) the Securities and Exchange Commission and any regulatory agencies with oversight authority of the Debtors; (d) the Internal Revenue Service; (e) the United States Attorney's office for the District of Delaware; (f) other known Holders of Claims (or potential Claims) and Interests; (g) all entities known to the Debtors to hold or assert a Lien or other interest in the Debtors' property; and (h) any other parties that have requested notice pursuant to Bankruptcy Rule 2002.

14.     The Debtors are authorized to take or refrain from taking any action necessary or appropriate to implement the terms of, and the relief granted in, this Order.

15.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16.     The Court shall retain jurisdiction to hear and determined all matters arising from or related to the interpretation, implementation, and enforcement of this Order.

**Dated: October 22nd, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

7